LAW OFFICES OF LINGEL H. WINTERS
A Professional Corporation
Lingel H. Winters, Esq. (SBN 37759)
2900 Shasta Rd.
Berkeley, California 94708
Email: sawmill2@aol.com

Attorneys for Plaintiff
And All Others Similarly Situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMES ATTRIDGE, in behalf of themselves and all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>GOOGLE LLC; ALPHABET, INC.; XXVI HOLDINGS INC.,<br><br>        Defendants. | Case No:  4:25-cv-02775-DMR<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## I.    NATURE OF THIS ACTION

1.    Plaintiff and the class of End Users of Google's general search services bring this action for Google's monopolizing of and maintaining its monopoly in the general search services and general search text advertising markets in the United States and for combining, conspiring and agreeing with Apple, Inc. and the Android parties to maintain Google's monopoly and restrain trade in those markets, sharing revenues and dividing markets with them in violation of Sections 1 and 2 of the Sherman Act through the use of distribution agreements with Apple, Inc. and the Android parties that contain exclusionary default clauses, that impose a barrier to entry that prevents Google's competition from gaining sufficient scale to compete in the markets, enabling Google to extract, collect and sell End User's search data to advertisers for billions of dollars, with no

compensation to End users, preventing End users from monetizing their own data, while precluding competition and Google's competitors from providing End-users with search products that are more privacy protective and ad-free.

The plausibility of Plaintiff's allegations of Defendants' antitrust violations of monopolizing and maintaining a monopoly in violation of Section 2 of the Sherman Act is confirmed by Judge Mehta's 286-page Memorandum Opinion ("MO") in United States v. Google, 20-cv-3010, (D.D.C. Aug. 5, 2024) Dkt. No. 1033 page 4), issued after nine weeks of trial, in which the court held at page 4:

"(1) there are relevant product markets for general search services and general search text ads;

(2) Google has monopoly power in those markets;

(3) Google's distribution agreements are exclusive and have anticompetitive effects; and

(4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."

Plaintiff also claims violation of the UCL and Disgorgement of Unjustly Earned Profits.

## II.    JURISDICTION, VENUE, AND COMMERCE

2.    Plaintiff brings this action under sections 1 & 2 of the Sherman Act (15 U.S.C. §§ 1 & 2), section 4 of the Clayton Act (15 U.S.C. sec. 15(a)) to recover damages, treble damages, and to obtain injunctive, and equitable relief under section 16 of the Clayton Act (15 U.S.C. §26) against Defendants Google LLC, and its parent Alphabet, Inc., for violations of Sections 1 & 2 of the Sherman Act (15 U.S.C. §§ 1 & 2) arising from Google's unlawful maintenance of its monopoly and illegal conspiracy, combination, and agreements  with Apple and the Android OEMs and wireless carriers to monopolize and maintain Google's monopoly in the markets for general search services and general text advertising under which Google has entered into exclusive agreements with Apple, paying Apple billions of dollars to be the default search engine on Apple's devices, and exclusive agreements with the Android OEMs and wireless carriers (the Android parties") to protect Google's

monopoly, by paying the Android parties billions of dollars for Google to be the exclusive search engine on their devices, restricting  distribution of rival search engines and excluding Google's competition. Plaintiff' claims that Defendants violated the California Unfair Competition Law ("UCL") and for Disgorgement of Unjustly Earned Profits-Unjust Enrichment are based on the supplemental, ancillary jurisdiction of this Court. 28 U.S.C. §1387.

3.     This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

4.     The Court has personal jurisdiction over Google; venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 because Google transacts business and is found within this District.

**THE PLAINTIFF**

5.     Plaintiff James Attridge is a resident of Littleton, Colorado and is an End-user of Google general search services and participates in the Google general search text ads market by receiving such ads.

6.     Members of the End-user class are End-Users of Google general search services and domiciled in various states, including the State of California.

III.    **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

7.     Plaintiff bring this action under Federal Rule of Civil Procedure Rule 23, on behalf of himself and a class defined as follows:

> All End-Users, including consumers and business End Users in the United States, who used Google's general search services for their own end use since January 1, 2015 to and including the filing of this Complaint ("the Class Period"). Excluded from the class are Defendants, competitors of the Defendants, any co-conspirators of Defendants, Defendants' predecessors, successors, parent, subsidiaries, affiliates, officers and directors, federal and state government entities and agencies, cities, counties, and other municipalities, and any judge, justice or judicial officer presiding over this matter and members of their immediate family.

8.     The anticompetitive violations of Defendants alleged herein is common to Plaintiff and the class, and has imposed, and threatens to impose, a common antitrust injury on Plaintiff and the class members, including Google's extraction and collection of their data for no compensation and Google's anticompetitive use of distribution default contracts to preclude competitors from

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

providing End-users with high quality search products that are more privacy protective and ad-free. The number of potential Plaintiff class members is so numerous that joinder is impracticable.  Online Google general search services stated on March 18, 2025:

> "Google Sites Receive 276 million Unique Monthly Visitors in the U.S. [United States]."

9.	Plaintiff, as representative of the Plaintiff class will fairly and adequately protect the interests of the class members and Plaintiff have engaged counsel experienced and competent in litigation of this type. The interests of Plaintiff are typical of with, and not antagonistic to, those of the class members.

10.	The anticompetitive conduct and effects of Defendants Google have been substantially uniform. Plaintiff's claims are typical of those of the End-user class. Except as to the amount of damages each member of the class has sustained, all other questions of law and fact are common to the class, including, but not limited to, Google's maintenance of its monopoly in the general search services and general search text ads markets and the conspiracy, combination and agreements between Google and Apple and the Android OEMs and wireless carriers to maintain Google's monopoly, through Google's exclusive distribution agreements and Google's acts of unfair competition and unjust enrichment herein alleged, and the effects of such violations.

11.	The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Among the questions of law and fact common to the class are the following:

a.	Whether the general search services and general search text ads markets are relevant product markets.

b.	Whether Google maintained a monopoly in the general search services market and /or the general search text ads markets in violation of Section 2 of the Sherman Act.

c.	Whether Google engaged in a combination, conspiracy and agreements with Apple and the Android OEMs and wireless carriers  to maintain Google's monopoly in violation of Section 2 of the Sherman Act.

d.	Whether Google engaged in a combination, conspiracy and agreements with Apple

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

and the Android parties to share revenue and divide markets in violation of Section 1 of the Sherman Act.

e.    All questions of law and fact relating to Defendants are common to all members of the class..

f.    Whether End-users suffer direct antitrust injury by having their valuable data extracted and collected by Google for no compensation and by Google's exclusion of competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free.

g.    Whether google  violated the California Unfair Competition Law ("UCL").

h.     Whether Google engaged in Disgorgement of Unjustly Earned Profits-Unjust Enrichment

i.    Whether Class action treatment is a superior method for the fair and efficient adjudication of the controversy, as joinder is impracticable.

The separate prosecution by individual class members would create risks of inconsistency or varying adjudications respecting the validity, scope and enforceability of Defendants' combination and conspiracy to restrain trade and maintain its monopoly in the general search services and general search text ads markets and would establish incompatible standards. Since the damages suffered by class members are small in relation to the expense and burden of individual litigation, it is highly impractical for such class members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

12.    Plaintiff and other End-users of Google's search engine suffer antitrust injury  by the taking of their valuable search data for no compensation and by the preclusion of competition and competitors from providing End-users with innovation in search products that are more privacy protective and ad-free, while Google enables advertisers to use End-users' data  to target and bombard End-users with general search text ads.

## THE DEFENDANTS

13.    Google LLC ("Google") is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google is

owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Google engages in, and its activities substantially affect, interstate trade and commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers.

14.     "Google is a subsidiary of Defendants XXVI Holdings Inc., which is a subsidiary of Defendants Alphabet Inc. a publicly traded company  incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California."

15.     Alphabet, Inc. is a publicly traded company with a net worth exceeding $1 trillion, and is incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California, and does business in the State of California and throughout the United States and is the parent company of Google whose CEO, Sundar Pichai is also the CEO of Google. As CEO of both Google and Alphabet, Pichai is the agent of both Google's general search services and Google's general text advertising. Google and Apple and the Android parties have entered into Google's distribution agreements that are exclusive and exclusionary and have anticompetitive effects, that provide for Google's search engine to be the out-of-the-box default general search engine ("GSE") on most of Apple's and the Android parties' devices. As used herein, Google includes Alphabet, Inc.

## IV.     GOOGLE HAS WILLFULLY MONOPOLIZED AND MAINTAINED ITS MONOPOLIES IN THE GENERAL SEARCH SERVICES MARKET AND THE GENERAL SEARCH TEXT ADS MARKETS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

16.     Plaintiff realleges paragraphs 1 through 15 above.

17.     Google has willfully monopolized and maintained its monopolies in the general search services market and the general search text ads markets in violation of section 2 of the Sherman Act as held by Judge Mehta in his 286-page Memorandum Opinion ("MO") in *United States v. Google*, 20-cv-3010 (2020) (D.D.C. Aug. 5, 2024) Dkt. No. 1033 page 4),

18.     Google has used anticompetitive tactics to maintain and extend its monopolies in the markets for general search services and general search text advertising involving Google's general

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

search engine ("GSE") for many years.

19.    Google's general search engines are distributed to End users primarily on mobile devices (smartphones and tablets) and computers (desktops and laptops) which contain "search access points," including web browsers, (software applications for accessing information on the internet) that call on a general search engine to respond to an End user's query. Over the last ten years, internet searches on mobile devices have grown rapidly, eclipsing searches on computers and making mobile devices the most important avenue for search distribution in the United States. In FOF 59 in *United States v. Google*, Dkt. No. 1033, the court found that End-user's browsers interacted with Google's GSE through access points that were integrated into Google's general search services and general search text ads markets, stating:

> "The most efficient channel of GSE distribution is, by far, the placement as the preloaded out-of-the-box default GSE. That access point varies by device. On Apple products, it is  the integrated search bar in the Safari browser…On Android devices, it is the search widget…and the search toolbar in the Chrome browser…Google is the default GSE on all of these access points except on Edge where the default GSE is Bing." FOF 59.

20.    As Judge Mehta found: "The most efficient channel of GSE distribution is, by far, placement as the preloaded out-of-the-box GSE." MO FOF 59. Even where End users can change the default, they rarely do. This leaves the preset default general search engine with de facto exclusivity, which is particularly true on mobile devices, where defaults are especially sticky, as found by Judge Mehta in United States v. Google, LLC, MO Finding of Fact ("FOF") Nos. 58-79, 66-70 [defaults are sticky].

21.    For years, Google has entered into exclusionary distribution agreements with Apple and the Android parties that contain default clauses that make Google's search engine exclusive that, lock up distribution channels and block rivals from providing compensation to users for their valuable search data.

22.    Google's maintenance of its monopoly includes exclusive distribution agreements among Google and Apple and Google and the Android parties which secure exclusionary  default status for Google's general search engine on their mobile devices, smartphones, tablets and desktop and laptop computers to the exclusion of Google's competitors such as DuckDuckGo and Neeva,

7

that enable Google to extract and collect End User's search data without compensation to End Users, foreclosed efficient channels of distribution and resulted in network effects that blocked their ability to gain the scale of user data that would enable them to develop search products that offer greater privacy protection or are less clogged with ads, and to sell advertising to advertisers who target End-users.

23.    Google has entered into exclusive distribution agreements with Apple, a potential competitor,  that include the Amendment To the Information Services Agreement, Exhibit A hereto, the Joint Cooperation Agreement, Exhibit B hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple, in which Google has paid Apple billions of dollars to secure exclusionary default status for Google's general search engines on Apple's devices, that have anticompetitive effects and exclude Google's competitors, to maintain Google's monopoly in general search services and general search text advertising, in violation of Section  2 of the Sherman Act.

24.    Google has also entered into exclusive distribution agreements with Android Original Equipment Manufacturers, Samsung and Motorola and wireless carriers Verizon, AT&T and T-Mobile (the "Android parties"), including the Google Mobile Revenue Share Agreement between Google LLC and Samsung Electronics Co., Ltd., attached hereto as Exhibit C for revenue share in which Google has paid Samsung significant dollars to secure exclusionary default status for Google's general search engines on their devices, that have anticompetitive effects and exclude Google's competitors, to maintain Google's monopoly in general search services and general search text advertising, in violation of Section 2 of the Sherman Act.

25.    In his MO in *United States v. Google* (2020), Judge Mehta stated in his Findings of Fact ("FOF") 379-384, that RSAs ["Revenue Share Agreements"] provide for revenue share and are exclusive agreements to the exclusion of competitors. The Google Mobile Revenue Share Agreement between Google LLC and Samsung Electronics Co., Ltd. attached hereto as Exhibit C, Attachment A of which provides that: "(a) Google will pay Company the following percentage of Qualified Net Ad Revenue with respect to the following Core Qualified Device categories and Service Access Points collectively, "Shared Net Core Ad Revenue") [% redacted]. Attachment C-1

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

provides "Search Access Points – Google provided widget and Google Search Application [to be] Set pursuant to MADA."  "Attachment C-2 provides: "Search Access Point - Chrome Browser – Set as the default system browser intent and no disambiguation screen is ever presented to the end user out-of-the-box, Chrome Browser icon is placed on the Application Dock, and Other requirements pursuant to MADA."

26.     A key element of Google's monopolization and maintenance of its monopoly in the general search services and general search text ads markets is Google' agreements to share revenue from its advertisers with Apple and the Android parties. Google represented that it priced its sales of end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. As proof of its monopoly, "When Google made these pricing changes, Google did not consider its rivals' text ad pricing." FOF 267. In 2024, Google's revenue from advertisers was $350 billion and its profits were $100 billion.

27.     As Judge Mehta found in FOF 348 of  his MO in *United States v. Google* (2020), "Google has entered into Mobile Application Distribution Agreements,  or MADAs with all Android OEMs, including Motorola and Samsung, among others…The MADA is a device-by-device license that allows OEMs to use Google's proprietary mobile applications developed for the Android ecosystem…OEMs pay no fee for the GMS license, but Google requires OEMs to preload certain applications in prominent placements."  In FOF 351 Judge Mehta found:  "Google views the MADA as securing 'baseline distribution of [its] apps on Android'…Under the MADA, partner OEMs must preload all 11 GMS applications onto a new device, including the Google Search Widget, Chrome, YouTube, Gmail, Google Maps, Google Drive, among others…Six of these applications , including the Google Search application and Chrome (which both default to Google), cannot be deleted by the user…Without a MADA, an OEM cannot distribute any one of these GMS applications."

28.     Google and Apple and Google and the Android parties have entered into Google's default distribution agreements that are exclusionary and have anticompetitive effects, that provide for Google's search engine to be the out-of-the-box default general search engine ("GSE") on

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

Apple's and the Android parties' devices.

29.    Google's exclusionary agreements cover roughly 50 percent of all general search queries. "Another 20% of all general search queries in the United States flow through user-downloaded Chrome, which default to Google." MO FOF 62-65. Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 70 percent of the general search queries in the United States. Largely as a result of Google's exclusionary agreements and anticompetitive conduct, Google in recent years has accounted for nearly 89.2 percent of all general-search-engine queries in the United States, and almost 94.9 percent of queries on mobile devices. *United States v. Google, LLC* (2020), MO Concl of Law at pp. 152-161.

30.    Google has thus foreclosed a substantial share of the general search services and general search text ads markets from competition that enables Google to extract and collect End User's search data without compensation to End Users, foreclosed efficient channels of distribution and resulted in network effects that blocked their ability to gain the scale of user data that would enable them to develop search products that offer greater privacy protection or are less clogged with ads, and enable advertisers to target and clog users with ads.

31.    Google monetizes this search monopoly in the market for general search text ads, which Google has also monopolized for many years. Google uses consumer search queries and End-user search data to sell advertising. In the United States, advertisers pay about $50 billion annually to place ads on Google's search engine results page ("SERP"). It is these search advertising monopoly revenues that Google "shares" with distributors in return for commitments to make Google's search engine exclusionary by default on their devices. These enormous payments create a strong disincentive for distributors to switch from Google. The payments also raise barriers to entry for rivals—particularly for small, innovative search companies that cannot afford to pay a multi-billion-dollar entry fee. Through these exclusionary payoffs, and the other anticompetitive conduct described below, Google has created continuous and self-reinforcing monopolies in the general search services and general text ads markets. ("The court thus concludes that Plaintiff have shown that Google's exclusive distribution agreements substantially contribute to maintaining its monopoly

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR
COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

in the general search text advertising market, violating Section 2 of the Sherman Act."). MO Concl. of Law at pp. 258-265.

32.     Google's anticompetitive practices deny rivals scale to compete effectively. General search services and general search text advertising require complex algorithms that are constantly learning which organic results and ads best respond to user queries; the volume, variety, and velocity of data accelerates the automated learning of search and search advertising algorithms. By using distribution agreements to lock up scale for itself and deny it to others, Google unlawfully maintains its monopolies. FOF 86-90.

33.     Google's grip over distribution also thwarts potential innovation. For example, one company recently started a subscription-based general search engine that does not rely on advertising profits derived from monetizing user information. Another, DuckDuckGo, differentiates itself from Google through its privacy-protective policies. But Google's control of search access points means that these new search models are denied the scale to become effective competitors with access to End-users, advertisers, or data. MO Concl of Law pp. 226-234.

34.     Google's practices of shutting off effective distribution channels for rivals, such as Google's requiring exclusive preset default status and making software undeletable are  exclusionary and unlawful and violate Section 2 of the Sherman Act under long-established antitrust law. *United States v. Microsoft*, 253 F.3d 34, 71 (D.C. Cir. 2001) ("Because Microsoft's exclusive contract with Apple has a substantial effect in restricting distribution of rival browsers…reducing usage share of rival browsers serves to protect Microsoft's monopoly, its deal with Apple must be regarded as anticompetitive…Microsoft's exclusive deal with Apple is exclusionary, in violation of Section 2 of the Sharman Act").

35.     The plausibility of Plaintiff' allegations of Defendants' antitrust violations of monopolizing and maintaining a monopoly in violation of Section 2 of the Sherman Act is confirmed by Judge Mehta's 286-page Memorandum Opinion ("MO") in United States v. Google, 20-cv-3010, (D.D.C. Aug. 5, 2024) Dkt. No.1033 page 4), issued after nine weeks of trial, in which the court held at page 4:

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

"(1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads.  That conduct has allowed Google to earn monopoly profits."

36.     Judge Mehta stated in his Conclusion to his Concl. Of Law in United States v. Google, LLC, MO Concl of Law at p. 276:

 "For the foregoing reasons, the court concludes that Google has violated section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising –through its exclusive distribution agreements."

37.     At page 2 of his MO, Judge Mehta stated:

"But Google also has a major, largely unseen advantage over its rivals: default distribution. Most users access a general search engine through a browser (like Apple's Safari) or a search widget that comes preloaded on a mobile device. Those search access points are preset with a "default" search engine. The default is extremely valuable real estate. Because many users simply stick to searching with the default, Google receives billions of queries every day through those access points. Google derives extraordinary volumes of user data from such searches. It then uses that information to improve search quality. Google so values such data that, absent a user-initiated change, it stores 18 months-worth of a user's search history and activity.

The distribution agreements benefit Google in another important way. More users mean more advertisers, and more advertisers mean more revenues. As queries on Google have grown, so too has the amount it earns in advertising dollars. In 2014, Google booked nearly $47 billion in advertising revenue. By 2021, that number had increased more than three-fold to over $146 billion. Bing, by comparison, generated only a fraction of that amount—less than $12 billion in 2022.

For years, Google has secured default placements through distribution contracts. It has entered into such agreements with browser developers, mobile device manufacturers, and wireless carriers. These partners agree to install Google as the search engine that is delivered to the user right out of the box at key search access points.

Google pays huge sums to secure these preloaded defaults. Usually, the amount is calculated as a percentage of the advertising revenue that Google generates from queries run through the default search access points. This is known as "revenue share." In 2021, those payments totaled more than $26 billion. That is nearly four times more than all of Google's other search-specific costs  combined. In exchange for revenue share, Google not only receives default  placement at the key search access points, but its partners also agree not to preload any other general search engine on the device. Thus, most devices in the United States come preloaded exclusively with Google. These distribution deals have forced Google's rivals to find other ways to reach users."

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

38.    **End-users' Suffer Antitrust Injury And Have Standing To Sue**

39.    Google's monopoly in general search services and general search text ads enable Google to collect End-users' data for no compensation to End-users and sell and provide it to advertisers and others for billions of dollars. When End-users make queries on Google's general search services, End Users disclose their data while searching information on Google's search engine that Google extracts and collects and provides End-users' data to advertisers that enable them to bombard End-users with general search text advertisements targeted to End Users' expressed interests.

40.    End-users' data is collected by Google through Apple's Safari browser, Android And Chrome, as access points for Google's GSE, which operate as integral components of Google's GSE.

41.    In FOF 59 in *United States v. Google*, the court found that End-user's browsers interacted with Google's GSE through access points that were integrated into Google's general search services and general search text ads markets, stating:

> "The most efficient channel of GSE distribution is, by far, the placement as the preloaded out-of-the-box default GSE. That access point varies by device. On Apple products, it is the integrated search bar in the Safari browser…On Android devices, it is the search widget…and the search toolbar in the Chrome browser…Google is the default GSE on all of these access points except on Edge where the default GSE is Bing."

42.    In *United States v. Google* (2020), Judge Mehta's MO  found that search access points on Safari and Mozilla browsers are incorporated in Google's GSE. ("The Apple ISA requires that Google be preloaded as the exclusive default search engine on all *Safari access points*…FOF 298… About 65% of queries on all Apple devices (mobile and desktop), and 61.8% on iOS devices (mobile) flow through the Safari default, *demonstrating that default placement is a primary channel [] for distribution of search*. FOF 296-297… Google is the default GSE on all *Firefox search access points*." (at pp. 204-205). As the primary channel for distribution of search through Safari [and Firefox] access points, the Safari [and Firefox] browsers and access points are an integral component of Google's general search engines in which search queries are entered and distributed through Google's code embedded on websites. (Emphasis supplied).

43.     In his ruling, Judge Mehta found that default search access points that provide search access to default browsers are integral to Google's GSE and incorporated in Google's general search services and general search text ads markets in which Google's exclusionary browser agreements substantially foreclose competition, are anticompetitive and violate Section 2 of the Sherman Act..

44.     In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

45.     Likewise, in *Brown v. Google, LLC*, 4:20-cv-3664-YGR; 2023 WL 5029899 (N.D. Cal Aug. 7, 2023), 685 F.Supp.3d 909 the court described the interaction of End-users' browsers with Google's GSE through Google code embedded on developers' websites creating an integrated search system:

> "**Data Collection**…When a user visits a website, the user's browser sends a "GET" request to the  website to retrieve it. (Id.) This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the Useragent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. (Id.) At the same time, *the user's browser reads Google's code, which is embedded on the website*. (Id.) *Google's code instructs the user's     browser to send a second and concurrent transmission directly to Google. (Id.) This second transmission tells Google exactly what a user's browser communicated to the website.* (Id.)
>
> Google's services are ubiquitous on the internet: over 70 percenta [sic] of websites use Google Analytics and Ad Manager. (4AC ⁋⁋ 67 and 78.) To use these services, ***Google requires website developers to embed Google's code onto their websites*** and agree to its Privacy Policy. (PAF 6.) *Google does not tell website developers that it tracks their visitors* even when they are in private browsing mode. (Id.)
>
> According to Plaintiff, Google then takes users' private browsing history and associates it with their preexisting user profiles. (PAF 47; Response to SUF 65.) Doing so allows Google to offer better, more targeted, advertisements to users.

(Response to SUF 63; 4AC ℙ84.) This is at the core of Google's business: the bulk of Google's hundreds of billions of dollars in revenue come from selling targeted advertisements to other companies. (4AC ℙ89.) By selling users' information, Google prevents users from monetizing their own data. (4AC ℙ138; PAF 27–28.) The value of this data can be quantified; for example, Google itself has piloted a program to pay users $3.00 per week to track them." (Docket No. 969, at pp. 2-3.)(Emphasis added).

46.    Thus, End-users' data is collected by Google in its general search services and general search text ads markets that incorporate the access points in Apple's Safari browser, and the Android and Chrome browsers for Google's GSE through which queries are entered and distributed through Google's code embedded on websites. Thus, when the End-user's browser reads Google's code embedded on the website, it operates as an extension of Google's general search engine in the general search services and general search text ad markets.

47.    End-users are also directly injured because Google's anticompetitive use of distribution agreements that contain default provisions that exclude competitors have precluded competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free.

48.    Google uses its general search services to compile End Users' data, including searches on the web, which End User data Google sells and provides to advertisers and others. When an End User uses Google, the End User provides data, including personal information to Google in exchange for search results, for no compensation to the End User, which End-user data Google monetizes by selling or providing to advertisers and others, producing search advertising targeting End Users with masses of text advertising based on the End User's data collected by Google. "By selling [End] Users' information, Google prevents End Users from monetizing their own data." *Brown et al. v. Google LLC*, No. 4:20-cv-3664-YGR (N.D. Cal. 2023).

49.    In *Brown*, the Court under "Damages or Loss" at page 33 of its opinion further stated:

"Second, Google argues Plaintiff suffered no "damage or loss by reason of a [CDAFA] violation." Cal. Pen. Code § 502(e)(1). Plaintiff disagree and offer evidence showing that they have a stake in the value of their misappropriated data. *Facebook Tracking*, [In re *Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019) (cleaned up))]is instructive. In Facebook Tracking, the Ninth Circuit found that Plaintiff had sufficiently alleged their browsing histories carried financial value. Id. at 600. So too here. Plaintiff have evidence that there is a market for their data—Google itself has piloted a program where it pays users $3.00 a

day for their browsing history. (PAF 28.) Google responds that Facebook Tracking does not apply because it was a decision about standing, not liability. That is beside the point. The Ninth Circuit's decision stands for the proposition that Plaintiff can state an economic injury for their misappropriated data. Because Plaintiff proffer evidence that there is a market for their data—one Google itself has created—the Court cannot rule, as a matter of law, that Plaintiff suffered no damages . . ." (Docket No. 969, at p. 33

50.    Google uses its monopoly power to extract and collect End-users' data during their use of Google search. As described by the Court in *Brown v. Google LLC*, Plaintiff and the class of End-users herein, have suffered injury having their valuable search data extracted and collected by Google for no compensation and resold to advertisers and others for billions of dollars. Google induces End-users to use its search engine, which is protected by Google's monopoly and default distribution agreements, and when End-users use Google's search engine, Google extracts and collects the End-user's valuable search data for no compensation to the End-user. Google then monetizes the End-user's search data by selling it to advertisers and others for billions of dollars in revenue. Google's monetization of Plaintiff' data by selling it to advertisers establishes its value and, as held in *Brown v Google LLC*, Google's extraction of End-users' data for no compensation results in a direct injury to End-users. Plaintiff are injured because Google uses its monopoly power to extract and collect Plaintiff's and the class of End-users' personal data during their use of Google search.

51.    Plaintiff' injury is both particularized and concrete—particularized with respect to the End-user's specific data that is extracted for no compensation—and concrete with respect to the monetized value in billions that Google obtains by re-selling the End-users' data to advertisers and others. As further injury, Plaintiff and other End-users of Google's search engine are not only injured by the taking of their valuable search data for no compensation but Google has also harmed End-users by reducing the quality of the general search experience, by lessening choices, and by impeding privacy and innovation.

52.    End-users are also directly injured by Google's anticompetitive use of distribution agreements that contain default provisions that exclude competitors have and precluded competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free and injured by being bombarded by advertisers' text ads enabled by Google.

53.     Google's exclusive default distribution agreements stifle more privacy protected and ad-free innovation by competitors.

In *United States v. Google LLC* (2020), No. 20-CV-3010 (APM) Dkt. No. 1033, 2024 WL 3647498 (D.D.C. 2024) Aug. 5, 2024, the Google court found that Google's exclusive default distribution agreements with Apple and others prevented Google competitors such as Neeva and Duck Duck Go from providing End-users high quality search products that were more privacy protected and ad-free. In *United States, v. Google LLC* in its MO, the court (the "*Google* court") also concluded that Google's default agreements with Apple and others foreclosed efficient channels of distribution and resulted in network effects that made it difficult for competitors to gain the volume of users and user data that would allow the development of high-quality search products at *79, *109, *111-14. The *Google* court stated in its MO at:

> FOF "76. Neeva exemplifies the importance of search distribution through a readily accessible channel. Neeva secured the capital and human resources needed to build a search engine. Tr. at 3671:4-3672:13 (Ramaswamy).  Although it initially syndicated search results from Bing; it eventually crawled the web, built an index, and developed a ranking model, which relied heavily on artificial intelligence technology, to generate its     own search results for about 60% of its queries. *Id*. at 3775:9—3776:21, 3739:14-16  (Ramaswamy).  But Neeva was unable "to be even a default provider on things like the major browsers or operating system," which "was what made [its founders] conclude that it was hard to have Neeva consumer search as a viable business. *Id*.at 3701:1-7 (Ramaswamy). The reason "why Neeva failed …was simply because [it] could not get enough users to be in that state where they regularly used Neeva." *Id*. at 3712:10-12 (Ramaswamy); *id*. 3677:2-3, 3700:25-3701:7 (Ramaswamy) (testing that more users on Neeva would result in greater revenues through subscription fees); *id*. at 3724:18-21 (Ramaswamy) ("[I]f a well-funded and exceptionally talented team like Neeva could not even be a provider on most of the browsers, I don't see that as the market working.").

54.     The court further found that Neeva, as a competitor to Google sought to create a subscription-based model for search that did not serve ads, but due to Google's exclusive default contracts, due to its inability to develop enough of a user base to have sufficient user data, it was driven out of the search market. Likewise, the court found that Duck Duck Go ("DDG"), another competitor of Google's, cannot compete effectively because of Google's exclusionary default search agreements and the lack of access to  sufficient user data, at Google court at MO pp. 162-163.

The *Google* court found: "As a result, DDG and Neeva are the only two notable market entrants in the last 15 years. Each attempted to innovate—DDG on privacy and Neeva through a

17

subscription-based model—but found only limited success (DDG) or left the market altogether (Neeva)." *Google* court at MO pp. 162-163. FOF paras. 14, 25, 76.

55.    As the *Google* court found in FOF 74 of its MO:

 "A GSE's placement as the default thus drives search volume through that access point. Tr. at 3689: 21-24 (Ramaswamy) (testifying that "the convenience of easy accessability and tapping into …engrained default behaviors are the deciding factors when it comes to whether a search engine gets lots of usage"); id. at 7674:6-7675:21 (Pichai) ("[B]ecause you're taking existing users, and by giving them more convenient access points, you're making them search more…Done correctly, and if you're putting a product out in front of users which users like and want to use, yes, defaults can make a difference.").  In 2017, over 60% of all queries entered on Google flowed through defaults. UPX83 at 967; see id. (60% of iOS queries were through the Safari [Apple] default, and 80% of Android queries were through defaults secured by the distribution deals…

"Google recognizes that securing the default placement is extremely valuable for monetizing search queries." FOF 75

56.    At page 237 of its MO Conclusions of Law, the *Google* court stated:

"The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment. Neeva is a case in point.  It could not gain a foothold in the market in part because it was relegated to a less efficient means of distribution, such as an alternative default GSE [general search engine] on any mobile device. FOF 76. Ultimately, Neeva's inability to retain and attract users—and thus acquire scale—was a primary reason for its withdrawal from the market. Id. The loss of nascent competitors is a clear anticompetitive effect.  See AREEDA para. 1802d5 (observing that exclusive  dealing arrangements that deny smaller firms access to retailers may 'impair their ability to expand, thus becoming more effective competitors with the dominant firm. Indeed, the smaller [firms] may decline and even be forced to exit the market.')."

57.    At MO p. 162 the *Google* court stated:

"The tales of DDG and Neeva illustrate *Rebel Oil*'s point. Both entered the market notwithstanding Google's dominance, but neither has "taken significant business from Google and they therefore have not posed any meaningful threat to its "market power." DDG though in operation since 2008, has barely reached a 2% market share. FOF 25; *Surescipts*, 665 Supp. 3d at 46-47 ("[T]he ability on one competitor to capture [a relatively minor percentage of the market does not undermine [the dominant firm's] durable monopoly power protected and perpetuated by barriers to entry."]. As for Neeva,it entered and exited within four years. FOF 14…The lack of access to efficient channels of distribution diminished Neeva's ability to grow its user base and significantly contributed to its demise."

58.    At MO page 200 the *Google* court stated:

"Google has no true competitor. Consider that Google's monopoly in general search has been remarkably durable. Its market share in 2009 was nearly 80%, and it has increased since then to nearly 90% by 2020. FOF 23. Bing during that same period, has never held a market share above 11%, and today holds less than 2.5% of the market. Id. Thus over the last decade, Google's grip on the market has only grown stronger…

"Moreover, there have been only two new market entrants of note in the last 15 years—DDG and Neeva. One of them is no longer in business(Neeva) , and the other has achieved a market share of 2.1% (as of 2020) after more than a decade in business. If there is genuine competition in the market for general search, it has not manifested in familiar ways, such as fluid market shares, lost business or new entrants."

59.    Thus, Neeva and Duck Duck Go, competitors of Google, who offered better privacy or ad-free alternatives to Google were unable to offer the same high quality of search to End-users, as Google, due to their lack of access to a large volume of user data and scale due to Google's anticompetitive use of exclusionary default agreements.

60.    As a result of Google's use of anticompetitive exclusionary default agreements with Apple and others that foreclosed DDG's and Neeva's access to the large volume of user data needed to offer the same high quality of search to End-users as Google, Plaintiff and End-users have been injured by being deprived of the better quality privacy and ad-free searches from Google's competitors, DDG and Neeva, which those companies offered.

61.    At MO page 222, the *Google* court stated:

"The court finds that as to the general search services market Plaintiff has proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume."

62.    At MO page 226-227, the *Google* court stated::

"Naturally then, GSE distributors prefer Google because of its search quality and because it would be economically irrational to sacrifice the high revenue share. They thus routinely renew the distribution deals with their exclusive terms. In this feedback loop, the revenue share payments" effectively make the ecosystem exceptionally resistan[t] to change" and basically freeze the ecosystem in place[.]" Tr at 3937:24-3798:21 (Ramaswamy); see id at 3513:1-3 (Nadella) ("[T]his vicious cycle that [Microsoft is]  trapped in can become even more vicious because the defaults get reinforced." That is the          antithesis of a competitive market."

At MO page 230 "Armed with its scale advantage, Google continues to use that data to  improve search quality…Scale also improves search ads monetization."

63.    At MO page 234 the *Google* court stated:

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

"No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile. The exclusive distribution agreements have substantially contributed to these anticompetitive market conditions."

64.    At MO page 236, the *Google* court found:

"*The Exclusive Agreements Have Reduced Incentives To Invest and Innovate*. The distribution agreements have caused a third key anticompetitive effect: they have reduced the incentive to invest and innovate in search.

65.    Scale is a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience and since advertisers pay more to buy ads from a search provider with a large audience of searched customers, targeted as potentially in the advertiser's product or service, the Google, Apple, Android parties' conspiracy, combination and agreements effectively eliminate Google's competitors' ability to build the scale necessary to compete in the general search services and general search text ads markets. By April 2018, Google estimated that its share of the general search services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general search engine inquiries in the United States, and almost 95 percent of inquiries on mobile devices.

66.    Google obtained dominant audience scale by being the exclusive general search engine preset default on Apple's devices and the Android devices since, as Judge Mehta found users typically do not change their devices preset default search functions. FOF 65-75. Google's scale is critical to generating the general search services and general search advertising revenues and profits it shares with Apple since advertisers pay more to buy ads from a search provider with a large audience of searched customers. In concert with Apple, Google can deliver the largest search audiences, especially in mobile, from which Google's competitors are foreclosed by the Google-Apple combination.

67.    Google's large and durable market shares with the significant barriers to entry in general search services and general search text ads demonstrate the effectiveness of Google's maintenance of its monopolies through its default distribution agreements with Apple and the Android parties in those markets in the United States.

68.    **Relevant Markets**

69.     ***General Search Services***.  The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at pp. 156-157. See pp. 151-165.

70.     ***General Search Text Ads***.  The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88% market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

71.     There are currently only four meaningful general search providers in the general search services market: Google, Bing, Yahoo!, and DuckDuckGo. According to public data sources, Google today dominates the general search services and general search text ad markets with approximately 87% percent market shares, followed far behind in general search services by Bing with about seven percent (7%), Yahoo! with less than four percent (less than 4%), and DuckDuckGo with less than two percent (less than 2%).  MO p. 200.

72.     Judge Mehta's findings and holdings that "(1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads.  That conduct has allowed Google to earn monopoly profits," are prima facie evidence herein.

73.     Under Section 5(a) of the Clayton Act (15 U.S.C. sec. 16(a)) a final judgment or decree in a government action is prima facie evidence of the facts directly determined in the case. 15 U.S.C. sec. 16(a). *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 542-43, 74 S. Ct. 257, 260,98 L. Ed. 273 (1954) 15 U.S.C. sec. 16(a) provides:

21

"A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a Defendants has violated said laws shall be prima facie evidence against such Defendants in any action or proceeding brought by any other party against such Defendants under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto; Provided, that this section shall not apply to consent judgments or decrees entered before any testimony has been taken. Nothing contained in this section shall be construed to impose any limitation on the application of collateral estoppel...."

In *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568, 71 S. Ct. 408, 95 L.Ed.2d 534 (1951), the U.S. Supreme Court stated:

"By its terms, however, § 5 makes a prior final judgment or decree in favor of the United States available to a private suitor as prima facie evidence of 'all matters respecting which' the judgment 'would be an estoppel' between the defendants and the United States. We think that Congress intended to confer, subject only to a defendant's enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit."

74.    **Plausability And Plus Factors**

The plausibility of Plaintiff's allegations of Defendants' antitrust violations is confirmed by Judge Mehta's Opinion in *United States v. Google LLC*. In United States v. Google, 20-cv-3010, (D.D.C. Aug.5, 2024 Dkt. No.1033), Judge Mehta issued his Memorandum Opinion after nine weeks of trial in which the court held that:

(1)    there are relevant product markets for general search services and general search text ads;

(2)    Google has monopoly power in those markets;

(3)    Google's distribution agreements are exclusive and have anticompetitive effects; and

(4)    Google has not offered valid procompetitive justifications for those agreements.

Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits."

Judge Mehta further stated in his Conclusion on MO page 276:

"For the forgoing reasons, the court concludes that Google has violated section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising–through its exclusive distribution agreements."

Plausability of the allegations herein is further enhanced by the jury verdict in *In Re Google Play Store Litigation*, MDL Case No. 21-md-02981-JD, Member Case No. 20-cv-05671-JD, Dkt. No. 866, in which the jury found in response to Question No. 3 that "…Google willfully acquired or maintained monopoly power by engaging in anticompetitive conduct…"

In his Opinion Judge Mehta cited *United States v. Microsoft*, 253 F.3d 34, 71-74 (D.C. Cir. 2001 en banc). In *Microsoft*, Microsoft found to have monopoly power, also employed exclusionary agreements with Apple to make Microsoft's Internet Explorer browser the default browser on MacOffice to the exclusion of competing browsers such as the Netscape Navigator browser. In *Microsoft*, the D.C. Circuit held:

> "Because Microsoft's exclusive agreement with Apple has a substantial effect in restricting distribution of rival browsers and because…reducing usage share of rival browsers serves to protect Microsoft's monopoly, it's deal with Apple must be regarded as anticompetitive…in violation of sec. 2 of the Sherman Act." (253. F.3d at 73-74).

Thus, the *Microsoft* case that held that Apple's exclusionary agreements with Microsoft to the exclusion of competitors was an antitrust violation is a plus factor that lends plausibility to Plaintiff's allegations that Apple's exclusionary agreements with Google that exclude competitors constitute plausible antitrust violations. Apple's additional plus factor is that it was found to have engaged in a per se price-fixing conspiracy with book publishers in violation of section 1 of the Sherman Act in *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015).

## **ANTICOMPETITIVE CONDUCT**

75.    Google has unlawfully conspired, combined and agreed with Apple, a potential competitor, in restraint of trade and to monopolize to share revenue with Apple and to divide the markets for general search services and general search advertising with Apple by paying Apple billions of dollars annually to provide Google with exclusive access as the default search engine provider on Apple's devices coupled with a right of first refusal in Google as to ads or paid listings on Apple's search technologies, Siri and Spotlight, per Section 2 of the Amendment To the Information Services Agreement. Google's exclusionary contracts cover almost 60 percent of U.S. search inquiries, and almost half the remaining searches are processed through properties operated

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

directly by Google. As a result, the large majority of searches are covered by Google's exclusionary contracts and properties, depriving competitors of the ability to compete by denying its them access to the scale necessary to compete with Google. By depriving competitors of scale and distribution, Google and Apple and Google and the Android parties have deprived competitors of the ability to compete and innovate and injured Plaintiff and the class by collecting their personal search data without compensation while re-selling it to advertisers for billions of dollars who target and bombard End-users with text ads in the general search text ads market.  By depriving competitors of scale and distribution, Google, Apple and the Android parties have precluded competitors from providing End-users with innovation in higher-quality search products that are more privacy protective and ad-free.

76.    By foreclosing competition from competitors, Google and Apple harm competition and harm End Users by collecting their search data without compensation while selling End Users' search data to advertisers for billions of dollars annually.

## **<u>ANTICOMPETITIVE EFFECTS</u>**

77.    In its MO, the court in *United States v. Google* (2020) stated at page 216-222:

> "The key question then is this: Do Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market?  The answer is "yes." Google's distribution agreements are exclusionary contracts that violate Section 2 because they ensure that half of all GSE users in the United States will receive Google as the preloaded default on all Apple and Android devices, as well as cause additional anticompetitive harm. The agreements "clearly have a significant effect in preserving [Google's] monopoly." *Microsoft* at 71.

78.    Moreover, Judge Mehta held that Microsoft's exclusive browser contracts that were held to violate Section 2 of the Sherman Act in *United States v. Microsoft*, 253. F.3d 34, 67-71 (D. C. Circuit 2001) was authority for finding that Google's browser agreements in the search markets violated Section 2 of the Sherman Act, stating:

> "Google's browser agreements [with Apple and Mozilla] are exclusive insofar as they establish Google as the out-of-the-box default search engine," (at MO p. 204) and "Google's default placements on Firefox [access points] generate 80% of Mozilla's overall operating revenue, demonstrating that the vast majority of query volume on Firefox goes through defaults" FOF 335, in violation of Section 2 of the Sherman Act (at p. 205).

> The agreements have three primary anticompetitive effects: (1) market foreclosure, (2)

preventing rivals from achieving scale, and (3) diminishing incentives of rivals to invest and innovate in general search…"

1. *The Exclusive Agreements Foreclose A Substantial Share of the Market…*

…Aggregating the foreclosure effects of the [Apple and Mozilla ] browser agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…" MO p. 216-217

"The court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume. MO p. 222.  The 50% figure meets the [significant] threshold.

2. "*The Exclusive Agreements Have Deprived Rivals of Scale*, MO p. 226. Google's exclusive agreements have a second important anticompetitive effect: They deny rivals access to user queries, or scale, needed to effectively compete.  Scale is the essential raw material for building, improving and sustaining GSE [General Search Engines]. FOF paras. 86-106. For more than a decade, the challenged distribution agreements have given Google access to scale that its rivals cannot match FOF 87-89.  Google has used that scale to improve its search product and ad monetization. FOF90-94, 103-105. Meanwhile, without access to scale, other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google. FOF 76, 87-89, 106." MO at p. 226.

a. "The Power of Defaults, MO p. 227

Numbers help explain the power of the search default setting. Half of all GSE queries in the United States are initiated through the default search access points covered by the distribution agreements…An additional 20% of all searches nationwide are derived from user-downloaded Chrome, a market reality that compounds the effect of the default search agreements. FOF 63. That means only 30% of all GSE queries in the United States come through a

search access point that is not preloaded with Google.  Additionally, default placements drive significant traffic to Google. Over 65% of searches on Apple devices go through the Safari default. FOF 296.  On Android, 80% of all queries flow through a search access point that defaults to Google." FOF 74.

"All of this makes defaults extremely valuable.  In 2021, Google spent $26.3 billion in traffic acquisition costs—the revenue share paid to its partners—which is four times more than the company's other search-related costs combined, including research and development." FOF para 289… MO pp. 227-228.

      b.    "The Impact of Scale…, MO pp. 230-234

The sheer magnitude of Google's query volume, or scale, compared to rivals is startling: Users enter nine times more queries on Google than on all rivals combined. On mobile devices, that multiplier balloons to 19 times. FOF 87… This wealth of data gives Google greater insight into search behavior in part because it simply sees more queries than other GSEs See e.g. FOF 89…The more precisely targeted an ad, the greater likelihood that it will be clicked, which translates into higher revenues that Google uses to make larger revenue share payments. The market for GSEs is thus characterized by a type of network effect. Cf. *Microsoft* 253 F.3d at 49 (discussing network effects). (1) More user data allows a GSE to improve search quality, (2) better search quality attracts more users and improves monetization, (3) more users  and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, (5) more ad revenue enables a GSE to expend more resources on traffic acquisition  costs (i.e., revenue-share payments) and investments, which enable the continued acquisition of scale…There is a reason that Google still retains 18-months of a user's data.  It is still highly valuable to Google. Google's massive scale advantage thus is a key reason why Google is effectively the only genuine choice as a default GSE. MO pp.230-234.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

"That barrier is reinforced by the size of Google's revenue share payments… The end result here is not dissimilar from the Microsoft court's conclusion as to the browser market.  Just as the agreements in that case "help[ed] keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly," Google's distribution agreements have constrained the query volumes of its rivals, thereby inoculating Google against any genuine competitive threat. *Microsoft* 252 F.3d at 71…No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile. The exclusive distribution agreements have substantially contributed to these anticompetitive market conditions."

3.    "*The Exclusive Agreements Have Reduced Incentives to Invest and Innovate*

The distribution agreements have caused a third key anticompetitive effect: They have reduced the incentive to invest and innovate in search…The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment." MO 236-237.

79.    Google and Apple and the Android parties, OEM Samsung and the wireless carriers Verizon, AT &T and T-Mobil (the "Android parties") have monopolized and maintained Google's monopoly in a substantial share of general search services and general search ads text markets and injured Plaintiff and the class and harmed competition by:

a.    By foreclosing competitors and competition from a substantial share of  the general search services and general search text ad markets, by sharing Google's general search services and general search text ad revenues with Apple by paying Apple billions of dollars in return for Apple's agreement to grant Google's search engine exclusive out-of-the-box default status on Apple devices, Google and Apple have monopolized and maintained Google's monopoly in a substantial share of those markets and foreclosed competition and competitors from a substantial share of those markets resulting in Google collecting End Users' private search data without

27

compensation while reselling it to advertisers for billions of dollars annually and precluding competitors from providing End-users with high quality search products that are more privacy protected and ad-free while enabling advertisers to target and bombard End-users with text ads in the general search text ads market.

b. By foreclosing competitors and competition in the general search services and general search text ads markets, by sharing Google's general search services and general search advertising revenues with the Android parties, by paying the Android parties billions of dollars in return for their agreement to grant Google exclusive out-of-the-box default status on their devices, Google and the Android parties have engaged in and unlawfully monopolized and maintained Google's monopoly in a substantial share of those markets and foreclosed competition and competitors from a substantial share of those markets resulting in Google collecting End Users' private search data without compensation and reselling it to advertisers for billions of dollars annually while precluding competitors from providing End-users with high quality search products that are more privacy protected and ad-free while enabling advertisers to target and bombard End-users with text ads in the general search text ads market.

c. By foreclosing competitors and competition in the general search services and general search text ad markets, by sharing Google's general search services and general search text ad revenues with Apple by paying Apple billions of dollars in return for Apple's agreement to grant Google exclusive out-of-the-box default status on Apple devices, Google and Apple have monopolized and maintained Google's monopoly in a substantial share of those markets and substantially foreclosed competition and competitors from those markets resulting in Google collecting End Users' private search data without compensation while reselling it to advertisers for billions of dollars annually and precluding competitors from providing End-users with high quality search products that are more privacy protected and ad-free while enabling advertisers to target and bombard End-users with text ads in the general search text

ads market.

80.     In his Memorandum and Opinion, Judge Mehta held that Google's default distribution agreements with Apple and the Android parties raise substantial barriers to entry for Google's competitors in the general search services and general search text ad markets and has substantially foreclosed competition and competitors from competing with Google in those markets. The Google–Apple-Android agreements substantially foreclose Google's general search services and general search text ad competitors from a substantial share of the general search services and general search text ad markets.

81.     Google obtained dominant audience scale by being the exclusive general search engine preset default on Apple's devices and the Android devices since, as Judge Mehta found in his MO, users typically do not change their devices preset default search functions. FOF 65-75. Google's scale is critical to generating the general search services and general search advertising revenues and profits it shares with Apple since advertisers pay more to buy ads from a search provider with a large audience of searched customers. In concert with Apple, Google can deliver the largest search audiences, especially in mobile, from which Google's competitors are foreclosed by the Google-Apple combination.

82.     There are currently only four meaningful general search providers in the general search services market: Google, Bing, Yahoo!, and DuckDuckGo. According to public data sources, Google today dominates the general search services and general search text ad markets with approximately 87% percent market shares, followed far behind in general search services by Bing with about seven percent (7%), Yahoo! with less than four percent (less than 4%), and DuckDuckGo with less than two percent (less than 2%).  MO p. 200

83.     Scale is a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience and since advertisers pay more to buy ads from a search provider with a large audience of searched customers, targeted as potentially in the advertiser's product or service, the Google-Apple conspiracy, combination and agreements effectively eliminate Google's competitors' ability to build the scale necessary to compete in the general search services and general search text ads markets. By April 2018, Google estimated that its share of the general search

29

services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general search engine inquiries in the United States, and almost 95 percent of inquiries on mobile devices.

84.    Google's large and durable market shares with the significant barriers to entry in general search services and general search text ads demonstrate the effectiveness of Google's maintenance of its monopolies through its default distribution agreements with Apple and the Android parties in those markets in the United States.

85.    Google has willfully acquired and maintained a monopoly in a substantial share of the general search services and the general search text advertising markets in violation of Section 2 Of the Sherman Act, through exclusionary distribution agreements that contain default provisions that exclude Google's competitors resulting in harm to competition and End-users by precluding competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free and  by enabling Google to extract and collect End-users' valuable data, for no compensation, transfer it to advertisers who use it to target and bombard End-users with general search text ads in the general search text ads market.

**V.    GOOGLE AND APPLE AND GOOGLE AND THE ANDROID PARTIES HAVE ENTERED INTO   CONSPIRACY, COMBINATIONS AND AGREEMENTS TO MAINTAIN GOOGLE'S MONOPOLY IN THE GENERAL SEARCH SERVICES AND THE GENERAL SEARCH TEXT ADVERTISING MARKETS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**

86.    Plaintiff realleges paragraphs 1 through 85 above.

87.    Google and Apple have entered into  conspiracy, combinations and default distribution agreements that are exclusionary and anticompetitive to maintain Google's monopoly in the general search services and general text advertising markets in violation of Section 2 of the Sherman Act, in which Google has paid Apple billions of dollars pursuant to the Amendment To the Information Services Agreement, Exhibit A hereto, the Joint Cooperation Agreement, Exhibit B hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple, in which Google has paid Apple billions of dollars to secure exclusionary default status for

Google's general search engines on Apple's devices and exclude competition.

88.     Google entered into exclusive distribution agreements with Android Original Equipment Manufacturers, Samsung and Motorola and wireless carriers Verizon, AT&T and T-Mobile (the "Android parties") for revenue share. For example, the Google Mobile Revenue Share Agreement between Google LLC and Samsung Electronics Co., Ltd. is attached hereto as Exhibit C, Attachment A of which provides that "(a) Google will pay Company the following percentage of Qualified Net Ad Revenue with respect to the following Core Qualified Device categories and Service Access Points collectively, "Shared Net Core Ad Revenue") [redacted]. Attachment C-1 provides "Search Access Points – Google provided widget and Google Search Application [to be] Set pursuant to MADA."  "Attachment C-2 provides: "Search Access Point - Chrome Browser – Set as the default system browser intent and no disambiguation screen is ever presented to the end user out-of-the-box, Chrome Browser icon is placed on the Application Dock, and Other requirements pursuant to MADA." "Nearly all RSA-covered devices are presently enrolled at the highest-revenue tier, thus locking in Google as [the] only preloaded GSE." MO Finding of Fact ("FOF") 379-384, that RSAs provide for revenue share and are exclusive agreements to the exclusion of competitors.

89.     Said exclusionary default distribution agreements constitute an unlawful combination and conspiracy to maintain Google's monopoly in the general search services and general text advertising markets in violation of Section 2 of the Sherman Act, that raises barriers to entry for Google's competitors, so that at the time of a consumer's purchase of a new Apple device such as an iPhone or iPad or Android device, all the significant access points default to Google as their general search provider in Google's general search services and general search text ads markets, to the exclusion of Google's competitors.

90.     In May 15, 2014, Apple and Google entered into  the JCA, Exhibit B, that amended their Information Services Agreement (ISA) beyond the termination date of July 31, 2015, which provided  that Google's search engine would be the exclusionary preset out-of-the- box default general search engine on Apple's devices so that at the time of a consumer's purchase of a new Apple device such as an iPhone or iPad, all the significant access points default to Google as their general search services and general search advertising provider. The JCA, Exhibit B states:

31

"Apple and Google wish to extend the ISA beyond the present termination date of July 31, 2015.
Search Rev. Share
1.      Rev share will become [Redacted] effective July 31, 2015.
2.      Subject to the options in point #3, Google shall remain the default search engine in all Geo's."

91.      Under the Information Services Agreement, Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple Google has expressly agreed to pay and paid Apple billions of dollars in Net Ad Revenue that Google receives for Google ads run on Apple devices. The Amendment To the Information Services Agreement, Exhibit A hereto provides at Section 4 on page 5:

"Effective September 1, 2016, Google will pay Apple [% Redacted] of its Net Ad Revenue for the remainder of the term."

92.      Under these agreements, Google has paid Apple the following amounts in general advertising revenue sharing:

 2017 - $3 Billion; 2018 - $9 Billion; 2019 - $12 Billion;

 2020 - $12 Billion; 2021 - $15 Billion; 2022 - $20 Billion

93.      Since almost 50 percent of Google's search traffic originated on Apple devices, Google's own documents recognize that Apple's "Safari default is a significant revenue channel" and that losing its exclusive general default status with Apple could reduce Google's revenues by at least 50 percent; thus, Google views the prospect of losing default status on Apple devices as a "Code Red" scenario.

**Relevant Markets**

94.      ***General Search Services***.  The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at pp. 156-157. See pp. 151-165.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR
COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

95.     ***General Search Text Ads***.  The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88% market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

96.     Google and Apple have foreclosed competition in a substantial share of the general search services and general search text ad markets through the Information Services Agreement, Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple that cover almost 60 percent of all general search inquiries. Coupled with Google owned properties such as Chrome, gives Google roughly 90 percent of the general search services inquiries in the United States, and almost 95 percent of inquiries on mobile devices.

97.     Google has 88% of the general search text ad market in the United States.

98.     As early as May 15, 2014, Google's CEO and Apple's CEO entered into the Joint Cooperation Agreement, Exhibit B hereto, which provides: "1. Rev Share will become [Redacted] effective July 31, 2015; 2. Subject to the options in Point #3 below, Google shall remain the default search engine in all Geo's."  Subsequently Apple and Google held meetings to negotiate the Google-Apple the Information Services Agreement ("ISA"), the Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements. The Amendment To the Information Services Agreement provides in Section 5. CEO Check-Ins: "At the end of each contract year, or earlier if reasonably requested by a party, Chief Executive Officers from each party will meet to review and discuss in good faith the performance of the ISA agreement vis-à-vis the Agreement Purpose, and, upon request, to conform each party's compliance with terms of the ISA agreement."

99.     By entering into and implementing the Information Services Agreement ("ISA"), the Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements, Google and Apple, with specific intent, have entered into a combination and conspiracy in the general search services and general search text ad markets by agreeing that Google's search engine will be the out-of-the-box default search engine on all

Apple devices to the exclusion of Google's competitors and by sharing Google's general search services and general search text ads revenues in the billions of dollars annually with Apple in return for Apple's agreement to employ Google's search engine as the default out-of-the-box search engine on Apple's devices to the exclusion of Google's competitors and competition  Said anticompetitive conduct constitutes unlawful exclusion of competitors and competition and unlawful sharing of revenues and division of the general search services and general search text ads markets between Google and Apple.

100.    A key element of Google's combinations, conspiracy and agreements with Apple and the Android parties to monopolize and maintain its monopoly in the general search services and general search text ads markets is Google' agreements to share revenue from its advertisers with Apple and the Android parties. Google represented that it priced its sales of end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. As proof of its monopoly, "When Google made these pricing changes, Google did not consider its rivals' text ad pricing." FOF 267. In 2024, Google's revenue from advertisers was $350 billion and its profits were $100 billion.

101.    In *United States v. Google*, 20-cv-3010, (D.D.C. Aug.5, 2024, Dkt. No. 1033),  at p. 4 Judge Mehta issued his Memorandum Opinion ("MO") after nine weeks of trial and held that:

(1)    "there are relevant product markets for general search services and general search text ads;

(2)     Google has monopoly power in those markets;

(3)    Google's distribution agreements are exclusive and have anticompetitive effects;

(4)    Google has not offered valid procompetitive justifications for those agreements.

(5)    Importantly, the court also finds that Google exercised its monopoly power by charging supracompetitive prices for general search text ads.  That conduct has allowed   Google to earn monopoly profits." In the Conclusion of his Memorandum Opinion in *United States v. Google*, 20-cv-3010, held: "For the forgoing reasons, the

court concludes that Google has violated section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States—general search services and general text advertising –through its exclusive distribution agreements."

102. Google's large and durable market shares in combinations, conspiracy and agreements with Apple and the Android parties and the significant barriers to entry in general search services and general search text ads demonstrates the effectiveness of the Google-Apple combination and conspiracy and the Google-Android parties' combination and conspiracy to maintain Google's monopoly in those markets in the United States.

103. In his Memorandum and Opinion, Judge Mehta held that Google's default distribution agreements with Apple and the Android parties raise substantial barriers to entry for Google's competitors in the general search services and general search text ad markets and has substantially foreclosed competition and competitors from competing with Google in those markets. The Google–Apple and Google-Android agreements substantially foreclose Google's general search services and general search text ad competitors from a substantial share of the general search services and general search text ad markets.  MO pp. 157-161.

104. Google obtained dominant audience scale by being the exclusive general search engine preset default on Apple's devices and the Android devices since, as Judge Mehta found  users typically do not change their devices preset default search functions. FOF 65-75. Google's scale is critical to generating the general search services and general search advertising revenues and profits it shares with Apple since advertisers pay more to buy ads from a search provider with a large audience of searched customers. In concert with Apple, Google can deliver the largest search audiences, especially in mobile, from which Google's competitors are foreclosed by the Google-Apple combination.

105. There are currently only four meaningful general search providers in the general search services market: Google, Bing, Yahoo!, and DuckDuckGo. According to public data sources, Google today dominates the general search services and general search text ad markets with approximately 87% percent market shares, followed far behind in general search services by Bing with about seven percent (7%), Yahoo! with less than four percent (less than 4%), and DuckDuckGo

with less than two percent (less than 2%)  MO p. 200, FOF 21-26.

106.    Scale is a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience and since advertisers pay more to buy ads from a search provider with a large audience of searched customers, targeted as potentially in the advertiser's product or service, the Google-Apple conspiracy, combinations and agreements effectively eliminate Google's competitors' ability to build the scale necessary to compete in the general search services and general search text ads markets. By April 2018, Google estimated that its share of the general search services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general search engine inquiries in the United States, and almost 95 percent of inquiries on mobile devices.  MO p. 156.

107.    Google's large and durable market shares with the significant barriers to entry in general search services and general search text ads demonstrate the effectiveness of Google's maintenance of its monopolies through its default distribution agreements with Apple and the Android parties in those markets in the United States.

108.    In its MO, the court in *United States v. Google* (2020), found as follows at page 242:

> "Still, the ultimate question is whether the ISA reasonably appears capable of significantly contributing to keeping Apple on the sidelines of search, thus allowing Google to maintain its monopoly. *See Microsoft*, 253 F.3d at 79. The revenue share payments unquestionably have that effect. The prospect of losing tens of billions in guaranteed revenue from Google—which presently come at little to no cost to Apple—disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so. The payments need not be Apple's sole reason for staying out of search to constitute an anticompetitive effect. Plaintiff are not required to prove that Google's "continued monopoly power is precisely attributable to" the ISA. Id. 14."

109.    **End-users' Have Standing To Sue**

110.    General search services and general search text ads enable Google to target End Users as potential customers based on keywords entered by End Users, when utilizing search to make inquiries that express interest in the topic of the inquiries. General search text ads provide advertising keyed to an End User's data that the End User discloses while searching information on Google's search engine that Google collects and provides and sells and provides to advertisers and others for billions of dollars that enable search advertisements to target End Users' expressed

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

interests.

111.    Google uses its general search services to compile End Users' data, including searches on the web, which End User data Google sells and provides to advertisers and others. When an End User uses Google, the End User provides data, including personal information to Google in exchange for search results, for no compensation to the End User, which End-user data Google monetizes by selling or providing to advertisers and others, producing search advertising targeting End Users with masses of text advertising based on the End User's data collected by Google. "By selling [End] Users' information, Google prevents End Users from monetizing their own data." *Brown et al.v. Google LLC*, No. 4:20-cv-3664-YGR (N.D. Cal. 2023). In *Brown v. Google, LLC*, 4:20-cv-3664-YGR Dkt. 969 at pp. 2-3 (N.D. Cal. 2023), Judge Rogers, in denying Google's motion for summary judgment against End-users, stated:

"Data Collection. . . . When a user visits a website, the user's browser sends a "GET" request to the website to retrieve it. (Id.) This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the User agent, which identifies the user's device platform and browser; user's geolocation, if available; the Referrer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. (Id.) At the same time, the user's browser reads Google's code, which is embedded on the website. (Id.) Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. (Id.) This second transmission tells Google exactly what a user's browser communicated to the website. (Id.)…According to Plaintiff, Google then takes users' private browsing history and associates it with their preexisting user profiles. (PAF 47; Response to SUF 65.) Doing so allows Google to offer better, more targeted, advertisements to users. (Response to SUF 63; 4AC ¶84.) This is at the core of Google's business: the bulk of Google's hundreds of billions of dollars in revenue come from selling targeted advertisements to other companies. (4AC ¶89.) By selling users' information, Google prevents users from monetizing their own data. (4AC ¶138; PAF 27–28.) The value of this data can be quantified; for example, Google itself has piloted a program to pay users $3.00 per week to track them." (Docket No. 969, at pp. 2-3.).

112.    Google looked to the Ipsos Screenwide Panel, a consumer research study conducted by Google since 2012 to 'collect information about how users browse the internet.' *Id*. para. 135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

37

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

113.    In *Brown v. Google LLC*, Dkt. No. 969 at p. 33, the Court under "Damages or Loss" in its opinion further stated:

> "Second, Google argues Plaintiff suffered no "damage or loss by reason of a [CDAFA] violation." Cal. Pen. Code § 502(e)(1). Plaintiff disagree and offer evidence showing that they have a stake in the value of their misappropriated data. *Facebook Tracking*, [*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019) (cleaned up))]is instructive. In *Facebook Tracking*, the Ninth Circuit found that Plaintiff had sufficiently alleged their browsing histories carried financial value. Id. at 600. So too here. Plaintiff have evidence that there is a market for their data—Google itself has piloted a program where it pays users $3.00 a day for their browsing history. (PAF 28.) Google responds that *Facebook Tracking* does not apply because it was a decision about standing, not liability. That is beside the point. The Ninth Circuit's decision stands for the proposition that Plaintiff can state an economic injury for their misappropriated data. Because Plaintiff proffer evidence that there is a market for their data—one Google itself has created—the Court cannot rule, as a matter of law, that Plaintiff suffered no damages . . ." (Docket No. 969, at p. 33

114.    In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

115.    Plaintiff' injury is both particularized and concrete—particularized with respect to the End-user's specific data that is extracted for no compensation—and concrete with respect to the monetized value in billions that Google obtains by re-selling the End-users' data to advertisers and others. As further injury, Plaintiff and other End-users of Google's search engine are not only injured by the taking of their valuable search data for no compensation but   Google has also harmed End-users of general search services by reducing the quality of their general search experience, by lessening choices, and by impeding privacy and innovation in general search services.

116.    End-users are also directly injured because Google's anticompetitive use of distribution agreements that contain default provisions that exclude competitors have precluded

competitors from providing End-users with higher-quality search products that are more privacy protective and ad-free. Plaintiff are injured because Google extracts and collects Plaintiff's and the class of End-users' personal data to Google during their use of Google search, an injury that has been quantified by Google at $3.00 per month in Google's pilot program.

117. Having had their data extracted in the general search services market for no compensation, which data Google resold to advertisers and others for billions of dollars, End-Users are targeted and bombarded with general search text ads in the general search text ads market, and suffer direct injury by Google's anticompetitive use of default distribution agreements that have precluded competitors from providing End-users with higher quality search products that are more privacy protective and ad-free results and such direct injury to End-users gives Plaintiff and the class of End-users standing to sue.

118. Google and Apple specifically targeted End Users in their written agreements. The written ISA contract, Exhibit A hereto, sets out the parties' agreement to share revenue, the parties specifically recited that the stated "Agreement Purpose" was to improve the "performance of the Services, the Spotlight Services and the Siri Services *for End Users* on Apple products." (Exhibit A, p. 7) (Emphasis Added.).

119. Google's monopoly in general search services and general search text ads enable Google to collect End-users' data for no compensation and sell and provide it to advertisers and others for billions of dollars. When End-users make queries on Google's general search services and general search text ads, End-Users disclose their data while searching information on Google's search engine that Google collects and provides to advertisers that enable them to bombard End-users with general search text advertisements to targeted to End Users' expressed interests.

120. In *United States v. Google LLC* (2020), No. 20-CV-3010 (APM), 2024 WL 3647498 (D.D.C. 2024) Aug. 5, 2024, the *Google* court found that Google's exclusive default agreements with Apple and others prevented Google competitors such as Neeva and Duck Duck Go from providing End-users high quality search products that were more privacy protected and ad-free. In *United States v. Google LLC* ( 2020), the court (the "*Google* court") also concluded that Google's default agreements with Apple and others foreclosed efficient channels of distribution and resulted

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

in network effects that made it difficult for competitors to gain the volume of users and user data that would allow the development of high-quality search products. The Google court stated in its MO:

> FOF "76. Neeva exemplifies the importance of search distribution through a readily accessible channel. Neeva secured the capital and human resources needed to build a search engine. Tr. at 3671:4-3672:13 (Ramaswamy).  Although it initially syndicated search results from Bing; it eventually crawled the web, built an index, and developed a ranking model, which relied heavily on artificial intelligence technology, to generate its own search results for about 60% of its queries. Id. at 3775:9—3776:21, 3739:14-16 (Ramaswamy).  But Neeva was unable "to be even a default provider on things like the major browsers or operating system," which "was what made [its founders] conclude that it was hard to have Neeva consumer search as a viable business. Id.at 3701:1-7 (Ramaswamy). The reason "why Neeva failed …was simply because [it] could not get enough users to be in that state where they regularly used Neeva." Id. at 3712:10-12 (Ramaswamy); id. 3677:2-3, 3700:25-3701:7 (Ramaswamy) (testing that more users on Neeva would result in greater revenues through subscription fees); id. at 3724:18-21 (Ramaswamy) ("[I]f a well-funded and exceptionally talented team like Neeva could not even be a provider on     most of the browsers, I don't see that as the market working.").

121.    The court further found that Neeva, as a competitor to Google sought to create a subscription-based model for search that did not serve ads, at , but due to Google's exclusive default contracts, due to its inability to develop enough of a user base to have sufficient user data, it was driven out of the search market. Likewise, the court found that Duck Duck Go ("DDG"), another competitor of Google's, cannot compete effectively because of Google's exclusionary default search agreements and the lack of access to  sufficient user data, at Google court at pp. 162-163.

The *Google* court found: "As a result, DDG and Neeva are the only two notable market entrants in the last 15 years. Each attempted to innovate—DDG on privacy and Neeva through a subscription-based model—but found only limited success (DDG) or left the market altogether (Neeva)." *Google* court at MO pp. 162-163. FOF paras. 14, 25, 76.

122.    As the *Google* court found in its MO, FOF 74:

> "A GSE's placement as the default thus drives search volume through that access point. Tr. at 3689: 21-24 (Ramaswamy) (testifying that "the convenience of easy accessability and tapping into …engrained default behaviors are the deciding factors when it comes to whether a search engine gets lots of usage"); id. at 7674:6-7675:21 (Pichai) ("[B]ecause you're taking existing users, and by giving them more convenient access points, you're making them search more…Done correctly, and if you're putting a product out in front of users which users like and want to use, yes, defaults can make a difference.").  In 2017, over 60% of all queries entered on Google flowed through defaults. UPX83 at 967; see id. (60% of iOS queries were through the Safari [Apple] default, and 80% of Android queries were through defaults

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

secured by the distribution deals…    "Google recognizes that securing the default placement is extremely valuable for   monetizing search queries." FOF 75

123.    At MO page 237 of its Conclusions of Law, the *Google* court stated:

"The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment. Neeva is a case in point.  It could not gain a foothold in the market in part because it was relegated to a less efficient means of distribution, such as an alternative default GSE [general search engine] on any mobile device. FOF 76. Ultimately, Neeva's inability to retain and attract users—and thus acquire scale—was a primary reason for its withdrawal from the market. *Id*. The loss of nascent competitors is a clear anticompetitive effect.  See AREEDA para. 1802d5 (observing that exclusive  dealing arrangements that deny smaller firms access to retailers may 'impair their ability to expand, thus becoming more effective competitors with the dominant firm. Indeed, the smaller [firms] may decline and even be forced to exit the market.')."

124.    At MO page 162 the *Google* court stated:

"The tales of DDG and Neeva illustrate *Rebel Oil's* point. Both entered the market notwithstanding Google's dominance, but neither has "taken significant business from Google and they therefore have not posed any meaningful threat to its "market power."  DDG though in operation since 2008, has barely reached a 2% market share. FOF 25; *Surescipts*, 665 Supp. 3d at 46-47 ("[T]he ability on one competitor to capture [a relatively minor percentage of the market does not undermine [the dominant firm's] durable monopoly power protected and perpetuated by barriers to entry."]. As for Neeva, it entered and exited within four years. FOF 14…The lack of access to efficient channels of distribution diminished Neeva's ability to grow its user base and significantly contributed to its demise."

125.    At MO page 200 the *Google* court stated:

"Google has no true competitor. Consider that Google's monopoly in general search has been remarkably durable. Its market share in 2009 was nearly 80%, and it has *increased* since then to nearly 90% by 2020. FOF 23. Bing during that same period, has never held a market share above 11%, and today holds less than 2.5% of the market. *Id*. Thus over the last decade, Google's grip on the market has only grown *stronger*…

"Moreover, there have been only two new market entrants of note in the last 15 years—DDG and Neeva. One of them is no longer in business (Neeva) , and the other has achieved a market share of 2.1% (as of 2020) after more than a decade in business. If there is genuine competition in the market for general search, it has not manifested in familiar ways, such as fluid market shares, lost business or new entrants."

126.    Thus, Neeva and Duck Duck Go, competitors of Google, who offered better" privacy or ad-free alternatives to Google were unable to offer the same high quality of search to End-users, as Google, due to their lack of access to a large volume of user data due to Google's anticompetitive

use of exclusionary default agreements.

127.    As a result of Google's use of anticompetitive exclusionary default agreements with Apple and others that foreclosed DDG's and Neeva's access to the large volume of user data needed to offer the same high quality of search to End-users as Google, Plaintiff and End-users have been injured by being deprived of the better quality privacy and ad-free searches from Google's competitors, DDG and Neeva, which those companies offered.

128.    At MO page 222, the *Google* court stated:

"The court finds that as to the general search services market Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume."

129.    At MO pages 226-227, the *Google* court stated::

"Naturally then, GSE distributors prefer Google because of its search quality and because it would be economically irrational to sacrifice the high revenue share. They thus routinely renew the distribution deals with their exclusive terms. In this feedback loop, the revenue share payments" effectively make the ecosystem exceptionally resistan[t] to change" and basically freeze the ecosystem in place[.]" Tr at 3937:24-3798:21 (Ramaswamy); see id at 3513:1-3 (Nadella) ("[T]his vicious cycle that [Microsoft is]  trapped in can become even more vicious because the defaults get reinforced." That is the antithesis of a competitive market."

At MO page 230 "Armed with its scale advantage, Google continues to use that data to improve search quality…Scale also improves search ads monetization."

130.    At MO page 234 the *Google* court stated:

"No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile. The exclusive distribution agreements have substantially contributed to these anticompetitive market conditions."

131.    At MO page 236, the *Google* court found: "*The Exclusive Agreements Have Reduced Incentives To Invest and Innovate*. The distribution agreements have caused a third key anticompetitive effect: they have reduced the incentive to invest and innovate in search.

132.    Google and Apple and Google and the Android Parties have entered into a combination, conspiracy and exclusive default distribution agreements that are exclusionary and anticompetitive to maintain Google's monopoly in the general search services and the general search

text Ads markets in violation of Sections 2 of the Sherman Act.

VI.    **GOOGLE AND APPLE, AS A POTENTIAL COMPETITOR OF GOOGLE HAVE CONSPIRED AND COMBINED TO RESTRAIN TRADE AND SHARE SEARCH REVENUE AND DIVIDE THE SEARCH MARKETS**

133.    Plaintiff reallege paragraphs 1 through 132 above.

134.    Google and Apple as a potential competitor of Google in the general search services market have conspired and combined to restrain trade, share revenue, and divide the search markets pursuant to agreements for Google to pay Apple billions of dollars not to compete in violation of Sections 1 of the Sherman Act.

135.    The sharing of revenue provided in the agreements between Google and its potential competitor Apple is a restraint of trade and a per se violation of Section 1 of the Sherman Act. *Citizens Publishing Co. v. United States*, 394 U.S. 131 (1969) (affirming summary judgment for profit pooling). Moreover, by dividing the markets for general search services between them in which Google maintains its monopoly in search and Apple surrenders its devices to Google's out- of- the- box default search engine, excluding competitors, the agreements between Google and Apple are likewise per se unlawful under Section 1 of the Sherman Act. *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) (reversing a grant of summary judgment for defendants and holding that horizonal market allocation is a *per se* violation of the Sherman Act.).

136.    The court in *United States v. Google* (2020), recognized that Google's revenue share payments to Apple "disincentivizes" Apple, a potential competitor, from competing in search "when it otherwise has the capacity to do so, stating in its MO at p. 246,

> "Still, the ultimate question is whether the ISA reasonably appears capable of significantly contributing to keeping Apple on the sidelines of search, thus allowing Google to maintain its monopoly. *See Microsoft*, 253 F.3d at 79. The revenue share payments unquestionably have that effect. **The prospect of losing tens of billions in guaranteed revenue from Google—which presently come at little to no cost to Apple—disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so.** The payments need not be Apple's sole reason for staying out of search to constitute an anticompetitive effect. Plaintiff are not required to prove that     Google's "continued monopoly power is precisely attributable to"        the ISA. Id. 14." (Emphasis added)"

137.    As Judge Mehta stated in his MO at p. 238, Apple is a "fierce potential competitor" of

Google, who "remains on the sidelines due to the large revenue share payments it receives from Google."

138.    In acknowledgement of Apple as a potential competitor in general search services and general search advertising, Google obtained a right of first refusal of Apple's general search services and general search advertising technologies, including Apple's Siri and Spotlight search in their Amendment To the Information Services Agreement, Exhibit A hereto at paragraph 2 at page 4 which states:

> "Following the initial implementation of the Spotlight Services or Siri Services, if Apple includes ads or paid listings in Siri or Spotlight (or successor versions), Apple will offer Google the opportunity to supply such ads or paid listings under the financial terms set forth in Section 4 of this agreement and on equivalent implementation term.

139.    As a potential competitor, Apple has worked on developing "Apple Search," at least since 2013 when it acquired Topsy Labs' technology used to access information for Apple's iPhone voice assistant, Siri and the Apple's Mac' search feature, Spotlight. In 2018, Apple acquired Laserlike and its search technology based on artificial intelligence. Since 2018, Apple has acquired 21 artificial intelligence startup companies.

140.    In May 15, 2014, Apple and Google entered into  the JCA, Exhibit B, that amended their Information Services Agreement (ISA) beyond the termination date of July 31, 2015, which provided  that Google's search engine would be the exclusionary preset out of the box default general search engine on Apple's devices so that at the time of a consumer's purchase of a new Apple device such as an iPhone or iPad, all the significant access points default to Google as their general search services and general search advertising provider. The JCA, Exhibit B hereto states:

> "Apple and Google wish to extend the ISA beyond the present termination date of July 31, 2015.
>
> Search Rev. Share
>
> (1)    Rev share will become [Redacted]effective July 31, 2015.
>
> (2)    Subject to the options in point #3, Google shall remain the default search engine in all Geo's."

141.    Under the Information Services Agreement, Amendment To the Information Services

Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements between Google and Apple, Google has expressly agreed to pay and paid Apple billions of dollars in Net Ad Revenue that Google receives for Google ads run on Apple devices. The Amendment To the Information Services Agreement, Exhibit A hereto provides at Section 4 on page 5:

> "Effective September 1, 2016, Google will pay Apple [Redacted] of its Net Ad Revenue for the remainder of the term."

142.    A key element of Google's combination, conspiracy and agreements with Apple and the Android parties to restrain trade in the general search services and general search text ads markets is Google' agreements to share revenue from its advertisers with Apple and the Android parties. Google represented that it priced its sales of end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. As proof of its monopoly power, "When Google made these pricing changes, Google did not consider its rivals' text ad pricing." MO, FOF 267. In 2024, Google's revenue from advertisers was $350 billion and its profits were $100 billion.

143.    Under these agreements, Google has paid Apple the following amounts in general advertising revenue sharing:

2017-$3 Billion; 2018 - $9 Billion; 2019 - $12 Billion;

2020 - $12 Billion; 2021 - $15 Billion; 2022 - $20 Billion

144.    The sharing of revenue between Google and its potential competitor Apple is a *per se* violation of Section 1 of the Sherman Antitrust Act. *Citizens Publishing Co. v. United States*, 394 U.S. 131 (1969) (affirming summary judgment for profit pooling). Moreover, by dividing the markets for general search services between them in which Google maintains its monopoly in search and Apple surrenders its devices to Google's out-of-the-box default search engine, excluding competitors, the agreements between Google and Apple are likewise per se unlawful under Section 1 of the Sherman Act. *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) (reversing a grant of summary judgment for defendants and holding that horizonal market allocation is a per se violation

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

of the Sherman Act.).

## ANTICOMPETITIVE CONDUCT

145.    Google has unlawfully conspired, combined and agreed with Apple, a potential competitor, in restraint of trade to share revenue with Apple and to divide the markets for general search services and general search advertising with Apple in restraint of trade to disincentivize Apple from competing with Google paying Apple billions of dollars annually to provide Google with exclusive access as the default search engine provider on Apple's devices coupled with a right of first refusal in Google as to ads or paid listings on Apple's search technologies, Siri and Spotlight, per Section 2 of the Amendment To the Information Services Agreement. Google's exclusionary contracts cover almost 60 percent of U.S. search inquiries, and almost half the remaining searches are processed through properties operated directly by Google. As a result, the large majority of searches are covered by Google's exclusionary contracts and properties, depriving competitors of the ability to compete by denying its them access to the scale necessary to compete with Google. By depriving competitors of scale and distribution, Google and Apple and the Android parties have deprived competitors of the ability to compete and innovate and injured Plaintiff and the class by collecting their personal search data without compensation while re-selling it to advertisers for billions of dollars who bombard End-users with text ads in the general search text ads market.  By depriving competitors of scale and distribution, Google, Apple and the Android parties have precluded competitors from providing End-users with innovation in higher-quality search products that are more privacy protective and ad-free.

146.    By foreclosing competition from competitors, Google and Apple harm competition and harm End Users by collecting their search data without compensation while selling End Users' search data to advertisers for billions of dollars annually.

## ANTICOMPETITIVE EFFECTS

147.    In its MO, the court in *United States v. Google* (2020) stated at page 216-222:

> "The key question then is this: Do Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market?  The answer is "yes." Google's distribution agreements are exclusionary contracts that violate Section 2

because they ensure that half of all GSE users in the United States will receive Google as the preloaded default on all Apple and Android devices, as well as cause additional anticompetitive harm. The agreements "clearly have a significant effect in preserving [Google's] monopoly." Microsoft at 71.

The agreements have three primary anticompetitive effects: (1) market foreclosure, (2) preventing rivals from achieving scale, and (3) diminishing incentives of rivals to invest and innovate in general search…"

1.    *The Exclusive Agreements foreclose A Substantial Share of the Market …*

…Aggregating the foreclosure effects of the [Apple and Mozilla ] browser agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…" MO p. 216-217'

"The court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume. MO p. 222. The 50% figure meets the [significant] threshold.

2.    *"The Exclusive Agreements Have Deprived Rivals of Scale*, MO p. 226.

Google's exclusive agreements have a second important anticompetitive effect: They deny rivals access to user queries, or scale, needed to effectively compete. Scale is the essential raw material for building, improving and sustaining GSE [General Search Engines]. FOF paras. 86-106. For more than a decade, the challenged distribution agreements have given Google access to scale that its rivals cannot match FOF 87-89. Google has used that scale to improve its search product and ad monetization. FOF90-94, 103-105. Meanwhile, without access to scale, other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google. FOF 76, 87-89, 106." MO at p. 226.

a.    "The Power of Defaults, MO p. 227

Numbers help explain the power of the search default setting. Half of all GSE queries in the United States are initiated through the default search access points

47

covered by the distribution agreements…An additional 20% of all searches nationwide are derived from user-downloaded Chrome, a market reality that compounds the effect of the default search agreements. FOF 63. That means only 30% of all GSE queries in the United States come through a search access point that is not preloaded with Google.  Additionally, default placements drive significant traffic to Google. Over 65% of searches on Apple devices go through the Safari default. FOF 296.  On Android, 80% of all queries flow through a search access point that defaults to Google." FOF 74.

"All of this makes defaults extremely valuable.  In 2021, Google spent $26.3 billion in traffic acquisition costs—the revenue share paid to its partners—which is four times more than the company's other search-related costs combined, including research and development." FOF para 289… MO pp. 227-228.

b.      "The Impact of Scale…, MO pp. 230-234

The sheer magnitude of Google's query volume, or scale, compared to rivals is startling: Users enter nine times more queries on Google than on all rivals combined. On mobile devices, that multiplier balloons to 19 times. FOF 87… This wealth of data gives Google greater insight into search behavior in part because it simply sees more queries than other GSEs See e.g. FOF 89…The more precisely targeted an ad, the greater likelihood that it will be clicked, which translates into higher revenues that Google uses to make larger revenue share payments. The market for GSEs is thus characterized by a type of network effect. Cf. Microsoft 253 F.3d at 49 (discussing network effects). (1) More user data allows a GSE to improve search quality, (2) better search quality attracts more users and improves monetization, (3) more users  and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, (5) more ad revenue enables a GSE to expend more resources on traffic acquisition  costs (i.e., revenue-share payments) and investments, which enable the continued acquisition of scale…There is a reason that Google still retains 18-months of a user's data.  It is still highly valuable to Google. Google's

massive scale advantage thus is a key reason why Google is effectively the only genuine choice as a default GSE. MO pp. 230-234.

> "That barrier is reinforced by the size of Google's revenue share payments… The end result here is not dissimilar from the Microsoft court's conclusion as to the browser market.  Just as the agreements in that case "help[ed] keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly," Google's distribution agreements have constrained the query volumes of its rivals, thereby inoculating Google against any genuine competitive threat. Microsoft 252 F.3d at 71…No current rival or nascent competitor can hope to compete against Google in the wider marketplace without access to meaningful scale, especially on mobile. The exclusive distribution agreements have substantially contributed to these anticompetitive market conditions."  MO 230-234

3.    *"The Exclusive Agreements Have Reduced Incentives to Invest and Innovate*

> The distribution agreements have caused a third key anticompetitive effect: They have reduced the incentive to invest and innovate in search…The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment." MO 236-237.

148.    Google and Apple have engaged in a conspiracy and combinations and agreements to restrain trade in the general search services and general search text ads markets and injured Plaintiff and the class and harmed competition resulting in damages to Plaintiff.

149.    Google looked to the Ipsos Screenwide Panel, a consumer research study conducted by Google since 2012 to 'collect information about how users browse the internet.' *Id*. para. 135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

150.    Google and Apple have engaged in a conspiracy and combination to restrain trade in the general search services and general search text ads markets and injured Plaintiff and the class and

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

harmed competition by:

a.    By foreclosing competitors and competition in the general search services and general search text ad markets, by sharing Google's general search services and general search text ad revenues with Apple by paying Apple billions of dollars in return for Apple's agreement to grant Google's search engine exclusive out-of-the-box default status on Apple devices and dividing markets, Google and Apple have engaged in an unlawful conspiracy and combination to restrain trade and substantially foreclosed competition and competitors from those markets resulting in Google collecting End Users' private search data without compensation while reselling it to advertisers for billions of dollars annually and precluding competitors from providing End-users with higher quality search products that are more privacy protected and ad-free and bombarding End-users with text ads in the general search text ads market.

151.    In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

## VII.    <u>GOOGLE VIOLATED CALIFORNIA UNFAIR COMPETITION LAW BUS. & PROF. C. 17200</u>

152.    Plaintiff reallege paragraphs 1 through 151 above.

153.    Google has violated California Unfair Competition Law ("UCL") Bus. & Prof. C. 17200 et seq.

154.    Google's monopoly in general search services and general search text ads enable Google to collect End-users' data for no compensation and sell and provide it to advertisers and others for billions of dollars. When End-users make queries on Google's general search services and

general search text ads, End Users disclose their data while searching information on Google's search engine that Google collects and provides to advertisers that enable them to bombard End-users with general search text advertisements targeted to End Users' expressed interests based on their data extracted and collected from them by Google.

155.    In *Brown v. Google, LLC,* 4:20-cv-3664-YGR; 2023 WL 5029899 (N.D. Cal  Aug. 7, 2023), the court stated:

> "**Data Collection**…When a user visits a website, the user's browser sends a "GET" request to the  website to retrieve it. (Id.) This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the Useragent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. (*Id*.) At the same time, *the user's browser reads Google's code, which is embedded on the website*. (Id.) Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. (*Id*.) This    second transmission tells Google exactly what a user's browser communicated to the  website. (*Id*.)
>
> Google's services are ubiquitous on the internet: over 70 percenta of websites use Google Analytics and Ad Manager. (4AC ℙℙ 67 and 78.) To use these  services, *Google requires website developers to embed Google's code onto their websites* and agree to its Privacy Policy. (PAF 6.) *Google does not tell website developers that it tracks their visitors* even when they are in private browsing mode. (Id.) (Emphasis added).
>
> According to Plaintiff, *Google then takes users' private browsing history   and associates it with their preexisting user profiles. (PAF 47; Response to SUF 65.) Doing so allows Google to offer better, more targeted, advertisements to users*. (Response to SUF 63; 4AC ℙ 84.) This is at the core of Google's business: the bulk of Google's hundreds of billions of dollars in revenue come from selling targeted advertisements to other companies. (4AC ℙ 89.) By selling users' information, Google prevents users from monetizing their own data. (4AC ℙ 138; PAF 27–28.) *The value of this data can be quantified; for example, Google itself has piloted a program to pay users $3.00 per week to track them*. (PAF 28.)." (Emphasis added).

156.    As recognized in *Brown v. Google LLC*, Google requires website developers to embed Google's code onto their websites, so that Google's search engine can collect End-users' data directly from End-users' browsers.  Google's communications code embedded on websites is thus an extension of Google's search engine in the monopolized general search services and general search text ads relevant markets. Google then takes End-users' private browsing history that Google collected with Google's code embedded on websites and associates it with End-users' preexisting

user profiles that Google has compiled, which allows Google to offer higher quality, more targeted, advertisements to End-users and to build scale that far surpasses Google's competitors.

157. As stated in *Brown v. Google LLC*, Google has "piloted a program to pay users $3 per week to track them." Plaintiff' and End-users' data carried financial value and Google profited from their valuable data by selling or transferring it to advertisers. Plaintiff and End-users retained a stake in their data and in the profits garnered by Google from the disposition of Plaintiff and End-users' data. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 599-600.

158. In *Brown*, the Court under "**Damages or Loss**" further stated:

"Second, Google argues Plaintiff suffered no "damage or loss by reason of a [CDAFA] violation." Cal. Pen. Code § 502(e)(1). Plaintiff disagree and offer evidence showing that they have a stake in the value of their misappropriated data. *Facebook Tracking*, [*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019) (cleaned up))] is instructive. In *Facebook Tracking*, the Ninth Circuit found that Plaintiff had sufficiently alleged their browsing histories carried financial value. Id. at 600. So too here. *Plaintiff have evidence that there is a market for their data—Google itself has piloted a program where it pays users $3.00 a day for their browsing history.* (PAF 28.) Google responds that Facebook Tracking does not apply because it was a decision about standing, not liability. That is beside the point. The Ninth Circuit's decision stands for the proposition that Plaintiff can state an economic injury for their misappropriated data. Because Plaintiff proffer evidence that there is a market for their data—one Google itself has created—the Court cannot rule, as a matter of law, that Plaintiff suffered no damages . . ." (Docket No. 969, at p. 33).

159. As the court found in Brown v. Google: "Plaintiff have evidence that there is a market for their  data—Google itself has piloted a program where it pays users $3.00 a day for their browsing history. (PAF 28.)" Thus, Google itself has paid for users' search data, establishing that there is a market for user's search data and that user's search data has value.

160. Google uses its general search services and general search text ads to compile End Users' searches on the web which End User information Google sells to advertisers. When an End User uses Google, the End User provides personal information to Google in exchange for search results, for no compensation to the End User, which Google monetizes by selling the End User's information to advertisers and producing search advertising targeting the End User based on the End User's information collected by Google. "By selling [End] Users' information, Google prevents End Users from monetizing their own data." *Brown et al.v. Google LLC*, No. 4:20-cv-3664-YGR (N.D.

Cal. 2023). As the court found in *Brown v. Google*: "*Plaintiff have evidence that there is a market for their data—Google itself has piloted a program where it pays users $3.00 a day for their browsing history*. (PAF 28.)" Thus, Google itself has paid for users' search data, establishing that there is a market for user's search data and that user's search data has value.

161.    As described by the Court in *Brown*, Plaintiff and the class of End-users herein, have suffered injury by having their valuable search data extracted by Google for no compensation and resold to advertisers for billions of dollars.

162.    Google and Apple have engaged in a conspiracy and combination to restrain trade in the general search services and general search text ads markets and injured Plaintiff and the class and harmed competition resulting in damages to Plaintiff.

163.    Google looked to the Ipsos Screenwide Panel, a consumer research study conducted by Google since 2012 to 'collect information about how users browse the internet.' *Id*. para. 135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

164.    Google induces End-users to use its search engine and when End-users use Google's search engine, Google extracts the End-user's valuable search data for no compensation to the End-user. Google then monetizes the End-user's search data by selling it to advertisers and others for billions of dollars in revenue. Google's monetization of Plaintiff' data by selling it to advertisers establishes its value and, as held in *Brown v Google LLC*, and Google's extraction of End-users' data for no compensation results in a direct injury to End-users.

165.    In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

multiplying that figure by the number of months in the Class Period.

166. The End-user data Google collects contains personal viewing information, which Google  analyzes and associates with End-users' prior viewing histories, to  creates "profiles" for each End-user that enable Google charge its customers for targeted End-user data and monetize End-users' data  so that Google can profit from Google's ad-targeting services.

167. Google is paid high prices for these targeted End-user data-based profiles for advertisements by third-party advertisers because Google uses End-user data that Google collected from End-users to select and display advertisements targeted at those specific profiles. End-users retain a stake in the profits Google garnered from their data and it is unjust for Google to profit from End-users' data without compensating them for it.

168. Google also benefits by using the End-user data it collects to improve and refine existing and new Google products, services, and algorithms.

169. Google includes far more than volunteered personal information like name, birth date, gender and email address since Google secretly plants numerous tracking mechanisms on End-users' computers and web- browsers, which enable Google to track users' browsing histories and correlate them with End-user browser IDs, preventing End-users' from blocking access to their data.

170. Similarly, the value of End-user-correlated internet browsing history can be quantified, because Google itself was willing to pay users for the exact type of communications that Google illegally intercepted from Plaintiff and End-users during the Class Period. For example, Google Inc. had a panel during the Class Period (and still has one today) called "Google Screenwise Trends" which, according to the Google, is designed "to learn more about how everyday people use the Internet."

171. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated conclusively that internet industry participants understood the enormous value in internet users' browsing habits. Google now pays Screenwise panelists up to $3 per week to be tracked.

172. In a study, web browsing histories were valued at $52.00 per year, web search histories were valued at $57, GPS records were valued at $55, Emails and text messages were valued

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

at $59.

173.    Google has engaged in unlawful business practices in violation of California Bus. & Prof. C. 17200 et seq. for which Plaintiff and the class of End-users seek restitution and injunctive relief.

174.    Google's combinations, conspiracy and agreements with Apple and the Android parties in violation of sections 1 & 2 of the Sherman Act, constitute unlawful business acts in violation of California Bus. & Prof. C. 17200 et seq. that have resulted in injury and loss of money and property to Plaintiff and the class of End Users by having their private search data in which they retained a stake in the profits, extracted and collected by Google, without compensation to Plaintiff and the End User class, and resold to advertisers for billions of dollars annually, which revenue Google shared with Apple and the Android parties. Google's unlawful conduct has resulted in harm to Plaintiff and the class of End-Users by having their valuable private search data extracted and collected by Google without compensation to End-users, by foreclosing a substantial share of the general search services and general search text ads markets from competitors and precluding competitors from providing End-users with higher quality search products that are more privacy protective and ad-free, and by enabling advertisers to target and bombard End-users with text ads.

In *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011), the California Supreme Court held that "there are innumerable ways in which economic injury from unfair competition may be shown." For example, a Plaintiff may "surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have" or "have a present or future property interest diminished." *Id*. at 323.

175.    The California Consumer Privacy Act ("CCPA") recognizes that the End-users' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). Google violated the CCPA, which provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive,

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

176. End-users have a property right in the data that Google collects from them and End-users retain a stake in the unjustly earned profits that Google garnered from selling or transmitting End-users' data, including their personal browsing histories. Because California law recognizes a legal interest in unjustly earned profits from End-users' personal data, End-users have standing to sue under the UCL. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.").

177. By entering into and implementing the Information Services Agreement ("ISA"), the Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements. the Information Services Agreement ("ISA"), the Amendment To the Information Services Agreement, Exhibit A hereto, the Revenue Sharing Agreements ("RSA") and related agreements, and excluding competition and  by agreeing that Google's search engine will be the out-of-the-box default search engine on all Apple devices to the exclusion of Google's competitors and by sharing Google's general search services and general search text ad revenues in the billions of dollars annually with Apple in return for Apple's agreement to employ Google's search engine as the default out-of-the-box search engine  on Apple's devices to the exclusion of competitors and competition, Google has been unjustly enriched. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599-600 (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019).

178. A key element of Google's violation of the Unfair Competition Law ("UCL") is Google' agreements to share revenue from its advertisers with Apple and the Android parties. Google represented that it priced its sales of end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. FOF 267. In 2024, Google's revenue from advertisers was $350 billion and its profits were $100 billion.

179. Google's business acts and practices are likely to deceive the general public, and therefore fraudulent under the UCL in that Google failed to disclose that "Google requires website developers to embed Google's code onto their websites, and does not tell website developers that it tracks their visitors even when they are in private mode." See *Brown v. Google*, LLC, Dkt. No. 969 at p.3. Nor does Google tell End-users that it tracks them.

180. Through its false representations and unlawful data collection, Google is unjustly enriching itself at the cost of End-user's choice, when the End-user would otherwise have the ability to choose how they would monetize their own data.

181. If not for Google's violations of the UCL End-users could have received monetary value for their valuable data from other internet firms and received higher quality search products that are more privacy protective and ad free from Google's competitors.

182. Google's anticompetitive conduct in violation of Section 2 of the Sherman Act  and the CCPA and Google's misrepresentations have resulted in injury and loss of money and property to Plaintiff and the class of End-Users by having their private search data collected by Google, without compensation to Plaintiff and the End-User class, and resold to advertisers for billions of dollars annually, which revenue Google shared with Apple and the Android parties. In so doing, Defendants engaged in unlawful, unfair and fraudulent business acts and practices in violation of California Bus. & Prof. C. 17200 for which Plaintiff and the class seek restitution and injunctive relief.

**VIII.  END-USERS HAVE STANDING TO SUE GOOGLE FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT, IN WHICH END-USERS HAVE RETAINED A STAKE, THAT GOOGLE MADE BY EXTRACTING AND COLLECTING END-USERS' VALUABLE DATA, FOR NO COMPENSATION TO END-USERS, AND SELLING IT TO ADVERTISERS FOR BILLIONS OF DOLLARS**

183. Plaintiff reallege paragraphs 1 through 182 above.

184. When End-users make queries on Google's general search engine ("GSE") , End Users disclose their data in the general search services market and  Google extracts and collects End-

users' data and  sells it to advertisers and brokers, for billions of dollars that enable them to target and bombard End Users' with general search text advertisements in the general search text ads market focused on End-users' expressed interests.

185.    End-users have a property right in the data that Google collected from them, in which they retained a stake in the unjustly earned profits that Google garners from selling or transmitting their data including their personal browsing histories, which confers standing to sue on End-users. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable); *Greenley v. Kochava, Inc.*, No. 22-cv-01327-BAS-AHG, 2023 WL 4833466 at *4 (S.D. Cal. July 27, 2023) ("[T]o establish standing, Plaintiff must only establish a stake in the profits garnered from their personal data and that it is unjust for the Defendants to retain those profits.").

186.    In *Brown v. Google, LLC*, 4:20-cv-3664-YGR, Dkt. No. 969 at p.3; 2023 WL 5029899 (N.D. Cal Aug. 7, 2023), 685 F.Supp.3d 909, the court stated:

> "**Data Collection**…When a user visits a website, the user's browser sends a "GET" request to the  website to retrieve it. (Id.) This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the Useragent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. (Id.) At the same time, *the user's browser reads Google's code, which is embedded on the website*. (Id.) Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. (Id.) This second transmission tells Google exactly what a user's browser communicated to the  website. (Id.). (Emphasis supplied).
>
> Google's services are ubiquitous on the internet: over 70 percenta [sic] of websites use Google Analytics and Ad Manager. (4AC ₧₧ 67 and 78.) To use these services, *Google requires website developers to embed Google's code onto their websites* and agree to its Privacy Policy. (PAF 6.) *Google does not tell website developers that it tracks their visitors* even when they are in private browsing mode. (Id.) (Emphasis added).
>
> According to Plaintiff, *Google then takes users' private browsing history   and associates it with their preexisting user profiles. (PAF 47; Response to SUF 65.) Doing  so allows Google to offer better, more targeted, advertisements to users.* (Response to SUF 63; 4AC ₧ 84.) This is at the core of Google's business: the bulk of

Google's hundreds of billions of dollars in revenue come from selling targeted advertisements to other companies. (4AC ⁋ 89.) By selling users' information, Google prevents users from monetizing their own data. (4AC ⁋ 138; PAF 27–28.) *The value of this data can be quantified; for example, Google itself has piloted a program to pay users $3.00 per week to track them.* (PAF 28.)." (Emphasis added). *Brown v. Google, LLC*, 4:20-cv-3664-  YGR, Dkt. No. 969 at p.3

187.    As recognized in *Brown v. Google LLC*, Google requires website developers to embed Google's code onto their websites, so that Google's search engine can collect End-users' data directly from End-users' browsers.  Google's communications code embedded on websites is thus an extension of Google's search engine in the monopolized general search services and general search text ads relevant markets. Google then takes End-users' private browsing history that Google collected with Google's code embedded on websites and associates it with End-users' preexisting user profiles that Google has compiled, which allows Google to offer, more targeted advertisements to End-users and to build scale that far surpasses Google's competitors.

188.    As stated in *Brown v. Google LLC*, Google has "piloted a program to pay users $3 per week to track them." Plaintiff' and End-users' data carried financial value and Google profited from their valuable data by selling or transferring it to advertisers. Plaintiff and End-users retained a stake in their data and in the profits garnered by Google from the disposition of Plaintiff and End-users' data. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 599-600. In *Rodriguez v. Google LLC*, 20-cv-o4668 Dkt. No 352 at p. 13, Judge Seeborg stated:  "In [In re Facebook], the Court held that Plaintiff had adequately established standing because they alleged their data "carried financial value" and that the Defendants "profited from this valuable data."

189.    In *Brown*, the Court under "**Damages or Loss**" further stated:

"Second, Google argues Plaintiff suffered no "damage or loss by reason of a [CDAFA] violation." Cal. Pen. Code § 502(e)(1). Plaintiff disagree and offer evidence showing that they have a stake in the value of their misappropriated data. *Facebook Tracking*, [*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (citing *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3rd Cir. 2019) (cleaned up))]is instructive. In Facebook Tracking, the Ninth Circuit found that Plaintiff had sufficiently alleged their browsing histories carried financial value. Id. at 600. So too here. *Plaintiff have evidence that there is a market for their data—Google itself has piloted a program where it pays users $3.00 a day for their browsing history*. (PAF 28.) Google responds that Facebook Tracking does not apply because it was a decision about standing, not liability. That is beside the point. The Ninth Circuit's decision stands for the proposition that Plaintiff can state an economic injury for their misappropriated data. Because Plaintiff proffer

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

> evidence that there is a market for their data—one Google itself has created—the Court cannot rule, as a matter of law, that Plaintiff suffered no damages . . ." (Docket No. 969, at p. 33).
>
> Google uses its general search services and general search text ads to compile End Users' searches on the web which End User information Google sells to advertisers. When an End User uses Google, the End User provides personal information to Google in exchange for search results, for no compensation to the End User, which Google monetizes by selling the End User's information to advertisers and producing search advertising targeting the End User based on the End User's information collected by Google. "By selling [End] Users' information, Google prevents End Users from monetizing their own data." *Brown et al. v. Google LLC*, No. 4:20-cv-3664-YGR (N.D. Cal. 2023).

190. Google looked to the Ipsos Screenwide Panel, a consumer research study conducted by Google since 2012 to 'collect information about how users browse the internet.' *Id*. para. 135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

Thus, Google itself has paid for users' search data, establishing that there is a market for user's search data and that user's search data has value.

191. In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

192. Plaintiff' injury is both particularized and concrete—particularized with respect to the End-user's specific data that is extracted for no compensation—and concrete with respect to the monetized value in billions that Google obtains by re-selling the End-users' data to advertisers. As further injury, Plaintiff and other End-users of Google's search engine are not only injured by the taking of their valuable search data for no compensation. In addition, Google has also harmed consumers of general search services by reducing the quality of the general search experience, by

lessening choices, and by impeding innovation.

193.    Plaintiff and End-users are also directly injured because they have been deprived of alternative search engines that may be more responsive to Plaintiff' demands for privacy and ad-free and because Plaintiff have been subjected to an inferior search experience. Plaintiff and the class are injured because Plaintiff and the class relinquish their valuable personal information to Google without compensation during their use of Google search, an injury that has been quantified by Google at $3.00 per month.

194.    Google and Apple specifically targeted "End Users" in their written agreements. In the written ISA contract, which sets out the parties' agreement not to compete and to share revenue, the parties specifically recited that the stated "Agreement Purpose" was to improve the "performance of the Services, the Spotlight Services and the Siri Services *for End Users* on Apple products." (Exhibit A, p. 7) (Emphasis Added.) Having been expressly and unambiguously targeted as End-Users by the Defendants within the context of a document which is anticompetitive on its face, the Plaintiff meet the criteria for standing to bring this lawsuit.

Accordingly, when Google pays user's $3.00 a month for End-users' data, Google is paying for data that is collected in the general search services and general text ads markets.

195.    Google LLC as one of the largest technology companies and its parent Alphabet Inc. have over 276 million active users in the United States[1] and Alphabet Inc. boasts a net worth exceeding $1 trillion.[2]

196.    Google's enormous financial success results from its tracking and collection of the personal and sensitive End-user data of Plaintiff and Class members and selling and brokering that data to advertisers to optimize advertisement services in the general search text ads market.

197.    Google profits from the data it collects by charging its advertisers and others for

[1] See online Google.

[2] Many of Plaintiff' allegations herein are from Judge Rogers' Order Denying Summary Judgment in *Brown v. Google, LLC* , 4:20-cv-3664-YGR, Dkt. No. 969 and the Fourth Amended Complaint in *Rodriguez v. Google  LLC*, 3: 20-cv-04688-RS, Dkt. No. 289.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

advertisement-related services based on End-user data that targets advertisements to End-users, and bombards Plaintiff and the class with text ads and by using the results to improve Google's own algorithms and technology to achieve monopoly scale far beyond the scale its competitors can achieve.

198.    A key element of Google's agreements with Apple and the Android parties in the general search services and general search text ads markets is Google' agreements to share revenue from its advertisers with Apple and the Android parties. Google represented that it priced its sales of end-user data to advertisers based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently used "pricing knobs" to surreptitiously increase prices and the revenue from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. As proof of its monopoly, "When Google made these pricing changes, Google did not consider its rivals' text ad pricing." FOF 267. In 2024, Google's revenue from advertisers was $350 million and its profits were $100 million.

199.    The End-user data Google collects contains personal viewing information, which Google  analyzes and associates with End-users' prior viewing histories, to  creates "profiles" for each End-user that enable Google to charge its customers for targeted End-user data and monetize End-users' data  so that Google can profit from Google's ad-targeting services.

200.    Google is paid high prices for these targeted End-user data-based profiles for advertisements by third-party advertisers because Google uses End-user data that Google collected from End-users to select and display advertisements targeted at those specific profiles.

201.    Google also benefits by using the End-user data it collects to improve and refine existing and new Google products, services, and algorithms.

202.    Google's market power in general search services and general search text ads depends on Google's ability to track what consumers are doing. The trackers that Google has across the internet not only tell Google where consumers go after using Google, what websites are popular and how often they are visited. By surveying End-users' behavior across the web, Google is able to create a better and higher quality search product than its competitors.

203.    Google includes far more than volunteered personal information like name, birth date,

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR
COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

gender and email address since Google secretly plants numerous tracking mechanisms on End-users' computers and web- browsers, which enable Google to track users' browsing histories and correlate them with End-user browser IDs, preventing End-users' from blocking access to their data.

204. Similarly, the value of End-user-correlated internet browsing history can be quantified, because Google itself was willing to pay users for the exact type of communications that Google illegally intercepted from Plaintiff and End-users during the Class Period. For example, Google Inc. had a panel during the Class Period (and still has one today) called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet."

205. Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

206. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated conclusively that internet industry participants understood the enormous value in internet users' browsing habits. Google now pays Screenwise panelists up to $3 per week to be tracked.

207. In a study, web browsing histories were valued at $52.00 per year, web search histories were valued at $57, GPS records were valued at $55, Emails and text messages were valued at $59.

208. End-users' data increased in value as a commodity, where Google itself began paying End-users specifically for their browsing data. As early as 2012 Google publicly admitted it utilized End-users' browsing data, paired with other sensitive and valuable personal information, to achieve what it called "nowcasting," or "contemporaneous forecasting," which Google's Chief Economist Hal Varian equated to the ability to predict what is happening as it occurs.

209. Similarly, the value of user-correlated internet browsing history can be quantified, because Google itself was willing to pay users for the exact type of communications that Google illegally intercepted from Plaintiff and other members of the Class during the Class Period. For

example, Google Inc. had a panel during the Class Period (and still has one today) called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet."

210.    Thus, Google itself has recognized the value of End-user' data and has paid for End-users' search data.

**The End-users' Data Collected By Google Is Highly Valuable**

211.    The data Google has collected from End-users is highly valuable to Google, to advertising companies, and to End-users.  There was a growing consensus in the ecommerce industry that consumers' personal data was very valuable.[3]  In 2004, Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[4]

212.    In 2011, Christopher Soghoian, formerly of the Open Society Institute and current technologist at the ACLU, wrote in The Wall Street Journal:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search

---

[3] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD DIGITAL ECONOMY PAPERS No. 220 at 7 (Apr. 2, 2013), available at http://dx.doi.org/10.1787/5k486qtxldmq-en; Supporting Investment in Knowledge Capital, Growth and Innovation, OECD at 319 (Oct. 13, 2013), available at https://www.oecd.org/sti/inno/newsourcesofgrowthknowledge-basedcapital.htm; Pauline Glickman & Nicolas Glady, What's the Value of Your Data? TECHCRUNCH (Oct. 13, 2015), available at https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Nov. 11, 2020) Paul Lewis & Paul Hilder, Former Cambridge Analytica Exec Says She Wants Lies to Stop, THE GUARDIAN (March 23, 2018), available at https://www.theguardian.com/uknews/2018/mar/23/former-cambridge-analytica-executive-brittany-kaiser-wants-to-stop-lies (last visited Nov. 11, 2020); SHOSHANNA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM: THE FIGHT FOR A HUMAN FUTURE AT THE NEW FRONTIER OF POWER at 166 (2019).

[4] Paul M. Schwartz, Property, Privacy and Personal Data, 117 HARV. L. REV. 2055, 2056–57 (2004).

behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[5]

A.     *End-users' Data Is Valuable to Class Members*

213.    It is possible to quantify the cash value, to Class members, of the data collected and saved by Google, including by way of Google tracking and advertising code.

214.    In a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[6] web browsing histories were valued at $52.00 per year, web search histories were valued at $57, emails and text messages were valued at $59.00, and GPS records were valued at $55.

B.     *End-users' Data Is Valuable to Google*

215.    In addition to quantifying the value of the collected data to End-users, it is also possible to quantify the value of this data to Google.

216.    For example, it is possible to calculate the profits Google has earned from using End-users' data to enhance its "user profiles"; to sell targeted advertisements; and to develop and refine other Google products.

217.    It is also possible to assess the value of the collected data to Google by reference to the money that Google has, on other occasions, paid to users for this kind of data. Google began paying users for their web browsing data in 2012.[7]

---

[5] Julia Angwin, How Much Should People Worry About the Loss of Online Privacy?, THE WALL STREET JOURNAL (Nov. 15, 2011), available at https://www.wsj.com/articles/SB10001424052970204190704577024262567105738 (last visited Nov. 11, 2020).

[6] Tim Morey, What's Your Personal Data Worth?, DESIGN MIND (Jan. 18, 2011), available at https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html (last visited Nov. 11, 2020).

[7] Jack Marshall, *Google Pays Users for Browsing Data*, DigiDay (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/
 K.N.C., *Questioning the searches*, The Economist (June 13, 2012), https://www.economist.com/schumpeter/2012/06/13/questioning-the-searchers

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

218.    Google also pays internet users to participate in a panel that Google calls "Google Screenwise Trends."

219.    Upon becoming panelists for Google Screenwise Trends, these users add a browser extension that shares with Google the sites they visit and how they use them. The panelists consent to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google then pays panelists additional gift cards "for staying with" the panel.

220.    These gift cards, mostly valued at $5, demonstrated that Google assigned cash value to the data it obtained from internet users' communications with the websites they visited. Google now pays Screenwise panelists up to $3 per week.

221.    There are other ways to assess the value of End-users' data, including in terms of Google's ability to maintain and extend its monopolies.

C.    *End-users' Data Is Valuable to Other Internet Firms Who In A Competitive Market Would Compete By Compensating End-Users' For Their Search Data*

222.    Unrestrained by Google's default contracts, Google or other firms would compete by compensating End-users for their search data. Since Judge Mehta found that Microsoft was willing to pay even 100% of its Bing revenue for a default GSE with improved privacy in search, it is plausible that Microsoft would have competed by paying End-users for their data to accomplish improved privacy in search. Once in a position to compete, Google's competitor Microsoft/Bing would offer to pay for End-user' data just as Microsoft/Bing offered to pay Apple for a default GSE with "improved private searching." In *United States v. Google*, FOF 322-323, Judge Mehta found with respect to Microsoft, a Google competitor:

> "Microsoft made clear that it was 'willing to provide Apple with the majority of profits in a search partnership along with greater levels of flexibility and control over the product experience including user experience and branding,' with one example being improved private searching 'consistent with the broader Apple value proposition around respecting user privacy.' Microsoft understood that it 'would have to pay and even subsidize the transfer' for the period of the transition and was willing to do so for the long term. Tr. at 3502:21-3503:8 (Nadella)…Microsoft proposed sharing 100% of its Bing revenue with Apple to secure the default or even selling Bing to Apple."

Since Judge Mehta found that Microsoft was willing to pay even 100% of its Bing revenue for a default GSE with improved privacy in search, it is likely Microsoft would have paid users for data to accomplish improved privacy in search as would DDG who attempted to obtain default status. At FOF 330, Judge Mehta also found that DDG, because of its brand emphasis on privacy, on multiple occasions has attempted to convince Apple to switch to DDG as the default GSE on Safari's 'private browsing mode'.

Second, a number of platforms have appeared on which consumers monetize their data. For example: a. Brave's web browser pays users to watch online targeted ads, while blocking out everything else.[8]  b. Loginhood "lets individuals earn rewards for their data.[9]  c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[10]   d. Killi is a new data exchange platform that allows you to own and earn from your data.[11]  e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[12]  The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers

[8] Brandan Hesse, Get Paid to Watch Ads in the Brave Web Browser, LIFEHACKER (Apr. 26, 2019), available at https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser1834332279#:~:text=Brave%2C%20a%20chromiumbased%20web%20browser%20that%20boasts%20an,a%20more%20thoughtful%20way%20than%20we%E2%80%99re%20accustomed%20to (last visited Nov. 11, 2020) ("The model is entirely opt-in, meaning that ads will be disabled by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly")

[9] Privacy Drives Performance, LOGINHOOD, https://loginhood.io/ ; see also Chrome Browser Extension, LOGINHOOD, https://loginhood.io/product/chromeextension 2020) ("Start earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[10] *Your data – Your Property*, DATA DIVIDEND PROJECT, https://www.datadividendproject.com ("Get your Data Dividend…We'll send you $$ as we negotiate with companies to compensate you for using your personal data.").

[11] *Killi Paycheck*, KILLI, https:/killi.io/earn/

[12] FAQ, BIG TOKEN, https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[13]

223. The California Consumer Privacy Act ("CCPA") recognizes that the End-users' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers that opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). Google violated the CCPA, which provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4). Google's practices are unjust, unreasonable, coercive and usurious due to its monopolization of the general search services and general search text ads markets.

224. End-users have a property right in the data that Google collects from them and End-users retain a stake in the unjustly earned profits that Google garnered from selling or transmitting End-users' data to others, including their personal browsing histories, which confers standing on Plaintiff and the class, and it is unjust for the Defendants to retain those profits. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable); *Greenley v. Kochava, Inc.*, No. 22-cv-01327-BAS-AHG, 2023 WL 4833466 at *4 (S.D. Cal. July 27, 2023) ("[T]o establish standing, Plaintiff must only establish a stake in the profits garnered from their personal data and that it is unjust for the Defendants to retain those profits.")

225. Because California law recognizes a legal interest in Google's unjustly earned profits

---

[13] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

from the sale of [End]-users personal data, End-users have standing to sue for disgorgement of Google's unjustly earned profits.

226.    End-users have a property right in the data that Google collects from them, a reasonable expectation of privacy and a stake in the unjustly earned profits that Google garnered from selling or transmitting their data including their personal browsing histories which confers Article III Standing. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's actions directly caused the plaintiff's property to become less valuable.

227.    Through its false representations and unlawful data collection, Google is unjustly enriching itself at the cost of End-user's choice, when the End-user would otherwise have the ability to choose how they would monetize their own data.

228.    Through its false promises and unlawful data collection, Google is unjustly enriching itself.

229.    If not for Google's actions, End-users could have received monetary value for their data from other internet firms.

D.    *There Is Value to Class Members in Keeping Their Data Private*

230.    In addition to monetary value of selling their data, Class members also assign value to keeping their data private. It is possible to quantify this privacy value, which is destroyed when Google tracking and advertising code surreptitiously transmit End-users' data to Google.

231.    According to Google, more than 200 million End-users visit Google's "Privacy Checkup" website each year. Each day, nearly 20 million End-users check their Google privacy settings. because they care about keeping their data private and preventing its disclosure to anyone else, including to Google.

232.    Surveys of consumers indicate the importance that consumers assign to privacy. For example, in a recent study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have

someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was "very important" to control this.

233.    Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies, such as Google or Facebook, control too much of our personal information and know too much about our browsing habits.

234.    Through its false representations and unlawful data collection, Google is unjustly enriching itself at the cost of End-user choice, when the consumer would otherwise have the ability to choose how they would monetize their own data.

## IX.    TOLLING OF THE STATUTE OF LIMITATIONS

**The Statute Of Limitations Is Tolled Since The United States Proceeding To Punish Google's Violations Of Section 2 Of The Sherman Act Is Pending**

235.    The United States instituted *United States v. Google LLC* (2020) Case 1:20-cv-03010- APM in the U.S. District Court For The District Of Columbia on October 20, 2020 and said suit remains pending as of the date of the filing of this action. The statute of limitations herein is tolled pursuant to Section 5(i) of the Clayton Act (15 U.S.C. sec. 16(i)) which provides:

> (i)    "Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain or punish violations of any of the antitrust laws…the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter…"

## X.    FRAUDULENT CONCEALMENT

236.    Until shortly before the filing of this complaint, Plaintiff and members of the Plaintiff Class had no knowledge that Defendants were violating the antitrust laws as alleged herein. Plaintiff and the members of the class could not have discovered any other violations at any time prior to this date by the exercise of due diligence because of fraudulent and active concealment of the conspiracy by Defendants. With respect to Google' agreements to share revenue from its advertisers with Apple and the Android parties, Google represented that it priced its sales of end-user data to advertisers

based on auction pricing as Judge Mehta found in his MO at FOF 238-242. But Google fraudulently concealed that it used "pricing knobs" to increase prices and the revenue from advertisers that it shared with Apple and the Android parties and the profits thereon. Mehta MO at FOF 243-267. FOF 267. Google further concealed the extent of its tracking of End-users.

237.    The affirmative actions of Defendants hereinbefore alleged were wrongfully concealed and carried out in a manner which precluded detection such as raising prices "incrementally" to avoid detection as Judge Mehta found in MO, FOF 264. Plaintiff had no knowledge of the antitrust violations herein alleged or any facts that might have led to their discovery. Plaintiff could not have uncovered the violations alleged herein at an earlier date inasmuch as the means for discovering their causes of action were not reasonably ascertainable due to Defendants' fraudulent concealment of activities through various means and methods designed to avoid detection. Defendants secretly conducted activities in furtherance of its  maintenance of its monopoly, its conspiracy to maintain its monopoly, its conspiracy to  restrain trade  and violate the UCL by confining information concerning the conspiracy to key officials and engaged in concealment giving rise to an estoppel to assert the statute of limitations.

## XI.    DAMAGES

In his ruling, Judge Mehta found that default search access points that provide search access to default browsers are integral to Google's GSE and incorporated in Google's general search services and general search text ads markets in which Google's exclusionary  agreements substantially foreclose competition, are anticompetitive and violate Section 2 of the Sherman Act. Google has thus foreclosed a substantial share of the general search services and general search text ads markets from competition that precludes users from monetizing their own data,  enabling Google to extract and collect End User's valuable search data without compensation to End Users and foreclosed efficient channels of distribution resulting in network effects that blocked competitors' ability to gain the scale of user data that would enable them to develop search products that offer greater privacy protection or are less clogged with ads, and enable advertisers to target  users with ads.

238.    During the period of time covered by the antitrust violations by Defendants, Google

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

collected End Users' private search data without compensation and resold it to advertisers for billions of dollars annually.

239.    Google and Apple have engaged in a conspiracy, combination and agreements to maintain Google's monopoly and to restrain trade in the general search services and general search text ads markets and injured Plaintiff and the class and harmed competition resulting in damages to Plaintiff.

Google looked to the Ipsos Screenwide Panel, a consumer research study conducted by Google since 2012 to 'collect information about how users browse the internet.' Id. para. 135…The minimum recurring payment is $3 a month." Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

240.    In the "Ipsos Screenwise Panel, a consumer research study conducted by Google since 2012…The minimum recurring payment is $3 a month." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) at p. 20 lines 13-17 "…[A]s the court in *Brown* already noted, "The $3 rate is derived from looking at what Google *actually* pays Screenwise participants for agreeing to allow Google to collect their browsing data." *Rodriguez v. Google LLC*, 20-cv-04688, Dkt. No. 352 (Order granting class certification) p. 22 lines 18-20. Thus, damages at $3 per month can be calculated by multiplying the number of class members by $3, and then multiplying that figure by the number of months in the Class Period.

241.    Plaintiff and the Class are entitled to damages, treble damages, injunctive relief, disgorgement, and attorneys' fees and costs against defendants as set forth below.

## XII.    DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT,

242.    End-users have a property right in the data that Google collected from them, in which they retained a stake in the unjustly earned profits that Google garners from selling or transmitting their data including their personal browsing histories, which confers standing to sue on End-users. *In re Facebook, Inc. Internet Tracking Litig.*, No. 17-17486 at pp. 14-17 ("In other words, California law requires disgorgement of unjustly earned profits regardless of whether a defendant's actions caused a Plaintiff to directly expend his or her own financial resources or whether a defendant's

actions directly caused the plaintiff's property to become less valuable); *Greenley v. Kochava, Inc.*, No. 22-cv-01327-BAS-AHG, 2023 WL 4833466 at *4 (S.D. Cal. July 27, 2023) ("[T]o establish standing, Plaintiff must only establish a stake in the profits garnered from their personal data and that it is unjust for the Defendants to retain those profits.").

## XIII.    VIOLATIONS ALLEGED

**First Claim for Relief: Google Violated Section 2 Of The Sherman Antitrust Act (15 U.S.C. § 2) By Maintaining Its Monopoly in The Markets For General Search Services And General Search Text Ads**

243.    Plaintiff incorporate the allegations of paragraphs 1 through 242. above.

244.    Google has unlawfully maintained its monopoly in general search services and general search text ads markets in violation of Section 2 of the Sherman Antitrust Act by entering into exclusionary default agreements with Apple and the Android partiess that have foreclosed a substantial share of these markets from competitors that have resulted in Plaintiff and the class of End-Users having their private search data collected by Google without compensation, which Google resold to advertisers for billions of dollars annually, which revenue it shared with Apple and the Android parties, targeting End-users with text ads and precluded competitors from providing End-users with high quality search products that are more privacy protective and ad-free.

245.    *General Search Services*.  The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at p. 156-157. See pp. 151-165.

246.    *General Search Text Ads*.  The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88% market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

247. Google and Apple's conspiracy and combination and agreements and Google and the Android parties' conspiracy, combination and agreements are anticompetitive and exclusionary in that they lock up the preset default positions for Google's search engines on Apple's and the Android's mobile devices, computers, and other devices and has foreclosed a substantial share of the general search services and general search text advertising markets to competitors and competition, depriving Google's competitors of the scale required to compete in the general search services and general search advertising markets, effecting a substantial barrier to entry for competitors resulting in injury to Plaintiff and the class of End Users.

248. The Google-Apple and Google-Android parties' combinations, conspiracy and agreements effectively eliminate Google's competitors' ability to build the scale necessary to compete in the general search services and general search text ads markets and are thus a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience since advertisers pay more to buy ads from a search provider with a large audience of searched customers, targeted as potentially in the advertiser's product or service.  By April 2018, Google estimated that its share of the general search services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general search engine inquiries in the United States, and almost 95 percent of inquiries on mobile devices

249. Google's and Apple's and the Android parties' anticompetitive acts have had substantial harmful effects on competition, and Plaintiff and the class of End Users. In its MO, the court found that "Aggregating the foreclosure effects of the [Apple] browser and Android agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…The Court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume." MO p. 222.

250. With respect to the general search text ads market, Judge Mehta found that the challenged agreements foreclose 45% of the general services text ads market and that it was "significant." MO pp. 258-259.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

251. Google's default distribution agreements have foreclosed a substantial share of the general search services and general search text advertising markets from competitors and harmed competition and Plaintiff and the class of End-Users.

252. The anticompetitive effects of Google's and Apple's anticompetitive agreements outweigh any procompetitive benefits in this market or can be achieved through less restrictive means.

**Second Claim for Relief: Conspiracy And Combinations to Monopolize The General    Search Services And General Search Text Ads Markets In Violation of Sherman Act § 2**

253. Plaintiff incorporate the allegations of paragraphs 1 through 252 above.

254. With specific intent, Google and Apple and Google and the Android parties have entered into combinations, conspiracy, and agreements to maintain Google's monopoly in the general search services and general search text ads markets in violation of Section 2 of the Sherman Act, (15 U.S.C. § 2) that have foreclosed a substantial share of those markets from competitors that have resulted harm to  Plaintiff and the class of End-Users by having their private search data extracted and collected by Google without compensation, which Google resold to advertisers for billions of dollars annually, which revenue it shared with Apple and the Android parties, and enabled the targeting and bombarding of End-users by advertisers with text ads and by precluding competitors from providing End-users with higher quality search products that are more privacy protective and ad-free.

255. *General Search Services*.  The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at p. 156-157. See pp. 151-165.

256. *General Search Text Ads*.  The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88%

market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

257. Google and Apple's conspiracy and combination and agreements and Google and the Android parties' conspiracy, combination and agreements are anticompetitive and exclusionary in that they lock up the preset default positions for Google's search engines on Apple's  and the Android's mobile devices, computers, and other devices and has foreclosed a substantial share of the general search services and general search text advertising markets to competitors and competition, depriving Google's competitors of the scale required to compete in the general search services and general search advertising markets, effecting a substantial barrier to entry for competitors resulting in injury to Plaintiff and the class of End Users.

258. The Google-Apple and Google-Android parties' combinations, conspiracy and agreements effectively eliminate Google's competitors' ability to build the scale necessary to compete in the general search services and general search text ads markets and are thus a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience since advertisers pay more to buy ads from a search provider with a large audience of searched customers, targeted as potentially in the advertiser's product or service.  By April 2018, Google estimated that its share of the general search services and general search text ad markets was 79 percent on computers and 93.5 percent on mobile devices. More recently, Google has accounted for almost 90 percent of all general search engine inquiries in the United States, and almost 95 percent of inquiries on mobile device

259. Google's and Apple's and the Android parties' anticompetitive acts have had harmful effects on competition, and Plaintiff and the class of End Users. In its MO, the court found that "Aggregating the foreclosure effects of the [Apple] browser and Android agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…The Court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume." MO p. 222.

260. With respect to the general search text ads market, Judge Mehta found that the

challenged agreements foreclose 45% of the general services text ads market and that it was "significant." MO p. 258-259.

261.    The effects of Google's and Apple's anticompetitive agreements outweigh any procompetitive benefits in the general search advertising market or that can be achieved through less restrictive means. MO p. 4.

262.    **Third Claim for Violations of Section 1 of the Sherman Act.**

263.    Plaintiff incorporate the allegations of paragraphs 1 through 262 above.

264.    Google and Apple and the Android parties have entered into a conspiracy, combination and agreements to restrain trade  in the general search services and general search text ads markets in violation of Section 1 of the Sherman Act, (15 U.S.C. § 1) that have foreclosed a substantial share of these markets from competitors that have resulted in Plaintiff and the class of End-Users having their private search data collected by Google without compensation, which Google resold to advertisers for billions of dollars annually, which revenue it shared with Apple and the Android parties, targeting and bombarding End-users with text ads and precluding competitors from providing End-users with higher quality search products that are more privacy protective and ad-free.

265.    *General Search Services*.  The general search services market is a relevant market that consists of general search engines that End Users can use to search the internet for answers to a wide range of queries. Google has an 89.2% share of and monopoly power in the general search services market that is fortified by barriers to entry, including (1) high capital costs, (2) Google's control of key distribution channels (3) brand recognition, and (4) scale, "The Court finds that these barriers exist and that, both individually and collectively, they are significant barriers to entry." As stated by Judge Mehta in his MO at p. 156-157. See pp. 151-165.

266.    *General Search Text Ads*.  The general search text ads market is a relevant market that includes all text advertisements in connection with a general search query. Google had an 88% market share of the general search text ads market in 2020 and monopoly power in the general search text ads market, protected by high barriers to entry as stated by Judge Mehta's MO at p. 185.

267.    Google and Apple's conspiracy and combination and agreements and Google and the

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

Android parties' conspiracy, combination and agreements are anticompetitive and exclusionary in that they lock up the preset default positions for Google's search engines on Apple's  and the Android's mobile devices, computers, and other devices and has foreclosed a substantial share of the general search services and general search text advertising markets to competitors and competition, depriving Google's competitors of the scale required to compete in the general search services and general search advertising markets, effecting a substantial barrier to entry for competitors resulting in injury to Plaintiff and the class of End Users.

268.    Google's and Apple's and the Android parties' anticompetitive acts have had harmful effects on competition, and Plaintiff and the class of End Users. In its MO, the Google court found that "Aggregating the foreclosure effects of the [Apple] browser and Android agreements is an appropriate way to understand the overall effect of Google's exclusive dealing in the relevant markets…The Court thus finds that as to the general search services market, Plaintiff have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume." MO p. 222.

269.    With respect to the general search text ads market, Judge Mehta found that the challenged agreements foreclose 45% of the general services text ads market and that it was "significant." MO p. 258-259.

270.    The effects of Google's and Apple's anticompetitive agreements outweigh any procompetitive benefits in the general search advertising market or that can be achieved through less restrictive means.

**Fourth Claim for Relief: Violations of California Unfair Competition Law Bus. & Prof. C. 17200 et seq.**

271.    Plaintiff incorporate the allegations of paragraphs 1 through 270 above.

272.    Google's combination and conspiracy with Apple and the Android parties has resulted in injury and loss of money and property to Plaintiff and the class of End Users by having their private search data in which they retained a stake in the profits, collected by Google, without compensation to Plaintiff and the End User class, and resold to advertisers for billions of dollars annually, which revenue Google shared with Apple and the Android parties. Google's

anticompetitive conduct has foreclosed a substantial share of these markets from competitors and has resulted in Plaintiff and the class of End-Users having their private search data collected by Google without compensation, which Google resold to advertisers for billions of dollars annually, which revenue it shared with Apple and the Android parties. Google's anticompetitive conduct resulted in targeting End-users with text ads and precluded competitors from providing End-users with high quality search products that are more privacy protective and ad-free.

273. In so doing, Google engaged in unlawful, unfair and fraudulent business acts and practices in violation of California Bus. & Prof. C. 17200 for which Plaintiff and the class of End-users seek restitution and injunctive relief.

**Fifth Claim for Relief: Disgorgement Of Unjustly Earned Profits - Unjust Enrichment**

274. Plaintiff incorporate the allegations of paragraphs 1 through ___ above. Defendants anticompetitive conduct has resulted in injury and loss of money and property to Plaintiff and the class of End Users by having their private search data collected by Google, without compensation to Plaintiff and the End User class, and resold to advertisers for billions of dollars annually, which revenue Google shared with Apple and the Android parties. Plaintiff and the class of End-users "retained a stake in the profits" garnered from Google's sale of their data because "as between the two [parties], it is unjust for [Google to retain it." *In re Facebook, Inc. Internet Tracking Litigation*, No. 17-17486 at pp. 15-16, 956 F.3d 589 (Ninth Cir. 2020).

**REQUEST FOR RELIEF**

275. To remedy these illegal acts, Plaintiff request that the Court:

a. Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure Rule 23.

b. Appoint Plaintiff as class representatives to represent the End-user class.

c. Appoint the undersigned attorney as class counsel to represent the class.

d. Adjudge and decree that Google maintained its monopoly in and monopolized the general search services and general search text advertising markets in violation of Section 2 of the Sherman Act.

e. Adjudge and decree that the alleged conspiracy, combination and agreements

between Google and Apple and Google and the Android parties be adjudged and decreed to be  illegal combinations and conspiracy to monopolize the general search services and general search advertising markets in violation of Sherman Act sections 2.

f.    Adjudge and decree that the alleged conspiracy, combination and agreements between Google and Apple and the Android parties be adjudged and decreed to be an illegal combination and conspiracy to restrain trade in the general search services and general search advertising markets in violation of Sherman Act sections 1.

g.    Enter judgment in favor of Plaintiff and each member of the class for damages, for threefold their damages and interest thereon;

h.    Adjudge and decree that the alleged conspiracy, combination and agreements between Google and Apple and the Android parties be adjudged and decreed to be unlawful, unfair and fraudulent business acts and practices in violation of the California Unfair Competition Law, California Bus. & Prof. C. 17200, and that Plaintiff and the class are entitled to restitution and injunctive relief thereunder.

i.    Adjudge and decree that Defendants Google has been unjustly enriched by its conduct of collecting End-users' private search data, without compensation to Plaintiff and the End User class, and resold to advertisers for billions of dollars annually, in which Plaintiff and the class of End-users retained a stake in the profits, resulting in injury and loss of money and property to Plaintiff and the class of End- Users and that it is unjust for Google to retain such profits.

j.    Order disgorgement of all of Defendant's profits that were derived, in whole or in part, from Google's extraction, collection, saving, and subsequent use and sale of End-user's data.

h.    Order Defendants to disgorge revenues and profits wrongfully obtained;

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

i.    Permanently enjoin Defendants from continuing to engage in the anticompetitive practices described herein, including employment of default distribution agreements and from engaging in any other practices with the same purpose and effect as the challenged practices, provide structural relief to cure any anticompetitive harm therefrom and restore competition, and permanently enjoin Defendant, and its officers, agents, servants, employees and attorneys, from intercepting, tracking, collecting, saving, or using End-user data;

j.    Award Plaintiff and the Class members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

k.    Enter any additional relief the Court finds just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable."

Dated:  March 25, 2025                    By:  _____ */s/ Lingel H. Winters* _____
                                          Lingel H. Winters, Esq. (State Bar No. 37759)
                                          **Attorneys for Plaintiff**

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW AND FOR DISGORGEMENT OF UNJUSTLY EARNED PROFITS-UNJUST ENRICHMENT

# EXHIBIT A

# AMENDMENT TO THE INFORMATION SERVICES AGREEMENT

This AMENDMENT TO THE INFORMATION SERVICES AGREEMENT (this "**Agreement**") is entered into effective as of September 30, 2016 ("**Execution Date**") by and among Apple Inc., Apple Distribution International ("**ADI**"), and Apple South Asia Pte. Ltd. ("**ASA**" and collectively with Apple Inc., ADI and their respective subsidiaries, "**Apple**"), on the one hand, and Google Inc., Google Ireland Limited ("**GIL**"), and Google Asia Pacific Pte. Ltd. ("**GAP**" and collectively with Google Inc., GIL and their respective subsidiaries, "**Google**"), on the other hand, amending that certain Information Services Agreement dated December 20, 2002 between Apple, Inc. and Google Inc. (as amended or otherwise modified prior to the Execution Date and as amended by this Agreement, the "**ISA Agreement**"). The provisions of this Agreement are effective as of the Execution Date, and the remaining provisions of the ISA Agreement remain unchanged and in full force and effect.

## 1.   Use and Implementation of Google Services in Apple Software

### (a)   Safari (Web Browser Software)

Apple will pre-set and use the Services as the Default search service for Search Queries in Apple's web browser software (e.g., Safari or successor versions) designed for use on (i) one or more of the following Apple operating systems: iOS, watchOS, tvOS, macOS or any other operating system software made generally available by Apple during the Term, or (ii) the Microsoft Windows operating system (such web browser software, the "**Web Browser Software**").  During the Term, Apple's use of the Services as Default in the Web Browser Software will remain substantially similar to its use (including, without limitation, vis-a-vis other providers of internet services) as of the Execution Date of this Agreement (such use, the "**Permissible Software Default Use**").

Subject to the Permissible Software Default Use, Apple shall not be limited in its ability to alter, modify and innovate its Web Browser Software, and Google shall not be limited in its ability to control branding, presentation, and use of the Services.

"**Default**" means the Services will automatically be used for responding to Search Queries initiated from the Web Browser Software, unless the End User selects a different third-party search service.

"**Search Query**" means any textual, voice, image or other input entered by an End User in the Web Browser Software or Siri or Spotlight (or successor versions) that requests information; provided however, that subject to the Permissible Software Default Use, Apple may determine an End User's input is not a Search Query so long as Apple's determination is based exclusively on its intent to provide a superior user experience.

1

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

Ex. No.
JX0033
1:20-cv-03010-APM

GOOG-DOJ-02696793

"**Services**" means Google's search services made generally available at www.google.com and the applicable international equivalents thereof (or successor versions) that handle Search Queries initiated from the Web Browser Software in accordance with the ISA Agreement.

"**End User**" means a user of the Web Browser Software, Spotlight, or Siri.

*(b) Spotlight*

Redacted

*(c) Siri*

Redacted

2

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696794

Redacted

Subject to the Permissible Software Default Use, Apple will not use Siri in response to Search Queries from the Web Browser Software, unless Apple's use is based exclusively on its intent to provide a superior user experience.

Redacted

**(d) Provision of Query Set**

Redacted

**(e) Reporting**

Redacted

3

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696795

Redacted

## 2.   Advertising and Monetization

Following the initial implementation of the Spotlight Services or Siri Services, if Apple includes ads or paid listings in Siri or Spotlight (or successor versions), Apple will offer Google the opportunity to supply such ads or paid listings under the financial terms set forth in Section 4 of this Agreement and on equivalent implementation terms. Redacted

Redacted

4

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696796

Redacted

## 4. Ad Revenue Share

Effective September 1, 2016 Google will pay Apple <sup>Redacted</sup> of its Net Ad Revenue for the remainder of the Term.

Redacted

5

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

# Redacted

## 5.    CEO Check-Ins

*Agreement Purpose*

Both parties agree they are entering into this Agreement for the following purposes (collectively, the "**Agreement Purpose**"): (1) to create tangible and intangible value for each party, (2) to increase the revenue performance of each party, and (3) to improve the search experience and performance of the Services, the Spotlight Services and the Siri Services for End Users on Apple products.

*Annual CEO Check-In*

At the end of each contract year, or earlier if reasonably requested by a party, Chief Executive Officers from each party will meet to review and discuss in good faith the performance of the ISA Agreement vis-a-vis the Agreement Purpose, and, upon request, to confirm each party's compliance with the terms of the ISA Agreement ("**Annual CEO Check-In**").  The parties mutually agree to address and resolve in good faith any issues identified during the Annual CEO Check-In that are interfering or have interfered with the Agreement Purpose.  If a particular issue is under the reasonable control of Apple, then Apple will have primary responsibility for addressing and resolving such issue in good faith, with input from Google.  If a particular issue is under the reasonable control of Google, then Google will have primary responsibility for addressing and resolving in good faith such issue, with input from Apple.  The parties will have joint responsibility for addressing and resolving in good faith any other issues identified during the Annual CEO Check-Ins that are not under the reasonable control of one party.

# Redacted

## 6.    Limitation of Liability

# Redacted

7

*Confidential – Subject to Party NDA*

# Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696799

Redacted

7.   **Term & Termination**

Redacted

8.   **Branding, Presentation and Usage**

Redacted

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696800

### 9.    Regulatory and Government Actions

Apple and Google will cooperate to support and defend the ISA Agreement, work in good faith to modify it if necessary to resolve regulatory concerns, and not intentionally delay or prevent implementation of the ISA Agreement.

Redacted

### 10.   Audit

Redacted

9

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696801

Redacted

11. **Assignment**

Redacted

12. **Parties and Affiliates**

Redacted

10

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696802

Redacted

**13. Amendment**

Redacted

**14. Tax**

Redacted

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*[Remainder of page intentionally blank; Signature page follows]*

11

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696803

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**

By: Redacted

Print Name: DANIEL ALEGRE

Title: President

Date: Sept. 30, 2016

1600 Amphitheatre Parkway
Mountain View, CA 94043
Tel: (650) 330-0100
Fax: (650) 618-1711

**Apple Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1 Infinite Loop, MS 301-4GC
Cupertino, CA 95014
Tel: (408) 996-1010
Fax: (408) 966-0275

**Apple Distribution International**

By: _____

Print Name: _____

Title: _____

Date: _____

Hollyhill Industrial Estate
Hollyhill, Cork, Ireland
Tel: (353) 21 4284000

**Apple South Asia Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

No. 7 Ang Mo Kio Street 64
Singapore 569086
Tel: (65) 6481 5511

**Google Ireland Limited**

By: _____

Print Name: _____

Title: _____

Date: _____

Gordon House, Barrow Street
Dublin 4, Ireland

**Google Asia Pacific Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

8 Marina View, Asia Square 1 #30-01
Singapore 018960



12

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696804

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1900 Amphitheatre Parkway
Mountain View, CA 94043
Tel: (650) 330-0100
Fax: (650) 618-1711

**Apple Inc.**

Redacted

By: _____

Print Name: _Eddy Cue_____

Title: _SVP Internet Software & Svcs_

Date: _9/29/16_____

1 Infinite Loop, MS 301-4GC
Cupertino, CA 95014
Tel: (408) 996-1010
Fax: (408) 966-0275

**Apple Distribution International**

By: _____

Print Name: _____

Title: _____

Date: _____

Hollyhill Industrial Estate
Hollyhill, Cork, Ireland
Tel: (353) 21 4284000

**Apple South Asia Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

No. 7 Ang Mo Kio Street 64
Singapore 569086
Tel: (65) 6481 5511

**Google Ireland Limited**

By: _____

Print Name: _____

Title: _____

Date: _____

Gordon House, Barrow Street
Dublin 4, Ireland

**Google Asia Pacific Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

8 Marina View, Asia Square 1 #30-01
Singapore 018960



12

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1900 Amphitheatre Parkway
Mountain View, CA  94043
Tel:  (650) 330-0100
Fax:  (650) 618-1711

**Apple, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1 Infinite Loop, MS 301-4GC
Cupertino, CA  95014
Tel:  (408) 996-1010
Fax:  (408) 966-0275

**Apple Distribution International**

By:  Redacted

Print Name:  MICHELO SULLIVAN

Title:  DIRECTOR

Date:  29a SEPT 2016

Hollyhill Industrial Estate
Hollyhill, Cork, Ireland
Tel:  (353) 21 4284000

**Apple South Asia Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

No. 7 Ang Mo Kio Street 64
Singapore 569086
Tel:  (65) 6481 5511

**Google Ireland Limited**

By: _____

Print Name: _____

Title: _____

Date: _____

Gordon House, Barrow Street
Dublin 4, Ireland

**Google Asia Pacific Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

8 Marina View, Asia Square 1 #30-01
Singapore 018960



12

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696806

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1900 Amphitheatre Parkway
Mountain View, CA  94043
Tel:  (650) 330-0100
Fax:  (650) 618-1711

**Apple, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1 Infinite Loop, MS 301-4GC
Cupertino, CA  95014
Tel:  (408) 996-1010
Fax:  (408) 966-0275

**Apple Distribution International**

By: _____

Print Name: _____

Title: _____

Date: _____

Hollyhill Industrial Estate
Hollyhill, Cork, Ireland
Tel:  (353) 21 4284000

**Apple South Asia Pte. Ltd.** Redacted

By: _____

Print Name: PGH HWEE  HWEE

Title: Director

Date: 9/29/16

No. 7 Ang Mo Kio Street 64
Singapore 569086
Tel:  (65) 6481 5511

**Google Ireland Limited**

By: _____

Print Name: _____

Title: _____

Date: _____

Gordon House, Barrow Street
Dublin 4, Ireland

**Google Asia Pacific Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

8 Marina View, Asia Square 1 #30-01
Singapore 018960



12

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696807

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**                                      **Apple Inc.**

By: _____                        By: _____

Print Name: _____                        Print Name: _____

Title: _____                        Title: _____

Date: _____                         Date: _____

1600 Amphitheatre Parkway                             1 Infinite Loop, MS 301-4GC
Mountain View, CA 94043                               Cupertino, CA 95014
Tel: (650) 330-0100                                   Tel: (408) 996-1010
Fax: (650) 618-1711                                   Fax: (408) 966-0275


**Apple Distribution International**                  **Apple South Asia Pte. Ltd.**

By: _____                        By: _____

Print Name: _____                        Print Name: _____

Title: _____                        Title: _____

Date: _____                         Date: _____

Hollyhill Industrial Estate                          No. 7 Ang Mo Kio Street 64
Hollyhill, Cork, Ireland                             Singapore 569086
Tel: (353) 21 4284000                                Tel: (65) 6481 5511

Redacted

**Google Ireland Limited**                           **Google Asia Pacific Pte. Ltd.**

By: _____ Redacted _____                             By: _____

Print Name: ROWAN HARRIS                             Print Name: _____

Title: DIRECTOR                                      Title: _____

Date: 30/09/2016                                     Date: _____

Gordon House, Barrow Street                          8 Marina View, Asia Square 1 #30-01
Dublin 4, Ireland                                    Singapore 018960



12

*Confidential – Subject to Party NDA*

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-02696808

This Agreement may be executed in counterparts, including facsimile counterparts.

**Google Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1600 Amphitheatre Parkway
Mountain View, CA 94043
Tel: (650) 330-0100
Fax: (650) 618-1711

**Apple Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

1 Infinite Loop, MS 301-4GC
Cupertino, CA 95014
Tel: (408) 996-1010
Fax: (408) 966-0275

**Apple Distribution International**

By: _____

Print Name: _____

Title: _____

Date: _____

Hollyhill Industrial Estate
Hollyhill, Cork, Ireland
Tel: (353) 21 4284000

**Apple South Asia Pte. Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

No. 7 Ang Mo Kio Street 64
Singapore 569086
Tel: (65) 6481 5511

**Google Ireland Limited**

By: _____

Print Name: _____

Title: _____

Date: _____

Gordon House, Barrow Street
Dublin 4, Ireland

**Google Asia Pacific Pte. Ltd.**

Redacted

By: _____

Print Name: MARCO BORLA

Title: DIRECTOR

Date: SEP 30, 2016

8 Marina View, Asia Square 1 #30-01
Singapore 018960

12

*Confidential – Subject to Party NDA*

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-02696809

# EXHIBIT B

EXECUTION COPY

## Joint Cooperation Agreement (JCA)

*This JCA between Apple and Google includes three parts: (i) a commercial agreement relating to search, that amends the Information Services Agreement (ISA) between the parties dated December 20, 2002, as amended, (ii) a litigation dismissal and executive escalation mechanism, and (iii) a collaboration framework regarding patent policy and reform.*

### Term & Termination

Redacted

### (1) COMMERCIAL DEAL

Apple and Google wish to extend the ISA beyond the present termination date of July 31, 2015 to be co-terminus with this JCA.

### Search Rev Share

1. Rev share will become Redacted effective July 31, 2015.
2. Subject to the options in point #3 below, Google shall remain the default search engine in all Geo's.
3. Apple will have the option to select a different default search engine in China and S. Korea on or after July 31, 2014, and in Russia on or after July 31, 2016.
4. Google will consider, in good faith, additional single country exclusions in countries where Google's usage share compared with other general search engines only declines to Redacted or less for Redacted consecutive years.

### Default Bookmark

Redacted

Redacted

Ex. No.
JX0024
1:20-cv-03010-APM

1

GOOG-DOJ-02696822

REDACTED FOR PUBLIC FILING

EXECUTION COPY

Redacted

**(2) LITIGATION NOTICE AND ESCALATION**

Redacted

2

Redacted

REDACTED FOR PUBLIC FILING

GOOG-DOJ-02696823

EXECUTION COPY

Redacted

(4) MISCELLANEOUS

Redacted

3

Redacted

REDACTED FOR PUBLIC FILING

GOOG-DOJ-02696824

EXECUTION COPY

Redacted

**GOOGLE INC.**

By: Redacted
_____
(signature)

Printed Name: _LARRY PAGE_

Title: _CEO_

Date: _May 15, 2014_

**APPLE INC.** Redacted

By: Redacted
_____
(signature)

Printed Name: _TIM COOK_

Title: _CEO_

Date: _MAY 15, 2014_



4

Redacted

REDACTED FOR PUBLIC FILING

GOOG-DOJ-02696825

# EXHIBIT C

Google Confidential

## GOOGLE MOBILE
## REVENUE SHARE AGREEMENT

| Go gle | Google LLC<br>Google Asia Pacific Pte. Ltd.<br>Google Ireland Limited<br><br>Address for Legal Notices:<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043 | Mobile Partnerships: Jim Kolotouros, Christopher Li, Jinyoung Baik<br><br>Google Legal: Kate Lee, Richard Lee, Marie Mackey |
| --- | --- | --- |

| COMPANY CONTACT DETAILS | | |
| --- | --- | --- |
| | Company Contact Information: | Company Legal Notices to: |
| **Attention:** | Jay Kim, Seung Song | Steve Lee, Yuna Hong |
| **Title:** | Strategic Partnership Group (Mobile) | Legal Support & Compliance Group (Mobile) |
| **Address, City, State, Postal Code, Country:** | 129 Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, Korea 16677 | 129 Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, Korea 16677 |
| **Email:** | Redacted | Redacted |

**Effective Date:** July 1, 2020

## Confidential

Ex. No.
JX0071
1:20-cv-03010-APM

1

Google Mobile Revenue Share Agreement

Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-21682392

Google Confidential

This Google Mobile Revenue Share Agreement, including all attachments (collectively referred to as this "**Agreement**"), effective as of the date noted above (the "**Effective Date**"), is made between:

**GOOGLE LLC**, organized in the state of Delaware, **GOOGLE ASIA PACIFIC PTE. LTD.**, organized in Singapore, and **GOOGLE IRELAND LIMITED**, organized in Ireland (in this Agreement, "**Google**" will mean Google LLC, Google Asia Pacific Pte. Ltd., and/or Google Ireland Limited, as the context requires), on the one hand; and

**SAMSUNG ELECTRONICS CO., LTD.**, a company existing under the laws of the Republic of Korea ("**Company**"), on the other hand.

# Not Reviewed for Confidentiality

# Confidential

2



Google Mobile Revenue Share Agreement

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-21682393

Google Confidential

1.5     "Alternative Search Service"    Redacted                          **Confidential**

**Confidential**

**Confidential**

# Not Reviewed for Confidentiality

# Confidential

# Not Reviewed for Confidentiality

Confidential

## Not Reviewed for Confidentiality

1.16    "Client ID(s)" means the range of unique alphanumeric code(s) that Google provides to Company pursuant to this Agreement or the Prior Agreements that are used to identify Ad Revenue on Devices or Installed Base Devices, including Ad Revenue from particular access points on Devices or Installed Base Devices (e.g., Chrome Browser, Bixby, etc.).

# Not Reviewed for Confidentiality

REDACTED FOR PUBLIC FILING & ABRIDGED

Redacted                                                            GOOG-DOJ-21682394

Google Confidential

**Confidential**

**Not Reviewed for Confidentiality**

**Confidential**

Not Reviewed for Confidentiality

**Confidential**

1.48     "**Minus One Screen**" means the screen accessed by the End User by swiping their finger once from left to right on the Default Home Screen (excluding the lock screen and the notification tray).

**Confidential**

**Not Reviewed for Confidentiality**

Confidential

**Not Reviewed for Confidentiality**

**Confidential**



Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-21682397

Google Confidential

1.58    "**Query**" means any End User query input through a Service Access Point.

# Confidential

# Not Reviewed for Confidentiality

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-21682398

Google Confidential

# Confidential

# Not Reviewed for Confidentiality

10.    COMPANY AND GOOGLE OBLIGATIONS

10.1    **MADA, EMADA and TMADA.** During the Term, Company must have an effective MADA, EMADA and TMADA and be a licensee in good standing under the MADA, EMADA and TMADA; provided, however, that any termination of this Agreement for the reason of non-compliance with the foregoing shall made pursuant to Section 14.2 or Section 14.3, and further, that in case of any non-compliance with respect to TMADA, such termination shall be effectuated for devices distributed in Turkey only.

# Not Reviewed for Confidentiality

Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

Google Confidential

IN WITNESS WHEREOF, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

| COMPANY: | GOOGLE LLC |
|---|---|
| **Redacted** | **Redacted** 2020.11.10 10:11:39 -08'00' |
| By      _Jay Kim_ | By |
| Name    _VP_ | Na    Jamie Rosenberg / Authorized Signatory |
| Title | Title |
| Date    _Nov 9, 2020_ | Date |
| | **GOOGLE ASIA PACIFIC PTE. LTD.** |
| | By **Redacted** 2020.11.11 |
| | Nam   Lavanya Swetharanyan   10:17:04 |
| | Title   Director   Google Asia Pacific Pte. Ltd   +08'00' |
| | Date |
| | **GOOGLE IRELAND LIMITED** |
| | By |
| | Name   **Redacted**   2020.11.10 |
| | Title   Luciano Moreto   10:25:44 Z |
| | Date   For, Nick Leeder (Director) |

24



**Redacted**

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-21682415

Google Confidential

<u>ATTACHMENT A</u>

<u>REVENUE SHARE</u>

1.    Subject to the terms and conditions of this Agreement, Google will pay Company revenue share during the Term as follows:

(a)    <u>Core Qualified Devices</u>.  Google will pay Company the following percentage of Qualified Net Ad Revenue with respect to the following Core Qualified Device categories and Service Access Points (collectively. "**Shared Net Core Ad Revenue**"):

| % of Qualified Net Ad Revenue | Core Qualified Device Category | Service Access Points |
|---|---|---|
| **Confidential** | Core Qualified Devices sold or distributed in Territories other than Turkey | - Search Access Points under Attachment B-1; and<br><br>- Assistant Access Points |
| | Core Qualified Devices sold or distributed in Turkey | - Search Access Points in Attachment B-2; and<br><br>- Assistant Access Points |

# Confidential

(b)    <u>Enhanced Qualified Devices</u>.  In addition to the Shared Net Core Ad Revenue, for those Core Qualified Devices that are configured to meet the additional requirements for Enhanced Qualified Devices, Google will pay Company the following percentage of Qualified Net Ad Revenue with respect to the following Enhanced Qualified Device categories and Service Access Points (collectively "**Shared Net Enhanced Ad Revenue**"):

| % of Qualified Net Ad Revenue | Enhanced Qualified Device Category | Service Access Points |
|---|---|---|
| **Confidential** | Search Enhanced Qualified Devices | Search Access Points in Attachment C-1 |
| | Chrome Enhanced Qualified Devices **Confidential** | Search Access Points in Attachment C-2 |
| | Search/Chrome Enhanced Qualified Devices **Confidential** **Confidential** | Search Access Points in both Attachment C-1 and Attachment C-2 |

(c)    **Confidential**

25



Redacted

REDACTED FOR PUBLIC FILING & ABRIDGED

GOOG-DOJ-21682416

Google Confidential

## ATTACHMENT C-1

### SEARCH ACCESS POINTS FOR VALID QUERIES ON SEARCH ENHANCED QUALIFIED DEVICES

**Confidential**

| Search Access Point | Minimum Usage and Placement Requirements |
|---|---|
| Google-provided widget | Set pursuant to MADA |
| Google Search Application | Set pursuant to MADA |
| (a) All search intents on the Enhanced Qualified Device, **Confidential** | For search intents: Set to Google Search Application |
| **Confidential** | **Confidential** |

31



**REDACTED FOR PUBLIC FILING & ABRIDGED**

Redacted

GOOG-DOJ-21682422

Google Confidential

## ATTACHMENT C-2

**SEARCH ACCESS POINTS FOR VALID QUERIES AND CONFIGURATION REQUIREMENTS ON CHROME ENHANCED QUALIFIED DEVICES**  **Confidential**

Confidential

Subject to Section 9 (Permitted Activities), each of the below-listed Search Access Points must meet the Minimum Usage and Placement Requirements.

| Search Access Point | Minimum Usage and Placement Requirements |
| --- | --- |
| Chrome Browser | Set as the default system browser intent and no disambiguation screen is ever presented to the end user out-of-the-box; <br><br> Chrome Browser icon is placed on the Application Dock; and <br><br> Other requirements pursuant to MADA. |

33



Redacted

**REDACTED FOR PUBLIC FILING & ABRIDGED**

GOOG-DOJ-21682424