WILMER CUTLER PICKERING
HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
CHRISTOPHER W. JOHNSTONE (SBN 242152)
Chris.Johnstone@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant Google LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA,**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JAMES ATTRIDGE, ZACHARY CROWELL, CHRISOPHER WEBER, and TRACY ROSENBERG, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 3:25-cv-02775-RFL<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Judge: Hon. Rita F. Lin<br>Courtroom 15, 18th Floor<br>Date: November 18, 2025<br>Time: 10:00 a.m. |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on November 18th, 2025, at 10:00 a.m. in Courtroom 15 of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Ave., San Francisco, CA, this Motion To Dismiss filed by Defendant Google LLC will be heard.

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant moves to dismiss the Second Amended Complaint in the above-captioned action. Defendant's Motion to Dismiss is based on this Notice of Motion and the supporting Memorandum of Points and Authorities.

Dated: September 1, 2025

Respectfully submitted,

By: */s/ Sonal N. Mehta*

WILMER CUTLER PICKERING
HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
CHRISTOPHER W. JOHNSTONE (SBN 242152)
Chris.Johnstone@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant Google LLC*

**TABLE OF CONTENTS**


MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

BACKGROUND ..... 2

- A. This Court's Narrowing Of Claims In Arcell ..... 2
- B. Plaintiffs' Counsel's Attempt At A Do-Over ..... 3
- C. Plaintiffs' Recycled Theory Realleged In The SAC ..... 4
  - 1. Plaintiffs' Use of Google Search ..... 4
  - 2. The Challenged Agreements ..... 4
  - 3. Plaintiffs' Theories of Antitrust Injury ..... 5

ARGUMENT ..... 5

- I. The Second Amended Complaint Fails to Allege Antitrust Standing ..... 6
  - A. Plaintiffs Fail to Allege a Plausible Antitrust Injury ..... 6
    - 1. Plaintiffs Fail To Plausibly Allege A BFW Where GSEs Would Pay Users To Search The Internet ..... 7
    - 2. Plaintiffs Fail To Plausibly Allege Injury Based On The Purported Suppression Of More Privacy-Protective Or Ad-Free Search Engines ..... 10
    - 3. Plaintiffs' Ill-Conceived BFW Further Demonstrates Their Failure To Allege The Challenged Agreements Caused Their Claimed Injury ..... 12
  - B. The Other Antitrust Standing Factors Further Support Dismissal ..... 14
- II. The Second Amended Complaint is Time-Barred ..... 16
  - A. The Sherman Act Claims For Damages Are Time-Barred ..... 16
  - B. The Sherman Act Claims For Injunctive Relief Are Barred By Laches ..... 18
- III. Plaintiffs Fail To Sufficiently Allege Their State Law Claims ..... 19
- IV. Dismissal Should Be With Prejudice ..... 20

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Arcell v. Google LLC*,
2023 WL 5336865 (N.D. Cal. Aug. 18, 2023) ....................2, 3

*Arcell v. Google LLC*,
2024 WL 1090009 (N.D. Cal. Feb. 5, 2024) ....................2, 3, 17, 19

*Arcell v. Google LLC*,
2025 WL 210877 (N.D. Cal. Jan. 16, 2025) ....................3, 7, 10, 19

*Arcell v. Google LLC*,
2025 WL 210878 (N.D. Cal. Jan. 16, 2025) ....................3

*Arcell v. Google LLC*,
744 F. Supp. 3d 924 (N.D. Cal. 2024) ....................3, 6, 7, 10

*Arcell v. Google LLC*,
No. 3:22-CV-02499-RFL (N.D. Cal.) ....................1, 3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................10, 19

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ....................12, 14, 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....................11

*In re: Cathode Ray Tube (CRT) Antitrust Litigation*,
2016 WL 3648478 (N.D. Cal. July 7, 2016) ....................20

*Chipanno v. Champion International Corp.*,
702 F.2d 827 (9th Cir. 1983) ....................16

*United States v. Corinthian Colleges*,
655 F.3d 984 (9th Cir. 2011) ....................20

*Danjaq v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2001) ....................18

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) ....................19

*Doe v. CVS Pharmacy, Inc.*,
982 F.3d 1204 (9th Cir. 2020) ....................19

*ESG Capital Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ....................20

*Feitelson v. Google Inc.*,
80 F. Supp. 3d 1019 (N.D. Cal. 2015) ....................12

*Garrison v. Oracle Corp.*,
159 F. Supp. 3d 1044 (N.D. Cal. 2016) ....................17, 18

*Gibson v. Chrysler Corp.*,
261 F.3d 927 (9th Cir. 2001) ....................12

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024) .................... *passim*

*Klein v. Meta Platforms, Inc.*,
444 F.3d 312 (4th Cir. 2006) ....................14

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ....................17

*Kloth v. Microsoft Corp.*,
698 F. Supp. 3d 1119 (N.D. Cal. 2023) ....................14, 15

*Kuhn v. Three Bell Capital*,
698 F. Supp. 3d 1119 (N.D. Cal. 2023) ....................4

*In re Late Fee Litigation*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) ....................20

*Moser v. Benefytt, Inc.*,
8 F.4th 872 (9th Cir. 2021) ....................12

*Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ....................6, 12, 14, 15

*Oliver v. SD-3C LLC*,
751 F.3d 1081 (9th Cir. 2014) ....................18

*In re Online DVD Rental Antitrust Litigation*,
2011 WL 1629663 (N.D. Cal. Apr. 29, 2011) ....................14

*Parducci v. Overland Solutions, Inc.*,
399 F. Supp. 3d 969 (N.D. Cal. 2019) ....................19

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ....................20

*Reveal Chat Holdco LLC v. Facebook, Inc.*,
2021 WL 1615349 (N.D. Cal. Apr. 26, 2021) ....................18

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020) .......... 18

*Reveal Chat HoldCo LLC v. Meta Platforms, Inc.*,
2022 WL 595696 (9th Cir. Feb. 28, 2022) .......... 16

*Rodriguez et al. v. Google LLC et al.*,
No. 3:20-cv-04688-RS (N.D. Cal.) .......... 3

*Russell v. Walmart, Inc.*,
680 F. Supp. 3d 1130 (N.D. Cal. 2023) .......... 20

*Samsung Electronics Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014) .......... 17, 18

*SEIU Health and Welfare Fund v. Phillip Morris Inc.*,
249 F.3d 1068 (D.C. Cir. 2001) .......... 13

*In re Sequoia Benefits & Insurance Data Breach Litigation*,
2024 WL 1091195 (N.D. Cal. Feb. 22, 2024) .......... 20

*Somers v. Apple, Inc.*,
729 F.3d 953 (9th Cir. 2013) .......... 11, 12

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) .......... 19

*Wilson v. Hewlett-Packard Co.*,
668 F.3d 1136 (9th Cir. 2012) .......... 19

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971) .......... 16

**State Cases**

*Federal Deposit Insurance Corp. v. Dintino*,
84 Cal. Rptr. 3d 38 (Cal. Ct. App. 2008) .......... 19

**Federal Statutes**

15 U.S.C.

§ 15(b) .......... 16, 18

§ 16(i) .......... 16

**State Statutes**

Cal. Bus. Prof. Code § 17208 .......... 19

**MEMORANDUM OF POINTS AND AUTHORITIES**

In April 2022, approximately two dozen Google Search users—represented by, among others, one of Plaintiffs' counsel here—filed an antitrust action concerning Google's agreements with third parties to promote Google Search. *See Arcell v. Google LLC*, No. 3:22-CV-02499-RFL (N.D. Cal.). After four motions to dismiss a thrice-amended complaint, this Court substantially narrowed the case, including by rejecting a theory of antitrust injury premised on the speculative notion that, absent the agreements, search engines would have paid users to search the internet.

Plaintiffs' counsel now seeks to evade *Arcell*'s prejudicial dismissals and try again. The Second Amended Complaint ("SAC") adds factual allegations and plaintiffs but asserts the same core dispute as *Arcell*. Plaintiffs allege, again, that Google committed antitrust violations related to agreements with third parties to promote Google's general search engine ("GSE") on their browsers and devices. The SAC incorporates Judge Mehta's decision in *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024) ("DOJ Search") by reference and quotes from it extensively in a misguided attempt to revive a case that has already been largely rejected. But it ignores that Judge Mehta addressed claims brought by the government, subject to more lenient procedural and substantive hurdles than Plaintiffs must clear in this case. The key differences between Judge Mehta's decision and this case are where Plaintiffs' allegations most obviously falter. That includes the requirements of antitrust standing and antitrust injury. Judge Mehta considered claims brought by the DOJ, which is not required to establish that it was injured by the antitrust violations it alleges, while Plaintiffs must plausibly allege antitrust injury for their suit to proceed.

Plaintiffs appear to rely on the same two theories of antitrust injury as the *Arcell* plaintiffs. First, they contend that the challenged agreements foreclosed competition and prevented the emergence of a hypothetical market where GSEs paid users for their search data. But this Court has already rejected that theory in *Arcell*, and the SAC's new allegations only further demonstrate its implausibility. Search engines succeed based on the quality of their search results, not because of harebrained schemes cooked up to justify damages for a free product. Second, Plaintiffs claim the agreements prevented the market success of subscription-based, ad-reduced, ad-free, or more privacy-protective GSEs. To the extent this is an identical theory to the theory permitted to go

forward in *Arcell*, this case should be stayed to allow the first filed case to proceed to decision, rather than engaging in wasteful, duplicative litigation over the same claim. But if Plaintiffs' extensive new allegations are meant to plead a different theory than that in *Arcell*, it is far from clear what that theory is. What is clear is that the SAC's various allegations undermine any plausible inference that Google's agreements caused the harm they allege. Plaintiffs' alleged but-for world ("BFW") relies on an attenuated, speculative line of reasoning that ignores their own allegations about the world as it currently exists.

The SAC must also be dismissed because Plaintiffs' claims are time-barred by the statute of limitations for their damages claims and by laches for their claims for injunctive relief. Even assuming Plaintiffs had plausibly alleged antitrust injury, the only reasonable inference the SAC supports is that the antitrust injury stemmed from conduct completed more than 15 years ago—well beyond the limitations period. And, even if the alleged injury were traceable to the challenged agreements—it is not—the relevant agreements *also* fall outside the limitations period. Plaintiffs' appeal to statutory and equitable tolling provisions cannot save their tardy claims.

Finally, as in *Arcell*, the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims given the deficiencies in Plaintiffs' lone federal claim. And in any event, Plaintiffs' cursory allegations regarding those claims fail to plausibly allege their essential elements, independently justifying dismissal.

## BACKGROUND

### A. This Court's Narrowing Of Claims In *Arcell*

Beginning in April 2022, the *Arcell* plaintiffs filed a total of four complaints alleging antitrust violations by Google, ultimately settling on the theory Plaintiffs advance here: that Google's agreements with browser developers, device manufacturers, and wireless carriers violated Section 2 of the Sherman Act. From the outset, among other deficiencies, they failed to allege an "actionable antitrust injury," because they did not "draw[] any line between" the absence of competing search engines "and reductions in innovation …, poorer privacy practices, or distortion of search results." *Arcell v. Google LLC*, 2023 WL 5336865, at *4-5 (N.D. Cal. Aug. 18, 2023) ("*Arcell I*"). And they failed to plead around the statute of limitations by alleging a

"continuing violation" or "fraudulent concealment," prompting the Court to dismiss with prejudice each of the Sherman Act claims to the extent they sought relief for pre-April 22, 2018 injuries. *Id.* at *5-6; *see also Arcell v. Google LLC*, 2024 WL 1090009, at *3-6 (N.D. Cal. Feb. 5, 2024) ("*Arcell II*") (similar). After their second amended complaint was dismissed in its entirety, the Court "caution[ed] … that this w[ould] likely be their last opportunity to amend" to plausibly plead antitrust injury. *Arcell v. Google LLC*, 744 F. Supp. 3d 924, 935 (N.D. Cal. 2024) ("*Arcell III*").

The third amended complaint, filed on September 23, 2024, was also largely unsuccessful. The Court again held that the plaintiffs failed to allege antitrust injury premised on a BFW in which users would be compensated for their searches. But it held that the plaintiffs had plausibly alleged antitrust injury "based on their theory that Google's allegedly anticompetitive use of default contracts have precluded competitors from" developing search engines with more privacy protections or fewer ads. *Arcell v. Google LLC*, 2025 WL 210877, at *5 (N.D. Cal. Jan. 16, 2025) ("*Arcell IV*"). The Court denied leave to file yet another amended complaint, in part because of "the undue delay and prejudice [to] Defendants that would result from further amendment." *Arcell v. Google LLC*, 2025 WL 210878, at *1 (N.D. Cal. Jan. 16, 2025) ("*Arcell V*").

**B. Plaintiffs' Counsel's Attempt At A Do-Over**

On March 3, 2025—the same date Google answered the third amended complaint in *Arcell*—Plaintiffs' counsel here (Lingel Winters) moved to withdraw from *Arcell*. *See* No. 3:22-CV-02499-RFL, Dkts. 144, 145. That motion was granted on March 20, *id.* Dkt. 146, and four days later, Winters filed this case and an amended complaint the next day. Dkts. 1, 3. Despite Winters's involvement in *Arcell*'s years-long narrowing of claims, that amended complaint was a haphazard collection of allegations copied and pasted from the *Arcell* complaints, including those long-since dismissed with prejudice. *See* Dkt. 18 Ex. A. Despite the clear overlap between the initial plaintiff's claims and those resolved in *Arcell*, he opposed Google's motion to relate the two cases, *see Arcell*, No. 3:22-CV-02499-RFL, Dkt. 160, instead filing a motion to relate this case to *Rodriguez et al. v. Google LLC et al.*, No. 3:20-cv-04688-RS (N.D. Cal.), Dkt. 489, a web and app activity data privacy case involving no alleged antitrust violations. That motion to relate was denied, *id.* Dkt. 494, and Google's was granted, *Arcell*, No. 3:22-CV-02499-RFL, Dkt. 165.

Winters then obtained a nearly two-month extension to file the SAC at issue here. Dkt. 27. The SAC adds more counsel, more Plaintiffs, and more paragraphs copied from Judge Mehta's opinion.[1] The SAC's revisions do not change that it raises the same core dispute—and theories of antitrust injury—as in *Arcell*, but the SAC's additional detail undermines each of Plaintiffs' claims.

**C. Plaintiffs' Recycled Theory Realleged In The SAC**

**1. Plaintiffs' Use of Google Search**

Plaintiffs have used Google Search "for many years," with one, Plaintiff Rosenberg, having used Google Search for "over two decades." SAC ¶¶ 20-23. Two plaintiffs are alleged to have used Google Search "through default access points on Apple devices and various browsers." *Id.* ¶¶ 21-22. The others are not alleged to have used Google Search through any purported default access points, and no Plaintiffs are alleged to have accessed Google Search on Android devices or any specified web browser. *Id.* ¶¶ 20-23. Plaintiffs allege that Google has obtained their "search data," and that Google has not paid them for that search data. *Id.* None of the Plaintiffs are alleged to have ever used a GSE other than Google's.

**2. The Challenged Agreements**

The SAC alleges that since the mid-2000s, Google has entered into agreements under which mobile device manufacturers, wireless carriers, or web browsers agree to set Google Search as the default GSE for their devices or browsers. *E.g.*, SAC ¶¶ 2, 64. The first of these alleged agreements is Google's Internet Services Agreement ("ISA") with Apple, which first contained provisions under which Google exchanged search advertising revenue for default placement in 2005. *Id.* ¶¶ 67-70. The SAC also identifies Mobile Application Distribution Agreements ("MADAs") and Revenue Share Agreements ("RSAs") with original equipment manufacturers ("OEMs") and wireless carriers of Android devices. *Id.* ¶ 78. In the MADAs, Android OEMs receive royalty-free licenses to certain proprietary Google applications, including Google Play and the Chrome browser, and agree to preload those applications on their devices. *Id.* ¶¶ 78, 83-84. The RSAs generally provide tiered compensation structures that permit OEMs and carriers to opt

[1] Under "the doctrine of incorporation by reference" the Court may treat Judge Mehta's opinion "as if it were part of the complaint," because the SAC "'refers extensively to the document.'" *Kuhn v. Three Bell Capital*, 698 F. Supp. 3d 1119, 1122 (N.D. Cal. 2023).

in to varying levels of promotion on a device-by-device basis, such as placing the Chrome browser "in the device's dock or hotseat" and making Google Search the default on other browsers on the devices. *Id.* ¶ 87. "[N]o OEM or carrier is required to enter into an RSA." *Id.* ¶ 91.

The SAC also alleges that Google entered an RSA with Mozilla, the developer of the Firefox internet browser, in 2017. SAC ¶¶ 95-97. It fails to mention, however, that this agreement was first reached years earlier, and that the 2017 renewal came only after Mozilla abandoned a three-year stint with Yahoo as its default GSE. *See Google*, 747 F. Supp. 3d at 96-97.

Users can easily change the default GSE on each of these devices and browsers. SAC ¶ 54.

### 3. Plaintiffs' Theories of Antitrust Injury

Plaintiffs allege two theories of antitrust injury. First, they fantasize that absent the challenged agreements, GSEs would have paid users to search the internet. SAC ¶ 18. Second, they allege that "but for Google's anticompetitive conduct, a vibrant market of alternative high quality GSEs would have emerged and competed for users by offering greater privacy protections and/or reduced or ad-free search experiences." *Id.*

## ARGUMENT

Plaintiffs press the same core theory that repeatedly failed in *Arcell*. As in *Arcell*, Plaintiffs fail to plausibly allege antitrust injury based on the fanciful theory that, but for the challenged agreements, Plaintiffs would have been paid to search the internet. The SAC offers new allegations, new quotes from Judge Mehta's opinion, and new supposed comparators in support of Plaintiffs' hypothesized BFW to try to make this case look different. But these new allegations do not cure the fundamental implausibility of the theory repeatedly dismissed in *Arcell*. Furthermore, Plaintiffs' additional allegations render implausible the hypothetical emergence of ad-free or more privacy protective GSEs that could compete with Google on quality absent the challenged agreements. Plaintiffs also join the *Arcell* plaintiffs in pleading stale claims barred by the statute of limitations and tacked-on state law claims they have not plausibly alleged. For the reasons detailed herein, the SAC should be dismissed with prejudice.[2]

[2] Google does not concede that only GSEs compete with Google Search, including, for example, because of so-called "specialized vertical providers." SAC ¶¶ 111-112. For purposes of this motion, Google takes allegations to this effect as true, because Plaintiffs' claims fail regardless.

## I. THE SECOND AMENDED COMPLAINT FAILS TO ALLEGE ANTITRUST STANDING

This is not the DOJ Search case and wishing (or attempting to plead) otherwise does not make it so. Private plaintiffs must plausibly allege antitrust standing and antitrust injury at the pleading stage and prove it at trial. Whether a plaintiff has alleged antitrust standing depends on: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021). Factors (2) through (5) are not dispositive, but "the first factor—antitrust injury—is mandatory." *Id.* at 456; *see also Arcell III*, 744 F. Supp. 3d at 930. Plaintiffs' failure to plausibly allege antitrust injury is fatal to their Sherman Act claims, and the balance of the remaining factors similarly supports dismissal.

### A. Plaintiffs Fail to Allege a Plausible Antitrust Injury

Plaintiffs' imagination of a BFW in which GSEs paid users to search the internet or competed with Google on quality while showing fewer ads or offering more privacy protections falls well short of plausibly alleging the requisite antitrust injury. Antitrust injury "requires '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Arcell III*, 744 F. Supp. 3d at 930 (quoting *Oakland*, 20 F.4th at 456). Plaintiffs "'must allege specific facts that raise an antitrust claim above the speculative level.'" *Id.* at 930-931. "[B]are assertions that 'innovation is suppressed, quality is less (in terms of privacy, data protection, and user of consumer data), user choice is reduced, and search results are distorted or steered' are too 'vague and conclusory' to plead a plausible antitrust injury." *Id.* at 931.

Plaintiffs offer two theories of antitrust injury: that in a BFW without the purportedly unlawful provisions of the challenged agreements, a never-before-seen market would have emerged in which multiple, high-quality GSEs would have (1) paid users to search the web, or (2) offered subscription-based, reduced-ad, or more privacy protective models. Plaintiffs' allegations—and the DOJ Search decision they rely on—show these allegations are not plausible.

### 1. Plaintiffs Fail To Plausibly Allege A BFW Where GSEs Would Pay Users To Search The Internet

This Court in *Arcell* repeatedly rejected a theory of antitrust injury based on a hypothetical, never-before-seen market in which high-quality GSEs paid users to search the internet. *See Arcell III*, 744 F. Supp. 3d at 931-934; *Arcell IV*, 2025 WL 210877, at *1. Plaintiffs offer nothing to save it from the same implausibility that doomed it in *Arcell*.

The SAC includes no non-speculative allegations that Google's contracts prevented the emergence of an entirely theoretical market in which search engines compete on price by paying users for searches. Common sense makes clear this is not how search engines compete successfully. When people look for information on Google or any GSE, they are looking for optimized, accurate search results. They are not dialing for dollars. The SAC alleges a graveyard of firms that failed precisely because they miscalculated that users would prioritize payment over quality and accuracy. *See, e.g.*, SAC ¶¶ 8, 198-199; *infra* 8. But it does not allege facts that make plausible an inference that these firms would have been successful but for Google's conduct or that Google would have paid users to use Google Search absent the challenged agreements.

Judge Donato recently rejected as "fanciful" the same theory—that free services would pay their users to use them in the absence of purportedly exclusionary conduct by an alleged monopolist. In *Klein v. Meta Platforms, Inc.*, the court excluded the testimony of an expert witness who planned to opine that, in a more competitive market, Meta "would compete on price instead of quality to avoid losing users to rivals." 766 F. Supp. 3d 956, 962 (N.D. Cal. 2025). The *Klein* decision is a complete refutation of Plaintiffs' theory here. Though *Klein* addressed these issues in deciding a *Daubert* motion and denying class certification, Plaintiffs offer nothing to fill the gaps that led the Court in *Klein* to reject this theory of antitrust injury that providers of free services would compete by paying individuals to use their services.

Instead, Plaintiffs allege Google once considered a "proposal for Google to compensate users that never came to fruition." SAC ¶ 11. But this refers to a lone "brainstorming" email from a marketing employee about how to respond to a 2018 news article's "narrative." *Id.* ¶ 191. "[S]uch internal trial balloons"—or marketing brainstorms—"that never ripened into serious proposals or

an actual practice" are "not a sufficient basis" to conclude that, in a BFW, Google would have paid users to search the internet. *Klein*, 766 F. Supp. 3d at 964. "At best, this idea indicates that" Google "on one occasion considered competing on 'price' in the market …. But this idea alone, which" Google "ultimately rejected, is too thin a reed on which to base the sweeping extrapolation" that in a BFW, Google would have paid users to search the internet. *Cf. id.* at 966.

Plaintiffs here point to comparators they claim as supposed evidence of competition by paying users, but virtually all of them are different in kind, including firms that aggregate and sell data to companies, SAC ¶ 160 (Bright Data, Oxylabs, Datarade), pay partner sites instead of users, *id.* ¶¶ 11, 198 (Google Affiliate Program, GoTo, AltaVista, Lycos), pay users for *browsing* history instead of only search data, *id.* ¶ 207 (Nielsen, Loginhood, Caden, Datacy), pay users only if they click on ads, *id.* ¶ 199 (Permission Search), pay users only if they buy something after searching, *id.* ¶¶ 198-199, 207 (Jellyfish, Microsoft Live Search Cashback, Ebates), or pay users that engaged in conduct other than searching like completing surveys or playing games, *id.* ¶ 207 (Swagbucks, Qmee, BIGtoken, Swash, InstaGC). As in *Arcell*, Plaintiffs fail to provide "any explanation why the[se] markets are similar" and "no facts to support a plausible inference that Google or other competitors would pay for search data, as" these companies purportedly did "for browsing [and other] data," absent the default contracts. *Arcell*, 744 F. Supp. 3d at 933; *see also Klein*, 766 F. Supp. 3d at 965 (plaintiffs did "not explain how or why … these transactions in a wholly different market, where the terms of exchange are different, would be informative of whether" Google "would choose to compete on price as opposed to quality in the but-for world"). Yet again, many of these supposed comparators are not even "alleged to be search engines. Nor do Plaintiffs offer any allegations explaining how the various markets to which these platforms belong are similar to the general search services market." *Arcell IV*, 2025 WL 210877, at *1.

More fundamentally, as in *Klein*, Plaintiffs "ignor[e] evidence"—alleged by them and set forth in DOJ Search—that Google "in the real world has consistently competed on the basis of quality," rather than price. 766 F. Supp. 3d at 966. Judge Mehta's opinion confirms that, far from its success depending on the challenged agreements, Google has consistently outperformed other GSEs on quality for more than 15 years. *See Google*, 747 F. Supp. 3d at 31. Plaintiffs' alleged

comparators confirm the same; many existed early in or even before this 15-year period and still failed. *See, e.g.*, SAC ¶¶ 8, 198-199 (GoTo in 1997; Lycos in 1994; AltaVista in 1995; iWon in 1999; Jellyfish in 2006; Microsoft Live Cashback, Microsoft SearchPerks!, and Scour in 2008). These firms' failures predate or were concurrent with the agreements Plaintiffs challenge here, demonstrating that their failure cannot have flowed from those agreements, but instead from the fact that paying users is not a viable means of competition, especially where a firm fails to compete on the quality of the core product: useful search results. Indeed, only Google and Bing even create their own "web search indexes that generate accessible results." *Google*, 747 F. Supp. 3d at 38-39. Many of Plaintiffs' comparators derive whatever success they achieve *from* Google's (or Bing's) investments in their GSEs, licensing (at least a portion of) their search capabilities from Bing or Google. *See* SAC ¶¶ 198, 211 (A9, DDG, Neeva). The result is that firms like DDG "operate[] as 'a veneer on top of other search engines.'" *Google*, 747 F. Supp. 3d at 96.

Given Google's undisputedly superior quality, it also strains credulity to allege that existing pay-for-search programs support the reasonable inference that paying users to search the internet is a viable avenue of competition, especially given the paltry sums offered by existing GSEs. "Microsoft Rewards," (also called "Bing Rewards") "allows users to accrue points" for searching on Bing, allowing users to amass, at most, a quarter a day. SAC ¶ 199(c). Brave, another GSE, offers a rewards program under which users earn tokens that can purportedly be exchanged for either "fiat [or] crypto" currencies, for amounts undisclosed by either Plaintiffs or, apparently, Brave itself. *Id.* ¶ 199(f). And Scour, yet another GSE offering a pay-for-search option, allegedly pays its users less than half of one cent for each internet search query. *Id.* ¶ 199(g).[3] Plaintiffs offer no allegations about whether any significant proportion of Bing, Brave, or Scour users even opt into these programs, rather than simply using their GSEs without compensation and bypassing the complex, low-value "rewards" schemes employed by these firms. Nor do Plaintiffs allege anything about their own search volumes, the value of their own search data, why spare change would persuade a user to use one of these competitor GSEs, or the extent to which Plaintiffs themselves allegedly would have been compensated by these supposed comparators—had Plaintiffs ever even

[3] Even this overstates things; as Plaintiffs allege, the users of this model get *nothing* until they complete more than six *thousand* internet searches. SAC ¶ 199(g).

attempted to use these services, which they also do not allege.

In short, Plaintiffs "provide no facts to support a plausible inference that Google or other competitors would pay for search data … absent the default contracts." *Arcell III*, 744 F. Supp. 3d at 933. The Court need not ignore this "common sense" conclusion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As in *Arcell*, this theory of injury cannot support their claims.

**2. Plaintiffs Fail To Plausibly Allege Injury Based On The Purported Suppression Of More Privacy-Protective Or Ad-Free Search Engines**

Plaintiffs' other theory of injury is that the default agreements have prevented competitors from offering search engines that are more privacy protective or ad-free. Google recognizes that the Court credited a version of this theory of injury in *Arcell IV*, 2025 WL 210877, at *1, and if Plaintiffs intend to offer nothing beyond that same theory, this case should be stayed to allow the first filed case to proceed to decision, rather than burdening the Court and the parties with duplicative litigation over the exact same theory.[4] But if Plaintiffs instead seek to press a different theory (or support a similar theory with new allegations), the allegations added to the SAC demonstrate that theory's implausibility.[5]

First, as Judge Mehta found, contrary to Plaintiffs' conclusory allegation that Google is "unresponsive to consumer demand" on privacy features, SAC ¶ 212, Google has repeatedly "considered undertaking privacy initiatives after looking to rivals," *Google*, 747 F. Supp. 3d at 54. Further, Plaintiffs here offer no allegations "that identif[y] the privacy features users value and, importantly, whether Google declined to adopt such features without any concern that its users would go elsewhere." *Id.* at 118-119. Nor do Plaintiffs' cherry-picked quotes, *e.g.* SAC ¶ 192, plausibly rebut Judge Mehta's finding that "Google refrained from particular privacy measures adopted by rivals to prioritize an improved user experience," *Google*, 747 F. Supp. 3d at 119.

Plaintiffs insist their BFW is "informed by … real-world attempts by rivals to compete on the quality dimensions of a more privacy protective and/or ad-free GSE experiences." SAC ¶ 185.

---

[4] The *Arcell* plaintiffs argued that their former counsel pursuing these claims is "a direct conflict of interest …and would have significant adverse effects upon their case." Dkt. 45 at 1.

[5] Google respectfully preserves its position that *Arcell IV* incorrectly found antitrust injury to be plausibly alleged.

But their lead example of competition on this front, DDG, all but admits to its users that its search results are suboptimal, providing a compelling explanation for its lack of success that has nothing to do with the alleged exclusionary conduct. As Plaintiffs allege, DDG explains to users that, if they use DDG, they are likely not to get "some of the results [they are] used to getting." SAC ¶ 211(a). Plaintiffs thus all but concede the competitive "tradeoff" between privacy and quality of search results identified by Judge Mehta, *Google*, 747 F. Supp. 3d at 119, which is inherent in their admission that Google uses "user search data … to improve its GSE," SAC ¶ 50. It is users' preference for quality over privacy that provides a competing and far more plausible explanation for Google's success. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567-568 (2007).

As for reduced-ad or ad-free GSEs, Plaintiffs again undermine their claimed injury because they allege that competition from these sources *is ongoing*. Plaintiffs identify Kagi Search, which they contend is "highly accurate" and "lightning fast," and offers a subscription-based model in exchange for an ad-free experience. SAC ¶ 211(c). Plaintiffs similarly identify Brave, which offers a $3/month ad-free search experience. *Id.* ¶ 211(d). But aside from generalized, conclusory assertions that these comparators have not "gained the sort of traction and widespread adoption that one would expect," *id.* ¶ 16, or "have been unable to achieve critical scale," *id.* ¶ 211, Plaintiffs fail to allege that these competitors have been forced from the market or inhibited from competing. These failures are fatal to any plausible inference of the illusory harm they allege. *Cf. Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) (no antitrust injury where "theory is … implausible in the face of contradictory market facts alleged in [the] complaint").

Plaintiffs' allegations also make clear that, even if they could allege the challenged agreements suppressed competition, it has resulted in no injury *to Plaintiffs*. Plaintiffs allege nowhere in the SAC's 118 pages that they ever attempted to use *any* of the innumerable alleged comparators Plaintiffs identify, or even attempted to do so and were thwarted by the diminished quality of these alternative products or services, or would have done so if only Google were not set as a default. Even today, Plaintiffs are free to use (or even set as their default GSE) DDG,

Brave, Bing, Kagi, Scour, or any of the countless supposed comparators they identify.[6]

As a result, Plaintiffs nowhere allege, as they must, that the challenged agreements have caused them injury. *See Somers*, 729 F.3d at 963 ("'[A] plaintiff must … allege some credible injury caused by the unlawful conduct.'"); *Oakland*, 20 F.4th at 456-457 (antitrust injury requires that plaintiff "'stands to suffer …' from the defendant's unlawful conduct"). They do not allege that they have sought to use an alternative product, and instead allege that they have used and continue to use Google Search "for years" and in Plaintiff Rosenberg's case, "over two decades." SAC ¶¶ 20-23. The SAC cannot plausibly allege antitrust injury where "there are no facts alleged to indicate that Defendant's conduct has prevented consumers from freely choosing among search products." *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015). Even if Plaintiffs could allege that default agreements "capitalize on the preference of consumers … for the status quo, … this does not victimize them or restrict their ability to 'mak[e] free choices between market alternatives.'" *Id.* (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("*AGC*")). Instead, the SAC makes evident that Plaintiffs chose to use Google Search because they preferred Google's offering (a free service) over the available pay-to-search or privacy-branded alternatives.

#### 3. Plaintiffs' Ill-Conceived BFW Further Demonstrates Their Failure To Allege The Challenged Agreements Caused Their Claimed Injury

The contours of Plaintiffs' posited BFW are unclear. They describe the BFW as one "where Google did not engage in its exclusionary and anticompetitive behavior," SAC ¶ 6, but the only conduct they allege to have been anticompetitive was the challenged agreements. *Supra* 4-5.

Do they mean a BFW where no GSEs sought default placement on devices or browsers? If so, there are no allegations whatsoever that such a counterfactual world would have emerged or that OEMs, carriers, and browsers would not have set a default anyway. As Judge Mehta made clear, OEMs, carriers, and browser developers design their products with a default GSE because it offers the best user experience and allows them to earn substantial revenue from whichever GSE

[6] It does not matter whether hypothetical class members might have chosen another GSE; the SAC does not allege the named plaintiffs would have used others. *See Moser v. Benefytt, Inc.*, 8 F.4th 872, 877 (9th Cir. 2021) ("'A class action, when filed, includes only the claims of the named plaintiff.'" (quoting *Gibson v. Chrysler Corp.*, 261 F.3d 927, 940 (9th Cir. 2001))).

they decide to set as the default. *Google*, 747 F. Supp. 3d at 44, 56-57, 94-96. Nor do Plaintiffs plausibly allege that, in a hypothetical world without the purportedly unlawful provisions of the challenged agreements, OEMs or browsers would have chosen GSEs other than Google for the default spot. Google unquestionably provides "the industry's highest quality search engine," has "innovated consistently," and earned the "trust of hundreds of millions of daily users." *Id.* at 31. The entities that currently place Google in the default position "'benefit[] and sell[] more'" of their devices "'by having their brand associated with the quality … of Google Search.'" *Id.* at 57. As an Apple executive testified, "there was 'no price that Microsoft could ever offer [Apple]' to" switch its default GSE to Bing, in part "because of Bing's inferior quality." *Google*, 747 F. Supp. 3d at 95. When Mozilla switched its default GSE to Yahoo, Google continued to receive "between 60-70%" of "queries on Firefox," and when it experimented with a switch to Bing as the default, nearly 40% of Mozilla users switched the default back to Google (with the majority of those users doing so *within the first day*). *Id.* at 96-97. Mozilla quickly switched its default back to Google, ending its experiment with Yahoo as its default after just three years. *Supra* 5.

There is thus no plausible basis to infer that the alleged BFW would have emerged without the allegedly anticompetitive conduct Plaintiffs identify. They have thus necessarily failed to allege injury that "flows from" the challenged agreements. In that BFW, there would be no such agreements, yet Google would still be the strongest choice for a default GSE on devices and browsers. *Cf. SEIU Health and Welfare Fund v. Phillip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001) (no antitrust standing where plaintiffs failed to allege "that their claimed economic harms were not caused by other independent factors" than "the defendants' alleged wrongdoing").

Perhaps the BFW Plaintiffs allege is one where other firms, like Microsoft, were not "slow to recognize the importance of developing a search product for mobile, and … ha[ve] been trying to catch up—unsuccessfully—ever since." *Google*, 747 F. Supp. 3d at 144. Even were it not implausible to think one could somehow equalize all firms' market insights before shooting the starter's pistol to compete for similar default agreements—a tall order—it would remain implausible to think Google would not come out on top. Its superior quality, consumer trust, and benefits to partners were established long before the challenged agreements. *See, e.g.*, SAC ¶ 119

(quoting *Google*, 747 F. Supp. 3d at 38) ("By 2009 80% of all general search queries, whether entered on a desktop computer or mobile device flowed through Google.").

It is not surprising that Plaintiffs fail to describe their BFW with any specificity; any attempt to do so reveals that, even assuming they could plausibly allege some injury, it did not flow from the purportedly unlawful terms of the challenged agreements.

**B. The Other Antitrust Standing Factors Further Support Dismissal**

In addition to antitrust injury, courts also consider "the directness of the injury," "the speculative measure of the harm," "the risk of duplicative recovery," and "the complexity in apportioning damages," in assessing antitrust standing. *Oakland*, 20 F.4th at 455. Here, all four factors weigh in favor of dismissal.

***Injury is speculative, not direct.*** The causal chain between Plaintiffs' asserted injury and Google's agreements "contains several somewhat vaguely defined links." *AGC*, 459 U.S. at 540. Plaintiffs allege a highly attenuated chain of hypothetical failures by other platforms to launch pay-to-search, subscription-based, or privacy-branded alternatives that successfully compete with Google, based heavily on user choice in a competitive market. *Supra* 8-11; *see also In re Online DVD Rental Antitrust Litig.*, 2011 WL 1629663, at *7 (N.D. Cal. Apr. 29, 2011) (alleged injury "simply too attenuated to be considered sufficiently direct"). The Court is thus forced to speculate as to whether, absent the challenged agreements, Google or any of the numerous supposed comparators in the SAC would have paid Plaintiffs—and whether the supposed comparators would have improved their quality enough for that payment to matter. *Supra* 8-9. Similar allegations were deemed insufficient by the Fourth Circuit in *Kloth v. Microsoft Corp.*, in which consumers challenged agreements to pre-install Microsoft software on personal computers. 444 F.3d 312 (4th Cir. 2006). Confronted with allegations that such default agreements "deprived consumers of competitive technology," the court held "[i]t would be entirely speculative and beyond the competence of a judicial proceeding to create in hindsight a technological universe that never came into existence." *Id.* at 324; *cf. Oakland*, 20 F.4th at 459-460 ("no way of knowing … what would have occurred in a more competitive marketplace" because "[t]here [we]re too many speculative links in the chain of causation"); *AGC*, 459 U.S. at 540 ("chain of causation between … injury and

the alleged restraint … contains several somewhat vaguely defined links").

***Plaintiffs' case risks duplicative recovery and complex apportionment.*** Plaintiffs articulate no reasonable theory for apportioning damages resulting from the vague injury of purportedly being deprived of alternative GSEs with particular characteristics. Instead, they suggest that damages should be apportioned based on an internal analysis of Google's search revenue. SAC ¶ 216. But these analyses are untethered to any injuries that these individual Plaintiffs claim to have suffered. Aside from this disconnected comparison, they allege—based in part on inapposite comparators set out above, *supra* 8-11—that "real-world examples of payments" "can be used … to … apportion damages." SAC ¶ 265. This theory of apportionment rests solely on Plaintiffs' allegations that they were deprived of pay-to-search models, a theory of injury this Court has already rejected. *Supra* 3, 7. And even on that theory, relying on per-search payment models would require detailed information about how *many* searches each Plaintiff in fact conducted and whether those searches would have qualified for payment (e.g., under Scour's model, there is no payment at all until the user exceeds 6,000 searches, *supra* 9 n.3). Plaintiffs allege nothing about how such information could even be discovered.

Damages premised on Plaintiffs' other theory—the supposed absence of ad-free or more privacy protective models—is somehow even more speculative. Plaintiffs conclusorily allege that hypothetical high-quality GSEs with these characteristics "would have provided additional value to consumers, which can be quantified." SAC ¶ 215. Quantified how? Plaintiffs don't say, instead pointing to the same internal revenue analysis, which is not alleged to have said anything at all about Google Search's privacy or ad-related features. *Id.* ¶ 216. That sort of speculative value estimation based on an entirely hypothetical market and unrelated economic analysis is not enough. As in *Kloth*, it would be "even more speculative to determine the relevant benefits and detriments that non-[Google] products would have brought to the market and the relative monetary value ... to a diffuse population of end users," meaning "the harms that the plaintiffs have alleged with respect to the loss of competitive technologies are so diffuse that they could not possibly be adequately measured." 444 F.3d at 324; *cf. Oakland*, 20 F.4th at 460-461 (measure of harm unduly speculative where damages "would be exceedingly difficult to calculate"). Thus, even if the Court

were to hold that Plaintiffs plausibly allege antitrust injury based on suppression of ad-free or privacy-protective alternatives (it should not, *supra* Part I.A), any valuation of that injury is too speculative to support a claim for damages, and should be limited to a claim for injunctive relief.

## II. THE SECOND AMENDED COMPLAINT IS TIME-BARRED

### A. The Sherman Act Claims For Damages Are Time-Barred

Plaintiffs' Sherman Act damages claims are subject to a four-year statute of limitations. *See* 15 U.S.C. § 15(b). Even if Plaintiffs' action is "'based … in part on any matter complained of'" in a civil antitrust suit brought by the United States, 15 U.S.C. § 16(i) "toll[s] the running of the period of limitations on [the] plaintiff['s] suit during the pendency of the government action" and for one year after. *Chipanno v. Champion Int'l Corp.*, 702 F.2d 827, 832 (9th Cir. 1983). This moves the absolute maximum time for which Plaintiffs may seek injuries back to, at most, October 20, 2016, four years before DOJ Search began on October 20, 2020. SAC ¶ 219

Claims under the Sherman Act "accrue[] and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Reveal Chat HoldCo LLC v. Meta Platforms, Inc.*, 2022 WL 595696, at *2 (9th Cir. Feb. 28, 2022) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)). Here, each of Plaintiffs' alleged injuries stems from Google's purported "dominance" in the general search services market. *E.g.*, SAC ¶ 19. But even if Plaintiffs had plausibly alleged injury, the SAC alleges that "dominance" arose as early as 2009, when "80% of all general search queries, whether entered on a desktop computer or mobile device flowed through Google" and Google Search was purportedly "unchallenged." SAC ¶ 119 (quoting *Google*, 747 F. Supp. 3d at 38). Neither statutory tolling nor the SAC's allegations sounding in equity can save these claims that accrued more than three times the limitations period ago.

Furthermore, even assuming the challenged agreements caused the alleged injury, the SAC makes clear that those agreements *also* fall outside the limitations period. They allege Google entered into a revenue share agreement with Apple in exchange for exclusive default placement in 2012, SAC ¶ 71, and, though the SAC conspicuously fails to specify, first entered into MADAs with Android OEMs and RSAs with Android OEMs and carriers approximately 15 years ago, *see* SAC ¶ 92. Google first entered a revenue share agreement with Mozilla well before 2014, and

Mozilla switched Firefox's default GSE from Yahoo back to Google in 2017. *Supra* 5. Thus, only the 2017 Mozilla agreement is plausibly, specifically alleged to have been entered within four years of October 20, 2020. That lone agreement concerning a single internet browser with a small share of searches cannot plausibly support the market-wide theory of injury, premised on agreements with Apple and Android OEMs and carriers, that Plaintiffs allege.

Nor have Plaintiffs plausibly alleged a basis to toll the limitations period. They fail to allege a "continuing violation," as they repeatedly concede that later-entered agreements were "routine[] renew[als]," SAC ¶ 31, and thus, "merely a reaffirmation of a previous act" rather than a "new and independent act … [that] inflict[s] new and accumulating injury," *Arcell II*, 2024 WL 1090009, at *5 (quoting *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014)). Even the "commission of a separate new overt act generally does not permit the plaintiff to recover for injury caused by old overt acts outside of the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Thus, "even if Plaintiffs properly alleged continuing overt acts that caused injury within the statute of limitations, they are only entitled to relief for injuries occurring from that overt act within the statute of limitations." *Arcell II*, 2024 WL 1090009, at *5.[7]

Plaintiffs similarly fail to plausibly allege fraudulent concealment. Their attempt to do so relies on actions Google purportedly took to *respond to* allegations about anticompetitive conduct. *See, e.g.*, SAC ¶ 227 (2015 Google statement explaining that "European Commission has asked questions about our partner agreements"); *id.* ¶ 228 (Google statement rebutting assertion that Android licensing created "less" "choice"); *id.* ¶ 229 (responding to "formal concerns raised by the European commission"). Google of course disputes that any of these statements were false, but even assuming the truth of Plaintiffs' allegations, these examples would constitute nothing more than an alleged "'failure to own up to illegal conduct' in response to an inquiry about whether [Google] engaged in illegal antitrust activity," which is "not sufficient for fraudulent concealment." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1076 (N.D. Cal. 2016). "[T]o find otherwise 'would effectively nullify the statute of limitations in these cases.'" *Id.* Moreover, the

[7] Plaintiffs' allegations that Google has "considered integrating Google's visual search, including Google's Lens … with Apple devices," SAC ¶¶ 247-248, is untraceable to any injury Plaintiffs allege here, and they offer no allegations to the contrary.

context of these statements was enough to establish Plaintiffs' "constructive knowledge" of the facts relevant to their claim; it is implausible to infer that a statement about, for example, "formal concerns" about anticompetitive conduct did not provide Plaintiffs with "enough information to warrant an investigation which, if reasonably diligent, would have led to discovery." *Reveal Chat Holdco LLC v. Facebook, Inc.*, 2021 WL 1615349, at *7 (N.D. Cal. Apr. 26, 2021).

**B. The Sherman Act Claims For Injunctive Relief Are Barred By Laches**

"[T]he deadline for suits for equitable relief under the antitrust laws is governed by laches," and courts use "the four-year statute of limitations in 15 U.S.C. § 15b [as] a guideline for computation of the laches period." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991 (N.D. Cal. 2020) (quoting *Samsung*, 747 F.3d at 1205). Laches bars relief where "a party has inexcusably delayed pursuing his claim and his adversary has been prejudiced as a result." *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 n.4 (9th Cir. 2014).

Plaintiffs inexcusably delayed the filing of this suit, which is premised exclusively on actions Google took more than four years before their filing. *Supra* 16. Plaintiffs identify multiple, publicly available articles responding to concerns about anticompetitive conduct, *supra* 17-18, and even describing DOJ Search, including the very day that it was filed, SAC ¶ 231. Thus, even if actual knowledge of those claims by Plaintiffs' counsel that initially filed this case—given his *Arcell* role—were not attributable to Plaintiffs, it strains credulity to argue that they "did not know of the extent of the" challenged conduct "until recently." *Danjaq v. Sony Corp.*, 263 F.3d 942, 954 (9th Cir. 2001); SAC ¶ 221 (claiming Plaintiffs "had no knowledge" that Google was purportedly "violating the antitrust laws" "[u]ntil shortly before the filing of this action").

Their delay results in obvious prejudice to Google, forcing it to relitigate the same claims and theories ad nauseum, after years of litigation in which this Court dismissed nearly every aspect of the core theory Plaintiffs advance here. *See Danjaq*, 263 F.3d at 955 ("A defendant may also demonstrate prejudice by showing that it … suffered consequences that it would not have, had the plaintiff brought suit promptly."). And, unlike in *Arcell IV*, the behavior by Plaintiffs' counsel and the prior, extensive, public litigation over the same claims means that this case does not present the same factual questions about when it was possible to know about the relevant contracts, making

the merits of a laches defense facially apparent. *See* 2025 WL 210877, at *3.[8]

## III. PLAINTIFFS FAIL TO SUFFICIENTLY ALLEGE THEIR STATE LAW CLAIMS

As in *Arcell II*, 2024 WL 1090009, at *5, because Plaintiffs' federal claim should be dismissed, the Court should decline to exercise supplemental jurisdiction over their state law claims, which are independently deficient.

***Plaintiffs' UCL Claim Fails.*** The UCL prohibits three types of unfair competition—"'acts or practices which are unlawful, or unfair, or fraudulent.'" *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). Relying on the same allegations to support their faulty Sherman Act claims, Plaintiffs fail to state a claim under the UCL. SAC ¶¶ 272-273.

*First*, a UCL action is not available unless Plaintiffs allege that they "lack[] an adequate remedy at law." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Plaintiffs here seek damages, and nowhere allege that the damages sought are an inadequate legal remedy. *Second*, Plaintiffs cannot rely on the "unlawful" UCL prong because, for the reasons discussed, they fail to plausibly allege an actionable violation of the Sherman Act. *See, e.g. Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012) ("To be 'unlawful' under the UCL, the [conduct] must violate another 'borrowed' law."). *Third*, Plaintiffs fail to allege any fraudulent conduct by Google. *Supra* 17-18. *Finally*, "where the unfair business practices alleged under the unfair[ness] prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Parducci v. Overland Sols., Inc.*, 399 F. Supp. 3d 969, 982 (N.D. Cal. 2019).[9] For these reasons and those demonstrating the deficiencies in Plaintiffs' Sherman Act claims, their UCL claim must also be dismissed.

---

[8] The state law claims are also subject to a four-year statute of limitations, *see* Cal. Bus. Prof. Code § 17208 (UCL), and three-year statute of limitations, *see Fed. Deposit Ins. Corp. v. Dintino*, 84 Cal. Rptr. 3d 38, 50 (Cal. Ct. App. 2008) (unjust enrichment), and are barred for the same reasons.

[9] Even if Plaintiffs could rely on the "unfair" prong, they do not allege any "unfair" acts under the measures of UCL "unfairness" beyond a recitation that Google's "acts and practices" are "immoral, unethical, oppressive, unscrupulous, unconscionable, substantially injurious to the public, and offensive to public policy." SAC ¶ 279; *see Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-1215 (9th Cir. 2020) (measures of unfairness). The Court should not accept such threadbare recitations as true. *See Iqbal*, 556 U.S. at 678.

***Plaintiffs' Unjust Enrichment Claim Fails.*** Plaintiffs' unjust enrichment claim should also be dismissed with prejudice. There is no standalone unjust enrichment cause of action under California law. *See, e.g.*, *In re Sequoia Benefits & Ins. Data Breach Litig.*, 2024 WL 1091195, at *9 (N.D. Cal. Feb. 22, 2024). Even if the Court were to construe the claim as a quasi-contract claim seeking restitution, a plaintiff "must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038-1039 (9th Cir. 2016). Such "restitution generally requires 'that a defendant has been unjustly conferred a benefit "through mistake, fraud, coercion, or request."'" *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. 2023). But Plaintiffs rely solely on their deficient antitrust allegations. Where such a claim "does not allege any distinct purported impropriety, but depends entirely on the allegation that the defendants benefitted from actions that are unlawful under other theories of liability in their complaint," the claim rises and here falls with those other claims. *In re Late Fee Litig.*, 528 F. Supp. 2d 953, 967 (N.D. Cal. 2007). Finally, the disgorgement Plaintiffs seek is barred as a matter of law for the federal antitrust claims. "[T]he Ninth Circuit disallows private use of Section 16 to pursue disgorgement." *E.g.*, *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 3648478, at *13 (N.D. Cal. July 7, 2016).

## IV. DISMISSAL SHOULD BE WITH PREJUDICE

Here, Plaintiffs have already amended their Complaint (twice) in this case, and yet still assert the same theory of antitrust injury asserted and dismissed repeatedly in *Arcell*. Dismissal without leave to amend is appropriate where, as here, "[f]urther amendment would simply be a futile exercise." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1239 (9th Cir. 2020). Moreover, leave to amend may be denied after considering "bad faith, undue delay, prejudice to the opposing party, … and whether the plaintiff has previously amended the complaint." *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011). Enough is enough. It is unduly prejudicial to force Google to continue to litigate the same dispute over again, particularly given Plaintiffs' repeated failures to state an actionable claim. Dismissal should be with prejudice.

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.

Dated: September 1, 2025

Respectfully submitted,

By: */s/ Sonal N. Mehta*

WILMER CUTLER PICKERING
HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
Sonal.Mehta@wilmerhale.com
CHRISTOPHER W. JOHNSTONE
(SBN 242152)
Chris.Johnstone@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
David.Gringer@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant Google LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of September 2025, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System.

*/s/ Sonal N. Mehta*

Sonal N. Mehta