UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES ATTRIDGE, et al.,

Plaintiffs,

v.

GOOGLE LLC,

Defendant.

Case No.  25-cv-02775-RFL

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 52

Plaintiffs are four consumers who seek to bring a class action against Google for alleged antitrust violations.  Relying on the findings of fact in *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), Plaintiffs allege that Google LLC has unlawfully foreclosed competition in the U.S. general search services market through exclusive dealing agreements with mobile device manufacturers, mobile device sellers, and browser developers.  Under those contracts, Google is allegedly preset as the default search engine across all Apple devices, all Android devices from major manufacturers, Apple's Safari browser, and Mozilla's Firefox browser. Plaintiffs contend Google has used these default contracts to exclude competitors and monopolize the search market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*.  Plaintiffs additionally raise an unjust enrichment claim based on Google's retention and use of search data that it allegedly would not have obtained if not for the default contracts.

Google moves to dismiss all claims.  Google principally argues that Plaintiffs lack antitrust standing to pursue their claim under the Sherman Act.  Unlike the federal government, private individuals must allege a plausible, non-speculative antitrust injury caused by the

defendant's anticompetitive conduct.  Plaintiffs offer two theories of antitrust injury: absent Google's allegedly unlawful conduct, search engines would have developed that either (1) paid users to search the web, or (2) were more privacy protective and had fewer ads.  Google argues that, even if it has engaged in anticompetitive conduct, it is fanciful to imagine that any such search engines would have developed in the absence of the challenged agreements.  Moreover, in a world without the challenged agreements, Google argues that it still would have been the strongest choice to be a default search engine due to its superior quality.  Google's arguments ignore Plaintiffs' extensive allegations about search engines that have already emerged in fledgling form with those features.  Assuming Plaintiffs' allegations to be true, as required at this stage, it is reasonable to infer that these search engines floundered due to the challenged agreements.  Accordingly, Plaintiffs have adequately pled antitrust injury, as well as the other antitrust standing factors.

Google further argues that the statute of limitations has run on Plaintiffs' claims.  This portion of Google's motion is granted in part and denied in part.  Plaintiffs plausibly plead that the statute of limitations has been tolled by *United States v. Google* and restarted by continuing violations.  And the doctrine of laches raises questions of fact that are not appropriately addressed on a motion to dismiss at the pleadings stage.  Plaintiffs' claims are therefore timely as to Google's acts since its 2017 agreement with Mozilla.  However, Google's motion is granted as to Plaintiffs' attempt to further extend the statute of limitations through the fraudulent concealment doctrine.  As currently pled, those allegations either fail to allege affirmative misleading acts by Google or are insufficiently specific to satisfy the heightened pleading standard for fraud.  Plaintiffs are granted leave to amend on that issue.

Finally, Google asserts that Plaintiffs' state law claims fail.  Since Plaintiffs have raised a plausible Sherman Act claim, their claim under California's UCL is also plausible.  Plaintiffs' claim for unjust enrichment is construed as a claim for restitution; they similarly state a restitution claim due to their plausible Sherman Act claim.

Google's motion is therefore denied except as to the fraudulent concealment allegations,

for the reasons further explained below.

## I.    THE SECOND AMENDED COMPLAINT'S ALLEGATIONS

The following is a recitation of the Second Amended Complaint's allegations, which are required to be taken as true at this stage of the proceedings.[1]

Google operates the most popular general search engine in the United States. (Dkt. No. 46 ("SAC") ¶¶ 1, 34.) General search engines produce links to websites and other relevant information by searching the internet. (*Id.* ¶ 33.) A general search engine is "'the first place that you can turn to,' and 'a place that you go to for the vast majority of your information needs.'" (*Id.*) Google's general search engine dominance is durable and has increased over time: Google maintained an 80% market share in 2009, rising to 89.2% by 2020. (*Id.* ¶ 119.) On mobile devices, Google's market share was 94.9% in 2020. (*Id.* ¶ 117.) At the same time, Google's closest competitor, Bing, had an overall market share of 5.5% and only 1.3% on mobile. (*Id.*)

Plaintiffs allege that Google has maintained and grown its dominance through agreements requiring Google to be placed as the default general search engine in various products. (*Id.* ¶¶ 59–63.) For instance, devices and browsers have search bars that allow users to quickly access a general search engine. (*Id.* ¶ 52.) There is significant value to a general search engine being preselected as the default for these search access points, since users are often unaware what the default is and whether they can change from the default. (*Id.* ¶¶ 54–58.) Fifty percent of all general search queries flow through search access points that default to Google, and another twenty percent of general search queries flow through Google's Chrome browser (which also defaults to Google). (*Id.* ¶ 60.) As a result, Google derives significant benefits from being preselected as the default general search engine. Google estimated that default placement drove 54% of its overall search revenue in 2017. (*Id.*)

According to Plaintiffs, Google's default placement is not the result of competition. (*Id.*

---

[1] Since the Second Amended Complaint "refers extensively" to *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), and that opinion's findings of fact appear to "form the basis" of Plaintiffs' allegations, it is incorporated by reference and treated as if it was part of the complaint itself. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

¶ 64.)  Rather, Google entered into agreements with mobile device manufacturers, mobile device sellers, and browser developers that require preselecting Google as the default general search engine.  (*Id.*)  Under these agreements, Google pays the manufacturers, sellers, and developers either a percentage of search advertising revenue or a per-device fee in exchange for preselecting Google as the default general search engine.  (*Id.* ¶ 65.)  For instance, since 2005, Google has entered into an Internet Services Agreement ("ISA") with Apple that requires Apple to set Google as the default general search engine on its Safari browser.  (*Id.* ¶¶ 67–68, 70–72.)  Apple is now further restricted from serving ads on Siri (its voice assistant) and Spotlight (its on-device search tool) unless certain conditions are met, and even then, Apple must offer Google a right of first refusal.  (*Id.* ¶ 76.)  In exchange, Google pays Apple 36% of its ad revenue from Apple-driven searches, or tens of billions of dollars each year.  (*Id.* ¶ 73.)  Google and Mozilla have entered into a similar agreement for default search placement on the Firefox browser.  (*Id.* ¶ 95.)

Google has entered into similar agreements with Android device manufacturers and carriers.  (*Id.* ¶ 78.)  Google has entered into Mobile Application Distribution Agreements ("MADAs") with all Android device manufacturers that require preloading certain Google applications with "prominent placements" in exchange for the ability to use Google's proprietary Android applications.  (*Id.* ¶ 83.)  Two preloaded applications are the Google Search Widget, required to be placed on the home screen, and Chrome; both default to Google as the general search engine.  (*Id.* ¶ 84.)  Google has also entered into Revenue Share Agreements ("RSAs") with carriers and manufacturers that sell Android devices.  (*Id.* ¶ 87.)  The RSAs prohibit preloading rival search engines, restrict the ability to promote other general search engines, and provide payments tied to setting Google as the default general search engine.  (*Id.* ¶¶ 87, 89.)  Google has signed RSAs with the major wireless carriers (Verizon, AT&T, and T-Mobile) as well as with the primary Android device manufacturers (Samsung and Motorola).  (*Id.* ¶ 87.)

These agreements are consequential because creating a search engine is "extremely capital- and human-resource intensive."  (*Id.* ¶ 35.)  Search data is key to developing a high-quality search engine, as it helps "adequately categorize queries and rank results."  (*Id.* ¶ 126.)

Without enough search data, a search engine will not produce quality search results and therefore cannot compete with established market participants like Google. (*Id.* ¶ 165.) But a search engine cannot secure search data without being able to compete with existing search engines. (*Id.*) As a result, a feedback loop is created that effectively freezes the marketplace. (*Id.*)

Nevertheless, some fledgling competitors to Google have emerged with additional features. For instance, Microsoft's Bing offers compensation for searches. (*Id.* ¶ 199(c).) Similarly, Presearch operates a search engine that rewards users for searches (as Scour used to). (*Id.* ¶ 199(d), (g).) Brave pays users for ad viewing, whereas Permission Search pays users for ad engagement. (*Id.* ¶ 199(e)–(f).) DuckDuckGo and Brave offer free privacy-protective search engines. (*Id.* ¶ 211(a), (d).) Finally, Kagi Search and Brave offer subscription search engines with no ads (as did Neeva before it shut down in 2023). (*Id.* ¶ 211(b)–(d).) But these search engines have at best floundered; Bing receives 5.5% of search queries, DuckDuckGo receives 2.1%, and all of Google's other rivals combined (excluding Yahoo) receive 0.9%. (*Id.* ¶ 34.) Plaintiffs allege that if Google did not enter into default search agreements, a competitive search engine market would have developed in which all search engines would have been expected to compete by offering features like privacy protections, fewer ads, and compensation. (*Id.* ¶ 189.)

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief." *Somers v. Apple, Inc.*, 729 F.3d 953, 959–60 (9th Cir. 2013) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" need not be accepted. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted); *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1149 (9th Cir. 2019) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." (citation omitted)).

## III.    DISCUSSION

### A.    Antitrust Standing

Google challenges that Plaintiffs have adequately alleged antitrust standing. Distinct from constitutional standing doctrine, antitrust standing is a "more demanding standard" used to determine whether a plaintiff is the "proper party to bring a private antitrust action." *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996), *as amended* (Jan. 15, 1997) (citation omitted). The Supreme Court has identified a non-exhaustive list of factors that courts should consider when evaluating antitrust standing: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Id.* (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983)). The first factor— antitrust injury—is mandatory. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986). The other factors are not dispositive and are instead balanced with antitrust injury. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999). Here, each factor supports antitrust standing.

#### 1.    Antitrust Injury

Antitrust injury requires "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust

laws were intended to prevent." *Id.*  To survive a motion to dismiss, a plaintiff must allege sufficient facts showing a "credible" and "plausible antitrust injury." *Somers*, 729 F.3d at 963 (cleaned up).  Plausibility means that a plaintiff alleges "specific facts that raise an antitrust claim above the speculative level." *Id.* at 965 (citation omitted).  Plaintiffs offer two theories of antitrust injury: in a world in which Google had not engaged in the challenged anticompetitive conduct, Google and other general search engines would have competed on (1) increased privacy protections or eliminating/decreasing ads; and (2) price, by offering compensation to users for searches.  (SAC ¶¶ 204, 211.)  In this "but-for world," Plaintiffs contend that they could have chosen among search engines offering more privacy protections, fewer ads, and/or rewards or other compensation.

As Google concedes, this Court already credited a version of the first theory in *Arcell v. Google LLC*, No. 22-CV-02499-RFL, 2025 WL 210877, at *1 (N.D. Cal. Jan. 16, 2025), a related antitrust case brought by a different set of consumers against Google based on similar exclusive default agreements.  But Google argues the SAC's allegations demonstrate the implausibility of that theory.  Not so.

Beginning with competition on privacy, Google's failure to implement certain privacy protections and the potential for privacy protections to change search results does not make it implausible that Google or other search engines would have adopted privacy protections in a but-for world.  Whether Google declined to implement privacy protections "to prioritize an improved user experience" is beside the point.  (*See* Dkt. No. 52 at 16 (quoting *Google*, 747 F. Supp 3d at 119).)[2]  Plaintiffs allege that Google did not need to implement privacy protections to retain users because the challenged agreements limited other search engines' ability to compete.  (SAC ¶¶ 212–15.)  As a result, the market pressures Google faced in this world are not necessarily representative of those it would have faced in the but-for world.

For similar reasons, Google's assertion that privacy-protective search engines inherently

---

[2] All citations to page numbers refer to ECF pagination.

provide poorer search results by collecting less search data raises factual questions that are inappropriate to adjudicate on the pleadings. Google quotes a statement from DuckDuckGo that users may not get "some of the results [they are] used to getting" because it doesn't "alter results based on someone's previous search history." (*Id.* ¶ 211(a).) But that allegation just indicates DuckDuckGo's results are not "slanted" by the specific user's past searches. (*Id.*) Plaintiffs plausibly allege that DuckDuckGo could offer comparable search quality to Google, with stronger privacy protections, if it had access to additional aggregate data containing real-world search queries, user interactions, and feedback. (*See id.* ¶ 158.) The reasonable inference is that, to the extent DuckDuckGo's search results are significantly worse, that is because of the anticompetitive effect of the challenged agreements rather than DuckDuckGo's commitments to user privacy. (*See id.* ¶ 165.)

Turning to competition on the number of ads, that Plaintiffs identified existing search engines with reduced or no ads does not undermine Plaintiffs' theory of decreased competition. A plaintiff "need not allege that the exclusionary conduct has succeeded in displacing all competition." *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1274 (9th Cir. 2022). Plaintiffs allege that search engines with fewer ads are, at best, fledgling competitors to Google, so it is difficult to infer that their existence demonstrates uninhibited competition. (*See* SAC ¶ 34 (largest four search engines are Google, Bing, Yahoo, and DuckDuckGo; with all other competitors combined having a 0.9% market share); SAC ¶ 211(b) (ad-free Neeva shut down in May 2023).) Rather, a more reasonable inference from the allegations is that the challenged agreements limited competitors' search volumes and therefore their quality by decreasing competitors' ability to optimize search results. (*See* SAC ¶ 165.) That decreased quality would prevent decreased- and no-ad search engines from "achiev[ing] critical scale." (*See id.* ¶ 211.) Such a chain of causation flowing from the challenged agreements is sufficient to plead antitrust injury. *See Ellis*, 24 F.4th at 1274.

Plaintiffs' second theory of antitrust injury based on a lack of compensation was found implausible in *Arcell* because the *Arcell* plaintiffs made only "conclusory assertions" in support

of it.  2025 WL 210877, at *1.  Here, however, Plaintiffs have pled sufficient facts to make it plausible that search engines would have compensated users in a but-for world.  Plaintiffs allege that competitors have developed general search engines with rewards schemes.  (SAC ¶¶ 198–99.)  For instance, the Microsoft Rewards program compensates users for, among other things, each search they make through Bing.  (*Id.* ¶ 199(c).)  Users can earn the equivalent of 25 cents per day for their Bing searches.  (*Id.*)  Presearch operates, and Scour formerly operated, search engines that similarly reward users for searches.  (*Id.* ¶ 199(d), (g).)  Relatedly, Brave and Permission Search pay users for ad viewing (Brave) or ad engagement (Permission Search).  (*Id.* ¶ 199(e)–(f).)  The continued development of general search engines with compensation schemes supports a reasonable inference that there is consumer demand for compensation when searching.  Indeed, Google itself allegedly considered an idea to "[c]ut users in on the deal" and compensate users for searches.  (*Id.* ¶ 191.)  And as discussed regarding Plaintiffs' first theory, the SAC plausibly alleges a causal chain linking the diminished success of compensation-offering competitors to the challenged agreements.

Google resists this conclusion by calling the idea that search engines would compensate users "theoretical" and "fanciful."  (Dkt. No. 52 at 13.)  But Plaintiffs allege search engines *have* attempted to compete by compensating users.  (SAC ¶¶ 198–99.)  This is not a situation in which plaintiffs did not "even allege . . . that any other participant in the [relevant] market has ever competed by paying users."  *See Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025) (analyzing the issue in the context of a *Daubert* motion).  Here, Plaintiffs have provided detailed factual allegations of search engines doing just that.

Google nonetheless counters that consumers are unlikely to use a rival search engine just because it offers "paltry" compensation.  (Dkt. No. 52 at 15.)  True, at first glance, a quarter a day may not seem significant, but it adds up to over $90 a year.  (*See* SAC ¶ 199(c).)  And as Plaintiffs observe, consumers frequently make decisions based on other rewards programs like frequent flyer programs that provide seemingly trivial compensation.  *See, e.g.*, *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 783 (9th Cir. 2012) (describing rewards program for

cigarettes). It is therefore reasonable to infer that consumers would demand search engines to offer compensation in a competitive market even if that compensation was small. Plaintiffs did not need to allege the proportion of users that opt-in to search engine rewards programs to make this inference reasonable; the continued entry of such competitors into the market suggests that consumers demand compensation. (*See* SAC ¶ 199.)

In a final argument against this theory of antitrust injury, Google contends that it and other search engines have consistently competed on quality, so it is implausible to believe search engines would compete on compensation in a but-for world. As an initial matter, this argument assumes (contrary to Plaintiffs' allegations) that Google and its competitors would have faced identical market pressures in a but-for world as they have in this world. (*See id.* ¶¶ 9–10.) Moreover, Plaintiffs plausibly allege that, in a market where search engines competed on relatively equal footing with respect to search quality, consumers enjoy compensation, and "people would expect compensation once it was provided" by some competitors with comparable search quality. (*See id.* ¶¶ 199, 202–05.) At this stage, Plaintiffs' allegations that users want compensation and competitors have continually attempted rewards schemes is sufficient to plausibly allege that search engines would compete on price in a but-for world.

Google also raises general challenges to Plaintiffs' but-for world, asserting it is "unclear" and "[i]ll-conceived." (Dkt. No. 52 at 18.) However, the SAC need only "'sketch the outline of the injury to competition with allegations of supporting factual detail' that are enough to 'raise a reasonable expectation that discovery will reveal evidence of an injury to competition.'" *See Don Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 767 (N.D. Cal. 2024) (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012)). Plaintiffs have done that.

Google contends that even absent the challenged agreements, device and browser manufacturers would still have chosen Google as their default general search engine due to its superior quality. But as previously discussed, Plaintiffs' allegations support a reasonable inference that absent the challenged agreements, Google's competitors would have provided higher quality search results. (*See* SAC ¶¶ 165–67.) It is therefore not obvious that in a but-for

world, Google would remain the default general search engine for nearly every device and browser.  (*See id.* ¶¶ 180, 203.)  The authority cited by Google on this point—a case concerning whether union health trust funds and foreign nations could sue tobacco companies for antitrust violations—bears little similarity to this case where Plaintiffs allege direct consumer injury.  *See Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001).

Google also argues that other competitors' failures resulted from Google's lawful conduct improving its search engine, not the challenged agreements.  As support, Google observes that it is alleged to have had an 80% market share in 2009, before it entered into many of the challenged agreements.  (*See* SAC ¶ 119.)  But some of those agreements did precede 2009, such as an alleged 2005 amendment to the Apple ISA requiring Apple to preinstall Google as the default search engine on Safari.  (*See id.* ¶ 70.)  And even assuming Google initially had a lawful advantage over competitors because of its superior quality, it was "'not entitled to maintain and magnify' the relevant network effects by entrenching its dominance through anticompetitive conduct."  *See In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 949 (9th Cir. 2025).

Finally, Google argues that Plaintiffs needed to allege that in a but-for world, either Google would have paid compensation, incorporated privacy protections, or showed fewer ads; or Plaintiffs would have used competitors with those features.  That was not necessary.  The Ninth Circuit has consistently concluded that one form of antitrust injury is "[c]oercive activity that prevents its victims from making free choices between market alternatives."  *Amarel*, 102 F.3d at 1509 (quoting *Associated Gen. Contractors*, 459 U.S. at 528).  It is accordingly error to "limit a purchaser/consumer's actionable antitrust injury to situations where the purchaser/ consumer has made or intends to make purchases in the relevant market."  *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374–78 (9th Cir. 2003).  Indeed, in an unpublished decision, the Ninth Circuit applied this line of cases to find antitrust injury from allegations that foreclosure of rivals' entry into the market left "one dominant provider offering inferior products and services."

*CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017).  That is squarely what Plaintiffs allege.

Plaintiffs therefore plead a plausible antitrust injury on theories that absent the challenged agreements, competition would have developed on (1) privacy protections or fewer ads; and (2) compensation for searches.

### 2.    Directness of Injury and Speculative Measure of Harm

The second and third antitrust standing factors require evaluating whether a plaintiff's injury was the "direct result" of the allegedly anticompetitive conduct and whether the asserted damages are "only speculative."  *Am. Ad Mgmt.*, 190 F.3d at 1058–59.  To be direct, an injury must not be "'derivative and indirect' or 'secondary, consequential, or remote.'"  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1004 (9th Cir. 2008) (first quoting *Amarel*, 102 F.3d at 1511–12, and then quoting *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 724 (1982)).  Usual instances of damages being too speculative are when a plaintiff asserts only an indirect injury or one that "may have been produced by independent factors."  *Am. Ad Mgmt.*, 190 F.3d at 1059 (quoting *Associated Gen. Contractors*, 459 U.S. at 542).

Plaintiffs assert a direct injury from Google's allegedly anticompetitive conduct.  Plaintiffs allege that the challenged agreements deprived them of compensation and of the ability to freely choose between search engines that offer more privacy protections or fewer advertisements.  (SAC ¶ 182.)  There is a direct chain of causation between the challenged agreements, their allegedly suppressive effect on competition, and Plaintiffs' inability to receive compensation or use superior search engines.  (*Id.* ¶¶ 165–67, 182, 186–87.)  Similarly, there are not any "more direct victims" than Plaintiffs here, as Plaintiffs themselves are the ones who would have been compensated or had access to superior search engines.  *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 459 (9th Cir. 2021).  Because Plaintiffs assert a direct injury and it is not apparent that independent factors produced that injury, the damages they assert are not speculative.  *See Am. Ad Mgmt.*, 190 F.3d at 1059.

Google relies on inapposite cases concerning indirect purchasers and non-purchasers to

resist this conclusion.  Google primarily suggests this case is comparable to *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006).  In that case, consumers who purchased computers with preinstalled Microsoft software asserted that Microsoft's two-tier licensing system (one for manufacturers, another for consumers) injured them by overcharging them for software, denying them the benefit of superior technologies, and preventing them from reselling Microsoft software.  *Id.* at 317–18.  The Fourth Circuit concluded that the consumers were indirect purchasers under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), because they had not purchased anything directly from Microsoft, but rather from manufacturers that preinstalled Microsoft software.  *Id.* at 320–23.  Though noting the antitrust standing question is analytically distinct from the *Illinois Brick* indirect purchaser rule, the court relied on the indirect purchaser analysis to conclude that the plaintiffs did not allege direct injuries.  *Id.* at 323–25.

Plaintiffs' allegations are substantially different than the allegations confronted in *Kloth*. Unlike in *Kloth*, Plaintiffs directly "purchase" Google's product by "providing their data and time and attention wading through advertisements" in exchange for search results.  (*See* SAC ¶ 14.)  Device manufacturers and browser developers also participate in a related market by being paid to preload Google as their default general search engine, and Plaintiffs in turn purchase those devices or browsers.  But Plaintiffs do not give their data to manufacturers or developers as intermediaries for Google; they give it directly to Google.  *Cf. Kloth*, 444 F.3d at 322.  And Plaintiffs—not manufacturers or developers—are primarily injured by not having alternative search engines with more privacy protections or fewer ads.  *Cf. id.* at 322–23.  Plaintiffs also need not "create in hindsight a technological universe that never came into existence," as they allege that technological universe already exists, albeit in a stunted form.  (*See id.* at 324; SAC ¶¶ 199, 211.)

This case is also not like *City of Oakland*.  There, a court would have had to speculate about whether Oakland would have retained the Oakland Raiders in a more competitive market. *City of Oakland*, 20 F.4th at 459–60.  That would have depended upon a panoply of unknowns, including whether: new teams would have joined the NFL, the Raiders would have left Oakland

regardless, Oakland was willing to pay a competitive price, and how other cities reacted. *Id.*
And since Oakland was "priced out of the market," there was no easily calculable measure of its
damages. *Id.* at 458, 460. But here, Plaintiffs allege the market was unable to fully mature, and
calculation of damages does not require extensive speculation about the behavior of third parties.

In sum, the second and third factors support antitrust standing.

### 3. Risk of Duplicative Recovery and Complexity in Apportioning Damages

The fourth antitrust standing factor requires considering whether "potential plaintiffs at
each level in the distribution chain would be in a position to assert conflicting claims to a
common fund . . . thereby creating the danger of multiple liability for the fund." *Associated Gen.*
*Contractors*, 459 U.S. at 544 (citing *Illinois Brick*, 431 U.S. at 737–38). But the "mere fact that
an antitrust violation produces two different classes of victims hardly entails that their injuries
are duplicative of one another." *Apple Inc. v. Pepper*, 587 U.S. 273, 287 (2019) (quoting 2A
Phillip E. Areeda et al., Antitrust Law ¶ 339d, at 136 (4th ed. 2014)). Rather, where "two suits
would rely on fundamentally different theories of harm," they "would not assert dueling claims
to a 'common fund.'" *Id.* The final antitrust standing factor is whether "calculation of damages
. . . [is] exceedingly complicated." *Am. Ad Mgmt.*, 190 F.3d at 1060. Such a determination
requires more than the mere necessity for expert testimony, since "that is hardly unusual in
antitrust cases." *Apple*, 587 U.S. at 286.

There is no apparent reason why this case would risk duplicative recovery. To the extent
that any other class of plaintiffs could assert a claim against Google, those claims would rely
upon a fundamentally different theory of harm. *See id.* at 287. Similarly, Plaintiffs allege that
damages are calculable by relying on, among other things, internal Google estimates that "its
default placements drove over half (then 54%) of its overall search revenue" and that "it would
lose between 60–80% of its iOS query volume should it be replaced as the default GSE on Apple
devices." (SAC ¶ 216.) Additionally, Plaintiffs allege specific "real-world examples of pricing
user time, attention, and data" can be used to calculate damages caused by search engines'

failure to pay users for searches. (*Id.* ¶ 265.) It is not clear without the benefit of discovery and expert testimony whether Plaintiffs will be able to adequately calculate damages. But what is clear is that Plaintiffs allege they have been directly and concretely harmed, and by "[h]ow much is a harder question for a later day." *See Don Copeland*, 716 F. Supp. 3d at 771.

Google asserts that this case risks duplicative recovery and complex apportionment of damages by relying on *Kloth* and *City of Oakland*. But as previously discussed, those cases involved indirect purchasers, whereas this case does not. Plaintiffs do not allege harms "so diffuse that they could not possibly be adequately measured." *See Kloth*, 444 F.3d at 324. Rather, they allege two specific injuries resulting from Google's conduct: they failed to receive compensation for their searches, and they were unable to use search engines with superior privacy protections or fewer ads. This case is therefore not "far afield" from conventional antitrust cases where "an actual purchaser seeks to recover . . . overcharges." *See City of Oakland*, 20 F.4th at 461. Instead, Plaintiffs seek that very relief. "*Illinois Brick* is not a get-out-of-court-free card for monopolistic retailers to play any time that a damages calculation might be complicated." *Apple*, 587 U.S. at 286. The fourth and fifth factors accordingly support antitrust standing as well.

### B.    Statute of Limitations

A Sherman Act claim accrues when a plaintiff "feels the adverse impact of an antitrust conspiracy." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971). A plaintiff must generally sue within four years of their claim accruing. 15 U.S.C. § 15b. However, when a "civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws," a claim "based in whole or in part on any matter complained of in said proceeding" is tolled "during the pendency thereof and for one year thereafter." 15 U.S.C. § 16(i). Google effectively concedes that this case has been statutorily tolled due to *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C., filed Oct. 20, 2020). (Dkt. No. 52 at 22.) Indeed, the SAC is expressly modeled on that case's findings of fact. (SAC ¶ 29.) As a result, the limitations period at least extends back to four years before the United

States' case was filed, or October 20, 2016.  *See* 15 U.S.C. §§ 15b, 16(i).

The operative complaint contains allegations about acts taken by Google after October 20, 2016.  However, Google contends that the claims based on those acts all accrued prior to that date.  The operative complaint alleges that Google has been entering into default contracts going as far back as 2005.  (*See, e.g.*, SAC ¶ 70.)  In response, Plaintiffs contend that the continuing violations and fraudulent concealment doctrines restart or further toll the statute of limitations.[3]

### 1. Continuing Violations

Under the continuing violations doctrine, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."  *Zenith Radio*, 401 U.S. at 338.  To restart the statute of limitations in this way, an act must (1) "be a new and independent act that is not merely a reaffirmation of a previous act"; and (2) "inflict new and accumulating injury on the plaintiff."  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987).  This standard differentiates cases where "a continuing violation is ongoing" from those where "all of the harm occurred at the time of the initial violation." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014).

Plaintiffs sufficiently allege that the continuing violation doctrine applies.  After October 20, 2016, Plaintiffs allege that Google signed new agreements that "fine-tune[d]" its allegedly illicit plan to restrict competition.  *See id.* at 1204 (citation omitted).  For instance, Google entered into an RSA with Mozilla in 2017.  (SAC ¶ 97.)  Similarly, Google finalized revised RSAs with all its Android partners between 2020 and 2021.  (*Id.* ¶ 88.)  When Verizon raised preloading Yahoo during negotiations over its 2021 RSA, Google rejected Verizon's request and

---

[3] California law recognizes the continuing violations doctrine (termed a continuous accrual doctrine) for breaches of continuing duties in violation of the UCL.  *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1200–02 (2013).  That logic applies equally to the unjust enrichment claim.  *See id.*  California law also generally recognizes the fraudulent concealment doctrine. *Regents of Univ. of California v. Superior Ct.*, 20 Cal. 4th 509, 533–34 (1999).  Accordingly, this order applies the same statute of limitations analysis to Plaintiffs' state law claims as to their Sherman Act claim.

advised that "all go-forward agreements with carriers include exclusivity provisions and exceptions cannot be made." (*Id.* ¶ 250.) Additionally, Google recently amended its Apple ISA "to include the emerging Google Search technology, Google Lens." (*Id.* ¶ 248.) Moreover, Google has enforced its preexisting agreements, including its RSA with Samsung in 2018 to prevent Samsung from lowering the default search engine "choice friction." (*Id.* ¶ 249.)

Google argues that each of these actions merely "maintained and reaffirmed its preexisting . . . agreements," which "does not qualify as an overt act." *See Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 885 (N.D. Cal. 2015). Such a characterization minimizes Google's actions. At oral argument, Google effectively conceded that the Apple ISA amendment concerning Google Lens qualified as an overt act. The same is true of the remaining acts listed above. First, the 2017 Mozilla RSA is alleged to be a new agreement. (SAC ¶ 97.) Even crediting that Google entered into a prior RSA with Mozilla, that agreement had lapsed for three years before execution of the 2017 RSA. *See Google*, 747 F. Supp. 3d at 96. Moreover, the 2017 RSA appears to have different terms than the prior RSA. *See id.* Similarly, at least the 2020 Samsung RSA and 2021 Verizon RSA were the product of renegotiations resulting in what appear to be different terms from their predecessor agreements. *Id.* at 101–02, 104–05. Such new agreements with different terms are sufficient to constitute "new and independent" acts. *See Samsung*, 747 F.3d at 1203–04. Enforcing a preexisting agreement—as Google did with the Samsung RSA in 2018—is also a new act that causes independent harm. (*See id.* at 1204; SAC ¶ 249.)

This case is therefore not like *SaurikIT, LLC v. Apple Inc.*, No. 4:20-CV-08733-YGR, 2022 WL 1768845, at *3 (N.D. Cal. May 26, 2022), *aff'd*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023). In *SaurikIT*, antitrust claims premised on certain contracts were dismissed because the plaintiff had not alleged that "Apple's conduct with respect to the [contracts] . . . has changed, nor how they have changed." 2022 WL 1768845, at *3. While the plaintiff generally alleged that Apple had "updat[ed] its contracts," there were no allegations regarding "how the terms of these contracts differed from the contracts outside the statutory period." *Id.* Allegations that

Apple applied the warranty contracts and developer agreements to new products did not change this conclusion. *Id.* The only similar contracts in this case are the MADAs, as Plaintiffs only allege that MADAs for new devices were entered into without explaining how the agreement itself changed. (*See* SAC ¶¶ 83–85.) But as described above, the remaining contracts are alleged to have materially changed or been enforced within the limitations period. That is sufficient to allege new acts. *See Samsung*, 747 F.3d at 1203–04.

Contrary to what Google asserts, Plaintiffs did not need to allege that each new act independently materially increased market foreclosure and prevented Plaintiffs from using search engines offering compensation, more privacy protections, or fewer ads. The purpose of requiring "new and accumulating injury on the plaintiff" is to exclude circumstances where an initial refusal to deal is "irrevocable, immutable, permanent and final" such that any injury within the limitations period "necessarily resulted" from acts outside of the limitations period. *See Pace*, 813 F.2d at 238; *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir. 1979). But such cases are "the exception, not the rule." *Samsung*, 747 F.3d at 1203. That is because unlawful acts typically do not make a market "effectively disappear[]" such that a competitor can "no longer produce [a product] that would be marketable even if the manufacturers refrained from any further acts of conspiracy." *See Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986). And this case is not the exception: Plaintiffs allege that competition would flourish absent Google's anticompetitive acts. (*See, e.g.*, SAC ¶¶ 212–13.) It is therefore enough that the previously described overt acts steered search queries to Google, further foreclosed competition, and in turn allowed Google to "maintain a 'critical mass of users.'" (*See* SAC ¶¶ 163–66; *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 797 (N.D. Cal. 2022); *see also id.* ("As the Seventh Circuit has explained, 'improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place.'" (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004))).)

In sum, Plaintiffs plausibly allege that within the limitations period, Google committed new and independent acts causing new and accumulating injury to Plaintiffs. As a result,

Plaintiffs' Sherman Act claim is timely.  Nevertheless, because continuing violations only restart the statute of limitations, they "generally do[] not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).  The continuing violations doctrine therefore only supports damages for injuries caused after Google's earliest new overt act within the limitations period.  That appears to be the 2017 Mozilla RSA.  (*See* SAC ¶ 97.)

### 2.    Fraudulent Concealment

Under the fraudulent concealment doctrine, "the statute of limitations for a cause of action is tolled if the plaintiff proves that the defendant fraudulently concealed the existence of the cause of action so that the plaintiff, acting as a reasonable person, did not know of its existence."  *Hennegan*, 787 F.2d at 1302 (citing *Rutledge v. Bos. Woven Hose & Rubber Co.*, 576 F.2d 248, 249–50 (9th Cir. 1978)).  A plaintiff must therefore allege "(1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have 'actual or constructive knowledge of the facts giving rise to [his] claim' as a result of the defendant's affirmative acts; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to his claim." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1073 (N.D. Cal. 2016) (quoting *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012)).[4]  Though it is generally inappropriate to resolve the "fact-intensive" allegations of fraudulent concealment on a motion to dismiss, a plaintiff still must make "specific factual allegations of fraudulent concealment."  *Id.* (citations omitted).  Moreover, a plaintiff must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b).  *Id.*  Plaintiffs' allegations of fraudulent concealment fall into four buckets: (1)

---

[4] At oral argument, Google contended for the first time that Plaintiffs must plead reliance on the allegedly fraudulent statements.  Courts appear to be split on that issue.  *Compare In re Optical Disk Drive Antitrust Litig.*, No. 10-MD-02143-RS, 2017 WL 11673139, at *2 (N.D. Cal. Dec. 18, 2017) ("In the antitrust context, the Ninth Circuit has not imposed a reliance requirement in order to establish fraudulent concealment." (citations omitted)), *with In re Magnesium Oxide Antitrust Litig.*, No. 10-CV-5943-DRD, 2011 WL 5008090, at *23 (D.N.J. Oct. 20, 2011) ("While the aforementioned elements of fraudulent concealment do not specifically note a reliance requirement, the language of the second element strongly suggests one.").  This Order declines to reach this argument, as it has been waived and was not briefed.

general statements about Google's support of competition; (2) statements about the competitive effect of its Android agreements; (3) statements concerning *United States v. Google*; and (4) Google's attempts to keep the challenged agreements and other documents secret. Each are considered in turn.

First, Plaintiffs allege that Google made general statements that it supported competitive markets. (SAC ¶¶ 223–26.) For instance, Google is alleged to have stated in 2008 it "take[s] Internet openness, choice and innovation seriously." (*Id.* ¶ 224.) Similarly, Google is alleged in 2009 to have outlined its "six principles of competition and openness," including "[m]ake it easy for users to change" and "[c]ompetition is just one click away." (*Id.* ¶ 225.) Such general statements are "inactionable 'puffery'" and cannot support a finding of fraudulent concealment. *See Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 606 (2d Cir. 2024) (citation omitted). Hearing vague statements that Google takes openness "seriously" and "promotes competition and openness" would not "lead a reasonable person to believe that he did not have a claim for relief." (*See* SAC ¶¶ 224–25; *Rutledge*, 576 F.2d at 250.) Furthermore, Plaintiffs fail to comply with Rule 9(b) because they do not "set forth what is false or misleading about [each] statement, and why it is false." *See Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228 (9th Cir. 2019) (quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute in irrelevant part*). Plaintiffs compare some of Google's statements to the findings of fact in *United States v. Google*, but conclusions about Google's behavior up to 2024 are not sufficient to explain why Google's statements were false or misleading in 2008 and 2009, when they were made. (*See* SAC ¶ 226; *In re GlenFed*, 42 F.3d at 1548–49.) Since these statements do not satisfy Rule 9(b)'s heightened pleading standard, they cannot support a finding of fraudulent concealment.

Second, Plaintiffs allege that Google made specific statements about how its agreements with Android partners supported competition. (SAC ¶¶ 227–29.) For example, Plaintiffs point to a 2015 statement that Android distribution agreements "are not exclusive" and a 2016 statement that Android manufacturers are not "obliged to preload any Google apps." (*Id.* ¶ 227.)

Such voluntary statements contesting factual claims and intended for third parties (consumers) go beyond "an alleged failure to own up to illegal conduct" and are instead conduct "more affirmatively directed at deflecting litigation." *Cf. Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–19 (4th Cir. 1987). But Plaintiffs' allegations fail Rule 9(b)'s requirement to explain why the statements are false or misleading. *See In re GlenFed*, 42 F.3d 1548. Instead, Plaintiffs only generally allege that those statements are "directly contrary to many of Judge Mehta's findings" as to the anticompetitive nature of the challenged agreements. (SAC ¶¶ 227–29.) Although both of those statements appear at least misleading in light of Plaintiffs' other factual allegations, Rule 9(b) requires Plaintiffs to spell out the connection, which they have not done.

Third, Plaintiffs allege that Google made statements about the allegations in *United States v. Google* after the government filed suit. (SAC ¶¶ 230–34.) As Plaintiffs conceded at oral argument, these statements could only toll the limitations period to 2020, when that suit was filed, at the earliest. But claims covering this period are already timely due to the continuing violations doctrine and statutory tolling. Accordingly, these statements cannot further toll the limitations period.

Finally, Plaintiffs allege that Google conducted secret activities to conceal its anticompetitive conduct, including entering into confidential agreements and failing to disclose its uses of users' data. (SAC ¶¶ 235–42.) These allegations do not include the "who, what, where, when, and how" of Google's fraudulent conduct as required by Rule 9(b). *See Garrison*, 159 F. Supp. 3d at 1074 (citing *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)). Even if they did, fraudulent concealment requires a defendant to take "affirmative acts" that are more than "mere passive concealment" and not inherently self-concealing. *Id.* at 1075–76 (citations omitted). For instance, a plaintiff might allege that a defendant "took affirmative steps to destroy evidence of the conspirators' secret meetings, avoided memorializing conversations, and used secret codes to refer to coconspirators and topics." *Id.* at 1077 (citation omitted). Plaintiffs do not allege that Google took any such actions. (*See* SAC ¶¶ 235–42.) Although Plaintiffs point to

non-disclosure provisions in the default agreements, there is no allegation that such provisions are unusual in these types of commercial contracts, absent an anticompetitive purpose. (*See id.* ¶ 236.) Without more, these allegations are not sufficient. As a result, even if this bucket of allegations was pled sufficiently under Rule 9(b), Plaintiffs have not adequately alleged affirmative concealing acts. *See Garrison*, 159 F. Supp. 3d at 1076–78.

Because Plaintiffs have not sufficiently pled that the fraudulent concealment doctrine applies, their claims are dismissed to the extent that they rely on fraudulent concealment to further toll the statute of limitations beyond 2017. Since amendment does not necessarily appear futile, dismissal is with leave to amend.

### C.    Laches

Google asserts that the doctrine of laches should bar equitable relief under Plaintiffs' Sherman Act claim. "Determining whether delay was unexcused or unreasonable and whether prejudice ensued," which a defendant must prove to establish the affirmative defense of laches, "necessarily demands 'a close evaluation of all the particular facts in a case.'" *L.B. v. W. Contra Costa Unified Sch. Dist.*, No. 16-CV-04382-DMR, 2017 WL 1208394, at *6 (N.D. Cal. Apr. 3, 2017) (quoting *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1041 (9th Cir. 2000)). As such, laches "is seldom susceptible of resolution by summary judgment," let alone "[a]t the motion-to-dismiss phase . . . because the defendant must rely exclusively upon the factual allegations set forth in the complaint." *Kourtis v. Cameron*, 419 F.3d 989, 1000 (9th Cir. 2005), *abrogated on other grounds by Taylor v. Sturgell,* 553 U.S. 880 (2008).

Google's laches defense "raises factual questions about when Plaintiffs knew or should have known about the default contracts, the reasonableness of any delay in filing suit, and whether the delay prejudiced Google." *Arcell*, 2025 WL 210877, at *3 (citing *Planet Drum Found. v. Hart*, No. 17-CV-02676-JCS, 2017 WL 4236932, at *7 (N.D. Cal. Sept. 24, 2017)). But as in *Arcell*, Google "identifies no basis on which the Court may resolve those issues as a matter of law on the pleadings." *See id.* Moreover, to the extent Google relies on allegations demonstrating awareness of *United States v. Google* to support its laches defense, statutory

22

tolling would seem to counsel against applying laches under those circumstances. *See* 15 U.S.C. § 16(i). After all, "in applying laches, we look to the same legal rules that animate the four-year statute of limitations" applicable to a damages claim for violation of the Sherman Act. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014). Since Google's defense would be inappropriate to resolve at this stage, its motion to dismiss based on laches is denied. *See Arcell*, 2025 WL 210877, at *3.

### D.    UCL Claim

Plaintiffs state a claim under the UCL. The UCL prohibits "unlawful, unfair or fraudulent" acts, with each of the three prongs providing a different theory of liability. Cal. Bus. & Prof. Code § 17200. Since Plaintiffs plead a plausible Sherman Act claim, they state a claim under both the unfair and unlawful prongs of the UCL. *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1068 (9th Cir. 2025) (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180–81, 186–87 (1999)); *see also Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735–36 (9th Cir. 2007) (noting that California courts have not settled whether consumers must meet the higher standard of *Cel-Tech*).

Plaintiffs also sufficiently allege that they lack an adequate remedy at law, as required to state a claim under the UCL. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Plaintiffs seek injunctive relief under the UCL, including "structural relief to cure any anticompetitive harm described in this complaint and prevent future harm." (SAC ¶¶ 284, Prayer for Relief). An injunction would be necessary to afford Plaintiffs complete relief for the harm that they have allegedly experienced, as money damages alone cannot compensate Plaintiffs for their inability to use "high quality" search engines "offering greater privacy protections and/or reduced or ad-free search experiences." (*See id.* ¶ 18.) As a result, Plaintiffs' legal remedies are sufficiently alleged to be inadequate.

### E.    Unjust Enrichment Claim

Plaintiffs' claim for unjust enrichment is construed as a quasi-contract claim for restitution. *See ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) ("While

California case law appears unsettled on the availability of such a cause of action, this Circuit has construed the common law to allow an unjust enrichment cause of action through quasi-contract." (citations omitted)).  Plaintiffs must therefore plead that "the defendant received and unjustly retained a benefit at the plaintiff's expense." *Id.* (citing *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)).  They have done so.

Plaintiffs allege that Google's violation of the Sherman Act allowed it to unjustly receive and retain valuable user data.  Specifically, Plaintiffs allege that "[a]s a result of Google's unlawful conduct," it "obtain[ed] and us[ed] the valuable time, attention, and search data of Plaintiffs and class members, which Google used for its own gain, including to reap economic, intangible, and other benefits."  (SAC ¶ 286.)  Since Plaintiffs have stated a claim under the Sherman Act, they also state a claim for restitution.  While Google challenges Plaintiffs' ability to receive disgorgement, "that determination is not within the scope of Rule 12(b)(6) and is therefore premature at this juncture."  *See Arcell*, 2025 WL 210877, at *3 (citation omitted).

## IV.    CONCLUSION

For the foregoing reasons, Google's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.  The SAC is **DISMISSED** to the extent it relies on fraudulent concealment. It otherwise survives dismissal.  Plaintiffs are granted **LEAVE TO AMEND** to address the identified deficiencies concerning fraudulent concealment.  If Plaintiffs wish to file a third amended complaint, they shall do so by **February 20, 2026**.  Plaintiffs may not add new claims or parties, or otherwise change the allegations except to correct the identified deficiencies, absent leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED.**

Dated: January 21, 2026

RITA F. LIN
United States District Judge