**BOIES SCHILLER FLEXNER LLP**
David Boies (*pro hac vice*)
Alexander Boies (*pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com
aboies@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Joshua Michelangelo Stein, CA Bar No. 298856
Margaux Poueymirou, CA Bar No. 356000
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
brichardson@bsfllp.com
jstein@bsfllp.com
mpoueymirou@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
John M. Lyons (*pro hac vice*)
James Keyte (*pro hac vice*)
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: 212 446 2332
jlyons@bsfllp.com
jkeyte@bsfllp.com

**LAW OFFICES OF LINGEL H. WINTERS**
Lingel H. Winters, CA Bar No. 37759
A Professional Corporation
2900 Shasta Rd.
Berkeley, California 94708
sawmill2@aol.com

*Counsel for Plaintiffs Zachary Crowell, Christopher Weber, Dylan Little, and Jennifer Hunt, and Interim Lead Counsel for All Others Similarly Situated*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ZACHARY CROWELL, CHRISTOPHER WEBER, DYLAN LITTLE, and JENNIFER HUNT, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 3:25-cv-02775-RFL<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

1   Plaintiffs Zachary Crowell, Christopher Weber, Dylan Little, and Jennifer Hunt, individually and on

2   behalf of all others similarly situated, file this third amended class action complaint against Defendant

3   Google LLC.   The allegations stated herein are based on information and belief, including through

4   investigation conducted by and through Plaintiffs' counsel, except as to those allegations pertaining to

5   Plaintiffs themselves.

6   **INTRODUCTION**

7   1.      This case is about the substantial harm to consumers caused by Google's unlawful

8   monopolization of the general search services market.   Over 90% of all general search engine ("GSE")

9   searches in the United States happen on Google.   After a nine-week bench trial in *United States v. Google*

10  *LLC*, Judge Amit Mehta of the United States District Court for the District of Columbia concluded that

11  "Google is a monopolist, and it has acted as one to maintain its monopoly" in the market for general search

12  services.   747 F. Supp. 3d 1, 32 (D.D.C. 2024).   Google violated Section 2 of the Sherman Act by entering

13  into "distribution agreements [that] are exclusive and have anticompetitive effects" because they require

14  Apple, manufacturers and sellers of Android devices, and browser developers to install or set Google as the

15  exclusive, default out-of-the box GSE in exchange for a steady stream of billions of dollars in annual

16  payments from Google.   *Id.* at 32-33.

17  2.      To understand how this exclusionary conduct harms consumers, it is important to look at

18  how the general search services market developed in the period after Google first launched its GSE in 1998.

19  As Judge Mehta found: "Around 2005, Google initiated the idea of an exchange of revenue share for default

20  exclusivity [for its GSE] after it grew concerned that Yahoo might replace Google." *Id.* at 92 (Finding of

21  Fact No. 313).   Under this agreement, "Apple agreed to preinstall Google as the default GSE on Safari, such

22  that it would 'automatically be used for web search unless the user selects another search provider.'" *Id.*

23  (Finding of Fact No. 314).   Numerous other default agreements followed, with Google agreeing to make

24  substantial payments to Apple, providers of Android devices (original equipment manufacturers and mobile

25  network providers, collectively, the "Android partners"), and internet browser developers (including

26  Mozilla/Firefox) for default exclusivity.

27  3.      As Judge Mehta found, Google used these exclusionary agreements to obtain "a major,

28

largely unseen advantage over its rivals: default distribution.  Most users access a general search engine through a browser (like Apple's Safari) or a search widget that comes preloaded on a mobile device.  Those search access points are preset with a 'default' search engine.  The default is extremely valuable real estate.  Because many users simply stick to searching with the default, Google receives billions of queries every day through those access points." *Id.* at 31.  These default distribution agreements maintain Google's monopoly in the general search services market because they ensure that "most devices in the United States come preloaded exclusively with Google" as the default GSE. *Id.* at 32.

4.  Rather than compete on the merits to attract and retain users, including through permanent reward programs or other compensation to users, "Google pays huge sums to secure these preloaded defaults.  Usually, the amount is calculated as a percentage of the advertising revenue that Google generates from queries run through the default search access points.  This is known as 'revenue share.'" *Id.*  "In exchange for revenue share, Google not only receives default placement at the key search access points, but its partners also agree not to preload any other general search engine on the device." *Id.*  As such, Google used these default distribution agreements to unlawfully maintain its monopoly in the general search services market. *Id.*

5.  When a monopolist like Google forecloses competition, consumers that would have enjoyed the benefits of that competition are harmed.  As a direct result of Google's unlawful conduct, Plaintiffs and class members were deprived of a competitive marketplace where high-quality GSEs would compete to attract and retain users by offering not only better privacy protections or fewer ads, but also compensation directly to users of those GSEs.  By foreclosing this vigorous competition on the merits, Google directly harmed Plaintiffs and class members in precisely the ways contemplated by the Sherman Act.

6.  The antitrust injury of Plaintiffs and class members is concrete and quantifiable, and is clearly shown by comparing how Google secured consumers through monopolistic conduct in the actual world with how consumers would have benefited from competition in the but-for world ("BFW").  In a BFW where Google did not engage in its exclusionary and anticompetitive behavior, the market for general search services would have flourished with dynamic and differentiated competition, including competitors offering not only greater privacy protection and fewer or no ads to attract and retain users but also compensation to

users for their time, attention, and search data.

7.      There is nothing speculative about this harm: as explained below, this is precisely how competition was evolving in the general search services market before Google's anticompetitive conduct, including with Microsoft and others attempting to compete with Google in this general search services market by offering compensation directly to users.  Microsoft and others, however, could never gain the necessary traction in the face of Google's exclusionary conduct, which allowed Google to maintain its monopoly position without any compensation to users of GSEs that competition would have otherwise dictated.

8.      As examples of companies that have tried to compete and gain traction in this market through compensation paid directly to users, notwithstanding Google's exclusionary conduct:

a.  **Microsoft** in 2007 purchased a company called Jellyfish, which offered people cash back for purchases they made after clicking on advertisements.  Microsoft incorporated Jellyfish's technology into its GSE (then named Live Search) in 2008 as Microsoft Live Search Cashback, which offered ad-funded cash rebates to customers who found and purchased products through Live Search.  Later in 2008, Microsoft launched SearchPerks!, a program described as "a sort of 'frequent flier' program that lets people cash in for every search they do."  Then in 2010, Microsoft Rewards was launched, which allows people to earn points for searches conducted using Microsoft's GSE, Bing.  Microsoft Rewards is still operating today, has users around the world, and has current published rewards rates of around 0.5 cents (or $0.005) per Bing search and a maximum daily earning potential of $0.25 or over $91 per year.  Microsoft Rewards points can be redeemed for gift cards and other items.

b.  **Scour** was a GSE launched in 2008 that allowed users to earn points for every search.  Points could then be redeemed for Visa gift cards at a rate of approximately 0.38 cents (or $0.0038) per search.

c.  **Yahoo!** in 2006 surveyed users on whether they would be willing to switch to using Yahoo's GSE for incentives such as frequent flyer miles, discounted or free music and movies, or Outlook access.  In 2008, multiple employees of Yahoo! Research published an article

entitled "Sharing Online Advertising Revenue with Consumers" in which they discussed the possibility of GSEs competing by offering "revenue sharing" to users. In 2012, there were reports that Yahoo! was considering launching "Yahoo! Incentivized Search" that would give users reward points for each search they conducted.

d.  **Brave Rewards** is offered by Brave in conjunction with its browser and GSE and pays users a share of advertising revenue in the form of cryptocurrency known as Basic Attention Tokens ("BAT") that are redeemable for money or gift cards.

e.  **Presearch** is a decentralized GSE that compensates users with cryptocurrency tokens every time they search. Presearch users can collect 0.01 PRE tokens per search, up to a maximum of 0.25 PRE tokens per day. PRE tokens are a blockchain-based cryptocurrency that can be exchanged for other types of cryptocurrency or converted to U.S. dollars.

9.    Google's exclusionary default distribution agreements, however, stifled the development of GSEs that use compensation to attract and retain users. Had Google not foreclosed competition through its unlawful acts, a market would have materialized in which competition on the merits—*including from Google*—would have included compensating users for their valuable time, attention, and search data. In a competitive BFW, without the foreclosure caused by Google, then Google and other GSEs would have competed to attract and retain users by offering both high-quality general search services and other benefits, including compensation. Put another way, competition through compensation would have taken permanent hold, in part because users were and still are essential to the development and monetization of high-quality GSEs.

10.    This type of competition for users is not speculative. While Google devised and implemented its exclusionary scheme, GSEs were seeking to compete to attract and retain users by offering compensation, even before Google began engaging in exclusionary conduct. For example, GSEs such as GoTo, AltaVista, Lycos, iWon, A9, Blingo, and Zotspot pioneered various types of compensation programs to attract and retain users in the late 1990s and early 2000s. Some offered compensation directly to users (or the sites that directed search traffic to GSEs). Others made users eligible to win prizes for searching, and one offered Amazon discounts for using a GSE. Absent Google's unlawful conduct, competition on the merits would

have blossomed and solidified into standard product offerings from rival GSEs, which would have included compensation paid directly to users by GSEs.

11.     In addition to many examples of the actual efforts of Google's rivals to compete in the general search services market by offering compensation to attract and retain users, Google itself has recognized that competition may involve paying users of its GSE in several ways.  *First*, internal Google e-mails made public in the United States' antitrust suit discussed whether Google should "[c]ut users in on the deal"—a proposal for Google to compensate users that never come to fruition.  *Second*, by 2000, Google launched its Affiliate Program that paid partner sites willing to embed Google's GSE in their websites 3 cents ($0.03) per completed search—demonstrating that paying compensation (in that case, to partner sites) to attract and retain GSE users was technologically feasible and accepted in the general search services market more than 25 years ago.  *Third*, since 2005, and as detailed by Judge Mehta, Google has paid billions of dollars a year to Apple, the Android partners, and browser developers to guarantee Google's status as the exclusive "default" GSE on most devices and browsers in the United States, payments that it euphemistically refers to as "Traffic Acquisition Costs" in its financial statements (i.e., paying to secure the gatekeepers with access to users, but not through competition on the merits by paying users directly).  Cutting users "in on the deal" would mean paying users directly and opening up the market to competition, which Google sought to prevent through its anticompetitive default distribution agreements.  Separately, Google considered offering a privacy protective GSE that did not collect user data, but rejected this proposal because, among other reasons, Google was concerned that users would select it and Google would lose out on billions of dollars in revenue.  Google also considered offering an "ads-free experience" for its GSE, but again never made this option available to users.

12.     In a competitive market for general search services—without Google's exclusionary conduct—Google would have been forced to compete with other GSEs on the merits by offering compensation to users to attract and retain those users.  This would have resulted in Google redirecting large parts of its "Traffic Acquisition Costs" from funding its anticompetitive default distribution agreements into direct compensation to users of its GSE.  This is not a theoretical possibility—the Government's expert in the remedies phase before Judge Mehta recently opined that Google could compete to attract and retain

users by "*[p]ay[ing] users directly for searching on Google*."[1]

13.    The normal course of competition on the merits—without Google's exclusionary conduct—would have been different.  Though ultimately futile, competition to attract and retain users in the general search services market continued even after Google began engaging in its anticompetitive scheme and conduct.  Rival GSEs continued to attempt to vigorously compete to attract and retain users by offering compensation—often in the form of rewards programs or advertising revenue shares—even after Google's exclusionary scheme was being implemented and in a rapidly locked-up general search services market. This is further real-world evidence that GSEs paying compensation to users to attract and retain users is a viable and established business model.  Absent Google's anticompetitive conduct, this price competition would have become standard in the GSE market, as it has in other platform markets that use rewards in combination with "free" services.

14.    Moreover, Google's GSE is not "free": users "pay a price" by providing their data and time and attention wading through advertisements embedded in their search results.  The exchange of data and time and attention for search services constitutes a real and measurable cost to consumers, even in the absence of a direct monetary exchange.  As one competitor to Google explains, with Google's GSE, "Your attention is literally being auctioned to the highest bidder."[2]

15.    Paying compensation to attract and retain users is routine in other platform markets, including online platforms.  For example, numerous platforms compensate users for their time and attention viewing advertisements and completing surveys, as well as for their online browsing and search data captured through a browser plugin or app.  As discussed in greater detail below, The Nielsen Company, Qmee, Swagbucks, Reklaim, and Caden are among the companies that offer compensation to users for their time, attention, and data.  Google has also compensated users through at least five separate programs discussed below.  All of these programs are additional evidence that in a competitive platform market, rivals will compete for users' time, attention, and data through paying compensation to those users, which likewise

---

[1] *See* ¶ 194, *infra* (slides for direct testimony of Dr. Tasneem Chipty in remedies trial).

[2] *Why Pay for Search?*, The True Cost in Numbers, KAGI, https://help.kagi.com/kagi/why-kagi/why-pay-for-search.html (last visited July 12, 2025) [https://perma.cc/BW2D-YPHW].

1  would have been a major competitive driver in the general search services market had Google not foreclosed

2  competition on the merits thought its unlawful conduct.

3     16.    In addition to being participants in the general search services market as consumers who

4  stand to be paid for their use of specific GSEs, Plaintiffs and class members would also be compensated for

5  (i) their time viewing advertisements embedded in their search results, and (ii) their search data that is

6  collected, stored, and monetized every time they use a GSE.  Numerous GSEs have attempted to compete

7  with Google by offering more privacy protections or reduced or ad-free search experiences, including

8  DuckDuckGo, Neeva, Kagi, and Brave.  Yet none of these competing GSEs have gained the sort of traction

9  and widespread adoption that one would expect, and many have gone out of business.  This is not because

10 of a lack of consumer demand or business viability.  Rather, Google's anticompetitive conduct effectively

11 foreclosed all competition on the merits in the general search services market, harming not only Google's

12 rivals but also consumers.

13     17.    Google's anticompetitive conduct has enabled it to (i) pay nothing to Plaintiffs and class

14 members for their use of Google's GSE, despite the fact that Google has generated billions of dollars each

15 year from the use of its GSE by Plaintiffs and class members; (ii) extract, collect, save, use, and monetize

16 search data for various purposes—including to generate and sell advertising, to update Google's GSE, to

17 build and refine other Google products and services, and to train and develop Google's Artificial Intelligence

18 products and services—with no compensation paid by Google to Plaintiffs and class members; and

19 (iii) prevent Plaintiffs and class members from having options in the general search services market that are

20 more privacy protective or ad-free.

21     18.    Plaintiffs and class members have suffered and continue to suffer antitrust injury as a direct

22 result of Google's anticompetitive conduct.  Google's actions have deprived Plaintiffs and class members

23 of the benefits of a competitive market in two primary ways.  *First*, but for Google's anticompetitive

24 conduct, a vibrant market of high quality GSEs would have emerged that compensated users by offering

25 compensation to attract and retain users.  *Second*, but for Google's anticompetitive conduct, a vibrant market

26 of alternative high quality GSEs would have emerged and competed for users by offering greater privacy

27 protections and/or reduced or ad-free search experiences.  Instead, Google's exclusionary conduct and its

28

foreclosing effect on rivals prevented this competition on the merits from ever taking hold. Thus, Plaintiffs and class members have suffered concrete and measurable harm that flows from the very conduct the antitrust laws are designed to prevent.

19.    Plaintiffs, on behalf of themselves and all those similarly situated, seek to be compensated for their injuries and to ensure that competition returns to the general search services market. Left unrestrained, Google will continue to unlawfully maintain and enhance its dominance, allowing the toll of Google's anticompetitive conduct to continue unbated.

## THE PARTIES

20.    Plaintiff Zachary Crowell is a resident of New York, New York who has for many years used Google's GSE, including through default access points on Apple devices and various browsers. Plaintiff Crowell has spent time and attention viewing advertisements embedded in Google search results, including general search text advertisements. Google has obtained and used Plaintiff Crowell's search data, including but not limited to through his use of Google's GSE. Google has never offered any kind of compensation to Plaintiff Crowell for his use of Google's GSE.

21.    Plaintiff Christopher Weber is a resident of San Francisco, California who has for many years used Google's GSE, including through default access points on Apple devices and various browsers. Plaintiff Weber has spent time and attention viewing advertisements embedded in Google search results, including general search text advertisements. Google has obtained and used Plaintiff Weber's search data, including but not limited to through his use of Google's GSE. Google has never offered any kind of compensation to Plaintiff Weber for his use of Google's GSE.

22.    Plaintiff Dylan Little is a resident of Lee's Summit, Missouri who has for many years used Google's GSE, including through default access points on Apple devices and various browsers. Plaintiff Little has spent time and attention viewing advertisements embedded in Google's search results, including general search text advertisements. Google has obtained and used Plaintiff Little's search data, including but not limited to through his use of Google's GSE. Google has never offered any kind of compensation to Plaintiff Little for his use of Google's GSE.

23.    Plaintiff Jennifer Hunt is a resident of Castle Rock, Colorado who has for many years used

Google's GSE, including through default access points on Apple devices and various browsers. Plaintiff Hunt has spent time and attention viewing advertisements embedded in Google's search results, including general search text advertisements. Google has obtained and used Plaintiff Hunt's search data, including but not limited to through her use of Google's GSE. Google has never offered any kind of compensation to Plaintiff Hunt for her use of Google's GSE. Plaintiff Hunt used Google's My Account buttons to request that Google delete or erase her search data.

24.     As described below, members of the proposed classes have (i) used Google's GSE, including through default access points, without any compensation; (ii) spent time and attention viewing search advertisements, including general search text advertisements, embedded in Google's search results, without receiving any compensation (including any share of advertising revenue); and (iii) had their search data extracted, collected, saved, used, and monetized by Google without compensation. Members of the classes are domiciled in all 50 states, including the State of California.

25.     Defendant Google LLC is a Delaware limited liability company with a principal place of business at what is officially known as the Googleplex, 1600 Amphitheatre Parkway, Mountain View, California 94093. Google LLC is one of the largest technology companies in the world and conducts product development, search, and advertising operations throughout California and in this district. Google LLC engages in, and its activities substantially affect, interstate trade and commerce.

## JURISDICTION AND VENUE

26.     This Court has general personal jurisdiction over Google because its principal place of business is in California. Additionally, Google is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' and class members' claims occurred in California.

27.     This Court has subject matter jurisdiction over this entire action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000 and at least one class member is a citizen in a state other than California or Delaware. This Court also has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337(a).

28.     Venue is proper in this District because a substantial portion of the events and actions giving rise to the claims took place in this judicial District.  Furthermore, Google is headquartered in this District.

## FACTUAL ALLEGATIONS

29.     Google is a monopolist that unlawfully monopolized the general search services market. After a nine-week bench trial in *United States v. Google*, Judge Amit Mehta of the United States District Court for the District of Columbia issued a 188-page published opinion with nearly 400 findings of fact supporting the court's conclusion that Google has a monopoly in general search services and that its default distribution agreements are exclusive and have anticompetitive effects:

> Google is a monopolist, and it has acted as one to maintain its monopoly.  It has violated Section 2 of the Sherman Act.
>
> Specifically, the court holds that (1) there are relevant product markets for general search services and general search text ads; (2) Google has monopoly power in those markets; (3) Google's distribution agreements are exclusive and have anticompetitive effects; and (4) Google has not offered valid procompetitive justifications for those agreements.  Importantly, the court also finds that Google has exercised its monopoly power by charging supracompetitive prices for general search text ads.  That conduct has allowed Google to earn monopoly profits.

*Google*, 747 F. Supp. 3d at 32-33.  Many of the allegations in this complaint are drawn from Judge Mehta's detailed opinion and findings of fact and cited accordingly.[3]

30.     As explained below, Google's dominance and exclusionary conduct is self-perpetuating and designed to prevent meaningful competition in general search services:

a.      Google's default distribution agreements with Apple, the Android partners, and browser developers have unlawfully maintained Google's monopoly in the general search services market by guaranteeing Google's position as the exclusive default, out-of-the-box GSE on virtually all devices and internet browsers in the United States.

b.      Because only GSEs can serve general search text advertisements, Google's monopoly in the general search services market has allowed it to dominate general search text

---

[3]  At the appropriate time, and pursuant to the principles of collateral estoppel and 15 U.S.C. § 16(a), Plaintiffs will ask that the Court preclude Google from re-litigating the issues resolved by Judge Mehta.

advertisements.  Empirical evidence confirms this; advertisers allocate their advertising dollars for general search text advertisements in proportion to a GSE's share of the general search services market.

c.  Google "shares" a portion of its search advertising profits with Apple, the Android partners, and browser developers as payments for continuing contractual commitments to make Google's GSE the sole default GSE.  *Google*, 747 F. Supp. 3d at 32 (Google's default distribution agreements give partners "a percentage of the advertising revenue that Google generates from queries run through the default search access points.").

d.  Google's position as the dominant GSE gives it unparalleled power and opportunity to collect, store, use, and monetize search data.  Google uses the vast volume of search data it obtains as a result of its monopoly in general search services for various purposes, including to (i) update its GSE; (ii) deprive potential competitors of the scale necessary to compete in the market for general search services; (iii) train its valuable artificial intelligence models; and (iv) better sell and target advertisements, including general search text advertisements, that are embedded in Google's search results.  These petabytes of search data further enable Google to reinforce and maintain its monopoly in the general search services market and also to better monetize and sell search advertising (including general search text advertising).

31.  Put another way, "without access to scale, other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google.  Naturally then, GSE distributors prefer Google because of its search quality and because it would be economically irrational to sacrifice the high revenue share.  They thus routinely renew the distribution deals with their exclusive terms.  In this feedback loop, the revenue share payments 'effectively make the ecosystem exceptionally resistan[t] to change' and basically freeze the ecosystem in place[.]'" *Id.* at 159 (citations omitted).  Relying on the *Microsoft* decision, Judge Mehta recognized that the "market for GSEs is thus characterized by a type of network effect.  (1) More user data allows a GSE to improve search

quality, (2) better search quality attracts more users and improves monetization, (3) more users and better monetization attract more advertisers, (4) more advertisers mean higher ad revenue, and (5) more ad revenue enables a GSE to expend more resources on traffic acquisition costs (i.e., revenue-share payments) and investments, which enable the continued acquisition of scale." *Id.* at 161 (citation omitted).

32.    Google's enormous payments to secure its place as the exclusive default GSE has created insurmountable barriers to entry and expansion for rivals in the general search services market, ensuring that Google did not have to face meaningful competition on the merits nor change its behavior toward users. Google's conduct was not for the benefit of consumers, and it did not benefit consumers.  Google engaged in this anticompetitive conduct to foreclose competition and maintain Google's monopoly power and profits in the general search services market.

**I.    Background on GSEs**

33.    "A general search engine is a tool that [people] use to search the worldwide web using queries" and that "produces links to websites and other relevant information in response to a user query." *Id.* at 35, 38 (Findings of Fact Nos. 3, 27).  "A GSE can supply information from a broad variety of sources, covering nearly any topic.  Thus, it is 'the first place that you can turn to,' and 'a place that you go to for the vast majority of your information needs.'" *Id.* at 39 (Finding of Fact No. 33).

34.    Google maintains a durable monopoly in the market for general search services.  In 2020, 89.2% of all general search queries flowed through Google and 94.9% of general search queries on mobile devices were performed on Google.  *Id.* at 38 (Findings of Fact Nos. 23-24).  "Google's second-place rival, Bing, receives roughly 6% of all search queries.  Bing (5.5%), Yahoo (2.2%), DDG [DuckDuckGo] (2.1%), and other rivals (0.9%) together see less than 11% of all queries.  Their numbers are even lower on mobile devices." *Id.* at 38 (Finding of Fact No. 25) (citations omitted).

35.    "Constructing a GSE is an extremely capital- and human-resource intensive endeavor. Developing just the technical infrastructure alone requires billions of dollars." *Id.* at 42–43 (Finding of Fact No. 50) (citations omitted). "The first step in developing a search engine is to crawl the web. . . .  The bot 'crawls the HTML on those websites and then it looks at the links inside of those web pages and then recursively crawls them.'  And, because websites 'are constantly changing and the web is constantly

growing,' GSEs 'constantly recrawl the web to index new content.'" *Id.* at 38 (Finding of Fact No. 28) (citations omitted).

36.    "The results of the web crawling are organized into an index. An index is 'a database essentially of the whole web that's publicly available that can be returned if [a] user asks for it.' The development of an index is 'a crucial piece of the puzzle,' because if a site is not in the index, it will not be presented to users in response to a query. Thus, the more sites in an index, the better. Today, only Google and Bing create fulsome web search indexes that generate accessible results. DDG [DuckDuckGo] indexes portions of the web to create its own search 'modules.' And Apple maintains an index of about [Redacted] billion websites, although it does not presently plan to use that index to offer a results page." *Id.* at 38-39 (Finding of Fact No. 29) (citations omitted and redaction in original).

37.    "An index is only useful if the GSE understands what the user is seeking with a query. GSEs 'aim to identify spelling errors, annotate the query with synonyms, mark multi-word concepts, generate terms related to the query, and more.' Google does this in many ways: through its spelling and synonyms functions, using 'query-based salient terms' (QBST) that are likely to show up in a responsive document, and semantic tools, such as query clustering and segmentation." *Id.* at 39 (Finding of Fact No. 30) (citation omitted). Judge Mehta explained that "QBST[] is a Google signal that helps respond to queries by identifying words and pairs of words that 'should appear prominently on web pages that are relevant to that query.' . . . It is trained on about 13 months of user data." *Id.* at 51 (Finding of Fact No. 95) (citation omitted).

38.    "The GSE then must retrieve and rank websites responsive to the query. Common queries can yield a nearly infinite number of potentially responsive sites, so the GSE must include a retrieval system that narrows the volume of responsive links to tens of thousands, as opposed to millions. The GSE then must rank these several thousand results. It first must decide which results are worth scoring at a more granular level, and then score those hundreds of sites to determine which top 10 or so should be surfaced to the user." *Id.* at 39 (Finding of Fact No. 31) (citation omitted).

39.    "GSEs produce information responsive to a query on a search engine results page, or SERP." *Id.* at 41 (Finding of Fact No. 41). The following types of information may appear on a SERP:

a. "Organic links, or 'blue links,' are unpaid search results that allow a user to navigate directly to a website." *Id.* (Finding of Fact No. 43).

b. "Paid advertisements are typically generated in response to a commercial query and usually appear at the top of a SERP. Multiple types of advertisements can appear on a SERP, but the two primary ones are general search text ads (which resemble organic results but are labeled 'sponsored' on Google) and shopping ads (which typically consist of a product photograph, vendor identity, and price information)." *Id.* (Finding of Fact No. 44) (citation omitted). One of the advantages of general search text advertisements over other types of advertisements is that they "resemble organic results." *See id.* ("general search text ads . . . resemble organic results but are labeled 'sponsored' on Google"); *see also id.* at 64 (Finding of Fact No. 176) ("text ads resemble the organic links on a SERP"); *id.* at 136 ("text ads have the appearance of organic search results and provide web links to the advertiser's site").

c. "A vertical offering is a category of specialized information that is accessible to users without leaving the SERP. Examples of verticals include information about flights, hotels, and restaurants. Such information is usually acquired from third parties and is referred to as 'structured data.'" *Id.* at 42 (Finding of Fact No. 45) (citations omitted).

40. "Most SERPs contain some mixture of advertisements, organic links, and vertical offerings." *Id.* at 41 (Finding of Fact No. 42).

41. Most of Google's revenue is generated through advertising, and specifically advertising tied to user search. "In 2022, Google reported Search+ revenues over $162 billion. Between 2014 and 2021, Google's Search+ revenues more than tripled, with gross margins ranging from 76–82% annually. The vast majority of [Google parent] Alphabet's revenues (nearly 80%) come from digital advertisements, and historically the largest component has been ads displayed on Google's search engine results page." *Id.* at 35 (Finding of Fact No. 8) (citations omitted). "Text ads are . . . the predominant form of advertising on Google, whether measured by revenue or number of advertisers. In 2020, text ads made up about 80% of Google's search ads by revenue." *Id.* at 65 (Finding of Fact No. 181) (citations omitted).

## II.    How People Use GSEs

42.    Because the internet is not organized in any purposeful manner, GSEs are almost always the beginning of a person's journey whenever they "search the internet," regardless of the purpose: from finding information, to conducting research, to simply navigating to another site.  As Judge Mehta recognized, "[m]any users begin their online information gathering journeys on GSEs." *Id.* at 40 (Finding of Fact No. 35).  Stated another way, "[a] general search engine is a tool that [people] use to search the worldwide web using queries" and that "produces links to websites and other relevant information in response to a user query." *Id.* at 38, 35 (Findings of Fact Nos. 27, 3).  Without some type of index or compass to navigate the internet, finding things and information—whatever a person might be looking for—could be nearly impossible.

43.    Google delivers organic search results and advertising together and in response to a single search query, so that when users search they are simultaneously presented with both organic results and embedded advertising that is targeted based on their search query.  "Organic links, or 'blue links,' are unpaid search results that allow a user to navigate directly to a website." *Id.* at 41 (Finding of Fact No. 43).  In contrast, "[s]earch advertisements are a form of digital advertising.  Search advertisements are paid, or 'sponsored,' postings published in response to a user's query on a search platform." *Id.* at 62 (Finding of Fact No. 167).  Google users cannot opt out of having advertisements embedded in their search results, and users are completely disintermediated by Google's GSE from being able to directly negotiate with advertisers.

44.    The purpose of search advertising is to intercept potential customers before they get to organic search results.  Google's President of Global Affairs explained the relationship between advertising and organic search results: "We take that same approach to online shopping searches.  If you're looking to buy a <coffee machine> or a <cast iron pan>, we want to connect you directly to merchants who sell them, whether that's through organic links or ads.  In recent years, we've improved the format of our ads to include more informative displays with pictures, prices, and links where you can buy products."[4]  Google unliterally

---

[4] Kent Walker, *Improving Quality Isn't Anti-Competitive, Part II*, GOOGLE EUROPE BLOG (Nov. 3, 2016),

dictates what advertisements are displayed and what are not between the advertiser and user, explaining that "[a]ds are only displayed if *we* believe they're relevant to the search terms [a user] entered."[5]

45.    Some search advertising is connected to the topic of the search query and designed to intercept users before they get to the organic search results that are actually responsive to their query.  For example, if a person searches Google for "best running shoes," the purpose of the search is to go on an "information gathering journey" to learn what could be the "best running shoes."  And the first "organic link" on Google's search results provides this information—it is an article from Runner's World titled "The 12 Best Running Shoes of 2025."  But Google embeds two kinds of advertising into this search result before this "organic link."    The first results on the SERP are advertisements known as "product listing advertisements" or "PLAs."[6]  Unlike the search text advertisements that follow, PLAs have an image of a product (here specific models of running shoes) with a link to a merchant offering that product at a specific price.  These PLAs are then followed by two search text advertisements—which appear similar in form to organic search results, but are labeled "Sponsored" and take a user to an advertiser's website (here On or Nike running shoes), rather than to a site directly responsive to their query.

//

---

https://blog.google/around-the-globe/google-europe/improving-quality-isnt-anti-competitive-part-ii/ [https://perma.cc/A3L9-4MYH].

[5] Google LLC, *Ads on Search*, https://www.google.com/intl/en_us/search/howsearchworks/our-approach/ads-on-search/ (last visited July 12, 2025) (emphasis added) [https://perma.cc/WBE3-X98G].

[6] *See Google,* 747 F. Supp. 3d at 64 (Findings of Fact Nos. 177-78) ("PLAs, also known as '[s]hopping ads[,] are designed for retail advertisers,' that is, sellers of tangible goods.  'The reason why is because when users are shopping, they often want to see pictures and prices and other relevant information about products.' Google developed PLAs both to meet this consumer need and to compete with Amazon's retail offerings." (citations omitted and alterations in original)).

46.     The GSE user neither requested PLAs nor search text advertisements, when he or she queried "best running shoes."  These were all unilaterally embedded by Google for its own profit-seeking purposes.  If a user clicks on either a PLA or search text advertisement (or both), Google then charges the advertisers on a "cost per click" basis.  *See id.* at 77 (Finding of Fact No. 239) ("An advertiser whose text ad appears on a SERP only pays Google if a user clicks on the ad.  A text ad is priced on 'cost per click' (CPC) basis." (citation omitted)).

47.     In other circumstances, both the advertising link and organic search result will take the user to the same place.  For instance, if a person searches for "Amazon," this is interpreted by Google as a

---

7 Throughout this complaint, certain images have been annotated with red boxes to draw attention to the relevant portion of the image or screenshot.  All of these red boxes have been added by counsel to assist the reader.

navigational query indicating the user is likely trying to navigate to Amazon's site. In response, Google serves two links that will take users to Amazon: first, there is a search text advertisement (labeled "Sponsored" by a willing advertiser, here Amazon); and second, there is an organic result for Amazon.



48.    The organic link for Amazon (second link) is substantively similar to the "sponsored" search text advertisements (first link) from the perspective of users—people may not even realize there is a distinction between clicking on the organic link versus the search text advertisement. The search text advertisement appears because advertisers participated in an auction run by Google, in the milliseconds between when the search query is submitted and the search results are actually shown to the users. The advertisers bid on terms in the user's search query (here, "Amazon"), and agreed to prices on placement unilaterally dictated by Google. In contrast, the organic search result appearing second is generated based on Google's ranking algorithms, and those displayed organically must heed to the sole dictates of Google in terms of where and the order in which they ultimately appear.

49.    Google also collects, stores, uses and monetizes search data every time a user submits a search query and interacts with its GSE. Judge Mehta found that "[t]he degree of privacy a GSE offers reflects a series of individual design decisions. Whether to track a user's sessions data is one such decision."

*Id.* at 55 (Finding of Fact No. 121) (citations omitted). "How much user data a GSE retains also is a measure of privacy. Google chose to retain 18 months, even though some survey data suggested users preferred a shorter retention period. The decision to retain 18 months of a user's data versus fewer months was largely arbitrary." *Id.* at 56 (Finding of Fact No. 125) (citation omitted). This vast trove of user search data is used by Google to optimize advertisements and monetization, and to improve its GSE in ways competitors cannot. *See id.* at 49–52 (Findings of Fact Nos. 86-106) (discussing use of search data by Google). Google relies on this vast quantity of search data to better target advertising, including general search text advertisements: "Scale also improves search ads monetization. This is intuitive: Understanding which advertisements users click on (or scroll past) enables Google to evaluate ad quality and serve more relevant ads in the future. The more precisely targeted an ad, the greater likelihood that it will be clicked, which translates into higher revenues that Google uses to make larger revenue share payments" to secure its position as the exclusive default GSE. *Id.* at 161 (citations omitted). Nonetheless, as further alleged herein, users cannot effectively opt out of Google collecting their search data, both because Google's anticompetitive conduct deprived class members of meaningful choices for other GSEs that are more privacy protective, and because Google gives users no actual ability to prevent Google from collecting, saving, or using their search data or having Google delete their saved search data.

## III. Distribution of GSEs and The Power of Defaults

50. "Search providers have multiple channels to make accessible, or distribute, their GSE to users on mobile and desktop devices." *Id.* at 44 (Finding of Fact No. 58).

51. "The most efficient channel of GSE distribution is, by far, placement as the preloaded, out-of-the-box default GSE. That access point varies by device." *Id.* (Finding of Fact No. 59) (citations omitted).

    a. "On Apple products, [the default GSE access point] is the integrated search bar in the Safari browser (and to some extent, Apple's voice assistant, Siri, and on-device search, Spotlight)." *Id.* (citations omitted).

    b. "On Android devices, [the default GSE access point] is the search widget (prominently displayed at the center of the device's home screen) and the search toolbar in the Chrome

browser. The Chrome browser typically appears on the home screen of Android devices either in the 'hotseat'—that is, the row of applications at the bottom of the home screen—or in a folder on the home screen along with other Google applications." *Id.* (citations omitted).

c.  "[O]n Windows desktop computers, the default access point is the integrated search bar in the Edge browser." *Id.* (citations omitted).

d.  "Other browsers, which are not preloaded on devices but can be downloaded, also use an integrated search bar [as the default GSE access point]." *Id.* (Finding of Fact No. 60) (citations omitted). "The search access points on Firefox include 'the search box' in the browser, 'the navigation or location bar,' any 'search box displayed on a Firefox Startpage,' among others." *Id.* at 96 (Finding of Fact No. 334).

52.  "Google is the default GSE on all of these access points except on Edge, where the default GSE is Bing." *Id.* at 44 (Finding of Fact No. 59).

53.  "Many users do not know that there is a default search engine, what it is, or that it can be changed." *Id.* at 45 (Finding of Fact No. 68). An internal Google study in 2020 found "that over half of iPhone users in the United States were 'unsure' which GSE powered Safari and conclude[ed] that users are 'often unaware they're using Google.'" *Id.* at 46 (Finding of Fact No. 68). Judge Mehta also cited a "2018 Google study showing substantial user confusion regarding which browser and GSE was in use." *Id.* at 45.46." Similarly, a "2007 Google study show[ed] that the default homepage on a browser is '[c]onfigurable by user but very few know/care to change it' and that '[u]sers do not always make an active, deliberate choice of a' search engine." *Id.* at 45.

54.  The default GSE access point on the Safari browser on Apple's iPhone demonstrates why users may be unaware that their browser defaults to searching Google: the search bar simply says "Search or enter website" without informing users (i) which GSE will be used for their search (Google is the default); (ii) that their search data will be transmitted to and then used, stored, and monetized by Google; or (iii) that Google will use their search data for various purposes, including to generate and sell advertisements:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    55.    "That users overwhelming[ly] use Google through preloaded search access points is

16    explained in part by default bias, or the 'power of defaults.'" *Id.* (Finding of Fact No. 65).

17    56.    "The field of behavioral economics teaches that a consumer's choice can be heavily

18    influenced by how it is presented" and "[t]he consensus in the field is that 'defaults have a powerful impact

19    on consumer decisions.'" *Id.* (citation omitted).  Google's internal documents are in accord.  "Google's

20    behavioral economics team wrote in 2021: 'Inertia is the path of the least resistance.  People tend to stick

21    with the status quo, as it takes more effort to make changes.'" *Id.* (Finding of Fact No. 67).  Similarly, in a

22    2005 letter to Microsoft, Google—in a moment of candor—stated that "most end users do not change

23    defaults." *Id.*

24    57.    Judge Mehta found that "[e]ven users who 'are not in this habitual mode and [] try to change

25    the default will get frustrated and stop the process' if there is 'choice friction.' 'Choice friction' refers to the

26    concept that subtle challenges or barriers make it increasingly more difficult to implement a change.  '[T]he

27    more choice friction it takes to change the defaults, the stickier the defaults are.'" *Id.* at 46 (Finding of Fact

28

No. 69) (citations omitted and alterations in original). Judge Mehta cited numerous internal Google documents in support of his finding of fact that "Google appreciates that increased choice friction discourages users from changing the default." *Id.* (Finding of Fact No. 73). These internal Google documents include (i) a "2021 Google document from Google's Behavioral Economics Team stating that a '[s]eemingly small friction points in user experiences can have a dramatically disproportionate effect on whether people drop or stick'"; (ii) an internal Google document commenting that "of the tiny fraction of end users who try to change the default, many will become frustrated and simply leave the default as originally set[.]"; and (iii) an internal Google document instructing that: "you want to think about each step, as small as it might be, and see if there is a way to eliminate it, delay it, simplify it, default it." *Id.* (citing Exs. UPX103, UPX172, UPX848).

58.    As explained below, Google has recognized the "power of defaults" and secured default placements for Google's GSE with phone and tablet manufacturers, mobile wireless carriers, and developers of internet browsers by entering into exclusionary search distribution contracts. Pursuant to these contracts, Google makes billions of dollars in annual payments that guarantee that (i) Google is the exclusive default GSE, and (ii) no other GSEs are pre-loaded on a device or browser. Google effectively pays OEMs and other access points to lock out rivals, which in turn prevents users from enjoying the benefits of competition—i.e., compensation paid to those users for their use of a GSE.

59.    Search data confirms that Google's efforts to exclude rivals and secure the position of default GSE have been enormously successful and significantly contribute to maintaining Google's monopoly position in the general search services market. "Roughly 50% of all general search queries in the United States flow through a search access point" that has Google as the default GSE. *Id.* at 44 (Finding of Fact No. 62). "Another 20% of all general search queries in the United States flow through user-downloaded Chrome, which defaults to Google." *Id.* at 45 (Finding of Fact No. 63). As Judge Mehta concluded, "securing the default placement is extremely valuable for monetizing search queries." *Id.* at 47 (Finding of Fact No. 75). "In 2017, Google estimated that its default placements drove over half (then 54%) of its overall search revenue, a percentage that had grown since 2014." *Id.*

60.    Google itself recognizes the immense benefit it derives from default distribution agreements.

Judge Mehta explained that "Google, of course, recognizes that losing defaults would dramatically impact its bottom line. For instance, Google has projected that losing the Safari default would result in a significant drop in queries and billions of dollars in lost revenues. The same would occur if Google were to lose the Android defaults." *Id.* at 160 (citation omitted). Stated another way, without anticompetitive default distribution agreements people would not blindly direct their search queries to Google's GSE and would make an informed choice. Based on the testimony of Google's expert economist, Dr. Kevin Murphy, Judge Mehta concluded that the "true value" of the defaults to Google is "undoubtedly far greater" than the billions of dollars in "Traffic Acquisition Costs" it pays Apple, the Android partners, and browser developers. *Id.*

61.     As explained below, Google's position as the default GSE maintains its monopoly in the general search services market. As Google is fully aware, default bias significantly reduces the likelihood that users will switch from a pre-set default GSE, even when alternatives are "available" in theory. This bias is particularly pronounced on mobile devices because interface constraints further inhibit switching. Google's default GSE status allows it to (i) not have to compete with other GSEs to attract and retain users, including by offering compensation to directly to users; (ii) embed advertising, including general search text advertising, into its search results that is used to generate billions of dollars a year in revenue, and (iii) collect search data without paying compensation to users who have no ability to stop Google from collecting, saving, using, and monetizing their search data—even if they have informed Google through its privacy features that they do not want Google to collect, save, or use their data.

62.     For the foregoing reasons, Google's status as the default GSE effectively forecloses meaningful competition in the general search services market.

## IV.    Google Has Entered Into Exclusionary Default Search Distribution Contracts With Apple, All Major OEMs of Android Devices, All Major Wireless Carriers, and Browser Developers

63.     Google's position as the default GSE on virtually all browsers and devices did not occur by happenstance. Rather, Google obtained its position as the "exclusive, out-of-the-box default GSE" on smartphones, tablets, computers, and internet browsers by entering into exclusionary "search distribution contracts." *Id.* at 89 (Finding of Fact No. 290). "Google has entered into search distribution contracts with two major browser developers (Apple and Mozilla); all major OEMs of Android devices (Samsung,

Motorola, and Sony); and the major wireless carriers (AT&T, Verizon, and T-Mobile) in the United States." *Id.* at 88 (Finding of Fact No. 289).

64.     Under these search distribution contracts, Google generally pays a percentage of search advertising revenue or a per device "bounty" in exchange for browser developers, OEMs, and wireless carriers making Google the exclusive default GSE.  "In 2021, Google paid out a total of $26.3 *billion* in revenue share under these contracts . . . "  *Id.* (citations omitted and emphasis added).  Yet none of these search distribution contracts obligate Google to pay users (i) for their use of Google's GSE; (ii) any share of advertising revenue, including any share of revenue from general search text advertising; or (iii) for their search data that is funneled to, saved by, and relentlessly used and monetized by Google.  Only competition on the merits—including competition involving compensation to users directly—would force Google to use its massive advertising revenues to attract and retain the very users that generate those billions of dollars each year in revenue for Google.

65.     Google's default distribution agreements foreclose a substantial percentage of the general search services market to rivals, with levels of foreclosure sufficient to support liability for exclusive dealing under the Sherman Act.  *See id.* at 157 ("The court thus finds that as to the general search services market Plaintiffs have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume."); *see also id.* at 177 (accepting expert testimony "that the challenged agreements foreclose 45% of the general search text ads market," which is a significant level of foreclosure (citation omitted)).

### 1.     Google's Internet Services Agreement with Apple

66.     "The Internet Services Agreement (ISA) is an agreement between Google and Apple, wherein Google pays Apple a share of its search ads revenue in exchange for Apple preloading Google as the exclusive, out-of-the-box default GSE on its mobile and desktop browser, Safari."  *Id.* at 89 (Finding of Fact No. 290).

67.     "The ISA requires Apple to set Google as the default search engine on Safari for all its devices.  Under the ISA, a 'Default' search engine is one that 'will automatically be used for responding to Search Queries initiated from the Web Browser software, unless the End User selects a different third-party

search service.'" *Id.* (Finding of Fact No. 294).

68.    Google signed its initial ISA with Apple in 2002, but it "did not start out with Google as the exclusive default GSE.  It granted Apple the right to license Google Search, allowing its users to access the Google SERP directly from the 'search box' in Apple's web browser.  The contract was not exclusive as to either party: Apple could preload rival search engines, and Google could license its search product to other third parties. . . .  The 2002 ISA did not include any payment of revenue share." *Id.* at 92 (Finding of Fact No. 312) (citations omitted).

69.    "Around 2005, Google initiated the idea of an exchange of revenue share for default exclusivity after it grew concerned that Yahoo might replace Google.  Apple did not ask for revenue share." *Id.* (Finding of Fact No. 313).  Under this Google-initiated amendment to the ISA, "Google would pay Apple a one-time sum of $10 million, plus 50% of its annual advertising revenue.  As consideration, Apple agreed to preinstall Google as the default GSE on Safari, such that it would 'automatically be used for web search unless the user selects another search provider.'" *Id.* (Finding of Fact No. 314) (citation omitted).

70.    In 2009 and 2012, "Apple sought greater flexibility to grant its users access to other GSEs." *Id.* at 93 (Finding of Fact No. 319); *see also id.* at 93-94 (Finding of Fact No. 320).  In 2009, "Apple proposed that it would receive slightly less revenue share for non-default queries (40%) and the full amount (50%) for queries on search access points preset with Google as the default." *Id.* at 93 (Finding of Fact No. 319).  Judge Mehta cited documentary evidence from Google showing that "Google rejected those terms in large part because Apple 'could decide to work with an alternate provider for the desktop/Safari search solution,' i.e., use Google as the default for some, but not all, locations or product lines/versions." *Id.* (citing Exs. UPX605 and UPX675).  The same story repeated itself in 2012, with Google's Partner Advisor, Global Partnerships, Joan Braddi, testifying before Judge Mehta that "'[i]f they wanted to receive revenue share,' Apple had to maintain Google as the exclusive Safari default." *Id.* (Finding of Fact No. 320).

71.    Google and Apple "entered into the current ISA in 2016, and in 2021 extended it for a period of five years until 2026.  Apple can unilaterally extend the agreement by two years until 2028.  After that point, the agreement can be further extended until 2031 if the parties mutually agree to do so." *Id.* at 89 (Finding of Fact No. 291) (citations omitted).  Following Judge Mehta's decision in August 2024, Google

entered into a new ISA with Apple.

72.    "In return for these default placements, Google pays Apple [an undisclosed percentage] of its ad revenue on Safari and Chrome, including queries initiated through Safari's default bookmarks.  Google pays revenue share on Chrome queries, notwithstanding the fact that Apple does not preload Chrome onto its devices."  *Id.* at 90 (Finding of Fact No. 298) (citations omitted).  "In 2022, Google's revenue share payment to Apple was an estimated $20 billion (worldwide queries)."  *Id.* (Finding of Fact No. 299) (citations omitted).  As of 2024, Google paid Apple 36% of its advertising revenue pursuant to the ISA.[8]

73.    Google has used its dominance in general search services and its significant financial leverage over Apple through the ISA to effectively prevent Apple from competing in the general search services market.

74.    Judge Mehta found that "Apple has taken steps to grow its capacity in search.  In 2018, it hired the former head of Google Search, John Giannandrea, as its Chief of Machine Learning and AI Strategy.    Under his leadership, Apple has made a significant commitment to developing certain foundational elements of a GSE, including crawling and indexing the web and creating a knowledge graph.  It also has integrated machine learning into its development efforts.  Apple has invested [Redacted] of dollars and committed [Redacted] employees to search development.  *Notwithstanding these investments, Apple has decided not to enter general search at this time.  Apple would forego significant revenues under the ISA if it were to do so.*"  *Google*, 747 F. Supp. 3d at 90 (Findings of Fact Nos. 301-02) (citations omitted, redactions in original, and emphasis added).  In the remedies phase of the United States' antitrust case pending before Judge Mehta, Apple's Senior Vice President of Services testified that Google's payments to

---

[8]  Rohan Goswami, *Apple Gets 36% of Google Search Revenue from Safari, Alphabet Witness Says, CNBC* (Nov. 14, 2023), https://www.cnbc.com/2023/11/14/apple-gets-36percent-of-google-search-revenue-from-safari-alphabet-witness.html ("Google Pays Apple 36% of Safari Search Revenue") ("Google pays Apple 36% of its search advertising revenue from Safari under the terms of the two companies' search default agreement, an Alphabet witness said in open court Monday amid a protracted antitrust battle between Google and the Department of Justice. . . .  The incidental disclosure from Alphabet's expert witness Kevin Murphy, a professor of economics at the University of Chicago, was not expected. Murphy's testimony came as part of the company's efforts to fight the Justice Department's claims that the company illegally maintains dominance over search and advertising markets.  Williams & Connolly antitrust partner John Schmidtlein visibly cringed when Murphy revealed the number, Bloomberg News reported.") [https://perma.cc/FKR3-DF8W].

1   Apple under the ISA are a "significant amount of money" and he could not disagree with the court's

2   statement that these payments were "a disincentive for [Apple] to do a search engine":



14   75.   Google has used its dominance to limit any attempts by Apple to expand into search or

15   advertising in additional ways.   *First*, in direct response to Apple's "Suggestions"—which makes

16   recommendations in response to user queries without sending them to Google—"Google negotiated a new

17   term in the 2016 ISA, which required that Apple's implementation of the Safari default must 'remain

18   substantially similar' to prior implementations." *Google*, 747 F. Supp. 3d at 91 (Finding of Fact No. 305).

19   *Second*, Google's "ISA also addresses Apple's ability to serve ads.   If Apple ever wishes to serve ads on Siri

20   or Spotlight queries or results, it may only do so if it intends 'to provide a superior user experience or align

21   with its general advertising principles.'   If that threshold requirement is met, Apple is further obligated by

22   the ISA to 'offer Google the opportunity to supply such ads or paid listings' before doing so itself.   This

23   provision has been described as the 'Right of First Refusal.'"   *Id.* at 92 (Finding of Fact No. 309) (citations

24   and emphasis omitted).

[9]   Pls.' Remedies Closing Argument: Distribution Remedies, Chrome Divestiture, Remaining Remedies, & Term of Judgement at Slide 7, *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. May 30, 2025), https://www.justice.gov/atr/media/1402261/dl?inline [https://perma.cc/CA66-4NT7].

76. In sum, Google sought and paid for exclusivity. Google has unlawfully conspired, combined, and agreed with Apple in restraint of trade and to monopolize by paying Apple billions of dollars annually to make Google the exclusive default GSE on Apple's browsers and devices.

### 2. Google's Mobile Application Distribution Agreements and Revenue Share Agreements with Android Partners

77. Google uses two types of agreements to secure its position as the exclusive default GSE on all Android devices. *First*, Google enters into Mobile Application Distribution Agreements ("MADAs") with all Android OEMs. These MADAs require the OEMs to preload a variety of applications on Android devices, including the Google Search Widget and Chrome browser—both of which must be installed on the home screen and default to Google as the GSE. *Second*, Google enters into Revenue Share Agreements ("RSAs") with all of the major wireless carriers (Verizon, AT&T, and T-Mobile) and OEMs that sell Android devices, which provide compensation in exchange for, among other things, making Google the default GSE. The entities that have entered into MADAs and RSAs with Google are collectively referred to as the "Android partners" in this complaint.

78. Mobile devices, like personal computers, require an operating system (an "OS"). OEMs pre-install an OS on each mobile device so that a consumer has immediate access to basic functions, such as cellular or Wi-Fi connectivity, camera and video recording, and a "store" to obtain mobile apps. Mobile OSs also include at least one, and often several, default access points for GSEs.

79. Entities that manufacture mobile devices are referred to as OEMs. The best-known OEMs in the United States include Apple, Samsung, LG, Motorola, and Sony. *Id.* at 88 (Finding of Fact No. 289) ("Google has entered into search distribution contracts with . . . all major OEMs of Android devices (Samsung, Motorola, and Sony) . . ."). Most OEMs, except for Apple, do not develop their own OS but license a third party's OS for their devices (referred to as a "licensable mobile OS"). *See id.* at 36 (Finding of Fact No. 9) ("Unlike Android, Apple's operating systems are not open source.").

80. "In 2008, Google developed Android, an open-source operating system for mobile devices. An open-source system allows third-party developers to create new smart devices and technologies by customizing the Android system to the device or technology." *Id.* at 35 (Finding of Fact No. 5) (citation and

emphasis omitted).  But Android is now "open-source" in name only.  The Google-certified version of Android OS powers all current Android devices, with Judge Mehta explaining that "[a]s of 2019, about 2.3 billion Android devices were subject to the MADA.  Google employees were not aware of any non-MADA Android device sold in the United States."  *Id.* at 98 (Finding of Fact No. 350) (citation omitted).  In this complaint, "Android" refers to the Google-certified version of the Android OS.

81.    As of July 2020, over 99% of smartphones with licensable mobile OSs were powered by Android.  Consumers cannot switch their mobile OS from Android to another OS because (i) mobile devices are designed to work with a particular OS; (ii) there are no other licensable OSs available on the market besides Android; (iii) there is no appreciable aftermarket for mobile OSs; (iv) switching to Apple's OS would require replacing smartphones, tablets, and other devices with Apple devices at a considerable cost; and (v) there are significant barriers to switching from one OS ecosystem to another, including synergies and integrations between devices.

82.    "Google has entered into Mobile Application Distribution Agreements, or MADAs, with all Android OEMs, including Motorola and Samsung, among others.  The MADA is a device-by-device license that allows OEMs to use Google's proprietary mobile applications developed for the Android ecosystem. This suite of applications is referred to as Google Mobile Services (GMS).  OEMs pay no fee for the GMS license, but Google requires OEMs to preload certain applications in prominent placements.  The MADAs may be terminated only by a breach by either party."  *Id.* at 97-98 (Findings of Fact Nos. 348-49) (citations omitted).

83.    Google uses these MADAs to privilege the apps it publishes over competing apps within its OS.  For example, Google embeds its own search, maps, and Chrome web browsing applications directly into the Android OS under the MADAs.  Google's apps are presented to the user immediately within the Android OS platform, such that users may not even be aware of possible competitive alternatives before they begin allocating their usage (and thereby their time and data, including search data) to Google, on Google's terms.  This positioning of Google's own apps above third-party apps only helps reinforce Google's anticompetitive edge.  This represents yet another dimension through which Google, the owner of Android OS, has set up barriers to entry to privilege Google.

a.    "Under the MADA, partner OEMs must preload all 11 GMS applications onto a new device, including the Google Search Widget, Chrome, YouTube, Gmail, Google Maps, and Google Drive, among others.  Six of these applications, including the Google Search application and Chrome (which both default to Google [as the GSE]), cannot be deleted by the user.  Without a MADA, an OEM cannot distribute any one of these GMS applications."  *Id.* at 98 (Finding of Fact No. 351) (citations omitted).

b.    "Part of the GMS suite of applications is the Google Search Widget (or Quick Search Box).  Signatories of the MADA agree to preload and place the Widget on the default home screen of the device.  Signatories also receive Chrome, and generally speaking, they agree to place Chrome in the Google applications folder, which appears on the default home screen."  *Id.* at 99 (Finding of Fact No. 356) (citations omitted).

c.    MADAs are especially important in terms of access to Google Play Store.  Google's Play Store is "the leading Android app store," and "[w]ithout a MADA, an OEM cannot distribute the Play Store.  The Play Store contains a set of application programming interfaces (APIs), which support the functionality of all Android applications—both those developed by Google and by third parties.  A user cannot effectively utilize GMS applications without having the Google Play Store installed, because the GMS apps' APIs rely on the Play Store's infrastructure."  *Id.* at 98 (Finding of Fact No. 352).  As Judge Mehta found, "[t]he Play Store is not just technically required, but it also contributes significantly to the user experience. Carriers view the Play Store as essential."  *Id.* at 98 (Finding of Fact No. 353).  "[T]he market reality that the Google Play Store is viewed by OEMs as essential to the Android customer experience."  *Id.* at 150 (Finding of Fact No. 97).  As Microsoft CEO Satya Nadella put it bluntly, "without the Play Store, the 'phone is a brick.'"  *Id.*

84.    A "MADA is a device-by-device license," and therefore Google enters into a new license agreement with an OEM for each device that is subject to the MADA.  *Id.* at 97-98 (Finding of Fact No. 348).  Following Judge Mehta's decision in August 2024, Google has entered into new MADAs with all of

the OEMs.

85.      Judge Mehta found Google's MADAs with the Android partners are "exclusive in practice." *Id.* "This exclusivity arises from two contractual requirements and two market realities. The two contractual requirements are that all MADA signatories must: (1) feature the Google Search Widget in the center of the home screen and (2) place Chrome on the home screen with Google as the default GSE. The two market realities are that: (1) the Google Play Store is a must-have on all Android devices, and (2) the industry-wide practice is to avoid excessive preloading of applications, or 'bloatware.' This combination of factors has resulted in all Android OEMs and carriers entering into MADAs, with all Android devices featuring the Google Search Widget and Chrome on the home screen to the exclusion of rivals as a practical matter." *Id.* (citations omitted).

86.      "A revenue share agreement, or RSA, is a separate agreement from the MADA. Each RSA generally follows a tiered structure, in which a carrier's or OEM's payment is tied to the degree of device exclusivity." *Id.* at 100 (Finding of Fact No. 362). "Google has signed RSAs with each major wireless carrier: Verizon, AT&T, and T-Mobile." *Id.* (Finding of Fact No. 364). "Google also has RSAs with the two primary Android OEMs, Samsung and Motorola. These RSAs cover the relatively small number of Android devices sold directly by OEMs." *Id.* at 103 (Finding of Fact No. 380).

      a.      Pursuant to their RSAs with Google, Verizon and AT&T receive a percentage share of search advertising revenue from Google for every device that meets certain requirements, including having Google as the exclusive default GSE (with Verizon's revenue share tripling if a device has additional default Google placements that qualify it as a "preferred tier" device). *Id.* at 101-02 (Findings of Fact Nos. 366, 376-77).

      b.      "T-Mobile's RSA is structured differently than the other[ carriers]. T-Mobile is compensated for the default placements on Qualifying Devices and Preferred Devices through a $[Redacted] bounty per device." *Id.* at 102 (Finding of Fact No. 378) (redaction in original).

      c.      The RSA with Samsung provides an advertising revenue share, which is increased if "Google [is] set as the default GSE on the S Browser" and other requirements are met.

*Id.* at 103 (Finding of Fact No. 381). The percentage revenue share is further increased if Samsung provides additional default placements for Google, "such as placing Chrome as the default browser (over S Browser) in the hotseat, or dock." *Id.* (Finding of Fact No. 382) (citations omitted). Google's CEO recently conceded that it is possible the percentage of advertising revenue it pays Samsung is "less than half of what it pays to Apple" (currently 36% of advertising revenue) even though Samsung is "Android's largest hardware partner."[10]

d.    Under Motorola's RSA with Google, "[a]ll devices sold must meet the minimum requirements of the Foundation Tier (preinstallation of Chrome with Google as the default GSE in the device's dock or hotseat). Motorola then earns at least $[Redacted] monthly in return." *Google*, 747 F. Supp. 3d at 103 (Finding of Fact No. 384) (redaction in original).

87.    At the time of the findings by Judge Mehta, all of the Android partners entered into their current RSAs with Google between 2020 and 2021. *See id.* at 102 (Finding of Fact No. 375) (Verizon entered its current RSA with Google in 2021); *id.* at 104 (Finding of Fact No. 389) (AT&T entered its current RSA in 2021); *id.* at 103 (Finding of Fact No. 385) (T-Mobile entered its current RSA in 2021); *id.* at 104 (Finding of Fact No. 390) (Samsung entered its current RSA in 2020); *id.* (Finding of Fact No. 385) (Motorola entered its current RSA in 2020). Following Judge Mehta's decision in August 2024, Google has entered into new RSAs with all of the entities listed above.

88.    The purpose of RSAs is to ensure that Google is the default GSE on Android devices. "The RSAs between Google and Android device distributors formalize the practical exclusivity of the MADAs. That has been their purpose from the outset. All of the RSAs contain an 'alternative search services' clause.

---

[10]   Google Pays Apple 36% of Safari Search Revenue ("An expert witness testifying on Google's behalf in Washington, D.C., antitrust proceedings revealed the 36% figure in open court on Monday, apparently by accident. An attorney for Epic asked Pichai if the detail presented by Google's witness was accurate. 'That's correct,' Pichai responded. The Epic attorney then alleged that Google pays Samsung, Android's largest hardware partner, less than half of what it pays to Apple. Pichai replied that while he didn't know for certain, it was possible.").

That clause prohibits Google's Android partners from preloading rival search engines. It also greatly restricts a partner's ability to promote other GSEs. In return, the Android partner receives revenue share. The structure of revenue share payments varies among the RSAs, but the basic barter is revenue share in exchange for default exclusivity. That is effectively how the RSAs operate." *Id.* at 151 (citations omitted).

89. RSAs preserve Google's monopoly in the general search services market by, among other things, prohibiting carriers and OEMs "from installing any Alternative Search Service or means of navigating to one; marketing any other Alternative Search Service; suggesting an Alternative Search Service to end users; or adjusting settings that would interfere with Google's default search position." *Id.* at 103 (Finding of Fact No. 385) (citation omitted) (citing T-Mobile and Motorola 2021 and 2020 RSAs).

90. "Although no OEM or carrier is required to enter into an RSA, all do so. It would be irrational for a profit-maximizing firm to sign a MADA but then forgo at least some revenue share under the RSA." *Id.* at 100 (Finding of Fact No. 363). Put another way, "[n]o rational market actor would sell a MADA-compliant device without ensuring that it earned search revenue through the RSA." *Id.* at 151 (citations omitted).

91. Internal Google documents show that "Google has long viewed RSAs with carriers as essential to securing query traffic on Android devices to the exclusion of rivals." *Id.* at 100 (Finding of Fact No. 365). Google has internally recognized that the RSAs are designed to exclude competitors such as Microsoft and Yahoo and ensure that there is no meaningful competition for users. For example, Google executive Chris Barton wrote about Google's exclusive distribution deals with T-Mobile, Verizon, and Sprint: "I think this approach is really important otherwise Bing or Yahoo can come and steal away our Android search distribution at any time, thus removing the value of entering into contracts with them. *Our philosophy is that we are paying revenue share \*in return for\* exclusivity.*" *Id.* (asterisks in original, rest of emphasis added). Mr. Barton also wrote: "We need to incentivize carriers to ship Google using the same approach we at Google have used for many years: *'We will pay for revenue share in return for exclusive default placement.' This contract is an exchange . . . Without the exclusivity we are not 'getting' anything.* Without an exclusive search deal, a large carrier can and will ship alternatives to Google[.] *. . . Android is by far the greatest opportunity for Search monetization in mobile over the next years and is very strategic*

*to Google.* You can bet that Microsoft and Yahoo will enter into contracts for search on Android through carrier deals if we do not." *Id.* at 101 (Finding of Fact No. 365) (citation omitted, emphases added, and alteration in original).

92.    Other real-world evidence confirms the exclusionary purpose of Google's RSAs. "On June 13, 2017, Verizon purchased Yahoo. One of Verizon's goals was to preload certain Yahoo features, including search, onto its devices. Verizon raised this with Google in its negotiations for the 2021 Google-Verizon RSA." *Id.* (Finding of Fact No. 369) (citations omitted). But Google said no and "advised [that] all go-forward agreements with carriers include exclusivity provisions and exceptions cannot be made." *Id.* at 102 (Finding of Fact No. 372) (citing Ex. UPX642).

93.    Google uses its dominant position in the field of licensable mobile OSs to obtain anticompetitive MADAs and RSAs with Android partners that ensure Google is set as the default GSE at multiple access points on Android devices. Google has unlawfully conspired, combined, and agreed with the Android partners in restraint of trade and to monopolize by paying the Android partners billions of dollars annually to make Google the exclusive default GSE on Android devices.

### 3.    Google's Revenue Sharing Agreement With Mozilla

94.    "Google also has a revenue sharing agreement with the browser developer Mozilla, whereby it pays Mozilla [Redacted] [percent] revenue share in exchange for the default search placement on the Firefox browser." *Id.* at 96 (Finding of Fact No. 334) (redaction in original).

95.    Web browsers like Mozilla are a valuable distribution path for GSEs because about 60% of queries are conducted in a web browser.

96.    Mozilla entered into its RSA with Google in 2017 and has renewed it continuously since then. Following Judge Mehta's decision in August 2024, Google entered into a new RSA with Mozilla. "Under the terms of the current Mozilla RSA, either party may terminate the agreement only upon a breach." *Id.* (Finding of Fact No. 336).

97.    "Google's 2021 revenue share payment to Mozilla was over $400 million, or about 80% of Mozilla's operating budget." *Id.* (Finding of Fact No. 335).

98.    Google has unlawfully conspired, combined, and agreed with Mozilla in restraint of trade

and to monopolize by paying Mozilla hundreds of millions of dollars annually to make Google the exclusive default GSE on Firefox.

### 4.    Google's Chrome Browser

99.    Google's anticompetitive conduct is both buttressed by and extends beyond formal distribution agreements as a result of Google's ownership and control of the Chrome browser—one of the most widely used browsers in the United States, which sets Google as the default GSE.  Judge Mehta included a graph in his opinion showing the dominance of Chrome on computers using Windows OS:



100.    In addition to searches conducted on Google through pre-installed Chrome browsers, Judge Mehta found that "20% of all general search queries in the United States flow through user-downloaded Chrome, which defaults to Google."  *Id.* at 45 (Finding of Fact No. 63).  Google's ownership of Chrome ensures that Google Search is set as the default GSE for Chrome users.  This is the "reality of control" that Google is the sole default on Chrome.  This default status, combined with Chrome's widespread adoption, further entrenches Google's dominance in general search services, even in the absence of explicit distribution contracts.  It is a market reality that significantly narrows the available channels of distribution and thus disincentivizes the emergence of new competition.

---

[11]  *Google*, 747 F. Supp. 3d at 49.

101.    Chrome has 4.1 billion monthly active users, and Google is set as the default search engine on 92% of Windows Chrome browsers, 95% of Mac Chrome browsers, 98% of Android Chrome browsers, and more than 99% of iOS Chrome browsers.[12]  Internal Google documents describe Chrome as a "critical endpoint" that drives value by expanding Google's reach and preventing disintermediation of Google Search by operating system providers.[13]

102.    Google's integration of its own search engine as the default in Chrome mirrors the anticompetitive conduct at issue in *United States v. Microsoft*, where the court found that tying the Windows operating system to Internet Explorer was exclusionary.  Google's conduct with Chrome must be considered as part of its broader pattern and long history of anticompetitive behavior.  As Judge Mehta found, "[t]hough the Chrome default is not alleged to be exclusionary conduct, it is a market reality that significantly narrows the available channels of distribution and thus disincentivizes the emergence of new competition."  *Google*, 747 F. Supp. 3d at 120.

## V.    Google Had and Has Monopoly Power in a Relevant Market for General Search Services

### 1.    General Search Services Is a Relevant Antitrust Market

103.    The market for "general search services is a relevant product market."  *Id.* at 106-07.

104.    The relevant geographic market for general search services is the United States.  *See id.* at 107 ("All parties agree that the relevant geographic market is the United States.").

105.    "Google itself recognizes general search services as a distinct product and separate market."  *Id.* at 112.  Google's former Senior Vice President of Search, Benedict Gomes put it best: Specialized Vertical Providers or "SVPs are not GSEs."  *Id.* at 58 (Finding of Fact No. 143).

106.    Historically, Google has "tracked its 'market share' relative only to other GSEs."  *Id.* at 113.  Judge Mehta found that Google internally "tracked its competitors' market shares or standing by identifying

---

[12] Pls.' Remedies Prop. Findings of Fact ¶ 459, *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. May 29, 2025), ECF 1370 ("Plaintiffs' Proposed Findings") (citing Ex. PXR0224).

[13] *Id.* at ¶ 462 ("Google uses Chrome to promote access to Google products, including Search, and to prevent disintermediation of Google Search by operating system providers. . . .  Google describes Chrome as a 'critical endpoint' that drives value by expanding Google's reach and preventing disintermediation. . . . 'Chrome is a key entry point for Search'" (citations omitted)).

other GSEs and comparing Google to those rivals." *Id.* at 57 (Finding of Fact No. 135).  Those rivals include Bing, Yahoo, DuckDuckGo, Qwant, and Ecosia.  *Id.* (citing Exs. UPX399, UPX475, and UPX268).

107.  "[B]rowser developers recognize that GSEs are a distinct product.  Browsers contain a default search access point, and only GSEs occupy that position." *Id.* at 112.  "No browser allows a user to change the default GSE to a specialized vertical provider, such as Amazon, or to a social media platform." *Id.* at 44 (Finding of Fact No. 61).

108.  "Android OEMs and mobile carriers [] consider GSEs to be a distinct product.  By signing the MADA, every Android OEM has installed a GSE—Google—as its default search access point (whether in the Google Search Widget or Chrome)." *Id.* at 112.

109.  Members of "the public [] view[] GSEs as a distinct product." *Id.* at 113.

110.  "[A]lternative sources for query information, like [specialized vertical providers] and social media sites, are not adequate substitutes" for GSEs from the perspective of users.  *Id.* at 109-10.  A user who desires to access different categories of information, such as commercial and non-commercial, informational and navigational, and other broad categories of information cannot get that functionality from a SVP or any other site that is not a GSE.

111.  "Specialized vertical providers, or SVPs, are platforms that respond to queries centered on a particular subject matter.  Examples of SVPs include Amazon, Expedia, and Yelp." *Id.* at 58 (Finding of Fact No. 141) (citation omitted).  "Most SVPs do not respond to noncommercial queries, although there are exceptions, e.g., Wikipedia." *Id.* (Finding of Fact No. 142).  "80% of Google's queries are noncommercial in nature." *Id.* at 40 (Finding of Fact No. 37).  That means that—from a user perspective—more than 80% of searches conducted on Google could not be conducted on most SVPs.  "Once a user is on an SVP's site, the SVP facilitates navigation 'only to sites in their segment where [the user] can make a transaction,' with some exceptions.  This is known as a 'walled garden' model, where the platform has proprietary, structured data that is not available on the open web." *Id.* at 58 (Finding of Fact No. 144) (citation omitted and alteration in original).

112.  Google's own internal research "demonstrates that use of SVPs is complementary, rather than cannibalistic.  In other words, there is no evidence that increased use of SVPs correlates with a

1  diminished use of Google or other GSEs.  For instance, Google's 2019 Project Charlotte study showed that

2  users who were members of SVP loyalty clubs (e.g., Amazon Prime) or who otherwise engaged with SVPs

3  were *more* likely to enter queries on Google.  Similarly, a 2018 Google analysis concluded that Android

4  users who were active on the Amazon application yielded $2.31 per user in incremental search revenue for

5  Google.  More recently, a 2020 Google study found a positive correlation between Amazon application use

6  and query volume on Google, ultimately determining that a user's adoption of any of six major SVP

7  applications—Amazon, eBay, Walmart, Pinterest, Spotify, or Twitter—was related to increased revenues

8  and queries on Google mobile, with no significant change on desktop behavior." *Id.* at 61 (Finding of Fact

9  No. 157) (citations omitted).  Thus, "[e]ven for overlapping queries, GSEs and SVPs can serve as

10  complementary search platforms" from the perspective of a consumer. *Id.* at 60 (Finding of Fact No. 153).

11  In short, Google's own internal empirical research demonstrates that people are not selecting between using

12  GSEs or SVPs—these different tools have different purposes, and increased use of SVPs is associated with

13  increased use of Google's GSE.

14      113.    Judge Mehta relied on significant evidence from Google and others in the search industry to

15  conclude that SVPs do not compete in the market for general search services.  For example, Judge Mehta

16  cited testimony from numerous witnesses to support the court's conclusion that "[f]act witnesses with

17  industry experience also agree that an SVP could not substitute for a GSE as a default search engine,"

18  including testimony from John Giannandrea of Apple (and formerly Google's head of search until 2018)

19  that "users, when they put something in the URL bar of Safari, they have an expectation that it's going to

20  go to a general search engine." *Id.* at 59 (Finding of Fact No. 147).  Judge Mehta also relied on testimony

21  from SVPs to conclude that "SVPs do not view themselves as competing with general search, although they

22  may compete with GSEs' vertical offerings." *Id.* at 61 (Finding of Fact No. 158).  Judge Mehta cited studies

23  conducted by Google's own expert "regarding query overlap [that] do not show that SVPs like Amazon and

24  Yelp belong in the same product market as Google." *Id.* at 60 (Finding of Fact No. 154).  But perhaps the

25  best evidence that SVPs do not compete in the general search services market is testimony from Google's

26  own employees—including Google's former Senior Vice President of search Benedict Gomes and Google's

27  Chief Economist Hal Varian—that Judge Mehta cited to conclude that "Google's own employees recognize

28

that SVPs are not GSEs." *Id.* at 59 (Finding of Fact No. 149).

114.    Social media platforms are also fundamentally different from GSEs from the perspective of users.  "Users go to social media platforms primarily to interact with others and view photos and videos." *Id.* at 61 (Finding of Fact No. 159).  "Examples of social media platforms are Facebook, Instagram, Twitter, Snapchat, LinkedIn, Pinterest, and TikTok." *Id.* (Finding of Fact No. 160).  For example, on TikTok—a popular social media platform—"users do not have to enter a query to view content.  Instead, they 'scroll through a video feed that's based on an algorithm of their engagement with past videos'" *Id.* (Finding of Fact No. 162).  And even if a user enters a query on a social media platform such as TikTok, "the results page only displays content already on TikTok and does not contain links or information from the open web." *Id.*  Judge Mehta quoted testimony from Google's own Senior Vice President of Knowledge and Information, Prabhakar Raghavan, that, "[a]s compared to Google, *the user experience on TikTok is 'quite different*, that's clear.'" *Id.* (emphasis added).  Like with SVPs, an internal Google's study demonstrated that "users who increase their use of Facebook tend to use Google more often, not less" and Judge Mehta consequently concluded that "[t]he evidence does not show, however, that increased use of social media corresponds to a decrease in use of Google. *Id.* at 62 (Finding of Fact No. 165) (citing Ex. UPX902).  And witnesses who testified on behalf of social media platforms (including TikTok and Facebook) further supported Judge Mehta's finding that "[i]ndustry participants do not consider social media sites to be GSEs." *Id.* at 61 (Finding of Fact No. 161).

115.    For the foregoing reasons, general search services is a relevant product market and only GSEs compete in this market.

## 2.    Indirect Proof of Google's Monopoly Power

### a)    Google's Monopoly Market Share

116.    Google has for many years possessed a dominant market share in the general search services market.  "Measured by query volume, Google enjoys an 89.2% share of the market for general search services, which increases to 94.9% on mobile devices." *Id.* at 119 (citations omitted).  In comparison, Bing has a market "share of 5.5% on all queries and 1.3% on mobile." *Id.*  Yahoo and DuckDuckGo have a market share of "under 3% regardless of device type." *Id.*

117.    The United States presented evidence before Judge Mehta showing the durability of Google's monopoly in general search services, with its market share steadily increasing during the period it engaged in the exclusionary conduct detailed in this complaint:



118.    Judge Mehta's findings confirm that Google's market share continued to increase over time: "By 2009, 80% of all general search queries, whether entered on a desktop computer or mobile device, flowed through Google.  That percentage had increased from 80% to 89.2% by 2020." *Google*, 747 F. Supp. 3d at 38 (Finding of Fact No. 23) (citation omitted).  Judge Mehta found that the plaintiffs "easily have demonstrated that Google possesses a dominant market share," finding that "[n]or is this market dominance of recent vintage.  Google has enjoyed an over-80% share since at least 2009.  That is a durable dominant share by any measure." *Id.* at 119 (citation omitted).

119.    In the market for general search services, Judge Mehta found that "Google has no true competitor." *Id.* at 144.  In fact, Google does not even "consider whether users will go to other specific search providers (general or otherwise) if it introduces a change to its Search product." *Id.* at 57 (Finding of Fact No. 129).  "In 2020, Google conducted a quality degradation study, which showed that it would not

---

[14] Pls.' Closing Statement at Slide A-17, *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. May 3, 2024), https://www.justice.gov/atr/media/1350576/dl?inline [https://perma.cc/P4XU-ELV3].

lose search revenue if [it] were to significantly reduce the quality of its search product.  Just as the power to raise price 'when it is desired to do so' is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers.  *The fact that Google makes product changes without concern that its users might go elsewhere is something only a firm with monopoly power could do.*"  *Id.* at 118 (citations omitted and emphasis added).[15]  "If there is genuine competition in the market for general search, it has not manifested in familiar ways, such as fluid market shares, lost business, or new entrants."  *Id.* at 144.

### b)  Entry Barriers for the General Search Services Market Are High

120.    Judge Mehta found that there are "significant barriers to entry to the market for general search services" which "means that new entrants are unlikely to emerge to meaningfully reduce the share of the market foreclosed by the distribution agreements."  *Id.* at 158-59.

121.    "Google's near-complete control of the most efficient search distribution channels is a major barrier to entry" for the general search services market.  *Id.* at 120-21.

    a.    "Google controls the most efficient and effective channels of distribution for GSEs.  It is the exclusive preloaded GSE on all Apple and Android mobile devices, all Apple desktop devices, and most third-party browsers (Edge and [DuckDuckGo] are the exceptions).  Rivals cannot presently access these channels of distribution without convincing Google's partners to break existing agreements, all of which are binding for a term of years."  *Id.* at 120 (citations omitted).

    b.    Google is the default GSE on Chrome, a web browser developed and owned by Google.  *Id.* at 35 (Finding of Fact No. 6).  "Queries on user-downloaded Chrome make up 20% of searches conducted in the United States."  *Id.* at 120.

---

[15]  As described by Judge Mehta, a 2020 internal Google experiment "assessed the impact of degrading aspects of its search quality for about three months" based on a "quality decline of 1 IS point, a measure of search quality equivalent to the loss of two times the information contained on all of Wikipedia."  *Google*, 747 F. Supp. 3d at 57 (Finding of Fact No. 134).  "This quality-reduction experiment correlated with only a 0.66–0.99% decline in global search revenue. In short, this study demonstrates that a significant quality depreciation by Google would not result in a significant loss of revenues."  *Id.*

122.    Google's "exclusive distribution agreements . . . have significantly contributed to Google's ability to maintain its highly durable monopoly." *Id.* at 145.  "Google understands there is no genuine competition for the defaults because it knows that its partners cannot afford to go elsewhere." *Id.*  "Google's partners have concluded that it is financially infeasible to switch default GSEs or seek greater flexibility in search offerings because it would mean sacrificing the hundreds of millions, if not billions, of dollars that Google pays them as revenue share." *Id.*

123.    Judge Mehta found that "[e]ven if a new entrant were positioned from a quality standpoint to bid for the default when an agreement expires, such a firm could compete only if it were prepared to pay partners upwards of billions of dollars in revenue share and make them whole for any revenue shortfalls resulting from the change.  No *current* search engine in the market can compete on those terms.  It is even harder to envision a new entrant doing so." *Id.* at 120 (citation omitted and emphasis in original).

124.    Google's brand recognition also serves as a barrier to entry for the general search services market.  "Google considers its brand as a benefit to its contracting partners, incentivizing them to choose Google." *Id.* at 121.  And "Google's brand recognition also provides its distribution partners with a powerful incentive to retain Google as the default GSE." *Id.*

125.    Search data is essential to GSEs, which require a massive amount of data in order to achieve the scale necessary to adequately categorize queries and rank results.  Acquiring an initial amount of search data to achieve this scale not only cements a GSE's market position, but it also allows the developer of the GSE to, among other things, continually improve its GSE over competitors that lack scale, better target and sell general advertising, train AI models, and develop other products.  Thus, "[s]ecuring users to generate scale, in order to then exploit the benefits of scale, is a significant barrier to entry" to the general search services market.  *Id.* (citation omitted).  Google processes over 5 trillion searches a year,[16] and "Google so values such data that, absent a user-initiated change, it stores 18 months-worth of a user's search history and activity."  *Google*, 747 F. Supp. 3d at 31-32.  That means that at any given time, Google has data from over

---

[16] Vidhya Srinivasan, *AI, Personalization and the Future of Shopping*, Google Ads and Commerce Blog (Mar 3, 2025) ("Personalization Post from Google Ads and Commerce Blog"), https://blog.google/products/ads-commerce/ai-personalization-and-the-future-of-shopping/ [https://perma.cc/473W-4U7D].

7.5 trillion searches that it can use for various purposes.  No other GSE has even a small fraction of Google's scale or petabytes of search data, which Google does not make available or sell to its competitors.

126.    Google's business practices—including its default placement agreements, billions of dollars in annual revenue sharing incentives (to lock up those default placements), and control over distribution channels—create strong economic and practical barriers that effectively foreclose rivals in the general search services market and lock users into Google's ecosystem.

### 3.    Direct Evidence of Google's Monopoly Power in General Search Services

127.    In addition to Google's extremely high market share—protected by major entry barriers—there is significant direct evidence of Google's monopoly power in the market for general search services.

128.    *First*, both before and during the class period, Google garnered immense profit margins, even after accounting for its anticompetitive payments to Apple, the Android partners, and browser developers. "Between 2014 and 2021, Google's Search+ revenues more than tripled, with gross margins ranging from 76–82% annually."  *Id.* at 35 (Finding of Fact No. 8).  As Judge Mehta found, "[u]nconstrained price increases have fueled Google's dramatic revenue growth and allowed it to maintain high and remarkably stable operating profits.  Google in turn has used these monopoly profits to secure the next iteration of exclusive deals through higher revenue share payments."  *Id.* at 178 (citations omitted).

129.    *Second*, Google's position as a monopolist allows it to be indifferent to the quality of its GSE. For example, Google admitted that it does not "consider whether users will go to other specific search providers (general or otherwise) if it introduces a change to its Search product."  *Id.*  at 57 (Finding of Fact No. 129) (citation omitted).  Citing *Microsoft*, Judge Mehta concluded that "[t]he fact that Google makes product changes without concern that its users might go elsewhere is something only a firm with monopoly power could do."  *Id.* at 118.

130.    *Third*, as Google's monopoly position became entrenched as a result of its anticompetitive exclusive default contracts, Google did not have to respond to pricing pressure from rivals, including as Microsoft and other competitors began offering compensation or rewards to attract and retain users to their GSEs.  Only a firm with monopoly power could do this.

131.    *Fourth*, Google was able to impose exclusive agreements on Apple, the Android partners,

and browser developers even where these gatekeepers to users wanted the flexibility to work with other GSE rivals. Only a monopolist can force key distribution customers to forsake competition, even if it came with a massive payoff to entrench that monopoly position.

132.    For the foregoing reasons, Google has a monopoly in the general search services market in the United States.

## VI.    Google's Unlawful Monopoly Maintenance In General Search Services Allows It To Embed Advertising In Its Search Results, Including General Search Text Advertising

133.    Google's monopolization of the general search services market has allowed it to generate billions of dollars in revenue each year by embedding advertising, including general search text advertising, in its search results (or "on the SERP").

134.    "GSEs earn revenue through the sale of search ads. When a user clicks on a GSE search ad, they are taken to an advertiser's website or platform and encouraged to complete a sale or some other indicia of conversion." *Id.* at 63 (Finding of Fact No. 172) (citations omitted). "A conversion typically is a sale or, for some goods or services, a new account or enrollment." *Id.* (Finding of Fact No. 171) (citations omitted). "[A]dvertisers view paid search as particularly efficient at driving conversions." *Id.* at 62 (Finding of Fact No. 171) (citations omitted).

135.    "There are two primary types of search ads sold on GSEs: (1) general search text ads and (2) shopping ads, or product listing ads (PLAs)." *Id.* at 63 (Finding of Fact No. 175). "Text ads are [] the predominant form of advertising on Google, whether measured by revenue or number of advertisers. In 2020, text ads made up about 80% of Google's search ads by revenue." *Id.* at 65 (Finding of Fact No. 181) (citations omitted).

136.    When people query Google's GSE, including through default access points, they provide search data that Google uses to conduct advertising auctions and then bombard users with targeted advertisements, including general search text advertisements. *See id.* at 31 ("Type the words 'running shoes' into a general search engine, and sellers of running shoes will compete with one another in a split-second auction to place an advertisement on the results page, which if clicked takes the user directly to the seller's website.").

137.    In the milliseconds between when someone enters a query into Google's GSE and when results are displayed, Google conducts an auction to determine what advertisements will appear on the SERP. "The price of a text ad 'is determined based on the results of the auction, and the maximum cost per click is specified by the advertiser.'" *Id.* at 77 (Finding of Fact No. 239). "A text ad is priced on 'cost per click' (CPC) basis." *Id.* Thus, "[a]n advertiser whose text ad appears on a SERP only pays Google if a user clicks on the ad." *Id.* Reports indicate that "[t]he average cost per click in Google Ads in 2024 is $4.66" and "[t]he average click-through rate in Google Ads in 2024 is 6.42%."[17] Stated another way, users click on—and Google earns money—for approximately 1 of every 15 searches for which it displays advertisements.

138.    Empirical evidence confirms that Google's monopoly in the general search services market has allowed Google to serve approximately 90% of general search text advertisements in the United States— advertisers report that they allocate their general search text advertising budgets in line with each GSE's share of the general search services market. *See Google*, 747 F. Supp. 3d at 76 (Finding of Fact No. 232) ("When it comes to general search text ads, advertisers have a fixed budget that largely mirrors the relative market shares of Google and Bing."); *see also id.* at 138 ("They testified that their text ads spending allocation mirrors Google's and Bing's relative query volumes (i.e., 90% of spend on Google vs. 10% on Bing). They also emphasized that under no circumstances would they spend more than 10% of their text ads dollars on Bing, and that no other platforms were viable substitutes." (citation omitted)). Advertisers believe that "shifting significant ad spending from Google to Bing would be ineffective (and unwise) because of Bing's lack of scale." *Id.* at 76 (Finding of Fact No. 233).

139.    Only GSEs can serve and display general search text advertisements; thus the only competition that Google has is from other GSEs. *See id.* 138 ("Because only GSEs can display text ads, new entrants face the same major obstacles as would the developer of a new GSE."). There are no third-party advertising platforms that can serve general search text advertisements because of the unique nature

---

[17] Susie Marino, *Google Ads Benchmarks 2024: New Trends & Insights for Key Industries*, WORDSTREAM (May 20, 2025), https://www.wordstream.com/blog/2024-google-ads-benchmarks [https://perma.cc/37T2-24XX].

of general search text advertisements—only a GSE is able to take a user search query, immediately use that to conduct an advertising auction in the milliseconds between when a user submits a search query and when the results are displayed, and then embed the search text advertisements into the search results page.

140.    Judge Mehta explained that "[t]he auction determines the ads displayed and the order in which they appear on the SERP. . .  The price of a text ad 'is determined based on the results of the auction, and the maximum cost per click is specified by the advertiser.'" *Id.* at 77 (Finding of Fact No. 239).  Judge Mehta found that "Google can affect the final price paid for an ad through so-called 'pricing knobs' or 'pricing mechanisms.'" *Id.* at 78 (Finding of Fact No. 243).  And Google did so: "Google strategically has used pricing knobs to raise text ads prices." *Id.* at 79 (Finding of Fact No. 248).

141.    When Google increased its prices for general search text advertising, "Google did not consider its rivals' text ads pricing." *Id.* at 84 (Finding of Fact No. 267).  Instead, Google's own internal "ad experiments" found that "small but substantial price increases would generate sustained long-term profits." *Id.* at 80 (Finding of Fact No. 250).  Judge Mehta cited a 2017 internal Google experiment called "Gamma Yellow" that "exposed 15% of advertisers to 'strongly increased format prices' for six weeks.  Google found that '50% of the initial revenue gains stuck' and 'found no evidence of notable format opt-out behaviour.'" *Id.* (citing Ex. UPX729).  Judge Mehta therefore concluded that Google can "increase text ads prices without any meaningful competitive constraint." *Id.* at 178.  "That Google makes changes to its text ads auctions without considering its rivals' prices is something that only a firm with monopoly power is able to do." *Id.* at 139.

142.    It is difficult to overstate the impact of Google's exclusionary behavior on consumer behavior.  Google claims that internal data shows "people shop more than a billion times a day across Google."[18] And Google cites third-party research finding that "consumers say they used Google or YouTube [owned by Google] in about two-thirds of their purchases where a new brand, product or retailer was discovered."[19]  Search advertisements occupy the time, attention, and activities of consumers, which is

---

[18]  Personalization Post from Google Ads and Commerce Blog (citing "Google Internal Data").

[19]  *Id.* (citing Google/Ipsos, Global Consumer Journeys, Dec. 2024, online survey).

1    exactly what advertisers want.  People using Google's GSE and reviewing the results of their search on

2    Google's SERP cannot avoid the advertisements, including search text advertisements, that Google embeds

3    into their search results *before* the "organic" search results.

4    **VII.   Google's Unlawful Monopoly Maintenance In General Search Services Allows It To Collect,**

5    **Store, Use, and Monetize Search Data Without Paying Compensation To Users**

6        143.   Google's unlawful monopolization of the general search services market also confers a

7    position as the dominant recipient of search data, allowing Google to collect, store, use, and monetize

8    approximately 90% of search data in the United States.  Google surreptitiously collects and retains search

9    data—including collection of search terms and detailed surveillance of how users move their mouse on

10   Google's SERP and what they click on—from everyone who conducts Google searches, with or without

11   their knowledge or consent and without compensation.  Google can only do this because of its monopoly

12   position in the general search services market, which it maintains through its exclusionary agreements to

13   secure default search access points.  Google's overwhelming market power and course of exclusionary

14   conduct together with high entry barriers in the GSE market creates a *de facto* exclusive dealing arrangement

15   for search data.

16       144.   Search data is a broad range of data that Google (i) relentlessly captures every time a person

17   conducts a Google search; (ii) stores for at least 18 months (and possibly much longer); (iii) combines with

18   other data it obtains from its apps and other sources to create rich profiles on individuals; and (iv) uses for

19   a variety of purposes, some of which are likely still unknown publicly and others that are discussed below.

20   In addition to search queries (e.g., the terms used to conduct a Google search), Judge Mehta noted that

21   "[t]here are different types of user data.  Click data, for example, includes the search results on which a user

22   clicks; whether the user returns to the SERP and how quickly; how long a user hovers over SERP results;

23   and the user's scrolling patterns on the SERP.  From such data, a GSE learns not only about the user's

24   interests but also the relevance of the search results and quality of the webpages that the user visits." *Google*,

25   747 F. Supp. 3d at 50 (Finding of Fact No. 88) (citation omitted).  All of these different types of "search

26   data" are illustrated by a slide the government used in the recent remedies trial before Judge Mehta:

27

28



145.    Google itself has an expansive definition of "User data" that includes "any data collected or processed from or about a User while the User is interacting with Alphabet Company [Google] Products. User Data is also any data observed, inferred, or derived from other User Data where the original User can be identified or original data recreated." This includes data such as (i) user queries; (ii) click-through rates; (iii) how long users over links; (iv) the location of the user; (v) the time of day; (vi) the type of device from which each query is issued; and (vii) whether the user's location shows that the query resulted in a physical in-store purchase.[21]

146.    All of the data described above by Judge Mehta and the data that Google refers to as "User data," as well as any other data collected, stored, or used by Google from people in conjunction with their use of Google's GSE constitute "search data" for purposes of this case.

147.    The scale of search data obtained by Google is massive: Google users conduct over 5 trillion searches a year.[22] And, as Judge Mehta found, "Google so values such data that, absent a user-initiated

---

[20]  Slides of Prof. David Evans, Data Privacy Expert, at Slide 10, *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. Apr. 24, 2025), https://www.justice.gov/atr/media/1397911/dl?inline [https://perma.cc/BN6Z-VDXD].

[21]  Plaintiffs' Proposed Findings ¶¶ 626, 660.

[22]  Personalization Post from Google Ads and Commerce Blog.

THIRD AMENDED CLASS ACTION COMPLAINT

change, it stores 18 months-worth of a user's search history and activity." *Google*, 747 F. Supp. 3d at 31-32. That means that at any given time, Google has data from over 7.5 trillion searches that it is saving, using, and monetizing.

148.    Google has set up a system in which users cannot prevent Google from collecting, storing, using, and monetizing their search data. In fact, Plaintiffs are informed and believe that Google continues to collect, store, use, and monetize search data even when users have taken steps to opt out of or prevent their data collection or have instructed Google to delete data that it had retained, such as by using the "delete" feature:



149.    Plaintiffs are informed and believe that Google's disclosures and privacy assurances are false. Google continues to collect, retain, and use search data even after individuals have used Google's privacy features to inform Google that their data—including search data—may not be collected or stored, or they request that Google delete their data. Google uses the search data it collects from users, with their consent or not, to maintain its dominance and in many other ways that enrich Google. Individuals obviously cannot consent to such a regime.

150.    Individuals cannot hope to receive compensation and robust privacy assurances in exchange for their search data because Google unlawfully collects and stores this data regardless of any steps they might take to limit that collection and storage.  Based on testimony from Google employees, Judge Mehta found that "Google recognizes that users increasingly care about the privacy of their online activity." *Google*, 747 F. Supp. 3d at 54 (Finding of Fact No. 116).

151.    As described in more detail below, in a competitive general search services market, individuals would select GSEs (and allocate their search data) based on the competitive offerings, including based on the privacy protections offered by a GSE or compensation to users for their search data.  In a competitive market, GSEs would face competitive pressure as individuals flock to competing GSEs that compensate users or that provide a more privacy protective GSE.  This did not occur because of Google's unlawful conduct in general search services.

152.    Google uses its monopolistic advantage over search data to maintain its monopoly in the market for general search services in various ways, including by using the scale of this data to entrench its GSE in ways competitors cannot.  *See id.* at 49-52 (Findings of Fact Nos. 86-106) (discussing use of search data by Google).  Google also relies on this vast quantity of search data to deliver and target advertising, including general search text advertisements.  *See id.*

153.    Google leverages the petabytes of search data that it has amassed for other purposes— without any compensation to users for this valuable data.  For example, it was recently revealed in the remedies phase of the United States' antitrust case pending before Judge Mehta that Google has approved using search data to train and improve its AI models, such as large-language models (LLMs):

//

//

//

//

//

//

//

Google Has Approved Using User-Side Data To Build Gemini Base Models

Search signals can be used for filtering

"[W]e just got approval to use several Search signals to help Gemini pretraining... Those signals will be very helpful for us to upweight[] good, authoritative pages and downweight[] the spammy, untrustable ones."



Google Has Approved Using Query Data To Build Gemini Base Models

**Phiroze Parakh**
Senior Director

```
16      Q.   Okay.  And the first dataset that is
17   included here for approval to be used in the Gemini
18   v3 pretrain model is Aquarium Magi.
19           Do you see that?
20      A.   Mm-hmm.

25      Q.   Okay.  So the data contained in this
1    dataset in this chart is described as following:
2           [As Read]  The Aquarium Magi includes
3    Magi responses scraped from anonymized
4    Aquarium (web answers/Magi) queries
5
6
7           Do you see that?
8      A.   Mm-hmm.
```
*Designated Testimony*

Deposition of Phiroze Parakh (Feb. 13, 2025) at 144:16-20 and 144:25-145:8.

154.     Google employee Phiroze Parakh testified that Google has approved training search-specific Gemini models on user search queries and Google incorporates click-and-query data into Search AI models.[24] Mr. Parakh testified that there are no privacy restrictions on using search data in Google Search's

AI models.[25]  Google employee Omkar Muralidharan also conceded that Google trains its AI LLM advertising models with user interaction data.[26]  And Google even uses search data from web publishers who have opted out of Google using their data to train its AI models.[27]  Google has also approved using the Google Common Corpus—which includes search data such as user behavior data, search metadata, and signals powering Google's GSE—to train its AI models.[28]  In the recent remedies trial before Judge Mehta, Google employee Eli Collins testified that Google DeepMind has studied the value of using these signals in AI model pretraining.[29]

155.    There was also evidence presented in the recent remedies trial before Judge Mehta, including testimony from Google employee Nicolas Fox, that Google has pushed for Apple to keep users signed into Google on the Safari browser to increase revenue.[30]  By having users remain signed in to their Google accounts, Google is better able to collect, store, use and monetize data—even if they have invoked Google's privacy features to tell Google not to collect, save, or use their data.

156.    Although individuals have been forced to provide their search data when searching Google's GSE without receiving any payment as a consequence of Google's unlawful conduct, this transaction between GSEs (offering search tools) and individuals (offering data) is a measurable economic exchange.

---

[25] *Id.* (explaining that there are no privacy restrictions on using search user data in Google Search's AI models (citing Des. Rem. Tr. 47:1–7 (Parakh (Google) Dep.))).

[26] *Id.* at ¶ 716 (citing Rem. Tr. 4459:22–4460:8 (Muralidharan (Google))).

[27] *Id.* at ¶ 119 ("Google Search trains and fine-tunes GenAI models on Google's extensive search data corpus, including user data and data from web publishers who have opted out of AI training under the Google-Extended opt-out.").

[28] Pls.' Remedies Responsive Prop. Findings of Fact ¶ 1228, *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. May 29, 2025), ECF 1371 ("Plaintiffs' Remedies Responsive Findings") ("Contrary to Google's assertions, the Google Common Corpus (GCC) used to train its Gemini foundation models contains Google's search data, including 'Search metadata and signals powering the internals of Google Search' which are 'derived from aggregated user behavior.'" (citing Ex. PXR0185)).

[29] *Id.* ("Google DeepMind has studied the value of using these signals in model pretraining, and received approval to filter data and train models using these signals." (citing Rem. Tr. 3355:20–3360:17 (Collins (Google)); Rem. Tr. 186:20–188:2 (Durrett (Pls. Expert)) (discussing PXR0016)).

[30] *See* Plaintiffs' Proposed Findings at ¶ 409 ("Google recognizes the importance of accessing Apple users, and has pushed for Apple to keep users signed into Google on the Safari browser to increase revenue." (citing Des. Rem. Tr. 221:4–22 (Fox (Google) Dep.); PXR0274 at -376–78)).

It is possible to quantify the cash value to Plaintiffs and class members of the search data that was collected and retained by GSEs, including Google, and also the value of that search data as it was used by Google for Google's own enrichment.

157.    There can be no real dispute that search data has immense value. GSEs rely on vast quantities of real-world search queries, user interactions, and feedback to refine their algorithms, improve the relevance of search results, and enhance the user experience. *See Google*, 747 F. Supp. 3d at 161 ("Click-and-query data also is used to build and train models that algorithmically improve results' relevance and ranking, as well as to run large-format experiments to develop new features. Scale also improves search ads monetization." (citations omitted)). In sum, Google's collection and use of uncompensated search data not only reinforces Google's dominance in the market for general search services but also enables Google to modify its own offerings, and develop new products by leveraging its scale advantage resulting from its vast trove of search data.

158.    A concrete example of the value of search data is the widespread practice of hiring individuals as "search engine evaluators." Companies such as Google, Microsoft, and others routinely pay people to perform searches, evaluate the quality of search results, and provide feedback. These evaluators are compensated specifically for generating and assessing search data, which is then used to train and calibrate search algorithms. Many job postings and third-party platforms confirm that individuals can earn income—often $15 per hour or more—by participating in these programs. This demonstrates that search data has intrinsic economic value and that there is an established market mechanism for its acquisition. The existence of paid search engine evaluators underscores that search data generated by users—whether through organic search activity or structured evaluation—is a commodity for which there is demand and for which compensation is routinely provided in a competitive environment.

159.    The value of search data is confirmed by the fact that several companies specialize in providing large-scale web data for AI and machine learning applications. These providers offer various types of data, including search data, that can be instrumental in training models to understand user search intent and behavior. For example:

a.   **Bright Data** offers extensive web data collection services, including SERP data from various search engines.  It provides pre-collected datasets and also allow for the custom collection of web data, which can be tailored to specific AI training needs.  Bright's data is collected in compliance with data privacy regulations.

b.   **Oxylabs** provides large-scale web scraping services and offers ready-to-use datasets.  Its offerings include real-time SERP data and other web data that can train natural language processing models and other AI systems.

c.   **Datarade** acts as a data marketplace, connecting data buyers with a wide array of data providers.  On Datarade, one can find listings for "Web Search Data" from various companies.

160.    As a result of Google's unlawful conduct, individuals are all but forced to hand over their search data to Google—even if they have invoked Google's privacy features to tell Google to delete their data and/or not to collect, save, or use their data.  If Google did not have a dominant position in the general search services market, users would have other options for providing their search data to GSEs that are more privacy protective, that are honest with users regarding privacy settings controlling what information is collected and stored, or that compensate users including for their search data.

**VIII.    Google Has Unlawfully Foreclosed Meaningful Competition In General Search Services**

161.    "Google has thwarted true competition by foreclosing its rivals from the most effective channels of search distribution" in the general search services market, e.g., default search access points on Apple devices, Android devices, and leading internet browsers.  *Google*, 747 F. Supp. 3d at 145.  Judge Mehta found that "Google's rivals must distribute their GSEs through less efficient, non-default access points, which results in fewer users and fewer ad dollars spent to target those users.  With less ad revenue, Google's rivals are limited in their ability to reinvest in quality improvements (both as to search and general search text ads) to attract more users and more ad dollars.  That cycle puts rivals in no position to compete with Google for the increased ad revenue that accompanies greater query volume." *Id.* at 180-81 (citations omitted).  Google's exclusionary contracts foreclosed efficient channels of distribution and resulted in network effects that made it difficult for competitors to gain the volume of users and search data that would

allow the development of high-quality search products, including high-quality GSEs that compensated users.

162.     Google would have only made these payments of billions of dollars a year to Apple, the Android partners, and browser developers if it believed there was a risk that rivals such as Microsoft or Yahoo! (and later DuckDuckGo and Neeva) could challenge Google's monopoly, including by attracting users with compensation.  If there was no risk that these competitors could challenge Google's monopoly, then it would have been illogical and economically irrational for Google to make these billions of dollars in annual payments.  But there was a significant risk—in 2016 "Google projected that without the ISA, it would lose around 65% of its revenue, even assuming that it could retain some users without the Safari default." *Id.* at 90 (Finding of Fact No. 300 Google internally estimated in 2017 "that its default placements drove over half (then 54%) of its overall search revenue, a percentage that had grown since 2014." *Id.* at 47 (Finding of Fact No. 75) (citing Ex. UPX83).  Google conducted additional internal modeling in 2020—the same year the Department of Justice filed its search antitrust case—in which it "projected that it would lose between 60–80% of its iOS query volume should it be replaced as the default GSE on Apple devices, which would translate into net revenue losses between $28.2 and $32.7 billion (and over double that in gross revenue losses).  *Id.* (citing Exs. UPX148 and UPX1050).  Based on the testimony of Google's expert economist, Dr. Kevin Murphy, Judge Mehta concluded that the "true value" of the defaults to Google is "undoubtedly far greater" than the billions of dollars in "Traffic Acquisition Costs" it pays Apple, the Android partners, and browser developers.  *Id.* at 160.  In sum, "Google, of course, recognizes that losing defaults would dramatically impact its bottom line." *Id.*

163.     After methodically reviewing the evidence and Google's arguments, Judge Mehta explained: "The key question then is this: Do Google's exclusive distribution contracts reasonably appear capable of significantly contributing to maintaining Google's monopoly power in the general search services market?  The answer is 'yes.'  Google's distribution agreements are exclusionary contracts that violate Section 2 because they ensure that half of all GSE users in the United States will receive Google as the preloaded default on all Apple and Android devices, as well as cause additional anticompetitive harm.  The agreements 'clearly have a significant effect in preserving [Google's] monopoly.'  The agreements have three primary

anticompetitive effects: (1) market foreclosure, (2) preventing rivals from achieving scale, and (3) diminishing the incentives of rivals to invest and innovate in general search." *Id*. at 153 (citation omitted). Judge Mehta therefore concluded that "as to the general search services market Plaintiffs have proven that Google's exclusive distribution agreements foreclose 50% of the general search services market by query volume." *Id.* at 157. Stated another way, these "distribution agreements foreclose a substantial portion of the general search services market and impair rivals' opportunities to compete." *Id.* at 159.

164.    As a result of Google's anticompetitive default distribution agreements, "consumer use of rival GSEs has been kept below the critical levels necessary to pose a threat to Google's monopoly." *Id.* at 145. Google's distribution agreements "deny rivals access to user queries, or scale, needed to effectively compete. Scale is the essential raw material for building, improving, and sustaining a GSE." *Id.* at 159 (citations omitted). "GSEs accumulate query data to, among other things, learn what information users are looking for." *Id.* at 50 (Finding of Fact No. 89). This inability of rivals to reach critical scale—which is simply another way to describe search data—stems from the practical exclusivity created by Google's arrangements, which work as an exclusive dealing arrangement.

   a.    Google's "distribution agreements have given Google access to scale that its rivals cannot match. Google has used that scale to improve its search product and ad monetization," including in the general search text advertising market. *Id.* at 159 (citation omitted). "Google receives nine times more queries each day than all of its rivals *combined* across all devices. The disparity is even more pronounced on mobile. There, Google receives *nineteen* times more queries than all of its other rivals put together." *Id.* at 49-50 (Finding of Fact No. 87) (emphasis in original). Google's "[s]cale also improves search ads monetization. This is intuitive: Understanding which advertisements users click on (or scroll past) enables Google to evaluate ad quality and serve more relevant ads in the future. The more precisely targeted an ad, the greater likelihood that it will be clicked, which translates into higher revenues that Google uses to make larger revenue share payments." *Id.* at 161 (citation omitted).

b.  "[W]ithout access to scale, other GSEs have remained at a persistent competitive disadvantage, and new entrants cannot hope to achieve a scale that would allow them to compete with Google.  Naturally then, GSE distributors prefer Google because of its search quality and because it would be economically irrational to sacrifice the high revenue share.  They thus routinely renew the distribution deals with their exclusive terms.  In this feedback loop, the revenue share payments 'effectively make the ecosystem exceptionally resistan[t] to change' and basically freeze the ecosystem in place[.]'"  *Id.* at 159 (citations omitted).  The importance of scale is confirmed by the fact that "Google continues to maintain significant volumes of data—despite the expense of storing it—because its value outweighs that cost."  *Id.* at 52 (Finding of Fact No. 105).

165.  Google's exclusive distribution agreements also "have reduced the incentive to invest and innovate in search."  *Id.* at 165.  "The foreclosure of efficient channels of distribution has contributed significantly to the lack of new investment."  *Id.*

a.  "Neeva exemplifies the importance of search distribution through a readily accessible channel.  Neeva secured the capital and human resources needed to build a search engine. . . .  But Neeva was unable 'to be even a default provider on things like the major browsers or operating systems,' which 'was what made [its founders] conclude that it was hard to have Neeva consumer search as a viable business.'  The reason 'why Neeva failed . . . was simply because [it] could not get enough users to be in that state where they regularly used Neeva.'"  *Id.* at 47 (Finding of Fact No. 76) (citations omitted).  Judge Mehta explained that Neeva "could not gain a foothold in the market in part because it was relegated to less efficient means of distribution, such as app downloads.  Neeva was unable to gain a position as an alternative default GSE on any mobile device.  Ultimately, Neeva's inability to retain and attract users—and thus acquire scale—was a primary reason for its withdrawal from the market."  *Id.* at 165 (citations omitted).  Perhaps most telling is the testimony from the founder of

Neeva, who Judge Mehta described as "a particularly compelling witness": "He put it best.  When the court asked why Google pays billions in revenue share when it already has the best search engine, he answered that the payments 'provide an incredibly strong incentive for the ecosystem to not do anything'; they 'effectively make the ecosystem exceptionally resist[ant] to change'; and their 'net effect . . . [is to] basically freeze the ecosystem in place[.]'  No one would ever describe a competitive marketplace in those terms.  When the distribution agreements have created an ecosystem that has a 'strong incentive' to do 'nothing,' is 'resist[ant] to change,' and is 'basically [frozen] in place,' there is no genuine 'competition for the contract' in search.  It is illusory." *Id.* at 145 (citation omitted).

b.    "Microsoft could invest more money in search but chooses not to without assurances of additional distribution on mobile.  That withholding of additional investment is in part attributable to Google's exclusive search distribution agreements." *Id.* at 166 (citation omitted).  "As Microsoft's former CEO of Advertising and Web Services, Mikhail Parakhin, testified, 'fundamentally it boils down to what kind of a long-term revenue we can achieve . . . .  If you don't have [the] ability to effectively distribute [through defaults], it's almost meaningless to invest in the area.'" *Id.* (alterations in original).  Judge Mehta found that "[n]o profit-driven firm in Microsoft's position would invest the substantial sums required to enhance its search product when there is little to no genuine opportunity for a default distribution deal." *Id.*  Thus, "Google's distribution agreements thus appear reasonably capable of having significantly contributed to disincentivizing Microsoft from enlarging its investment in search." *Id.*

c.    "The prospect of losing tens of billions in guaranteed revenue from Google—which presently come at little to no cost to Apple—disincentivizes Apple from launching its own search engine when it otherwise has built the capacity to do so." *Id.* at 168.

166.    The length and duration of Google's default distribution agreements also foreclose the market

for general search services.  For example, Judge Mehta found that the five-year term of Google's 2021 ISA with Apple (which can be extended for another five years), "amplifies the significance of the ISA's market foreclosure." *Id.* at 157-58.  Although "[t]he Mozilla RSA and the Android agreements are shorter, varying in terms of either two or three years, with opportunities for renewal" they nevertheless raise antitrust concerns because (i) the Android agreements "foreclose 19.4% of the market and . . . they are not easily terminable," and (ii) "although [the Mozilla RSA] forecloses a far smaller percentage of the search market, its effect is amplified by the significant foreclosure of larger channels." *Id.* at 158.  Moreover, "[t]he absence of meaningful rebidding further aggravates the foreclosure effects," especially when "[t]he more common story is Google's partners renewing the agreements without genuine consideration of an alternative." *Id.*

167.    The difficulty of terminating Google's default distribution agreements is additional evidence of market foreclosure.  "Google's partners cannot easily exit the agreements.  Neither Apple nor Mozilla have a unilateral right to terminate without cause, and the RSAs and MADAs [with the Android partners] can be terminated only upon breach.  There is an added disincentive with the MADA, where termination would result in loss of the GMS license, including the essential Play Store.  The lack of flexibility for partners to exit the distribution agreements reinforces their foreclosure effect." *Id.* (citations omitted).

168.    Judge Mehta also cited in support of his finding of market foreclosure the lack of "evidence on this record that consumers are apt to comparison shop among GSEs, likely in part due to the friction associated with switching the default or accessing a different search access point." *Id.* at 159 (citations omitted).

169.    As a result of Google's anticompetitive conduct, "there is no genuine competition among GSEs for defaults" and "there is no record evidence that competition for the default has motivated GSEs to make quality improvements.  If anything, Google's near dominance over the defaults for more than a decade has *reduced* the incentive to invest." *Id.* at 172 (emphasis in original).

170.    As Judge Mehta found, "[l]ike Microsoft before it, Google has thwarted true competition by foreclosing its rivals from the most effective channels of search distribution.  The result is that consumer use of rival GSEs has been kept below the critical levels necessary to pose a threat to Google's monopoly.  The exclusive distribution agreements thus have significantly contributed to Google's ability to maintain its

1   highly durable monopoly." *Id.* at 145 (citations omitted).

2   **IX.    Google Cannot Justify It Anticompetitive Conduct**

3          171.    Google cannot justify its exclusionary and monopolistic conduct.

4          172.    Judge Mehta rejected Google's claims regarding the benefits of its default distribution

5   agreements, explaining that "a non-exclusive default would still provide all the convenience and efficiency

6   benefits that Google touts." *Id.* at 172.  More specifically, Apple would still be incentivized to provide the

7   best possible user experience, and "Google does not explain why Apple would lack those same incentives

8   absent exclusivity.  Indeed, the original Google-Apple ISA preloaded Google as the default but did not

9   require exclusivity." *Id.*  Judge Mehta also recognized that "Apple in the past has sought greater flexibility

10  with defaults, which Google rejected.  Presumably, Apple would not have made that request if it felt that it

11  would harm the consumer experience." *Id.* (citation omitted).

12         173.    Google also cannot justify its anticompetitive conduct based on "increased search output due

13  to the efficiency of the default placements and its superior search quality" for at least two reasons.  *Id.* at

14  173.  *First*, there is "no evidence that default exclusivity—as opposed to a host of other market forces—is

15  a substantial cause of that" increase in search outputs.  *Id.  Second*, "increased output alone is insufficient

16  to outweigh their anticompetitive effects" or to "inoculate Google against liability." *Id.*

17         174.    None of Google's exclusionary conduct is efficient, nor does any of Google's exclusionary

18  conduct promote quality or any form of competition on the merits.  Just the opposite: Google's exclusionary

19  conduct creates inefficiencies, depriving the marketplace of rivals with the scale and distributional

20  opportunities to compete vigorously on the merits, including through compensation to attract and retain

21  users.

22         175.    Nor is there any valid argument that Google's monopoly power reflects a market failure or

23  that Google's monopoly power is somehow desirable in the general search services market.  Even in markets

24  with network effects, antitrust law does not recognize a defense to anticompetitive conduct based on size

25  and scale advantages that results from the misconduct at issue.

26         176.    As confirmed by relevant empirical and economic literature, competition between GSEs

27  results in better quality, better choices, and higher consumer welfare.  Competition on the merits would have

28

produced and will produce better outcomes for consumers because competing providers in the general search services market are incentivized to improve their products to compete, including by offering compensation to users, better privacy protections, fewer (or no) advertisements, and better product choice.

177.    Google's asserted justifications, such as improved user experience, product integration, or security, are pretextual, not supported by evidence, and do not need Google's exclusionary conduct to achieve any such result.  Any purported efficiencies could be achieved through competition on the merits or other less restrictive means that do not foreclose competition or harm consumers.

178.    Evidence presented during the remedies trial before Judge Mehta further confirms the lack of any competitive justification for Google's anticompetitive conduct.  As one example, the United States presented evidence that Google historically advocated against default GSE settings in browsers, because of the risk of a "company's own self-interests" determining what GSE is selected as the default: "We propose instead that users be prompted to select the default search provider, because it eliminates any company's own self-interests and places control in the hands of the end user, where it belongs."[31]  Google's views apparently changed once it was able to secure its position as the exclusive default GSE through anticompetitive agreements with Apple, the Android partners, and browser developers.

179.    As another example, Eddy Cue, Apple's Senior Vice President of Services, recently testified in the remedies trial that GSE results have not meaningfully improved in the past 20 years—a period that corresponds to when Google began engaging in anticompetitive conduct by entering into default distribution agreements.  Mr. Cue also testified that: "There's a lot of capabilities that I think searching can get a lot better [at] than it is today."[32]  Put another way, Google's anticompetitive default distribution agreements have allowed it to maintain (and increase) its monopoly in the general search services market despite the lack of any meaningful improvements in its technology.

---

[31] Plaintiffs' Remedies Responsive Findings ¶ 1219 ("Google itself uses choice screens and has advocated for choice screens for a default search provider in web browsers in the past, noting '[w]e propose instead that users be prompted to select the default search provider, because it eliminates any company's own self-interests and places control in the hands of the end user, where it belongs.'").

[32] Plaintiffs' Remedies Responsive Findings ¶ 936 (quoting Rem. Tr. 3845:13–3847:3) (alteration in original).

1    **X.    Plaintiffs and Class Members Suffer Antitrust Injury**

2        180.    Plaintiffs and class members all suffered antitrust injury as a direct result of Google's

3    unlawful conduct and have suffered and will continue to suffer substantial losses.  The full amount of such

4    damages will be calculated after discovery and upon proof at trial.

5        181.    Google's anticompetitive practices yield tangible and measurable harms to Plaintiffs and

6    class members, including but not limited to:

7            a.    Locking up distribution channels for general search services so that Plaintiffs and

8                class members did not and still do not have real competitive options, including GSEs

9                that provide compensation or are more privacy protective or have fewer (or no)

10               advertisements than Google;

11           b.    Not paying compensation to Plaintiffs and class members for their use of Google's

12               GSE;

13           c.    Not compensating Plaintiffs and class members for their time and attention spent

14               viewing advertisements, including general search text advertisements, embedded in

15               Google's SERPs;

16           d.    Not sharing revenue from advertising, including from general search text advertising,

17               with Plaintiffs and class members;

18           e.    Extracting, collecting, using, and monetizing search data for various purposes—

19               including to generate and sell advertising, to develop Google's GSE and other

20               applications, and to train Google's AI systems—with no compensation to Plaintiffs

21               and class members.

22       182.    These harms and forms of compensation are not speculative—competitors have long

23   attempted to attract and retain users with compensation, but Google's misconduct prevented that competition

24   from emerging.  Moreover, there are many real-world examples of users receiving compensation from GSEs

25   for their time, attention, and search data.  This harm to Plaintiffs and class members is economically

26   measurable.

27       183.    These harms are clearly demonstrated by comparing how Google dealt with consumers as a

28

monopolist unlawfully restricting competition in the general search services market in the *actual world* with how consumers would have benefited from competition in the *but-for world* ("BFW"). In attempting to define a BFW without any of Google's unlawful conduct, it is critical not to conflate the struggles of new entrants and rivals in the actual world with the likely differentiated scope of competition in the BFW.

184. The BFW here—absent Google's misconduct—is informed by (i) the demand and supply dynamics of platform competition; (ii) real-world competition—including competitors offering compensation to GSE users—both before and during Google's monopolistic misconduct; (iii) real-world attempts by rivals to compete on the quality dimensions of a more privacy protective and/or ad-free GSE experiences; and (iv) the scope of competition seen in similar platforms.

185. While Google's monopolistic misconduct necessarily precludes knowing precisely how the BFW would have evolved, the reality is that before Google's dominance solidified, compensation to attract and retain users was poised to be a major competitive factor from Google's rivals and, once enjoyed by users, would have become standard and ubiquitous. We see this in many platform marketplaces for "free" services—competition drives rivals to offer compensation, various rewards, or other benefits to attract and retain users or customers. Further, the value of privacy protections and reduced or ad-free GSEs were also unrealized competitive dimensions that would be key elements of a competitive supply in the BFW market for general search services—the value of which can be quantified in this action.

186. Stated another way, as competition in consumer-facing platforms intensifies, so does the breadth of competitive differentiation. In addition to direct payments to users (of cash, rewards points, or some other form of value) to attract and retain users, consumer-facing platforms are characterized by competition across several quality dimensions such as on privacy protections and differentiations on the amount of advertising.

187. Compensation paid directly to users is especially important in terms of this competition. A core principle of economics is that financial incentives tend to influence consumer behavior. Academic literature demonstrates the role of financial incentives in encouraging changed behavior and experimentation, especially with products for which consumers may lack familiarity.

188.    Finally, it is well understood as a matter of oligopoly and behavioral economics that, in non-monopoly markets, once consumers grow accustomed to receiving value for their patronage—including both price and quality dimensions—this breadth of competition becomes expected from all rivals and on a permanent basis.  This is in sharp contrast to monopolized markets where exclusionary behavior removes the competitive pressure from new entrants or rival expansion and precludes the natural development of differentiated competition in response to consumer demand.

189.    Plaintiffs and class members each suffered a direct injury from their inability to choose among high-quality GSEs that were not only more privacy protective and less clogged with ads but also that would have provided Plaintiffs and class members with compensation.  The injury to Plaintiffs and class members flows directly from the decrease in competition among GSEs caused by Google's exclusionary conduct.  Plaintiffs and class members provided their valuable time, attention, and data every time they used Google's GSE.  As a result of Google's exclusionary conduct, what Plaintiffs and class members got in return as part of that exchange was less than they otherwise would have gotten in a competitive market.  Put another way, Plaintiffs and class members all used Google's GSE without receiving the compensation or other competitive benefits they otherwise would have received.  The lack of compensation to Plaintiffs and class members is a concrete and traceable injury arising from Google's anticompetitive exclusionary conduct.

    1.    **Even As a Monopolist, Google Recognized The Possibility of Paying Compensation Directly to Users or Offering a More Privacy Protective or Ad Free GSE To Attract and Retain Users**

190.    In internal Google e-mails pre-dating when the United States filed its antitrust case, Google executives privately recognized the potential of compensating individuals for using Google's GSE.  For example, Merideth Hoffer, the Director of Marketing for Google Search, Google Pay and Google Account, suggested in a November 1, 2018 email that Google could "offer a paid subscription ads-free experience" or "[c]ut users in on the deal," noting that "[a]ligning interests [with users] would be a good place to start

1    brainstorming."[33]



On Thu, Nov 1, 2018 at 9:25 PM Meredith Hoffer <Redacted @google.com> wrote:
I agree this is a very tough narrative to counter. At heart it comes off that Google's incentives are not aligned with user's best interests.

Whether a user is on or quickly moves off Google.com is a pretty nuanced point and probably not especially relevant -- Google places ads all across the web.

There are already teams of people who work on showcasing the positive economic impact Google has on small businesses and communities everywhere.

I think the best way to counter this narrative is to show how our interests are aligned with those of our users. Should we offer a paid subscription ads-free experience? Cut users in on the deal like the bottom of this article)? Aligning interests would be a good place to start brainstorming.                    34

9        191.    Google also recognized the immense value of search data—both to users and Google—and

10   acknowledged that it considered offering a privacy protective version of Google's GSE.  But a Google senior

11   vice president conceded that one of the reasons Google did not adopt a proposal for a GSE that

12   "anonymize[d] the user's data and never log[ged] it" was because "users would pick it and Google would

13   lose billions of dollars in revenue":

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23

24

---

25   [33]  Email from Meredith Hoffer (Google), Fwd: Wired: The Privacy Battle to Save Google from Itself (Nov. 11, 2018) with attached Google document: A reintroduction to how Google uses personalization in search (Jan. 29, 2018), *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C.), Ex. UPX1044 (Bates No. GOOG-DOJ-09278606), available at https://www.justice.gov/d9/2023-11/417794.pdf [https://perma.cc/U8GQ-XXR7].

28   [34]  *Id.*

192.    Moreover, well before Google decided it was better to obtain and retain users through anticompetitive payments to Apple, the Android partners, and browser developers, Google itself tried various compensation systems to attract and retain users.  For example, by 2000, Google launched the "Google Affiliate Program" that invited web sites "to offer world-class Google search directly to your own web site visitors.  By placing a Google search box on your web site, your visitors can search the entire web using Google.  You earn $.03 for every search performed from your site."[36]  Google's Affiliate Program used compensation on a per-search basis to "spread the word" to attract and retain users of Google's GSE:

> In its new program publishers of news, shopping, and other Web sites could sign up to add a Google search box to their own sites, giving their users access to Google search while earning money for the referrals. . . .  '*By signing up for our affiliate program, you'll be able to place a Google search box on your site and begin receiving 3 cents for each search you send our way,' Brin and Page announced.*  'It's our way of saying thanks to all of you who have been spreading the word about searching the Google way.'"[37]

---

[35]  Pls.' Closing Statement at Slide A-4, *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. May 3, 2024), https://www.justice.gov/atr/media/1350576/dl?inline [https://perma.cc/P4XU-ELV3].

[36]  *Google Affiliate Program – FAQ*, Google ("Google Affiliate Program"), https://web.archive.org/web/20000510024531/www.google.com/affiliates/faq.html (archived May 10, 2000, at Internet Archive) [https://perma.cc/3X3L-UUQZ].

[37]  David A. Vise, *The Google Story* at 97 (2005) (emphasis added).

193.    In its frequently asked questions for this Google Affiliate Program, Google confirmed the technical feasibility of compensating on a per-search basis for use of its GSE: "How do you track the searches I send you?  Google uses an outside firm to track the number of searches conducted on your site and to report the number of searches conducted to us and to you.  When a search comes from your site, they verify it's legitimate and then credit your account."[38]  Google also acknowledged that its Affiliate Program was designed to increase traffic to Google: "Our affiliate program is primarily a way of rewarding you for helping us spread the word about Google."[39]  Although payments through Google's Affiliate Program were to other sites, this program demonstrates the technical and financial viability—as well as acceptance in the general search services market—of using a per-search compensation model to attract and retain users.  Later, in 2008, as other GSEs were offering compensation and rewards programs to attract and retain users, Google reportedly "considered offering prizes, though these never emerged, and the program was quickly removed"[40]—replaced instead with Google's anticompetitive agreements.

194.    Although the remedies phase being litigated in United States' antitrust case is not an attempt to reconstruct a BFW, a government expert testified that—in a competitive market—one way Google could "encourage users to use Google search" would be to "[p]ay users directly for searching on Google":[41]

//

//

//

//

//

---

[38]  Google Affiliate Program at FAQ.

[39]  *Id.*

[40]  Danny Sullivan, *SearchPerks: Microsoft's New Prizes for Searches Program*, SEARCH ENGINE LAND (Oct. 1, 2008) ("SearchPerks"), https://searchengineland.com/searchperks-microsoft-new-prizes-for-searches-program-14876 [https://perma.cc/468A-Q9M9].

[41]  Slides for Direct Testimony of Dr. Tasneem Chipty, at Slide 27, *United States v. Google LLC*, No. 20-cv-3010  (APM)  (D.D.C.  Apr.  29,  2025),  https://www.justice.gov/atr/media/1398406/dl?inline [https://perma.cc/7HT6-WZJ7].

195. Likewise, in its proposed findings of fact in the remedies phase, the United States responded to Google's arguments against the possibility of user payments: "Prof. Murphy [Google's expert], without evidence of real-world examples, claimed that offering to pay users would somehow introduce 'fraud problems.' *Nevertheless, Prof. Murphy acknowledged during cross-examination that several competitors in the market today offer rewards for search usage.* In fact, Microsoft has sought to expand Bing Rewards [Redacted]."[43]

### 2. In a But For World, GSE Rivals (As Well As Google) Would Have Competed By Offering Compensation to Attract and Retain Users

196. Unlike the remedies phase of the case brought by the United States before Judge Mehta, this action involves comparing the actual world that resulted from Google's unlawful conduct with the BFW of unfettered competition on the merits. In conceptualizing the BFW in the general search services market, it is evident that the marketplace was poised for intense competition in the form of using compensation to attract and retain users. The precise nature of that compensation—including how it would generate different

---

[42] *Id.*

[43] Plaintiffs' Remedies Responsive Findings ¶ 1047 (citation omitted, emphasis added, and redaction in original).

product features and forms of payment among rivals—cannot be known with certainty because of Google's misconduct.  Nevertheless, the conduct of actual market participants confirms that the marketplace for general search services encompassed compensation to users in order to attract and retain users.

197.    Specifically, real world evidence from before Google began engaging in its exclusionary conduct shows that GSEs were willing to offer compensation to attract and retain users—including via per-search payments, advertising revenue sharing, and the possibility of winning cash prizes—and market participants would have successfully launched and scaled such compensation models had there been a competitive market.  For example:

a.     **GoTo** was a GSE "launched in 1997, conceived and developed at Idealabs, a Pasadena-based incubator."[44]  "[I]n 1999, Overture (then GoTo) started paying [partner] sites $0.03 for each search they generated."[45]

b.     **AltaVista and Lycos** were two early GSEs, launched in 1995 and 1994 respectively, that paid partner sites for directing searches to their GSEs.[46]

c.     **iWon** launched in October 1999 and by 2000 was the fifth most trafficked site on the internet and "voted #1 in user site and feature satisfaction among the leading search engines and portal sites."[47]  "By simply using the site to search the Web, check email, go shopping, read the news, or perform other regular Internet activities, iWon users earn entries with practically every click" for raffles of "$10,000 every day, 30 prizes of $1,000 every week, $1 million every month and $10 million on Tax Day."[48]   In 2006, a

---

[44] Jay Hoffman, *GoTo: Forgotten Search Engine*, THE HISTORY OF THE WEB (May 22, 2018), https://thehistoryoftheweb.com/goto-forgotten-search-engine/ [https://perma.cc/5HJL-Z9P5].

[45] SearchPerks.

[46] *Id.*

[47] Excite, *iWon and Office Depot, Inc. Launch Double Your Winnings at OfficeDepot.com Program* (Oct. 30, 2000) (citing Nielsen/NetRatings, September 2000 and NPD Search and Portal Tracking Study, respectively), https://web.archive.org/web/20160821182550/http://www1.excite.com/home/companyinfo/press/press_partner_article_overview/0,4926,347%7Calliance_article,00.html (archived Aug. 21, 2016) [https://perma.cc/37BZ-KFEL].

[48] *Id.*

commentator noted that "[p]aying users to search isn't new—iWon.com has been doing this for years and attracts decent traffic."[49]

    d.    **A9.com** was launched by Amazon in 2004 and included a GSE that was licensed from Google (and supplemented with additional Amazon-based results).[50]  Users of A9 were offered 1.57% (or half the numerical value of $\pi$) off all Amazon purchases as an "instant reward" for continuing to use A9, with Amazon explaining that "[a]ll they have to do is use A9.com as their regular search engine."[51]  The compensation to users for selecting A9 as their GSE was a share of advertising revenue (or "sharing the pi"):  "How can we afford this additional $^\pi/_2$% discount?  Sponsored links revenue—from the small text-based ads on A9.com and Amazon.com search results pages—will help offset costs we incur through the Rewards promotion.  With our automatic $^\pi/_2$% discount, we are effectively sharing with you some of the money we collect from sponsored links, i.e. sharing the pi."[52]

    e.    **Blingo** was a GSE launched in 2004 that was described as "a new search engine offering users something extra along with their search results.  Every time users search on Blingo, they also have a chance to win a prize instantly."[53]  "As Blingo users search for words or phrases they get a chance to instantly win prizes like a Canon digital camera, a one-year

---

[49]  Elinor Mills, *Searching on Zotspot Could Earn Users a $10 Spot*, ZDNET (Oct. 30, 2006) ("Zotspot"), https://www.zdnet.com/article/searching-on-zotspot-could-earn-users-a-10-spot/  [https://perma.cc/AV2X-6XEG].

[50]  Robert Accettura, *Amazon Eager to Get A9 off the ground*, ROBERT ACCETTURA'S FUN WITH WORDAGE BLOG (Sept. 19, 2004), https://robert.accettura.com/blog/2004/09/19/amazon-eager-to-get-a9-off-the-ground/ (last visited July 7, 2025) [https://perma.cc/4PZM-SVHH].

[51]  *Id.*

[52]  *Id.*

[53]  Loren Baker, *Blingo Search Engine Offers Prizes To Users*, SEARCH ENGINE JOURNAL (Dec. 8, 2004), https://www.searchenginejournal.com/blingo-search-engine-offers-prizes-to-users/1130/ [https://perma.cc/M8E4-4CXR]; *see also id.* ("Blingo is not the first search engine to offer prizes and rewards for searching, IWon (an Ask Jeeves owned site) started the trend years ago.").

subscription to Netflix, an Amazon.com gift certificate, or a music CD."[54]  Blingo funded these rewards with a share of advertising revenue:  "The company receives revenue from advertiser-sponsored links correlated to specific search queries, and then gives a portion of the revenue back to users in the form of prizes."[55]  Blingo's CEO explained that by 2004, "all of the major search providers — Google, Yahoo, MSN, and others — [had] all adopted similar search technologies, so users are finding very little difference between the search results on these popular sites."[56]  Thus, "everybody is looking for new and compelling ways to differentiate the search experience."[57]

     f.    **Zotspot** was launched in 2006 as "a site that pays people to search, and pays them even more based on how many other people they refer to the site."[58]  "Paid via Paypal or check, Zotspot members can instead opt to donate their earnings to a charity or university.  They earn a portion of the revenue from the paid search listings every month based on their usage of the service and the number of people they refer to the site." [59]  In connection with the launch of Zotspot, a commentator noted: "In a field dominated by Google, some smaller search Web sites are hoping to lure people by offering them money or charitable donations to search."[60]

//

//

//

//

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] Zotspot.

[59] *Id*.

[60] *Id*.

g.    **Jellyfish** "debuted as a shopping search engine in June 2006."[61]  Jellyfish worked on a Cost-Per-Conversion model, by "shar[ing] 50% of [its] revenues with shoppers."[62]  On Jellyfish, "[s]hoppers see a list of prices from retailers, their final cost and how much rebate they will get from us."[63]  Jellyfish explained its compensation system: "Current advertising gives too much value to search engines (have you seen how much these guys are making?) at the expense of you and the stores that pay to advertise.  Instead of the search engine keeping all of the advertising, we set up a system that rewards us, you, and the advertiser fairly when you find the right product to buy online."[64]  In October 2007, Microsoft acquired Jellyfish and, as explained below, used its technology to launch its Live Search Cashback program.[65]

198.    Moreover, as Google was implementing its exclusionary scheme, some of its largest competitors were launching programs to attract and retain people to use their GSEs through direct compensation to users:

a.    **Microsoft Live Search Cashback** was a compensation program launched in 2008 in connection with Microsoft's Live Search GSE (later rebranded Bing) that "offer[ed] ad-funded cash rebates to customers who find and purchase their favorite products through a new program called Microsoft Live Search cashback. . . .  The complete Live Search

---

[61] Nick Kolakowski, *At This Auction Site, Prices (on Chickens, iPods, Etc.) Are Going, Going Down,* WASH. POST (Jul. 1, 2007), https://www.washingtonpost.com/wp-dyn/content/article/2007/06/28/AR2007062802053.html [https://perma.cc/A6UW-QQBU].

[62] Tom Foremski, *Jellyfish Pioneers a New Type of Online Bus. Model,* SILICON VALLEY WATCHER (Aug. 3, 2006), https://www.siliconvalleywatcher.com/jellyfish-pioneers-a-new-type-of-online-business-model/ [https://perma.cc/D5WY-L5BZ].

[63] *Id.*

[64] Mary Jo Foley, *Microsoft Buys Jellyfish Comparison-Shopping Search Engine*, ZDNET (Oct. 1, 2007) (quoting the Jellyfish website), https://web.archive.org/web/20071006220856/http://blogs.zdnet.com/microsoft/?p=772 (archived Oct. 6, 2007) [https://perma.cc/H34Y-GXXN].

[65] *Id.*

cashback product portfolio includes more than 10 million product offers from more than 700 merchants, including more than 13 of the top 40 U.S. retailers."[66]  "With Live Search cashback, Microsoft helps merchants maximize their advertising investments and drive more sales by providing consumers with an added incentive to buy — a cash rebate. Participating merchants choose to pay Microsoft a [Click-Per-Action] fee each time a customer completes a sale through Live Search cashback.  The fee is a percentage of the retail price, and when that transaction is complete, Microsoft returns that fee to the consumer in the form of a cash rebate."[67]  When Microsoft launched Live Search cashback, one industry observer noted that it "may help create sufficient incentives and 'escape velocity' for some to break away from their Google habit and try Live Search."[68]  Warren Cowan, chief executive of search agency Greenlight, said that he "wouldn't be surprised if Google tries to counter this move to win user loyalty."[69]  But Live Search was not competing on a level playing field for users due to Google's exclusionary conduct, and this program was discontinued in 2010.

b.    **Microsoft SearchPerks!** was launched in 2008 and described by commentators as "a sort of 'frequent flier' program that lets people cash in for every search they do."[70]

---

[66] Microsoft Corp., *Microsoft Outlines New Search-Bus. Model: Live Search Cashback Rewards Consumers & Advertisers*, MICROSOFT CORP. News (May 21, 2008), https://news.microsoft.com/source/2008/05/21/microsoft-outlines-new-search-business-model-live-search-cashback-rewards-consumers-and-advertisers/ [https://perma.cc/5HP8-9R2C].

[67] *Id.*

[68] Greg Sterling, *Microsoft Cashback Program Aims to Lure Com. Shoppers with Rebates, Marketers with CPA Model*, SEARCH ENGINE LAND (May 21, 2008), https://searchengineland.com/microsoft-cashback-program-aims-to-lure-commercial-shoppers-with-rebates-marketers-with-cpa-model-14048 [https://perma.cc/Q3W9-X48W].

[69] Ann-Marie Corvin, *Microsoft's Cashback Plan Gains Search Agency Support*, CAMPAIGN (May 28, 2008), https://www.campaignlive.co.uk/article/microsofts-cashback-plan-gains-search-agency-support/812138 [https://perma.cc/FW2G-9TKZ].

[70] Leslie Katz, *CNET News Daily Podcast: Will Paying Searchers Pay Off for Microsoft?*, CNET (Oct. 1, 2008), https://www.cnet.com/tech/tech-industry/cnet-news-daily-podcast-will-paying-searchers-pay-off-for-microsoft/ [https://perma.cc/EQA6-UYTZ].

SearchPerks! awarded up to 25 "tickets" a day for using Microsoft's GSE, which could then be redeemed for various rewards:[71]



c.   **Microsoft Rewards** was launched in 2010 and allows users to accrue points for various activities—including searches on Microsoft's GSE—that can then be redeemed for items or gift cards.[73]   Individuals can "[e]arn points for each search [they] make through Bing on [their] PC," "[e]arn points on the go when [they] search through Microsoft Bing on [their] mobile device," and users can "[s]tart searches in [their] Windows search box to keep on earning more":[74]

//

//

//

---

[71] SearchPerks.

[72] *Id.*

[73] *Rewards*, MICROSOFT, https://rewards.bing.com/welcome (last visited July 12, 2025) [https://perma.cc/SD7R-CPM6].

[74] *Id.*



75

Individuals can earn up to 250 points per day by conducting searches using Bing, and can exchange points for a variety of gift cards (including to merchants like Amazon.com).[76]  Five points are awarded for each search, and a $10 gift card requires approximately 10,000 points.[77]  Thus, a user is compensated at approximately a half-cent ($0.005) per Bing search, and has the potential to earn $0.25 a day.

     d.    **Presearch** is a "community-powered, decentralized search engine that provides better results while protecting your privacy and rewarding you when you search."[78]  Individuals "can earn Presearch reward tokens when you search and stake, when you operate a node, and when you refer others to join Presearch."[79]  "Presearch users can collect 0.01 PRE tokens per search, up to a max of 0.25 PRE tokens per day."[80]  PRE tokens are a

---

[75] *Id.*

[76] *Id.*

[77] Redeem, MICROSOFT, https://rewards.bing.com/redeem/000800000064 (offering $10 Amazon.com gift card for 10,500 points) (last visited July 12, 2025) [https://perma.cc/3BJA-HQKV].

[78] *About,* PRESEARCH, https://presearch.io/about (last visited July 12, 2025) [https://perma.cc/9CCY-BVE3].

[79] *Id.*

[80] *Why Are My Reward Tokens Not Increasing When I Search?*, PRESEARCH, https://docs.presearch.io/presearch-engine/faq/why-are-my-reward-tokens-not-increasing-when-i-search (last visited July 12, 2025) [https://perma.cc/U2V9-ARLF].

blockchain-based cryptocurrency that can be exchanged for other types of cryptocurrency or converted to U.S. dollars.[81]

e.   **Permission Search** is a "new kind of search engine that enables users to earn from their data by sharing it with brands."[82] With Permission Search, users "[j]ust search as [they] would on any other engine, except instead now [they] will get rewarded for engaging with ads!"[83] "When [users] engage with an ad from a brand on Permission Search, [they] are consenting to share [their] data directly with that brand. The data to be shared is outlined for [them], and sent directly to the brand upon submission, so [they] may get contacted from them right away! Upon completion, [they] also get rewarded for the ASK [a cryptocurrency] amount that is listed."[84] Permission Search is part of a broader platform that allows users to "[e]arn crypto by sharing [their] data with brands [they] trust."[85] The reason for using Permission is simple: "Your Data is Already Powering Advertising & AI But You're Not Getting Paid. Permission changes that. Contribute your data, get paid when its used."[86]

f.   **Brave**, a GSE and web browser, competes for users by offering them the opportunity to earn rewards through "Brave Rewards" in exchange for viewing advertising.[87] As Brave

---

[81] *PRE Token*, PRESEARCH, https://presearch.io/pre (last visited July 12, 2025) [https://perma.cc/2222-CXSH].

[82] *Commonly Asked Questions: What Is Permission Search?*, PERMISSION, https://www.permission.io/faqs#what-is-permission-search (last visited July 12, 2025) [https://perma.cc/5JW4-UXCB].

[83] *Commonly Asked Questions: How do I use Permission Search?*, PERMISSION, https://www.permission.io/faqs#how-do-i-use-permission-search (last visited July 12, 2025) [https://perma.cc/2LYB-SJHK].

[84] *Commonly Asked Questions: How Do Ads Work in Permission Search?*, PERMISSION, https://www.permission.io/faqs#how-do-ads-work-in-permission-search (last visited July 12, 2025) [https://perma.cc/7BR4-P7UY].

[85] PERMISSION, https://www.permission.io (last visited July 12, 2025) [https://perma.cc/42H9-UW3A].

[86] *Id.*

[87] *Brave Rewards,* BRAVE SOFTWARE INC., https://brave.com/brave-rewards/ (last visited July 12, 2025) [https://perma.cc/ZXH4-4QJK].

explains, "[b]y default, the Brave Browser blocks ads & trackers on the webpages you visit.  But if you choose to see Brave Ads, you can earn."[88]  "With Brave Rewards, you can earn tokens (called Basic Attention Tokens or 'BAT' for short) for ads you see in Brave.  You can choose which kinds of Brave Ads you see and earn from, such as images on the new tab page, push notifications, and more."[89]  "BAT can be exchanged for many different currencies (both fiat and crypto)."[90]  Brave explains that it "puts users first, and that means sharing any ad revenue we generate on eligible ads directly with users.  For eligible ads, users earn a share of the revenue greater than or equal to Brave's share for the ad."[91]  Stated another way, Brave compensates users for their time and attention spent viewing advertisements by sharing at least 50% of Brave's advertising revenue with its users (as opposed to Google's anticompetitive scheme of directing its advertising revenue to Apple, the Android partners, and browser developers to lock up default distribution points).

g.    **Scour** was a search engine launched in 2008 that aggregated search results from Google, Yahoo, and MSN.[92]  Users could earn points for every search conducted on Scour, as well as for other activities, that could then be redeemed for Visa gift cards.  Scour awarded users "[o]ne point . . . for each search, vote, or comment, and 6,500 points yields a $25 reward."[93]  This means that users were paid approximately 0.38 cents (or $0.0038) per Scour search.  Scour explained its pitch to users of competing GSEs:

---

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Learn More*, SCOUR,    https://web.archive.org/web/20080615101833/http://scour.com/learnmore/ (archived June 15, 2008) ("Scour") (last visited July 12, 2025) [https://perma.cc/ZD79-FV3H].

[93] Don Reisinger, *Scour Brings Friend Tracking & Personalization to Metasearch*, CNET (Dec. 2, 2008), https://www.cnet.com/tech/services-and-software/scour-brings-friend-tracking-and-personalization-to-metasearch/ [https://perma.cc/6TDN-3XNM].

The top search engines make billions of dollars a year in advertising revenue, wouldn't it be cool if the users got a piece of that too?  Enter Scour Points! Every member is awarded one point for every search, two for a vote and three for a comment with a maximum of 4 points a search.

Once you aggregate at least 6,500 points you can cash them out for a $25 Visa gift card . . . it's more than you currently make from searching, right?  On top of that, we offer referral points for the friends you introduce to Scour where you can earn 25% of the points they make.  So if you invited 25 friends that used scour regularly in addition to yourself, that's an easy $125 in your pocket for a year of what you already do![94]

h.   **Yahoo** in 2006 surveyed "users on what it would take to get them to make its search engine their primary choice for online queries."[95]  "Possible incentives include frequent flyer miles, discounted or free music and movies, and Outlook access."[96]  Another site reported in 2006 that "[e]ven Yahoo has considered offering incentives to searchers."[97]  In 2008, multiple employees of Yahoo! Research published an article entitled "Sharing Online Advertising Revenue with Consumers" in which they referenced Microsoft's Live Search Cashback program and discussed the possibility of "revenue sharing" of advertising revenue earned by GSEs.[98]  In this article, they explained that:

Advertising is the act of paying for consumers' attention: advertisers pay a publisher or service provider to display their ad to a consumer, who has already been engaged for another purpose, for example to read news, communicate, play games, or search.  Consumers pay attention and receive a service, but are typically not directly involved in the advertising transaction. *Revenue sharing, where the consumer receives some portion of the surplus generated from the advertising transaction, is a method of involving the user*

---

[94] Scour.

[95] *Use Yahoo Search, Get a Reward*, CNET (Feb. 9, 2006), https://www.cnet.com/culture/use-yahoo-search-get-a-reward/ [https://perma.cc/3LTW-7G37].

[96] *Id.*

[97] Zotspot.

[98] Yiling Chen, *et al.*, *Sharing Online Advertising Revenue with Consumers*, Lecture Notes in Comput. Sci., vol. 5385, at 556–65, Int'l Workshop on Internet & Network Econ. (WINE) (2008), https://yiling.seas.harvard.edu/files/2025/01/rwine-appendix.pdf [https://perma.cc/8KYC-4JPL].

*that could potentially lead to an increased user base for the service provider*, albeit at the cost of a possible decrease in short-term revenue.[99]

In 2012, there were media reports indicating that Yahoo was considering launching "Yahoo Incentivized Search" that "will give [users] points for all searches done on Yahoo. Those points can be cashed in on featured Yahoo service/products."[100]

199.    These facts demonstrate that Microsoft and numerous other companies were ready to compete with Google in the general search services market through payments directly to users before and after the time that Google began engaging in its exclusionary conduct.  But unlike Google, these GSEs did not enter anticompetitive agreements to share advertising revenue with Apple, the Android partners, or browser developers to lock up default GSE placement.  Instead, they sought to compete on the merits by providing compensation to users for conducting GSE searches, viewing or interacting with advertisements, and for sharing data.

200.    Google knew early on that competition on the merits had evolved into paying users for search.  Indeed, Google was tracking efforts by its competitors to pay compensation to "increase traffic."  In 2009, Consumer Watchdog acquired and posted on its website a presentation by Google's public affairs lead Adam Kovacevich that noted Microsoft was offering a "[c]ash back service to increase traffic" for its Live Search GSE:

//

//

//

//

//

//

//

---

[99]  *Id.* at 1-2 (emphasis added).

[100]  Barry Schwartz, *Yahoo To Offer Incentives To Search On Yahoo?*, Search Engine Roundtable (Oct. 23, 2012), https://www.seroundtable.com/yahoo-search-awards-15872.html [https://perma.cc/RAH5-XRBF].







## Search: Innovations and Investments    Google

**YAHOO! SEARCH**
- SearchMonkey (open developer platform)
- BOSS (Build Your Own Search Service)

"[Yahoo and Microsoft] have invested heavily to catch up in search and online ad auctions."
- *New York Times*
(10/13/07)

**Live Search**
- Planning $100M ad campaign to promote search engine
- Jan. 2009 syndication deals with Dell, Verizon Wireless
- Cash back service to increase traffic
- Acquired Powerset, startup in semantic search

**Ask.com**
- 3-D search, other innovations in search results
- TV advertising campaign

101

201.    In Google's proposed findings of facts submitted in the remedies trial before Judge Mehta, Google recognized that Microsoft's Rewards program compensated users for using the Bing GSE.[102]  In fact, Google quoted the testimony of its expert Dr. Kevin Murphy acknowledging that "we do see some things like Bing rewards."[103]  Dr. Murphy acknowledged that Microsoft and Brave offer rewards programs that reward consumers for searches and activity in adjacent markets.  Dr. Murphy also discussed Ecosia, which today encourages people to use its GSE by using its search advertising revenue to plant trees.  Dr. Murphy's testimony was consistent with testimony from the government's expert, Dr. Tasneem Chipty, that there is precedent for direct-to-consumer incentives or payments in the general search services market and

---

[101] Google, *Google, Competition and Openness* at Slide 13 of 26 ("Search: Innovations & Investments"), available at https://www.consumerwatchdog.org/resources/Googlepresentation.pdf (last visited July 12, 2025) [https://perma.cc/9N6S-YRG8].

[102] D.'s Prop. Findings of Fact ¶ 113, *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. May 29, 2025), ECF 1373.

[103] *Id.*

1    in adjacent markets.  Both Dr. Murphy and Dr. Chipty recognized that compensation to users and other

2    rewards programs are often used to attract and retain users in adjacent markets.

3        202.    Another way GSEs could seek to attract users—which also would be competition on the

4    merits in the BFW—is by paying an initial "switch bonus" to try a competing GSE.  For example, a recent

5    study demonstrated the viability of this strategy, finding that "[i]n the $10 Switch Bonus group, *58 percent

6    of Google users switched to Bing in exchange for [a] payment.*  Exposure to Bing increased users' self-

7    reported perceptions of its quality by 0.6 standard deviations.  Of those who switched to Bing, 33 percent

8    kept using Bing after making an unincentivized active choice."[104]  In a competitive general search services

9    market, Google and other GSEs would have competed to attract users by offering a "switch bonus" or similar

10   compensation to select a particular GSE as the default.  This is not purely an academic or theoretical idea—

11   Google's RSA with wireless carrier T-Mobile requires Google to pay a per-device "bounty" for each Android

12   device T-Mobile distributes with Google set as the default.  *See Google*, 747 F. Supp. 3d at 102 (Finding of

13   Fact No. 378) ("T-Mobile is compensated for the default placements on Qualifying Devices and Preferred

14   Devices through a $[Redacted] bounty per device.") (redaction in original).  The difference is that in a

15   competitive BFW, Google would pay these "bounties" to users for trying its GSE or making the choice to

16   set Google as their default GSE, rather than to a wireless carrier to lock up the default access points on a

17   device.

18       203.    These many examples demonstrate that companies are currently ready to compete on the

19   merits with Google in the general search services market through payments or rewards provided directly to

20   consumers, if they can do that without Google's exclusionary conduct.  Absent Google's unlawful conduct,

21   such compensation would have become a permanent feature of the GSE market, because people would

22   expect compensation once it was provided.

23       204.    Using compensation to attract and retain users, as well as to obtain their time, attention, and

24   data is a common practice, including for other online platforms.  For example, as discussed below, online

---

[104]  Hunt Allcott et al., *Sources of Market Power in Web Search: Evidence from a Field Experiment* at 2, NAT'L BUREAU OF ECON. RESEARCH, Working Paper No. 33410 (Jan. 2025) (rev. May 2025), https://www.nber.org/system/files/working_papers/w33410/w33410.pdf (emphasis added) [https://perma.cc/PVY2-EVZX].

platforms routinely offer compensation to individuals who are (i) willing to install browser plugins, apps, or other tools to track capture their internet usage data (including search data); (ii) permit advertisements to be displayed through a browser plugin or other tool; or (iii) offer their time and attention to complete consumer surveys.  These adjacent platforms serve as a window into the BFW to see what people were demanding for their time, attention, and data, and the dimensions of competition rivals were using.  Here, too, it is clear that rivals used compensation to attract and retain users.

205.    Revealingly, in other online contexts that are not subject to Google's exclusionary conduct, Google uses compensation to attract and retain people willing to provide their time, attention, and data:

a.    **Google's Online Insights Study** was launched in 2022 and allows users to "earn redeemable points worth up to $130 per year by using the internet like [they] already do."[105]  Google explains that to earn these rewards, users enroll their "phone or the web browser on [their] computer" and "[w]hile browsing the web, the study records the ads [they] see and [their] activity on different websites."[106]  The data Google pays users to collect in its Online Insights Study is similar to the search data Google collects from all users of its GSE without compensation.

b.    **Google Screenwise Trends** pays individuals who allow Google to collect their web browsing data.[107]  The purpose of this program is, according to Google, "to learn more about how everyday people use the Internet."  The Screenwise program includes certain upfront payments and also certain payments over time, which have reportedly at times included payments of $3 per month or other amounts.  Commentators observed that "Screenwise sounds a lot like Bing Rewards, Microsoft's pay-to-browse plan" and suggested: "If you're not overly concerned with online privacy, give Bing Rewards or

---

[105] *Online Insights Study*, GOOGLE, https://onlineinsightsstudy.google/signup/invitecode (last visited July 12, 2025) [https://perma.cc/AV83-R8NG].

[106] *Id.*

[107] Jack Marshall, *Google Pays Users for Browsing Data*, DIGIDAY (Feb. 10, 2012), https://digiday.com/media/google-pays-users-for-browsing-data/ [https://perma.cc/JL2W-PFWM].

Google Screenwise (once it starts accepting new members) a try. Search sites make money because you use them. Shouldn't they share the wealth with you?"[108]

c. **Google Opinion Rewards** was launched in November 2013 and allows individuals to earn "Google Play or PayPal credit" by "[c]omplet[ing] short surveys while standing in line, or waiting for a subway. . . . Topics include everything from opinion polls, to hotel reviews, to merchant satisfaction surveys."[109] Google explains that users "answer quick surveys and get paid up to $1 for each completed survey via [their] PayPal account. Surveys typically take less than 20 seconds."[110] Google recognizes the economic nature of the exchange of time and data (through anonymized survey answers) for compensation, telling users that: "When you take a survey using Google Opinion Rewards, your answers are aggregated and shared with the market researcher who wrote the survey questions. Unless otherwise explicitly stated at the beginning of the survey, as is the case with location-based surveys, these answers are completely anonymous and not linked to any of your personally identifiable information. *In exchange, we provide you, the user, money that is deposited into your linked PayPal account*."[111] One early commentator recognized the economic nature of this exchange, noting that users "can also opt-in to surveys that don't reward, however, [he's] not sure why anyone would want to do that."[112]

---

[108] Jeff Bertolucci, *Google Search's Screenwise vs. Bing Rewards: Which Pays More?*, PCWORLD (Feb. 9, 2012), https://www.pcworld.com/article/474349/google_searchs_screenwise_vs_bing_rewards_which_pays_more_.html [https://perma.cc/8675-T6J3].

[109] *Your Opinion Is Valuable*, GOOGLE, https://surveys.google.com/google-opinion-rewards/ (last visited July 12, 2025) [https://perma.cc/FLA5-UY8G].

[110] Google, *Google Opinion Rewards* (app), APPLE APP STORE, https://apps.apple.com/us/app/google-opinion-rewards/id1227019728?ls=1 (last visited July 12, 2025) [https://perma.cc/SAD7-K8XR].

[111] *Id.* (emphasis added).

[112] Kellen Barranger, *Google Releases G. Opinion Rewards App to Android—Answer Surveys & Receive Play Store Credit*, DROID LIFE (Nov. 6, 2013), https://www.droid-life.com/2013/11/06/google-releases-google-opinion-rewards-app-to-android-answer-surveys-and-receive-play-store-credit/ [https://perma.cc/5LH4-URZT].

d.  **Google Pay Rewards** is a rewards program launched in 2020 that allows users to "earn a lot of cashback and rewards with the new Google Pay app."[113]  "Cashback is perhaps the easiest way to earn essentially free money when using Google Pay.  Powered by Rakuten, these cashback options are available through many different online and brick-and-mortar retailers."[114]

e.  **Google Play Points** was launched in 2018 and "is a program that rewards over 220 million members for engaging with the Play ecosystem." [115]  According to Google, "[u]sers **earn** points on their purchase with Google Play, including in-app items, movies, books, and more, and by trying featured free apps and games."[116]  One commentator explains that: "If you have an Android device, you likely depend on the Google Play Store for all of your application needs.  By making simple transactions, such as purchasing apps, downloading featured apps, buying books, and more, you can earn points.  Most importantly, you can turn those points into rewards." [117]  Users "start to earn 1 point for every $1 USD [they] spend with Google Play.  When [they] collect enough points within a calendar year, [they'll] level up, which earns [them]more points and benefits.  The higher [their] level, the more points [they] earn."[118]  Google entices users to "rack up points just by doing what [they] already love":

---

[113]  Ben Schoon, *You Can Get Free Cashback & Rewards with These Google Pay Promos*, 9TO5GOOGLE (Jan. 11, 2022) ("Google Pay Promos"), https://9to5google.com/2022/01/11/google-pay-rewards-referrals-cashback-offers/ [https://perma.cc/HG3J-BPXU].

[114]  *Id.*

[115]  *Google Play Points*, GOOGLE, https://play.google.com/console/about/programs/googleplaypoints/ (last visited July 16, 2025) ("Google Play Points") [https://perma.cc/2YRP-5BJ6].

[116]  *Id.* (emphasis in original).

[117]  Sabrina Ortiz, *Use your Google Play points to get real-life stuff. Here's how*, ZDNET (Apr. 20, 2023), https://www.zdnet.com/article/use-your-google-play-points-to-get-real-stuff-heres-how/ [https://perma.cc/N5KZ-X9TE].

[118]  *Google Play Help: Join Google Play Points*, GOOGLE, https://support.google.com/googleplay/answer/9077312?hl=en&co=GENIE.CountryCode%3DUS (last visited July 16, 2025) [https://perma.cc/R5CR-M3F4].

**Supercharge the rewards game with Play Points**

Elevate your Play experience: More ways to earn points, more rewards to collect, and more exclusive experiences to enjoy.

*Rack up points just by doing what you already love—playing games and downloading apps.  Then redeem your points for epic in-game items, discounts, perks, and more.  It's never been easier to reward yourself.*

When you make Diamond, Platinum, or Gold status, you could unlock even more perks. Snag new and exclusive collectibles, earn limited edition swag, and get access to VIP experiences.[119]

"Users **redeem** [Google Play] points for special in-app items offered by developers, or for Google Play Credit to rent the latest movie or buy a best-selling audiobook."[120]  Users "can use points to get: In-app or in-game items; Coupons to buy in-app or in-game items at a discounted price; Google Play credit; [or] Partner rewards." [121]  In 2023, Google published a blog post highlighting the many ways Google Play Rewards could be redeemed, "including for Google merchandise and new offers from partners like DoorDash, Povo2.0 and Instacart."[122]  Google explains that "[w]e work with partners around the world so [users] can redeem Play Points for offers in other apps.  Right now, U.S. members can redeem points for $10 off their next DoorDash order and $10 off their

---

[119] *Google Play: Supercharge the rewards game with Play Points*, GOOGLE, https://play.google.com/store/apps/editorial?id=mc_editorialmd_playpoints_announcement_landing_fcp&gl=us&utm_source=na_Med&utm_medium=oth&utm_content=May2825&utm_campaign=Loyalty&pcampaignid=MKT-GAC-na-us-1709618-Med-oth-py-Loyalty-May2825-Other-RD_PP_SA_MGT_Custom_MGT (last visited July 16, 2025) [https://perma.cc/2ZA4-P3W8].

[120] Google Play Points (emphasis in original).

[121] *Google Play Help: Use points in the Google Play Store*, GOOGLE, https://support.google.com/googleplay/answer/9079840?sjid=9630572698987617026-NA#zippy=%2Cuse-points-for-google-play-credit (last visited July 16, 2025) [https://perma.cc/8XX3-SKME].

[122] Elena Chen, *4 ways to use your Google Play Points*, GOOGLE: THE KEYWORD BLOG (Apr. 18, 2023), https://blog.google/products/google-play/how-to-use-google-play-points/ [https://perma.cc/V8GM-84GD].

next grocery delivery with Instacart.  And soon, Japan members can redeem for 24 hours of unlimited data through Povo2.0."[123]  Users can also redeem Google Play Points for (i) "Google merchandise such as a t-shirt, sunglasses, a water bottle and Chrome Dino socks"; (ii) "discounts and special in-game items like characters and tokens" in "some of the top apps and games on Google Play"; and (iii) "Google Play Credit, which you can use to buy in-app products, apps, books and subscriptions."[124]

206.    "Similarly, it is informative to the BFW to see that there are many other examples of online platforms compensating individuals for providing internet usage data (including while conducting GSE searches), viewing advertisements, and completing surveys seeking consumer insights.  For example:

a.    **The Nielsen Company**, famous for tracking the behavior of television viewers, has extended its reach to computers and mobile devices through Nielsen Computer and Mobile Panel.  These applications track consumers' activities on computers, phones, tablets, e-readers, and other mobile devices.  In exchange, Nielsen gives users points worth up to $60 per year, plus the chance to win more money in regular sweepstakes.[125]

b.    **Ebates** was launched in 1999 and shared advertising revenue with users.  As a news site explained in 1999, "Ebates is the internets' [sic] next shopping portal where consumers get paid to shop at the Web's most popular retail sites.  By utilizing the collective buying power of their members, Ebates.com is able to pass commission payments they receive from their collection of online merchants, directly back to their members in the form of rebates - cash."[126]  "The original Ebates was founded in 1999, and the site has more than

---

[123]  *Id.*

[124]  *Id.*

[125]  The Nielsen Company: Computer and Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing?SourceId=195&PID=16611&PID2=102b 21d8885768d4b5fc7f5106136e / (last visited July 15, 2025) [ https://perma.cc/L74S-MXH8].

[126]  Description of "Ebates" segment in the text accompanying *Cheifet's Net Café* (Stewart Cheifet Productions 1999) (hosts Jane Wither, Andrew deVries, and Stewart Cheifet). The video at 22:09–28:02 provides contextual discussion. Available at Internet Archive, *ECommerce*, https://archive.org/details/ECommerc1999 (last visited July 8, 2025).

10 million users and has paid out more than $1 billion in cashback rewards" as of 2021.[127]

"[A]fter Rakuten acquired Ebates in 2014, it decided to officially change the name in 2019" and the site is now known as Rakuten.[128]  Rakuten is still operating today and has been described as "one of the largest and most commonly used cashback sites."[129]  In fact, as noted above, Google recently partnered with Rakuten to power its Google Pay Rewards program.[130]

c.    **Swagbucks** is an online rewards platform where users earn "SB points" for a variety of online activities.  Users can "[b]ecome a Swagbucks member and customize [their] online earning journey.  Choose between completing surveys, cashback shopping, or playing mobile games; your personal preferences unlock tailored tasks and rewards. Exchange Swagbucks for rewards, including Amazon and Walmart gift cards, or secure cash via PayPal."[131]  Users "[e]arn SB points when [they] search the web using our Yahoo! powered search engine!"[132]  Users have earned over $651 million by using Swagbucks.[133]

d.    **Qmee** is a browser extension and mobile app that allows users to earn cash for searching the web, shopping, and completing surveys.  Qmee users may "[e]arn extra cash when searching online too!  Add the Qmee app to your desktop browser to start earning money

---

[127]  Casey Bond, Ebates: *Here's How Ebates/Rakuten & Other Cashback Sites Really Work*, HUFFPOST (Dec. 17, 2018, updated Feb. 19, 2021), https://www.huffpost.com/entry/ebates-online-shopping-cashback_n_5c0f1d5fe4b0edf5a3a7eec0 [https://perma.cc/A5H9-3PR6].

[128]  *Id.*

[129]  *Id.*

[130]  Google Pay Promos.

[131]  SWAGBUCKS, https://www.swagbucks.com/ (last visited July 12, 2025) [https://perma.cc/R23H-N4TW].

[132]  *How It Works*, SWAGBUCKS, https://www.swagbucks.com/g/how-it-works (last visited July 17, 2025) [https://perma.cc/36W7-RP62].

[133]  *Id.*

online when you search for your favorite sites and engage with the hottest brands!"[134] There is no minimum payout threshold; users can cash out their earnings to PayPal at any time.  Qmee has paid over $45 million in compensation to users.[135]

e.    **Slice** is a Chrome browser extension that inserts "low key" ads into the web pages users visit.[136]   Stated another way, Slice pays users for their time and attention seeing advertisements as they browse the internet.  Slice claims to have over 750,000 users, who on average are paid $5 per month in rewards.[137]  Slice also notes the benefits of scale, explaining that its "access to favorable ad rates will increase proportionally to userbase growth.  For example, 12 months from now the same browsing activity may earn you $10-15 a month" instead of $3-5 per month.[138]

f.    **Reklaim** is a data exchange platform that allows users to own their data and earn money when it is shared.[139]  The Reklaim "app unveils data about you that exists online, showing you which companies are buying your data and what they are using it for.  Reklaim allows you to manage and monetize your data ethically and transparently."[140]   Earnings "depend[] on the amount and type of data you share and which orders you participate in.  On average, Reklaimers make $5-$10 per month."[141]

---

[134] *How It Works*, QMEE, https://www.qmee.com/how-it-works (last visited July 12, 2025) [https://perma.cc/QVL6-F5RK].

[135] QMEE, https://www.qmee.com/ (last visited July 12, 2025) [https://perma.cc/C4TT-JDKH].

[136] ADDSLICE, https://addslice.com/ (last visited July 12, 2025) [https://perma.cc/5NRN-HXTA].

[137] *Id.*

[138] *Id.*

[139] *Who We Are*, REKLAIM, https://www.reklaimyours.com/who-we-are (last visited July 12, 2025) [https://perma.cc/KXW2-JSQB].

[140] *How Does This Work?*, REKLAIM, https://help.reklaimyours.com/en/articles/4936578-how-does-this-work (last visited July 12, 2025) [https://perma.cc/22U5-2RC7].

[141] *How Much Money Can I Make from Reklaim?*, REKLAIM, https://help.reklaimyours.com/en/articles/10207753-how-much-money-can-i-make-from-reklaim (last visited July 12, 2025) [https://perma.cc/2S7Z-9QQF].

g.  **BIGtoken** "empowers [users] to take control of [their] data and earn rewards by participating in surveys."  Users can "[a]nswer survey questions, take a photo or other quick action and get rewarded with redeemable 'tokens,' turning your data into real value!"[142]

h.  **Loginhood** was "a Browser Extension for consumers to get paid for sharing real-time browsing & purchase intent data."[143]

i.  **The "Data Dividend Project" or "DDP"** inspired by ex-presidential candidate Andrew Yang is "dedicated to helping Americans regain ownership and control of our personal data. Our data is our property, and we should have the choice to get privacy and to get paid."[144]  "By signing up with DDP, you give us the ability to collectively bargain and collectively exercise your data rights.  DDP will harness that combined power to Opt Out of the sale and sharing of your data and to demand deletion of your data.  Or should you choose, we will get you paid for the use of your data.  With a critical mass of consumers exercising their data rights en masse, tech companies will no longer be able to get away with hoarding the gains made off your data."[145]

j.  **Facebook** launched market research app "Study" in 2019, which pays users to collect data on how they use various internet apps.[146]

k.  **Swash** is a browser extension that collects anonymized browsing data and sometimes displays additional pop-up ads or surveys.  Users receive a share of the ad revenue generated from their data and engagement, paid in cryptocurrency.  Over $9 million in

---

[142]  *For User*, BIGTOKEN, https://www.bigtoken.com/for-user/ (last visited July 12, 2025) [https://perma.cc/KZ8F-DYD3].

[143]  *About Loginhood*, F6S, https://www.f6s.com/company/loginhood#about (last visited July 12, 2025) [https://perma.cc/2BJH-93BU].

[144]  *Who We Are*, DATA DIVIDEND PROJECT, https://www.datadividendproject.com/aboutus (last visited July 12, 2025) [https://perma.cc/EA2P-4JB2].

[145]  *Id.*

[146]  Sage Ben-Zedeff, *Introducing Study from Facebook*, META NEWSROOM (June 11, 2019; updated Mar. 23, 2020), https://about.fb.com/news/2019/06/study-from-facebook/ [https://perma.cc/6N3B-TALN].

earnings have been distributed to more than 670,000 individuals.[147]  Swash explains that user "data is sold all the time, but [users] don't receive anything for it.  Not cool.  That's why Swash redistributes the profits [user] data generates to [users]."[148]  Using Swash, people "browse the web as normal and earn as [they] surf."[149]

l.     **InstaGC** is a rewards platform that pays users in gift cards for completing surveys, watching videos, shopping online, and searching the web.[150]

m.     **Caden** allows users to monetize their personal data, including browsing and search activity.  Users can view, manage, and sell their data to third parties in exchange for compensation.  The founder of Yahoo! explains: "Caden is a game changer.  Consumers are now empowered to have control of their valuable data and finally make money from it.  Brands have an ethical way to better serve their customers.  It's why [he's] personally invested in Caden and the future data economy."[151]  Caden explains the exchange between users and platforms (including search engines):

> Twenty-five years ago or so, in some fateful Silicon Valley conference room, there was an epiphany: personal data—*the data that describes you as a person, like who you are, what you like and what you buy*—is going to be worth trillions of dollars.
>
> Their question became: *"how do we get it?"*  Maybe through a fair and equitable system where users own their data, decide who gets to have it, and what they want in exchange?  Nah.  Instead, "free" services like search engines and social media networks were created to siphon that data from each of us without our consent and use it to power everything from advertising to marketing to alternative data.  The largest companies in the world are built upon this data.[152]

---

[147] Swash, https://swashapp.io/ (last visited July 12, 2025) [https://perma.cc/266N-8326].

[148] *Id.*

[149] *Id.*

[150] InstaGC, https://instagc.com/ (last visited July 12, 2025) [https://perma.cc/TZV7-GCBJ].

[151] Caden, https://www.caden.io/ (last visited July 12, 2025) [https://perma.cc/C39D-U8GV].

[152] *About*, Caden, https://www.caden.io/about (last visited July 12, 2025) (emphasis in original) [https://perma.cc/KJH9-586M].

n.    **Datacy** is a browser extension that pays users compensation to share their browsing and search data anonymously.  "Datacy helps [users] turn [their] everyday online activity into real money while giving [them] the power to make better decisions about [their] data. [User] data is fully anonymized, and [users] have complete transparency and control over what's collected and how it's shared."[153]

207.    These programs—including those offered by Google—to compensate users for their time, attention, and data have existed for years and demonstrate economic and technical feasibility, including on how to calculate compensation rates, pay users, and mitigate the risks of fraud.

208.    This evidence demonstrates that users would have been compensated for using GSEs in a general search services market unrestrained by Google's exclusionary conduct.  Absent Google's anticompetitive conduct, the search experiences of Plaintiffs and class members would have been different. In a competitive market, Plaintiffs and class members would have been able to access high-quality GSEs that competed by proving additional benefits, including compensation to Plaintiffs and class members. Google's exclusionary conduct instead resulted in the default selection of Google's GSE with no compensation to Plaintiffs and class members.

209.    These anticompetitive effects are ongoing and continue to harm consumers.  For example, Eddy Cue, Apple's Senior Vice President of Services, recently testified in the remedies trial before Judge Mehta that, as the market currently stands, Apple "do[es not] really have a choice today" apart from Google for the default GSE on Apple's devices and browsers.

**3.    In a But For World, Google Would Also Have Been Forced To Compete on the Merits Across Quality Dimensions Such As Privacy Protection and a Reduced or Ad-Free Experience**

210.    The actual world also gives us a window into the breadth of competition that would have developed in the BFW with regard to two quality dimensions: consumer demand for privacy protection as well as desire to reduce or avoid ads.  Plaintiffs and class members have suffered privacy harms as a result

---

[153]  Consumer, DATACY, https://datacy.com/consumer (last visited July 12, 2025) [https://perma.cc/S36K-EHAY].

of Google's anticompetitive conduct.  In a competitive market, consumers could have chosen between (i) GSEs that provide compensation while collecting and storing search data for various purposes, including monetizing this data through advertising, or (ii) other GSEs that are more privacy protective or ad-free.  Although some companies have attempted to compete for users by offering GSEs that are more privacy protective and/or offer users a reduced or ad-free experience,[154] they have been unable to achieve critical scale as a result of Google's anticompetitive conduct.  As Judge Mehta recognized, "DDG [DuckDuckGo] and Neeva are the only two notable market entrants in the last 15 years.  Each attempted to innovate—DDG on privacy and Neeva through a subscription-based model [without advertising]—but found only limited success (DDG) or left the market altogether (Neeva)."  *Google*, 747 F. Supp. 3d at 165.

a.    **DuckDuckGo** ("DDG") is a "Pennsylvania-based web services company founded in 2008.  It offers a product that is an integrated browser and GSE. . . .  DDG does not produce its own search results or search advertisements.  It syndicates both from Microsoft.  DDG attempts to differentiate itself from other GSEs through a focus on user privacy."  *Id.* at 36 (Finding of Fact No. 12) (citations omitted and emphasis added).  DuckDuckGo explains how it differentiates itself from Google with a strong focus on privacy:

> You share your most intimate secrets with your search engine without even thinking: medical, financial, and personal issues, along with all the day-to-day things that make you, well, you.  All of that personal information should be private, but – on Google – it's not.  *On Google, your searches are tracked, stored, and packaged up into a data profile for advertisers to follow you around the Internet through those intrusive and annoying banner ads, using Google's massive ad networks embedded across millions of sites and apps.*
>
> If you do switch to DuckDuckGo Search, keep in mind that some of the results you're used to getting when you search will be different.  And different isn't a bad thing!
>
> One way our search results are different is that, unlike other search engines, we don't alter results based on someone's previous search history.  *In fact,*

---

[154]  Throughout this complaint, Plaintiffs refer to the possibility of an "ad-free" GSE.  These references not only encompass GSEs that do not embed any advertising in the GSE or search results, but also those GSEs that serve fewer advertisements, less intrusive advertisements, and those that do not use search or other user data to target advertisements.

*since we don't track our users, we don't have access to search histories at all!* Those other search engines show you results based on a data profile about you and your online activity, including your search history; based on this profiling, your results can be slanted towards what they think you're most likely to click on. This effect is commonly known as the search filter bubble. Using DuckDuckGo can help you escape it.[155]

b. **Neeva** was a "California-based company incorporated in 2017 that introduced a new GSE in 2019. . . .  One of Neeva's distinguishing features was that it was a subscription-based service that did not serve advertisements. Although Neeva initially licensed Bing's search infrastructure to respond to all queries, by 2022 Neeva responded to about 60% of queries using its own systems, relying on Bing for the remainder. In May 2023, Neeva shut down and was acquired by Snowflake Inc., an enterprise data company. It no longer exists as a GSE." *Google*, 747 F. Supp. 3d at 36-37 (Finding of Fact No. 14) (citations omitted and emphasis added).

c. **Kagi Search** is a "highly accurate, lightning-fast, user-centric, 100% privacy-respecting search engine with results augmented by non-commercial indexes and personalized searches."[156] Kagi explains that: "'Free' search engines have two ways to make money – get more users or sell more ads per user. The easiest, fastest way is to mine more data to sell ads more effectively. Many search-engine companies have buckled under investor pressure, leading us to the online privacy issues we have today. Paid models like Kagi only make money when users pay us, and users only pay when they receive great value. We offer superior result quality, features, speed and, of course, privacy. If we compromise on any of these points, we lose users. Therefore we have to offer a better

---

[155] Gabriel Weinberg, *Is DuckDuckGo a Good Search Engine?*, SPREAD PRIVACY, https://spreadprivacy.com/is-duckduckgo-a-good-search-engine/ (last visited July 12, 2025) (emphases added) [https://perma.cc/GDL6-5TUH].

[156] Kagi, Inc., What Is Kagi?, KAGI HELP, https://help.kagi.com/kagi/faq/faq.html#what-is-kagi (last visited July 12, 2025) (emphasis added) [https://perma.cc/8DTT-NK9U].

product that includes the best possible privacy."[157]  Kagi charges users between $5 and $25 per month, depending on the number of searches conducted and other features (such as translation, AI, etc.).[158]

d.    **Brave** is a privacy protective GSE that allows users to "[s]earch without a trace."[159] Because "Brave Search doesn't profile [users].  It's impossible for [Brave] to share, sell, or lose [uers'] personal data, because we don't collect it in the first place."[160]  The difference between Brave and other GSEs such as Google is that "Brave Search adheres to core principles of privacy.  We don't profile you.  Ever.  This is far different from the vast majority of search providers, who siphon up every piece of data about your search behavior, and tie it directly to you."[161]  And for those individuals who do not want to spend their time viewing advertisements, they can subscribe to "Brave Search Premium" and "get an ad-free experience."[162]  Brave Search Premium costs $3 per month,[163] meaning that users pay $3 per month to not spend their time and attention viewing search advertisements.

### 4.    In a But For World, Google's Conduct Would Have Been Different

211.    The monopolistic supply and demand characteristics we have seen in the actual world for general search services would not have existed in the BFW.  In the BFW, Google would not have had the

---

[157] Kagi, Inc., *How Does Kagi Help Protect My Privacy?*, KAGI HELP, https://help.kagi.com/kagi/faq/faq.html#how-does-kagi-help-protect-my-privacy (last visited July 12, 2025) [https://perma.cc/X6UA-WWNS].

[158] Kagi, Inc., *Plan Types*, KAGI HELP, https://help.kagi.com/kagi/plans/plan-types.html (last visited July 12, 2025) [https://perma.cc/DVS9-78ZV].

[159] *Brave Search*, BRAVE, https://brave.com/search/ (last visited July 12, 2025) [https://perma.cc/HJS7-NLD6].

[160] *Id.*

[161] *Id.* at Brave Search Frequently Asked Questions: How is Brave Search Different?

[162] *Id.* at Brave Search Frequently Asked Questions: Will I See Ads in Brave Search?

[163] *Brave Premium*, BRAVE, https://brave.com/premium/ (last visited July 12, 2025) [https://perma.cc/RD26-6NBC].

luxury of being unresponsive to consumer demand.  Instead, like all rival suppliers in the general search services market, Google would have been to responsive to intensive competition across multiple dimensions of consumer demand, including compensation to attract and retain users of GSEs.

212.    The critical point about the BFW is that, with true competitive rivalry, the demand characteristics of users would drive supply dimensions for all rivals, including Google.  No rival would be able to afford not having product features desired by large swaths of consumers, including compensation in addition to "free" services.  As these manifest demand drivers would have taken hold in the BFW, their benefits would have been available for all users, the value of which can be measured in this case.  Precisely how that competitive equilibrium of supply and demand would have settled or evolved absent Google's monopolistic misconduct is not the key issue, and the development of that competitive marketplace for general search services was foreclosed by Google's anticompetitive conduct.

213.    Plaintiffs and class members suffered concrete and particularized injuries, including economic harm, loss of control over valuable personal data, diminished privacy, and reduced quality and choice in general search services.  By reason of Google's anticompetitive conduct, including the contracts entered into by Google and payments made by Google for exclusive default placement for its GSE, Plaintiffs and class members were forced to use inferior products (e.g., GSEs that do not offer compensation, are not privacy protective, and are not ad-free) and did not have meaningful access to superior products (e.g., GSEs that paid compensation or that provide a more privacy protective or ad-free experience).

214.    Google's anticompetitive conduct has blocked the development of competitive high-quality search offerings that compensate users or that are more privacy protective or ad-free.  In a BFW, these differentiated forms for competition would have evolved much faster, would have become standard product features, and would have provided additional value to consumers, which can be quantified.  Instead, because of Google's anticompetitive conduct, Plaintiffs and class members have been forced to use products that do not offer compensation, do not protect their privacy, and are not ad-free.  In a competitive market, viable high-quality alternative GSEs would have emerged that paid users and offered options that were more privacy protective or with reduced or no advertising.

215.    In determining what a BFW would look like, one relevant input is Google's internal estimate

95

in 2017 "that its default placements drove over half (then 54%) of its overall search revenue, a percentage that had grown since 2014." *Google*, 747 F. Supp. 3d at 47 (Finding of Fact No. 75) (citing Ex. UPX83). Google conducted internal modeling in 2020—the same year the Department of Justice filed its search antitrust case—in which it "projected that it would lose between 60–80% of its iOS query volume should it be replaced as the default GSE on Apple devices, which would translate into net revenue losses between $28.2 and $32.7 billion (and over double that in gross revenue losses). *Id.* (citing Exs. UPX148 and UPX1050). These and other analyses and estimates can be used to quantify and apportion damages.

216.    The harm to Plaintiffs and class members can be quantified. The quantification of damages will address how Google's anticompetitive conduct deprived Plaintiffs and class members of access to high-quality GSEs that would have provided them with compensation and other benefits. Google's exclusionary conduct prevented any broader development and success of high-quality GSEs that provided compensation to users, preventing Plaintiffs and class members from having access to those GSEs (including a Google GSE that involved payments directly to Plaintiffs and class members). That is a direct injury to Plaintiffs and class members that can be addressed in this class action lawsuit.

## TOLLING PURSUANT TO CLAYTON ACT

217.    The statutes of limitation are tolled because the United States has a pending antitrust action against Google.

218.    On October 20, 2020, the United States filed *United States v. Google LLC*, No. 1:20-cv-03010-APM in the U.S. District Court for the District of Columbia. The United States' case was pending when this action was filed.

219.    Pursuant to Section 16(i) of the Clayton Act, the statute of limitations on this action has been tolled by operation of the Clayton Act:

> Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, *the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof* and for one year thereafter: Provided, however, That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred

unless commenced either within the period of suspension or within four years after the cause of action accrued.

15 U.S.C. § 16(i) (emphasis added).

### GOOGLE'S FRAUDULENT CONCEALMENT

220.    Until shortly before the filing of this action, Plaintiffs had no knowledge that Google was violating the antitrust laws as alleged herein.

221.    Google actively and fraudulently concealed the existence, nature, and scope of its anticompetitive conduct and unlawful agreements as alleged herein.  Below are just a few examples of how Google actively and fraudulently concealed its violation of antitrust laws.

**I.    Google Began Concealing its Violations of Antitrust Laws Shortly After it Began Engaging in Anticompetitive Conduct**

222.    Google for many years in its Code of Conduct, including in the early 2000s, trumpeted its supposed focus on ensuring that "Google complies fully with [antitrust] laws."[164]

223.    In 2008, David Drummond, Google's Senior Vice President, Corporate Development and Chief Legal Officer, posted on Google's "Official Blog" warning of the dangers of a potential acquisition of Yahoo! by Microsoft, arguing that this raised "troubling questions" about "preserving the underlying principles of the Internet: openness and innovation."[165]  Google questioned whether—given Microsoft's history of anticompetitive conduct—the "the acquisition of Yahoo! [would] allow Microsoft—despite its legacy of serious legal and regulatory offenses—to extend unfair practices from browsers and operating systems to the Internet."[166]  Google then distinguished itself from Microsoft's potentially anticompetitive conduct by stating: "We take Internet openness, choice and innovation seriously.  They are the core of our

---

[164] Google Code of Conduct, https://web.archive.org/web/20041009211006/http://investor.google.com:80/conduct.html (archived October 9, 2004, at Internet Archive) [https://perma.cc/SGW4-MNUZ].

[165] David Drummond, *Yahoo & the Future of the Internet*, GOOGLE: OFFICIAL BLOG (Feb. 3, 2008), https://googleblog.blogspot.com/2008/02/yahoo-and-future-of-internet.html [https://perma.cc/YAB5-GC8H].

[166] *Id.*

culture."[167]  Absent from this blog post by Google's Chief Legal Officer was any acknowledgement that Google had already entered into anticompetitive contracts to secure exclusive default placement for its GSE with Apple and others.

224.    In 2009, Adam Kovacevich, Senior Manager, Global Communications and Public Affairs, authored a post on Google's Public Policy blog claiming:  "We believe that Google promotes competition and openness online, but we haven't always done a good job telling our story."[168]  In this blog post, Google took various positions designed to conceal its anticompetitive and monopolistic conduct:

> As Google has grown, the company has naturally faced more scrutiny about our business principles and practices.  We believe that Google promotes competition and openness online, but we haven't always done a good job telling our story.
>
> That's why we have recently been meeting with policymakers, think tank representatives, academics, journalists, ad agencies, and trade associations—in the U.S. and Europe—explaining Google's six principles of competition and openness:
>
> 1.    Help other businesses be more competitive.
>
> 2.    Make it easy for users to change.
>
> 3.    Open is better than closed.
>
> 4.    Competition is just one click away.
>
> 5.    Advertisers pay what a click is worth to them.
>
> 6.    Advertisers have many choices in a dynamic market.

225.    These public statements by Google are directly contrary to the evidence presented by the United States and the findings by Judge Mehta, and in some cases were directly contrary to what Google was saying internally in documents that it was forced to turn over to the United States in discovery:[169]

---

[167]  *Id.*

[168]  Adam Kovacevich, *Google's Approach to Competition*, GOOGLE PUBLIC POLICY BLOG (May 8, 2009), https://publicpolicy.googleblog.com/2009/05/googles-approach-to-competition.html [https://perma.cc/5QSG-TG9B].

[169]  The examples in this chart of Judge Mehta's findings that are directly contrary to Google's public statements are merely illustrative examples showing Google's fraudulent concealment, and are not meant

| Google Statement | Judge Mehta Findings |
|---|---|
| "Google promotes competition and openness online." | "Google is a monopolist, and it has acted as one to maintain its monopoly." 747 F. Supp. 3d at 32-33.<br><br>"Google has thwarted true competition by foreclosing its rivals from the most effective channels of search distribution." *Id.* at 145. |
| "Make it easy for users to change." | "Google appreciates that increased choice friction discourages users from changing the default." *Id.* at 46 (Finding of Fact No. 73).<br><br>"Many users do not know that there is a default search engine, what it is, or that it can be changed." *Id.* at 45 (Finding of Fact No. 68).<br><br>An internal Google study concluded that "[u]sers do not always make an active, deliberate choice of a" GSE. *Id.* |
| "Open is better than closed." | An internal Google e-mail stated: "We need to incentivize carriers to ship Google using the same approach we at Google have used for many years: *'We will pay for revenue share in return for exclusive default placement.' This contract is an exchange. . . . Without the exclusivity we are not 'getting' anything.* Without an exclusive search deal, a large carrier can and will ship alternatives to Google[.] ... Android is by far the greatest opportunity for Search monetization in mobile over the next years and is very strategic to Google. You can bet that Microsoft and Yahoo will enter into contracts for search on Android through carrier deals if we do not." *Id.* at 101 (Finding of Fact No. 365) (emphasis added; alteration in original). |
| "Competition is just one click away." | "Google has thwarted true competition by foreclosing its rivals from the most effective channels of search distribution." *Id.* at 145.<br><br>"Google appreciates that increased choice friction discourages users from changing the default." *Id.* at 46 (Finding of Fact No. 73). |

to be exhaustive. Judge Mehta's opinion provides ample additional evidence showing that Google's public statements fraudulently concealed its violations of antitrust law.

| Google Statement | Judge Mehta Findings |
|---|---|
| "Advertisers pay what a click is worth to them." | "Google can affect the final price paid for an ad through so-called 'pricing knobs' or 'pricing mechanisms.'" *Id.* at 78 (Finding of Fact No. 243). |
| | "Google strategically has used pricing knobs to raise text ads prices." *Id.* at 79 (Finding of Fact No. 248). |
| | "Google's incremental pricing approach was successful. In 2018 and 2019, Google conducted ROI Perception Interviews, which raised no red flags about advertisers' attitudes as to ad spending on Google. While advertisers could tell that prices were increasing, they did not understand those changes to be Google's fault." *Id.* at 84 (Finding of Fact No. 266) (citations omitted). |
| "Advertisers have many choices in a dynamic market." | "Advertisers confirmed Google's market dominance. They testified that their text ads spending allocation mirrors Google's and Bing's relative query volumes (i.e., 90% of spend on Google vs. 10% on Bing). They also emphasized that under no circumstances would they spend more than 10% of their text ads dollars on Bing, and that no other platforms were viable substitutes." *Id.* at 138 (citation omitted). |

226.     In 2015, Google's SVP, Platforms & Ecosystems, Hiroshi Lockheimer, authored a Google blog post entitled "*Android has helped create more choice and innovation on mobile than ever before.*"[170] Mr. Lockheimer explained: "The European Commission has asked questions about our partner agreements. It's important to remember that these are voluntary—again, you can use Android without Google—but provide real benefits to Android users, developers and the broader ecosystem. . . . *And remember that these distribution agreements are not exclusive*, and Android manufacturers install their own apps and apps from other companies as well."[171]     A year later in 2016, Kent Walker, Google's President of Public Affairs, authored a post entitled "*Android's model of open innovation*" on Google's *The Keyword* blog where he

---

[170] Hiroshi Lockheimer, *Android Has Helped Create More Choice & Innovation on Mobile Than Ever Before*, GOOGLE BLOG (Apr. 15, 2015), https://blog.google/products/android/android-has-helped-create-more-choice/ [https://perma.cc/J7PY-CX77].

[171] *Id.* (emphasis added).

discussed Android partner agreements, stating that "[o]ur partner agreements are entirely voluntary."[172]  In late 2016, Mr. Walker authored another blog post titled "*Android: Choice at every turn*," in which he claimed: "No manufacturer is obliged to preload any Google apps on an Android phone. . . .  A consumer can swipe away any of our apps at any time.  And, uniquely, hardware makers and carriers can pre-install rival apps right next to ours."[173]  These public statements by Google are directly contrary to many of Judge Mehta's findings—based on extensive discovery obtained by the United States—regarding the anticompetitive nature of Google's MADA and RSA agreements with the Android partners that are discussed above.

227.    In 2018, Sudar Pichai, Google's CEO, authored a post titled *"Android has created more choice, not less"* on Google's *The Keyword* blog in which he stated:  "In 2007, we chose to offer Android to phone makers and mobile network operators for free.  Of course, there are costs involved in building Android, and Google has invested billions of dollars over the last decade to make Android what it is today. This investment makes sense for us because *we can offer phone makers the option of pre-loading a suite of popular Google apps (such as Search, Chrome, Play, Maps and Gmail)*, some of which generate revenue for us, and all of which help ensure the phone 'just works', right out of the box.  *Phone makers don't have to include our services; and they're also free to pre-install competing apps alongside ours.*  This means that we earn revenue only if our apps are installed, *and* if people choose to use our apps instead of the rival apps."[174]  Mr. Pichai ended his post by claiming that "[r]apid innovation, wide choice, and falling prices are classic hallmarks of robust competition and Android has enabled all of them."[175]  These statements—made

---

[172]  Kent Walker, *Android's Model of Open Innovation*, GOOGLE: THE KEYWORD BLOG (Apr. 20, 2016), https://blog.google/around-the-globe/google-europe/androids-model-of-open-innovation/ [https://perma.cc/PCX6-R7E6].

[173]  Kent Walker, *Android: Choice at Every Turn*, GOOGLE: THE KEYWORD BLOG (Nov. 10, 2016), https://blog.google/around-the-globe/google-europe/android-choice-competition-response-europe/ [https://perma.cc/LT33-N5JX].

[174]  Sundar Pichai, *Android Has Created More Choice, Not Less*, GOOGLE: THE KEYWORD BLOG (July 18, 2018), https://blog.google/around-the-globe/google-europe/android-has-created-more-choice-not-less/ (emphasis added) [https://perma.cc/Q4QP-QMUZ].

[175]  *Id.*

two years before the United States commenced its antitrust lawsuit against Google—are again directly contradicted by Judge Mehta's findings that are based on a variety of sources, including secret Google e-mails and studies obtained in discovery showing the anticompetitive nature of Google's agreements with the Android partners.

228.    In 2019, Google's Kent Walker posted on the company's *The Keyword* blog in response to "formal concerns raised by the European Commission," telling the public that "we've always agreed on one thing—that healthy, thriving markets are in everyone's interest."[176]  Mr. Walker then explains that, for Android customers in Europe only, Google will now "do more to ensure that Android phone owners know about the wide choice of browsers and search engines available to download to their phones.  This will involve asking users of existing and new Android devices in Europe which browser and search apps they would like to use."[177]  Google has never offered a similar option to American users, and Mr. Walker's statements about Google championing "healthy, thriving markets" in the general search services market are directly contrary to Judge Mehta's findings.  And the choice screen that Google rolled out in Europe would not be permitted under Google's anticompetitive agreements with Apple, the Android partners, or browser developers in the United States.

## II.    Google Continued to Conceal its Violations of Antitrust Laws Even After The United States Filed Suit

229.    Even after the United States filed its antitrust case, Google made public statements outside the litigation process denying the government's allegations and that it engaged in any violations of antitrust laws.

230.    In an October 20, 2020 post by Kent Walker titled "*A deeply flawed lawsuit that would do nothing to help consumers*," Google disputed the government's claims and continued to conceal its anticompetitive activities.  In this public statement, Google argued that "[p]eople use Google because they

---

[176] Kent Walker, *Supporting Choice and Competition in Europe*, GOOGLE: THE KEYWORD BLOG (Mar. 19, 2019), https://blog.google/around-the-globe/google-europe/supporting-choice-and-competition-europe/ [https://perma.cc/QB76-ZF9P].

[177] *Id.*

choose to, not because they're forced to, or because they can't find alternatives" and that the government's lawsuit "would artificially prop up lower-quality search alternatives, raise phone prices, and make it harder for people to get the search services they want to use."[178]  Mr. Walker also claimed that Google's agreements with Apple were "not exclusive" and that its default agreements are "just like a cereal brand might pay a supermarket to stock its products at the end of a row or on a shelf at eye level" and that these "agreements have passed repeated antitrust reviews."[179]

231.    Immediately before the start of trial before Judge Mehta, Google published another post titled "*People use Google because it's helpful: Our response to U.S. v. Google*," in which it continued to conceal the anticompetitive nature of its conduct.  Google claimed that default placement on browsers and devices was the result of competition: "Browser makers like Apple and Mozilla choose to feature a default search engine.  They open competition for the default and pick the best search provider for their users.  *We compete hard for that placement*, so that users can easily access Google Search."[180]  In this public statement, Google further concealed its violations of antitrust law by informing the public that (i) "our browser *agreements are not exclusive*"; (ii) "[w]hen it comes to Android, we *offer phone makers the option* to preload popular Google services on the device's home screen for free"; (iii) "[o]ur promotional agreements on Android are *entirely optional*"; (iv) "[o]ur distribution agreements on Android *haven't harmed competition; they've promoted it*"; and (v) "our success comes down to the quality of our products, not the quantity of our contracts."[181]

232.    On a page titled "*Our approach to competition in the U.S.*," Google—as of the date of the

---

[178]  Kent Walker, *A Deeply Flawed Lawsuit That Would Do Nothing to Help Consumers*, GOOGLE: THE KEYWORD BLOG (Oct. 20, 2020), https://blog.google/outreach-initiatives/public-policy/response-doj/ [https://perma.cc/4D85-5LPN].

[179]  *Id.*

[180]  Kent Walker, *People Use Google Because It's Helpful: Our Response to U.S. v. Google*, GOOGLE: THE KEYWORD BLOG (Sept. 8, 2023), https://blog.google/outreach-initiatives/public-policy/response-us-v-google/ [https://perma.cc/92TQ-F3XU].

[181]  *Id.* (emphasis added)

filing of this complaint—claims that its "products increase choice and expand competition"[182] and that "Apple features Google Search in its Safari browser because they say Google is 'the best.' *This arrangement is not exclusive* — Bing and Yahoo! pay to prominently feature, and other competitor services also appear."[183]   On this same page, Google also claims that loading its apps, including Google Search, on Android devices is "optional": "The Android operating system is available to device makers and carriers for free.  This lowers the costs of mobile phones for consumers.  We incur costs in building and maintaining Android, and we've invested billions of dollars to make Android what it is today.  To support that investment*, we offer makers and carriers the option to preload a suite of products* — for free — including Google Play, Google Search and other Google apps like Gmail and YouTube. . . . *These agreements are optional and not required* for device makers who want to use Android."[184]

233.    Google's public statements— are directly contrary to Judge Mehta's detailed conclusions and findings of fact, and the significant evidence obtained by the United States in discovery.  These public statements by Google concealed its violations of antitrust law that form the basis for Plaintiffs' claims in this action.

## III.    Google Has Engaged in Other Acts To Conceal its Violations of Antitrust Laws

234.    Google engaged in other specific, affirmative acts to conceal its unlawful anticompetitive conduct, including but not limited to those discussed below.

235.    Google entered into secret, exclusionary default distribution agreements with Apple, the Android partners, and browser developers, under which Google paid billions of dollars in revenue sharing in exchange for being set as the exclusive, out-of-the-box default GSE on virtually all devices and browsers in the United States.  Google never publicly disclosed or acknowledged the anticompetitive purpose of these agreements, and instead has made public statements directly to the contrary.  Google and its contracting

---

[182] Google, *Our approach to competition in the U.S.*, https://blog.google/competition/#overview (last visited July 15, 2025) [https://perma.cc/S4PT-DC76].

[183] Google, *Our approach to competition in the U.S.* at Promoting Google Search, https://blog.google/competition/facts-google-competition/#promoting-google-search (last visited July 15, 2025) (emphasis added) [https://perma.cc/32U4-77WS].

[184] *Id.* (emphasis added).

partners took affirmative steps to keep the true nature of these agreements confidential, including through the use of non-disclosure provisions and the omission of material terms from public filings and statements. Even when those agreements were made public as part of the United States' antitrust case against Google, the agreements were heavily redacted and continued to conceal key terms from Plaintiffs and class members.

236.   Google concealed from Plaintiffs and class members that their search data—including but not limited to their queries, click data, and behavioral information—was being systematically collected, retained, and monetized as part of Google's anticompetitive scheme, including with false representations regarding privacy and Google's controls.

237.   Google's concealment was furthered by its public statements and omissions, which misrepresented the reasons for its dominance in the general search services market and failed to disclose that the exclusionary agreements and payments that secured its default status.

238.   Google secretly conducted activities in furtherance of its maintenance of its monopoly, its conspiracies to maintain its monopoly, its conspiracies to restrain trade, and its violations of California's Unfair Competition Law by confining information to key Google officials and engaged in concealment giving rise to an estoppel to assert the statute of limitations.

239.   Plaintiffs and class members, as ordinary consumers and users of Google's services, had no access to the confidential documents discussed in this complaint (or those that are likely to be produced in discovery).  Google's public narrative of innovation and user benefit intentionally concealed the anticompetitive intent and nature of Google's actions.  Even with reasonable diligence, Plaintiffs and class members could not have earlier discovered the facts constituting the antitrust violations and other violations of law asserted in this complaint.

240.   Due to Google's active and intentional concealment, Plaintiffs and class members could not have discovered, through the exercise of reasonable diligence, the facts constituting Google's violations of the antitrust and unfair competition laws until shortly before the commencement of this action.  The acts of Google alleged above were wrongfully concealed and carried out in a manner which precluded detection.

241.   As a result of Google's affirmative acts of fraudulent concealment, the applicable statutes of limitation should be tolled until the date on which Plaintiffs discovered, or reasonably should have

discovered, the facts constituting Google's violations.

**GOOGLE'S CONTINUING VIOLATIONS**

242.    Google's unlawful conduct constitutes continuing violations of the laws identified in this complaint, with Google repeatedly engaging in new and ongoing acts to unlawfully maintain and reinforce its monopoly in general search services and harm competition and consumers.

243.    Rather than being limited to a single, past event, Google's anticompetitive acts represent fresh acts that continue to harm competition and also continue to harm Plaintiffs and class members.  As a result, Google's conduct is not merely the lingering effect of an old violation, but an ongoing pattern of unlawful Google behavior that continues to violate the law and cause harm within the limitations period.

244.    As set forth above, Google entered into and/or renewed exclusionary default search distribution agreements with Apple, the Android partners, and browser developers during the limitations period.  Following Judge Mehta's August 2024 decision finding that Google unlawfully maintained its monopoly in the general search services market through anticompetitive default distribution agreements, Google entered into new or extended its existing default distribution agreements with Apple, the Android partners, and browser developers.  Pursuant to these new anticompetitive default distribution agreements, Google continues to be the exclusive default GSE on devices and browsers, and in some cases Google has leveraged these agreements to also obtain default position for other Google products.  Each time Google executed or renewed such an agreement, Google committed a new overt act in furtherance of its scheme and efforts to unlawfully maintain and reinforce its monopoly in the market for general search services.

245.    Every day, additional devices and browsers with Google set as the exclusive default GSE continue to be distributed to consumers pursuant to the anticompetitive agreements detailed above.  Apple, the Android partners, and browser developers have also launched new products subject to these anticompetitive default distribution agreements on a regular basis that have Google set as the exclusive, default out-of-the-box GSE pursuant to Google's anticompetitive default distribution agreements.

246.    Google has continued to devise additional anticompetitive ways to integrate Google's GSE into Apple devices—even after Judge Mehta concluded his bench trial.  For example, Google employee Nicolas Fox testified in the recent remedies trial that Google was discussing ways of integrating Search

suggestions into the Apple Safari suggestion box to increase revenue.[185]  The United States also offered into evidence a July 2024 Google email and presentation discussing new and continuing ways to integrate Google's GSE into Apple devices, as well as documents discussing how Apple could increase revenue by integrating Google Search suggestions into the Safari search bar and preferencing it over Apple's suggestions.[186]  Finally, the United States offered evidence that Google has considered integrating Google's visual Search, including Google's Lens and Circle to Search, with Apple devices.[187]

247.    Google and Apple recently amended the ISA to include the emerging Google Search technology, Google Lens, which provides users with the ability to access Google's GSE through the camera on Apple products.  This is yet another default search access point on Apple devices that Google has locked up through its exclusionary agreements.

248.    Yet another example of Google's continuing violations from the remedies phase before Judge Mehta are internal Google documents showing that, in 2018, Google stopped Samsung from lowering "choice friction" that would make it easier for customers to change their default GSE:

//

//

//

//

//

//

//

//

---

[185]  Plaintiffs' Proposed Findings at ¶ 381 ("Google continues to further plan Search integrations into Apple's devices." (citing Des. Rem. Tr. 216:21–220:12 (Fox (Google) Dep.))).

[186]  *Id.* (citing a "July 2024 Google email and presentation discussing new and continuing ways to integrate Search into Apple devices" (Ex. PXR0274) and an exhibit explaining how "Apple could increase revenue by integrating Search suggestions into the Safari search bar over Apple's suggestions" (Ex. PXR0274).

[187]  *Id.* at ¶ 391 ("Google has considered integrating visual Search, including Lens and Circle to Search, with Apple devices." (citing Ex. PXR0274).



[188]

249.    Similarly, in 2017, "Verizon purchased Yahoo.  One of Verizon's goals was to preload certain Yahoo features, including search, onto its devices.  Verizon raised this with Google in its negotiations for the 2021 Google-Verizon RSA."  *Google*, 747 F. Supp. 3d at 101 (Finding of Fact No. 369) (citations omitted).  Google continued with its anticompetitive behavior, rejecting Verizon's request and "advis[ing] [that] all go-forward agreements with carriers include exclusivity provisions and exceptions cannot be made."  *Id*. at 102 (Finding of Fact No. 372).

250.    Upon information and belief, Google has also actively enforced its exclusionary agreements by requiring its partners to maintain Google as the exclusive default GSE on devices and browsers, and by prohibiting the preloading or promotion of alternative GSEs.  Each action, including the imposition of default status on new devices or browsers, constitutes a new overt act that perpetuates Google's anticompetitive scheme and causes new injury to competition, and on Plaintiffs and class members.

251.    Google has also continued to relentlessly extract, collect, and monetize search data from

---

[188]  Slides of Prof. Antonio Rangel, Behavioral Economics Expert, at Slide 19, *United States v. Google LLC*, No. 20-cv-3010 (APM) (D.D.C. Apr. 22, 2025), https://www.justice.gov/media/1397591/dl [https://perma.cc/449T-58QE].

Plaintiffs and class members during the limitations period, without providing compensation or meaningful alternatives. Each instance of data extraction and use, including for advertising, AI training, or product development, constitutes a new overt act by Google that has inflicted new injury on competition, as well as on Plaintiffs and class members.

252.    For the reasons set forth in this complaint and additional reasons that will likely be revealed in discovery, Google's unlawful conduct constitutes continuing violations of law.

## CLASS ACTION ALLEGATIONS

253.    This is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes:

Class 1 – All persons in the United States who used Google's GSE since May 8, 2009.

Class 2 – All persons within Class 1 for whom (i) Google collected or saved their search data in connection with their use of Google's GSE, and (ii) who used any of Google's My Account buttons to request that Google delete or erase their search data.

254.    Excluded from the classes are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their families); (2) Defendant, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, legal representatives; (3) any alleged co-conspirators of Defendant; (4) competitors of Defendant; (5) persons who properly execute and file a timely request for exclusion from the class; (6) persons whose claims here have been finally adjudicated on the merits or otherwise released; (7) Plaintiffs' counsel, class counsel and Defendant's counsel; and (8) the legal representatives, successors, and assigns of any such excluded persons.

255.    The proposed class definitions are based on the information available to Plaintiffs. They may modify the class definitions in an amended pleading or when moving for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

256.    **Ascertainability**: Membership of the classes is defined based on objective criteria and individual members will be identifiable, including from Google's records.

257.    **Numerosity**: There are millions of class members, and joinder of all class members is impracticable.

258.    **Predominant Common Questions**: Common questions of law and fact exist as to all class members and predominate over any questions affecting solely individual class members.    Common questions for class members include, but are not limited to, the following:

        a.      Whether the general search services market is a relevant product market.

        b.      Whether the United States is the relevant geographic market.

        c.      Whether Google engaged in combinations, conspiracies, and agreements with Apple, the Android partners, and browser developers to maintain Google's monopoly in the general search services market in violation of Section 2 of the Sherman Act.

        d.      Whether Google had and has monopoly power and maintained a monopoly in the general search services market through exclusionary means, thereby violating Section 2 of the Sherman Act.

        e.      Whether Plaintiffs and class members suffered antitrust injury because of Google's monopolistic misconduct in the general search services market.

        f.      Whether Google  violated the California Unfair Competition Law.

        g.      Whether  Google should be required to disgorge its unjustly earned profits pursuant to a theory of unjust enrichment.

        h.      Whether class action treatment is a superior method for the fair and efficient adjudication of the controversy.

259.    **Typicality**: Plaintiffs' claims are typical of the claims of the other class members, as all members of the classes were uniformly affected by Google's wrongful conduct in violation of federal and state law as complained of herein.

260.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect class members' interests and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and antitrust actions.  Plaintiffs and their counsel have no interest that is in conflict with or otherwise antagonistic to the interests of the other class members.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of class members, and they have the resources to do so.

261. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court. Furthermore, as the damages individual class members have suffered may be small, the expense and burden of individual litigation make it difficult for class members to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

262. Google has acted on grounds that apply generally to class members as a whole, so that class certification, equitable relief, and corresponding declaratory relief are appropriate on a class-wide basis.

263. Particular issues are also appropriate for certification because such claims present particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

264. There are many real-world examples of pricing user time, attention, and data that can be used to reliably quantify and apportion damages based on a BFW in which Google faced unconstrained competition and competitors in the general search services market responded by paying users for their time, attention, and data. Those real-world examples of payments include, for example, per-search payments (e.g., $0.005 with Bing, $0.0038 with Scour, and $0.03 with Google's Affiliate Program), which could also be structured as revenue share payments (e.g., how Google structured its payments to other companies), or payments to embed a default GSE or change a default GSE (e.g., $10 switch bonus paid in at least one study). Other real-world examples of payments discussed above include monthly payments to users who allow the collection of their internet usage data (including search data), or payments made to users who are willing to download a browser plugin or app that embeds advertisements as they browse the internet. These are market-based indicators that can be used to reliably quantify and apportion damages.

265. Plaintiffs reserve the right to revise the foregoing class allegations based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**CLAIMS FOR RELIEF**

I.    **COUNT ONE:  Violation of Section 2 of The Sherman Antitrust Act, 15 U.S.C. § 2**

266.    Plaintiffs incorporate the allegations of paragraphs 1 through 266 as if fully stated herein.

267.    The general search services market defined above is a valid antitrust market.

268.    Google has for many years possessed monopoly power in the general search services market.

269.    Google willfully maintained and/or enhanced its monopoly in the general search services market in violation of Section 2 of the Sherman Antitrust Act by entering into exclusionary default distribution agreements with Apple, the Android partners, and browser developers and by engaging in other exclusionary conduct.  Google achieved its maintenance and/or enhancement of its monopoly power not only through explicit agreements but also through implied or de facto exclusive dealing arrangements that arise from its business practices and market dominance.  Google willfully sought to maintain and enhance its monopoly power through the alleged anticompetitive conduct and willfully seeks to continue doing so.

270.    Google, with specific intent, entered into conspiracies, combinations, and default distribution agreements that are exclusionary and anticompetitive to maintain Google's monopoly in the general search services market in violation of Section 2 of the Sherman Act.  These agreements include, but are not limited to, the ISAs, MADAs, and RSAs discussed above that guarantee Google's GSE will be the out-of-the-box exclusive default GSE to the exclusion of Google's competitors.  Pursuant to these anticompetitive agreements, Google paid billions of dollars of advertising revenue every year to Apple, the Android partners, and browser developers to maintain its position as the exclusive default GSE.  Google's anticompetitive conduct constitutes unlawful exclusion of competitors and competition, unlawful sharing of revenues, and an unlawful division of the general search services market.

271.    The general search services market has significant barriers to entry that result from Google's unlawful combinations, agreements, and conspiracies, including (i) high capital costs; (ii) Google's control of key distribution channels, including but not limited to default access points; (iii) Google's brand recognition; and (iv) Google's immense scale.  Google's conspiracies, combinations, and exclusionary agreements and actions effectively eliminate competitors' ability to build the scale necessary to compete in the general search services market and are thus one of the significant barriers to entry.

272. There are no procompetitive benefits or justifications that offset the competitive harm of Google's unlawful conduct.

273. Google's unlawful conduct has foreclosed a substantial share of the general search services market from competitors and harmed competition.

274. Google's unlawful conduct caused Plaintiffs and class members to suffer concrete and particularized injuries, including loss of competition, no ability to obtain compensation for using GSEs, loss of control over valuable personal data, diminished privacy, and reduced quality and choice in the general search services market.

275. As a result of Google's unlawful conduct, Plaintiffs and class members have suffered, and continue to suffer, monetary harm in an amount to be proven at trial.

## II.    COUNT TWO:  Violation of the Unfair Competition Law ("UCL"), Business & Professions Code § 17200

276. Plaintiffs incorporate the allegations of paragraphs 1 through 276 as if fully stated herein.

277. Google's acts and practices detailed in this complaint constitute unfair, unlawful, and/or fraudulent business acts or practices under California Business and Professions Code, Sections 17200, *et seq*.

278. Google's acts and practices are immoral, unethical, oppressive, unscrupulous, unconscionable, substantially injurious to the public, and offensive to public policy.

279. Plaintiffs and class members suffered injury-in-fact, caused by Google's acts and practices, including the loss of money and property as a result of Google's acts and practices.

280. Google reaped unjust revenues and profits as a result of its acts and practices.

281. The harm caused by Google's acts and practices substantially outweigh any utility.

282. As a direct result of Google's violations, Plaintiffs and class members have suffered, and continue to suffer, monetary harm in an amount to be proven at trial.

283. Plaintiffs and class members also seek injunctive relief and the costs of this suit, including reasonable attorneys' fees.

III.     **COUNT THREE:  Unjust Enrichment**

284.     Plaintiffs incorporate the allegations of paragraphs 1 through 284 as if fully stated herein.

285.     As a result of Google's unlawful conduct, Plaintiffs and class members conferred and Google received benefits that Google otherwise would not have achieved.  Those benefits to Google included Google obtaining and using the valuable time, attention, and search data of Plaintiffs and class members, which Google used for its own gain, including to reap economic, intangible, and other benefits.  Plaintiffs and class members thus conferred a specific and substantial benefit on Google.  That time, attention, and data has significant and quantifiable monetary value, as evidenced by Google's ability to monetize it through use for targeted search advertising and other commercial purposes.  Google knowingly accepted and retained this benefit, and did so without the knowledge or consent of Plaintiffs and class members, and without providing any compensation to Plaintiffs or class members.

286.     Google unjustly received and retained those benefits at the expense of Plaintiffs and class members.  Google harmed Plaintiffs and class members not only by foreclosing competition and depriving them of the benefits of competition but also by keeping the money Google made using their valuable time, attention, and search data, in multiple ways that benefited Google—without providing any commensurate compensation to Plaintiffs and class members in connection with those many benefits that Google derived.

287.     The benefits Google received and derived from Plaintiffs and class members rightly belong to Plaintiffs and class members.  Plaintiffs and class members had and have a property right in their time, attention, and data, and consequently have a stake in the money Google made using their valuable time, attention, and search data as a result of Google's unlawful conduct.  Plaintiffs retain a stake in the profits garnered from their data including personal search data and search-related history because it is unjust for Google to retain it without compensation.  It would be inequitable to permit Google to retain any of the profit or other benefits Google derived from its unlawful acts.

288.     Plaintiffs and class members seek all available relief in connection with Google's unjust enrichment, including without limitation restitution of or for the property and benefits received, retained, and appropriated by Google, and disgorgement of Google's profits, including non-restitutionary disgorgement.  As between Google and the Plaintiffs, class members, and/or those harmed by Google's

1 actions, not only are legal remedies inadequate, but it is unjust for Google to retain those benefits.  Nor

2 would it be disproportionate to Google, or infeasible, to provide such relief.

3       289.    Plaintiffs acknowledge that California courts are divided as to whether unjust enrichment

4 constitutes a standalone cause of action.  To the extent that this Court determines that unjust enrichment is

5 not an independent cause of action, Plaintiffs plead this claim in the alternative as a claim for restitution

6 based on quasi-contract, seeking the return of benefits unjustly retained by Google.

7                                    **PRAYER FOR RELIEF**

8       WHEREFORE, Plaintiffs respectfully request that this Court:

9       A.    Certify this action is a class action pursuant to Rule 23 of the Federal Rules of Civil

10 Procedure;

11      B.    Appoint Plaintiffs to represent the classes;

12      C.    Appoint undersigned counsel to represent the classes;

13      D.    Adjudge and decree that the Google's conduct violated Section 2 of the Sherman Act, the

14 California Unfair Competition Law and California Bus. & Prof. C. § 17200.

15      E.    Award all available monetary relief, including without limitation damages in an amount to

16 be proven at trial, including not only compensatory damages but also, because and to the extent such

17 remedies are not adequate remedies at law, any available equitable relief in the form of a constructive trust,

18 a fluid recovery fund, or restitutionary or non-restitutionary disgorgement as a measure of unjust enrichment

19 by Google due to this conduct, and also interest, nominal damages, treble damages, and punitive damages;

20      F.    Award all appropriate injunctive relief, including without limitation structural relief to cure

21 any anticompetitive harm described in this complaint and prevent future harm to Plaintiffs and class

22 members;

23      G.    Permanently enjoin Google and its officers, agents, servants, employees, and attorneys from

24 continuing to engage in the anticompetitive practices described herein;

25      H.    Award Plaintiffs and the class members their reasonable costs and expenses incurred in this

26 action, including without limitation attorneys' fees and expert fees; and

27      I.    Grant Plaintiffs and the class members such further relief as the Court deems appropriate.

28

**JURY TRIAL DEMAND**

Plaintiffs and class members demand a trial by jury of all the issues so triable.

Dated: February 6, 2026          By:    _/s/ David Boies_
                                        David Boies

**BOIES SCHILLER FLEXNER LLP**
David Boies (*pro hac vice*)
Alexander Boies (*pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com
aboies@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Hirsa Amin, CA Bar No. 349993
Owen D. Ward, CA Bar No. 365817
Joshua Michelangelo Stein, CA Bar No. 298856
Margaux Poueymirou, CA Bar No. 356000
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
brichardson@bsfllp.com
hamin@bsfllp.com
oward@bsfllp.com
jstein@bsfllp.com
mpoueymirou@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
John M. Lyons (*pro hac vice*)
James Keyte (*pro hac vice*)
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2332
jlyons@bsfllp.com
jkeyte@bsfllp.com

**LAW OFFICES OF LINGEL H. WINTERS**
Lingel H. Winters, CA Bar No. 37759
A Professional Corporation
2900 Shasta Rd.
Berkeley, California 94708
sawmi1l2@aol.com

*Counsel for Plaintiffs , Zachary Crowell,*
*Christopher Weber, Dylan Little, and*
*Jennifer Hunt, and Interim Lead Counsel*
*for All Others Similarly Situated*