# Exhibit 1

# Excerpt of Plaintiffs' First Amended Initial Disclosures

**BOIES SCHILLER FLEXNER LLP**
David Boies (*pro hac vice*)
Alexander Boies (*pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com
aboies@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
brichardson@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
John M. Lyons (*pro hac vice*)
James Keyte (*pro hac vice*)
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2332
jlyons@bsfllp.com
jkeyte@bsfllp.com

**LAW OFFICES OF LINGEL H. WINTERS**
Lingel H. Winters, CA Bar No. 37759
A Professional Corporation
2900 Shasta Rd.
Berkeley, California 94708
sawmill2@aol.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ZACHARY CROWELL, CHRISTOPHER WEBER, DYLAN LITTLE, and JENNIFER HUNT, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC,<br><br>    Defendant. | Case No. 3:25-cv-02775-RFL-SK<br><br>**PLAINTIFFS' FIRST AMENDED INITIAL DISCLOSURES**<br><br>Judge: Honorable Rita F. Lin<br>Courtroom: 15, 18th Floor |

Case No. 3:25-cv-02775-RFL

Plaintiffs make these amended initial disclosures per Federal Rule of Civil Procedure 26(a)(1).

## I.     INDIVIDUALS LIKELY TO POSSESS DISCOVERABLE INFORMATION

The individuals identified below are likely to possess discoverable information that Plaintiffs may use to support their claims.  Documents and information identifying additional witnesses are in the possession and control of Defendant Google LLC ("Google") and non-parties to this litigation, and Plaintiffs reserve the right to supplement or amend these lists as discovery proceeds.

In addition to the individuals identified below, Plaintiffs expect that the individuals likely to possess discoverable information that Plaintiffs may use to support their claims include the individuals identified by Google in its initial disclosures,[1] individuals for whom documents were produced and/or who testified by deposition or at trial during other cases against Google (including the D.C. search case before Judge Mehta (20-cv-3010 and 20-3715), the Play Store case before Judge Donato (3:21-md-02981), and the cases before Chief Judge Seeborg (3:20-cv-4688) and Judge Gonzalez Rogers (4:20-cv-03664)), individuals selected as custodians in this action, and individuals who testify in this action, including by deposition.

Google has not yet produced all of the documents from the Judge Mehta case or any of the documents from the other cases against Google, despite Judge's Lin's statements during the Case Management Conference.  *See* Feb. 25, 2025 Tr. at 4–5 (Judge Lin stating "I have a hard time understanding generally why Google wouldn't be producing most everything from Judge Mehta's case, which has a lot of overlap with this one" and for "the other cases, it's not the same claim, so I can understand some types of limitations on relevance, but I also don't see that as a justification for significant delay in the production. If Google wants to put on itself the burden of sifting through what it's produced in other cases to turn over the portion that is relevant to this case, it should be doing that promptly it seems to me.").  These disclosures are therefore preliminary and subject to supplementation and amendment.

---

[1] Google in its initial disclosures identified plaintiffs in the *Arcell* action as individuals who may possess information relevant in this action and also two former plaintiffs in this action.  Plaintiffs will if necessary at the appropriate time object to any effort by Google to seek or use any discovery involving those *Arcell* plaintiffs or those two former plaintiffs in this action.

## A.    Plaintiffs

| Witness Information | Subjects of Information |
|---|---|
| Zachary Crowell<br><br>May be contacted through undersigned counsel for Plaintiffs | Mr. Crowell is likely to have discoverable information regarding, among other things, his use of Google search, the devices and browsers he used to access the internet and general search engines, and his participation in rewards and loyalty programs. |
| Christopher Weber<br><br>May be contacted through undersigned counsel for Plaintiffs | Mr. Weber is likely to have discoverable information regarding, among other things, his use of Google search, the devices and browsers he used to access the internet and general search engines, and his participation in rewards and loyalty programs. |
| Dylan Little<br><br>May be contacted through undersigned counsel for Plaintiffs | Mr. Little is likely to have discoverable information regarding, among other things, his use of Google search, the devices and browsers he used to access the internet and general search engines, and his participation in rewards and loyalty programs. |
| Jennifer Hunt<br><br>May be contacted through undersigned counsel for Plaintiffs | Ms. Hunt is likely to have discoverable information regarding, among other things, her use of Google search, the devices and browsers she used to access the internet and general search engines, and her participation in rewards and loyalty programs. |

## B.    Google And Its Current or Former Employees

Google, along with its current or former employees, will have relevant information (i) regarding the factual allegations presented by Plaintiffs, and (ii) that Plaintiffs may use to support their claims.  This includes but is not limited to the individuals Google has identified for a hold notice for this litigation, with the individuals identified by Plaintiffs in their correspondence with Google who were subsequently issued hold notices.  The individuals previously identified by Plaintiffs was a preliminary and partial list of current and former Google employees likely to possess discoverable information that Plaintiffs may use to support their claims based on a limited amount of publicly available information.  Plaintiffs reserve the right to update this list.  The specific discoverable information each of these individuals will have that Plaintiffs may use to support their allegations and claims will depend on documents and information that Google has not yet produced to Plaintiffs, and also the extent to which Google preserved ESI for each of these individuals.  Plaintiffs have also asked Google to provide information that could be used to identify current and former Google employees likely to have discoverable information, but Google has so far not provided Plaintiffs with that information.  Google nonetheless insisted that Plaintiffs provide additional information

regarding Google's own employees. For these reasons, Appendix A is necessarily a preliminary list of people, where the information each of these individuals may provide could be broader than what is described in Appendix A. Plaintiffs reserve the right to update Appendix A.

## C.    Others

Other companies and individuals provided documents and testimony in the D.C. search case before Judge Mehta (20-cv-3010 and 20-3715) and also the Play Store trial before Judge Donato (3:21-md-02981), including at trial, and those materials may include additional information that can be used to identify he individuals likely to possess discovery information that Plaintiffs may use to support their claims. That may include, for example, information from companies that entered into the anticompetitive agreements with Google (along with their current and former employees) and companies that offered or considered offering general search engines (along with their current and former employees). Google has agreed to produce to Plaintiffs all documents produced to Google by third parties in the D.C. search case before Judge Mehta, but Google is currently notifying those third parties prior to making those productions. Plaintiffs reserve the right to update this list after receiving those productions. All third parties that produced documents in the D.C. search case likely have information that support Plaintiffs' claims given the overlap with the claims asserted in these actions. Below are examples of those third parties.

| Third Party Information | Subjects of Information |
|---|---|
| Apple | Apple is likely to have information regarding, among other things, the Information Services Agreement, changes to this agreement over time, Google being set as the default exclusive search on Apple browsers and devices, and the benefits of user choice in selecting a default search engine. |
| Samsung | Samsung is likely to have information regarding, among other things, the Mobile Application Distribution Agreements and Revenue Share Agreements entered into with Google, changes to these agreements over time, the placement of Google as the default exclusive search engine through multiple access points on all Android devices, and the benefits of user choice in selecting a default search engine. |
| Motorola | Motorola is likely to have information regarding, among other things, the Mobile Application Distribution Agreements and Revenue Share Agreements entered into with Google, the placement of Google as the default exclusive search engine through multiple access points on all Android devices, and the benefits of user choice in selecting a default search engine. |

| Verizon | Verizon is likely to have information regarding, among other things, the Revenue Share Agreements entered into with Google, changes to these agreements over time, the placement of Google as the default exclusive search engine through multiple access points on all Android devices, the benefits of user choice in selecting a default search engine, and Verizon's purchase of Yahoo! and efforts to offer Yahoo! as an alternative search engine to its users. |
|---|---|
| T-Mobile | T-Mobile is likely to have information regarding, among other things, the Revenue Share Agreements entered into with Google, changes to these agreements over time, the placement of Google as the default exclusive search engine through multiple access points on all Android devices, and the benefits of user choice in selecting a default search engine. |
| Mozilla | Mozilla is likely to have information regarding, among other things, the Revenue Share Agreements entered into with Google, changes to these agreements over time, the placement of Google as the default exclusive search engine in Mozilla's Firefox browser, and Mozilla's decision to switch the default to Yahoo! and its decision to switch back to Google. |
| Yahoo! | Yahoo! is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Yahoo!'s ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
| Neeva | Neeva is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Neeva's ability to compete for users, consideration of ways to compete such as offering users an ad-free search experience. |
| Microsoft | Microsoft is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Microsoft's ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
| Scour | Scour is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Scour's ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
| Brave | Brave is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Brave's ability to compete for users, consideration of ways to compete such as offering users rewards, reduced advertising, or increased privacy. |
| Permission Search | Permission Search is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Permission |

PLAINTIFFS' FIRST AMENDED INITIAL DISCLOSURES

| | Search's ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
|---|---|
| Presearch | Presearch is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Presearch's ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
| DuckDuckGo | DuckDuckGo is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on DuckDuckGo's ability to compete for users, consideration of ways to compete such as offering users a private search experience. |
| Qmee | Qmee is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Qmee's ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
| Swagbucks | Swagbucks is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Swagbucks's ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
| AltaVista | AltaVista is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on AltaVista's ability to compete for users, consideration of ways to compete such as offering compensation to partner sites. |
| Lycos | Lycos is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Lycos's ability to compete for users, consideration of ways to compete such as offering compensation to partner sites. |
| iWon | iWon is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on iWon's ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
| Amazon/A9.com | A9.com is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on A9.com's ability to compete for users, consideration of ways to compete such as offering users rewards or discounts. |
| Blingo | Blingo is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Blingo's ability to compete for users, consideration of ways to compete such as offering users rewards or prizes. |

Case No. 3:25-cv-02775-RFL                                    6

PLAINTIFFS' FIRST AMENDED INITIAL DISCLOSURES

| Zotspot | Zotspot is likely to have information regarding, among other things, its efforts to compete with Google and other search engines, the impact of Google's exclusive defaults on Zotspot's ability to compete for users, consideration of ways to compete such as offering users rewards or other compensation. |
|---|---|

Plaintiffs reserve the right to update this list.

## II.    DOCUMENTS IN PLAINTIFFS' POSSESSION

Plaintiffs have access to certain information by logging into Google, which is also in the possession, custody, and control of Google, relating to their use of Google search during the relevant time period and which Google stated it would preserve. Plaintiffs through counsel also have copies of documents cited in the Third Amended Complaint. In addition, Plaintiffs may use certain publicly available documents, such as Google's representations and press releases, marketing materials, and industry reports. Plaintiffs also expect to rely on relevant documents that will be produced to Plaintiffs in this litigation. That will include, for example, the productions from the D.C. search case before Judge Mehta. Plaintiffs are continuing their investigation and reserve the right to supplement and/or amend this response to identify additional documents, electronically stored information, and tangible things they may use in support of their claims.

## III.    DAMAGES

Plaintiffs seek all available damages and other relief as detailed in their Third Amended Complaint ("TAC"). Because any computation of damages and other relief in this case depends on documents and evidence to be produced by Google, as well as expert analysis, computing damages at this stage is premature. This is especially true given that discovery only recently began, and Google has not meaningfully produced documents from the D.C. search case before Judge Metha and has produced *no* documents from other cases, despite the Court's guidance during the February 25, 2026 case management conference that Google should be producing materials from both the D.C. search case and other cases. *See* Feb. 25, 2026 Hr'g Tr. at 4 ("But I have a hard time understanding generally why Google wouldn't be producing most everything from Judge Mehta's case, which has a lot of overlap with this one. Obviously the other cases, it's not the same claim, so I can understand some types of limitations on relevance, but I also don't see that as a justification for significant delay in the production. If Google wants to put on itself the burden of sifting through what it's produced in other cases to turn over the portion that is relevant to

this case, it should be doing that promptly it seems to me."). It is improper for Google to withhold information and not respond to requests seeking information relevant to the computation of damages, while simultaneously insisting for more specificity in Plaintiffs' initial disclosures. Plaintiffs therefore reserve the right to supplement this disclosure as appropriate.

Without limiting their entitlement to damages or other monetary relief, and based on the limited information now available to Plaintiffs, they seek—on behalf of themselves and members of the proposed classes—to recover compensatory damages (to be trebled), unjust enrichment, expenses and costs, attorneys' fees, pre- and post-judgment interest, and any other relief that the Court may deem just and proper.

To calculate damages, Plaintiffs anticipate retaining one or more expert who will offer opinions regarding the damages suffered by Plaintiffs and the putative classes based on, among other things, what compensation would have been paid in the "but-for world." This approach is consistent with the antitrust injury alleged in the Third Amended Complaint and discussed in the Court's decision on Google's motion to dismiss. *See Attridge v. Google LLC*, 2026 WL 160536, at *4 (N.D. Cal. Jan. 21, 2026) (discussing how Plaintiffs offered theories based on "a world in which Google had not engaged in the challenged anticompetitive conduct").

Although discovery has only begun and Google has failed to produce documents from the D.C. search and other cases, consistent with the detailed allegations in their Third Amended Complaint, the potential ways of calculating damages include for example and without limitation:

1. ***Damages on a per-search basis***. This damages calculation would involve determining the number of class member searches using Google during the relevant period (possibly using a sample and extrapolation) and multiplying that by the amount of per-search compensation that would have been paid in the but-for world. Although occurring in the real world subject to Google's anticompetitive conduct, and therefore likely lower than what would be paid in the but-for world, Plaintiffs identify in their Third Amended Complaint various real-world per-search compensation models that could be applied to calculate damages on a per-search basis, including (i) Google's own affiliate program that paid $0.03 per search (to partner sites in early 2000s so would need to be adjusted for inflation); (ii) GoTo's affiliate program that also paid

$0.03 per search to partner sites (and would likewise need to be adjusted for inflation); (iii) the Microsoft Reward program that currently pays users $0.005 per search, but previously paid more; and (iv) the $0.0038 per search paid by Scour. *See* TAC ¶¶ 8(a)-(b), 11, 197(a), 198(c), 198(g), 264; s*ee also id.* ¶¶ 8(c)-(e), 197(b)-(g), 198(d)-(h) (identifying other search engines that offered compensation or rewards to users); *Attridge*, 2026 WL 160536, at *3 ("For instance, Microsoft's Bing offers compensation for searches. Similarly, Presearch operates a search engine that rewards users for searches (as Scour used to).") (citations omitted); *id.* at *5 ("For instance, the Microsoft Rewards program compensates users for, among other things, each search they make through Bing.  Users can earn the equivalent of 25 cents per day for their Bing searches.  Presearch operates, and Scour formerly operated, search engines that similarly reward users for searches.  Relatedly, Brave and Permission Search pay users for ad viewing (Brave) or ad engagement (Permission Search).") (citations omitted).  Plaintiffs are currently seeking to have Google produce data and other documents that could be used to estimate the number of class member searches using Google during the relevant period.  Plaintiffs are also seeking discovery from Google regarding the potential compensation it may have considered paying users or that other general search engines were paying users.  Google should have such data and other documents, which should be produced and made available to Plaintiffs for purposes of these calculations.

2. ***Damages on a per-default basis.***  In a world in which Google had not engaged in the challenged anticompetitive conduct, competitive incentives may also have resulted in users receiving compensation for selecting defaults, instead of Google paying tens of billions of dollars a year to other companies to lock-up exclusive defaults without paying consumers.  Plaintiffs in their Third Amended Complaint cite the recent Allcott study, where users were paid $10 to change their default search engine to Bing.  *See, e.g.*, TAC ¶¶ 202, 264.  Plaintiffs also cite that Google pays certain wireless carriers an undisclosed per device "bounty" to set Google as the exclusive default.  *Id.* ¶¶ 64, 86(b), 202.  Plaintiffs are also seeking discovery from Google about the prices that various search engines paid to be placed on Android choice screens in certain European countries.  While these payments were made in the real world and are therefore likely

PLAINTIFFS' FIRST AMENDED INITIAL DISCLOSURES

lower than what would be offered in the but-for world, they provide a baseline for the damages to class members based on compensation tied to the selection of a default search engine (either on new devices or when they made the decision to use a choice screen to switch their default search engine).  Plaintiffs are currently seeking to have Google produce data and other documents that could be used to estimate these damages.  Plaintiffs will also seek discovery from Google regarding, among other things, the value it places on defaults, as that may inform the amount search engines would pay users to select a default search engine (or to change the default to a new search engine).  Google should have data that it can use to estimate damages based on this approach.

3. ***Damages on a per-month basis.***  In a world in which Google had not engaged in the challenged anticompetitive conduct, competition may have also resulted in compensation to class members on a per-month basis.  Google recognizes that users' time, attention, and data is valuable.  That has included Google payments to consumers through the Screenwise program.  In *Rodriguez v. Google*, Chief Judge Seeborg allowed expert testimony and other evidence at trial regarding Screenwise payments for purposes of calculating damages owed to consumers for Google collecting and using information regarding their activities on third-party apps.  *Rodriguez v. Google LLC*, No. 20-cv-04688-RS, 2025 WL 2396660, at *1 (N.D. Cal Aug. 18, 2025).  Those damages did not include Google's collection and use of information regarding consumers' search activities.  In this case, damages can also be calculated using a per-month payment, such as the payment through Screenwise—which for at least some time was $3 per month per device.  Plaintiffs are currently seeking to have Google produce data and other documents that would be used to estimate these damages.  Google has information, including but not limited to, the number of class members and the number of relevant months that can be used to estimate these damages.

4. ***Economic Modeling.***  Plaintiffs' damages calculations are likely to be informed by one or more types of economic modeling (*e.g.*, Bertrand), which may also use standard simulation or structural modeling techniques to estimate likely but-for world market structure, competitive dynamics, and outcomes.  Plaintiffs will seek to have Google produce data and other documents

that would be used as inputs for such modeling, along with other data relied on by experts when conducting such modeling.

Plaintiffs anticipate retaining one or more experts who also will offer opinions regarding damages suffered by Plaintiffs and class members resulting from Google's unlawful suppression of competition in terms of reduced-ad or ad-free general search engines.  Plaintiffs identify in their Third Amended Complaint general search engines such as (i) Neeva, which charged users a monthly subscription fee and did not show ads; (ii) Kagi, which charges $5-25 a month for various features including not showing advertisements; and (iii) Brave, which charges a monthly subscription of $3 for an ad-free experience.  *See* TAC ¶¶ 210(c)-(d); *see also Attridge*, 2026 WL 160536, at *3 ("Brave pays users for ad viewing, whereas Permission Search pays users for ad engagement. . . Finally, Kagi Search and Brave offer subscription search engines with no ads (as did Neeva before it shut down in 2023).") (citation omitted).  Plaintiffs are currently seeking to have Google produce data and other documents that can be used to estimate the number of class members and calculate these damages.  Google has data that can be used for these calculations.

Plaintiffs anticipate retaining one or more experts who will offer opinions regarding the damages suffered by Plaintiffs and class members resulting from Google's foreclosure of competition in terms of general search engines offering more privacy.  *See, e.g.*, TAC ¶¶ 16-18, 151; *see also Attridge*, 2026 WL 160536, at *3 ("DuckDuckGo and Brave offer free privacy-protective search engines.") (citation omitted).  These experts will also opine on damages for class two, which seeks damages for people who used any of Google's My Account buttons to request that Google not save, delete, or erase their search data but Google nevertheless collected or saved their search data.  *See, e.g.*, TAC ¶¶ 148-49, 253.  Plaintiffs identified various monthly payments for user data—including search data—that may reflect the value of search data obtained by Google as a result of its monopolistic and other wrongful practices detailed in the Third Amended Complaint.  For example, Plaintiffs cite Google's own Online Insights Study that allowed users to "earn redeemable points worth up to $130 per year by using the internet like [they] already do."  TAC ¶ 205(a).  Plaintiffs also cite Google's Screenwise Trends program that allowed users to earn up to $3 a month.  *Id.* ¶ 205(b).  Similarly, Plaintiffs cite a program by The Nielsen Company that paid users up to $60 a year for tracking online activities.  *Id.* ¶ 206(a).  In *Brown v. Google*, Judge Gonzalez Rogers denied

Google's motion to exclude expert testimony regarding damages based on a lack of privacy. *Brown v. Google, LLC*, No. 20-cv-3664-YGR, 2022 WL 17961497, at *5 (N.D. Cal. Dec. 12, 2022). That case involved Google's collection and use of information when consumers visited third-party websites in a private browsing mode. *Brown v. Google LLC*, 685 F. Supp. 3d 909, 919 (N.D. Cal. 2023). A similar approach to calculating damages based on a lack of privacy with respect to search would also be appropriate here. Google will have data and other information that can be used to estimate the number of class members, and can use a monthly payment figure to calculate a baseline for damages.

Plaintiffs also seek unjust enrichment, which will require data and documents from Google and expert analysis. That unjust enrichment calculation will include in part some of the calculations above regarding the payments that Google avoided through its unlawful conduct. It will also include any analysis of Google's enrichment from its collection and use of information tied to class members' searches during the relevant period. This calculation will include an analysis that starts with Google's revenues and costs. Plaintiffs are currently seeking data and other documents from Google that will identify, among other things, the specific information that Google collects and how Google uses that information, to calculate the amount of unjust enrichment. This information is currently available to Google and can be used by Google to estimate the total amount of unjust enrichment.

As Plaintiffs' investigation proceeds, and as the necessary discovery from Google and non-parties is completed and information and data are disclosed, Plaintiffs may supplement these First Amended Initial Disclosures. Exact measures and computations of Plaintiffs' and the proposed classes' damages will require expert analysis and testimony. Plaintiffs intend to provide expert reports on damages pursuant to Rule 26(a)(2) by March 22, 2027 and any rebuttal expert reports by June 4, 2027. *See* Dkt. No. 88 at 4. As indicated above, Plaintiffs anticipate that their damages experts will use various econometric tools including, among other things, multivariate regressions to articulate a formula for computing damages.

## IV.     INSURANCE AGREEMENT

Not applicable to Plaintiffs.

Dated: March 20, 2026                By:    /s/ *Beko Reblitz-Richardson*
                                            Beko Reblitz-Richardson

**BOIES SCHILLER FLEXNER LLP**
David Boies (*pro hac vice*)
Alexander Boies (*pro hac vice*)
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200
dboies@bsfllp.com
aboies@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
Mark C. Mao, CA Bar No. 236165
Beko Reblitz-Richardson, CA Bar No. 238027
Hirsa Amin, CA Bar No. 349993
Owen D. Ward, CA Bar No. 365817
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899
mmao@bsfllp.com
brichardson@bsfllp.com
hamin@bsfllp.com
oward@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
John M. Lyons (*pro hac vice*)
James Keyte (*pro hac vice*)
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2332
jlyons@bsfllp.com
jkeyte@bsfllp.com

**LAW OFFICES OF LINGEL H. WINTERS**
Lingel H. Winters, CA Bar No. 37759
A Professional Corporation
2900 Shasta Rd.
Berkeley, California 94708
sawmill2@aol.com

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 20, 2026, pursuant to the parties' agreement, I caused a true and correct copy of the foregoing to be served by email upon all listed counsel of record for Defendant.


By:   */s/ Beko Reblitz-Richardson*
         Beko Reblitz-Richardson